## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SCLS REALTY, LLC; SIXTY THREE JOHNSTON, LLC, | |
|     Plaintiffs, | Civil Action No. 1:25-cv-00088-MRD-PAS |
|     v. | **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| TOWN OF JOHNSTON, RHODE ISLAND; JOSEPH M. POLISENA, JR., in his official capacity as Mayor of the Town of Johnston; LINDA L. FOLCARELLI, LAUREN GARZONE, ALFRED T. CARNEVALE, ROBERT V. RUSSO, ROBERT J. CIVETTI, in their official capacities as Members of the Town Council of the Town of Johnston; and VINCENT P. BACCARI, JR., in his official capacity as Town Clerk of the Town of Johnston, | **ORAL ARGUMENT REQUESTED (20 minutes per side estimated)** |
|     Defendants. | |

## INTRODUCTION

In a shocking series of machinations manipulating the status quo to try and render ineffective any relief this Court may grant, the Town has accelerated the very eminent domain scheme the Santoro Family was already challenging as unconstitutional and *ultra vires*, seeking to so harden the cement that this Court is rendered powerless to do anything about it.[1] On March 12, 2025, two days after the

---

[1] Plaintiffs SCLS Realty, LLC, and Sixty Three Johnston, LLC are referred to jointly as "Santoro Family." Defendants the Town of Johnston, Mayor Joseph M. Polisena, Jr., the Town Council, and the Town Clerk are referred to collectively as "Town."

Santoros filed their Complaint for Constitutional and Civil Rights Violations in this Court, the Town—while intentionally keeping the Santoro Family in the dark by withholding notice—purported to seize the family's land *ex parte* by eminent domain without providing any compensation whatsoever (much less the 150% of fair market value Rhode Island law requires). Only two days after that, once the Town completed its secret tasks and quietly registered itself as the new title owner of the Santoro Property in public records, did its lawyer bother informing the Santoro Family's attorney (with whom he had been previously communicating) that the Town had *already seized* the Santoro land, and the Town now professed to own it. Letter from William J. Conley, Jr. to Kelly Morris Salvatore, re: 178-200 George Waterman Road; Condemnation of Property (Mar. 14, 2025) (Exhibit "A" attached). Conley has also threatened the Santoros with prosecution if they do not immediately remove their belongings from their property, or if they dare enter their own land. *Id.*

The Town's threatening eminent domain to pressure the Santoros to abandon their affordable housing plans, and its *ex parte* seizure of the Santoro Property isn't a typical taking, but "municipal thuggery."[2] Indeed, it is among the most unusual and aberrant abuses of a sovereign power imaginable. Starting late last year, after the Santoro Family's affordable housing plans for their land became known, the Town's mayor began publicly proclaiming that the Town would "fight back," and that he

---

[2] That is how the Rhode Island Supreme Court described a local government's actions in similar circumstances. *See Union Station Assocs. v. Rossi*, 862 A.2d 185, 187 (R.I. 2004) (abuse of governmental power to gain bargaining advantage rejected as "municipal thuggery").

"would use all the power of government that I have to stop it." He promised to "grind this project to a halt" by filing lawsuits, to "have zero care of who I may offend in the process," and warned the Santoro Family that they should "be prepared to fight a town with 30,000 people." Eventually, the Town settled on eminent domain as the solution, claiming to need the Santoro property for a new municipal campus (while also at the same time acknowledging that doing so would prevent low- and medium-income apartments from being built).

The Town held to the mayor's vow to "use all the power of government." Eventually, when the Santoro Family didn't cave into this intimidation, the Town shifted into higher gear: it went from merely *threatening* eminent domain, to overt acts. The Town Council adopted a series of resolutions which purported to empower it to seize the family's land. Because eminent domain is such an overwhelming government power (no other power allows government to deprive an innocent owner of private property with no showing or even allegation of wrongdoing), eminent domain procedures usually require pre-condemnation due process notice to the owner, good faith negotiations to attempt to acquire the property without resorting to forced acquisition and a lawsuit, a process by which a condemnor might obtain possession before trial—but only after due process notice to the owner, a set of procedures a court must follow in any judicial proceedings, and a guarantee that a jury will determine Just Compensation. But there are no such procedures that the Town could follow here, because Rhode Island law does not delegate to the Town the authority to simply grab the Santoro Property.

Lacking any procedures or authority, the Town just made some up: by *ipse dixit* resolutions, it announced what it claimed were the rules and procedures by which it could take the Santoro Property (and only the Santoro Property).

Having conjured up from whole cloth a process to take the Santoro land, the Town began to execute. On March 10, 2025, after the Town adopted what appeared to be the final overt act in this scheme (Town Resolution 2025-18), the Santoro Family immediately sought relief in this Court. *See Knick v. Twp. of Scott*, 588 U.S. 180, 202 (2019) ("pursuit of a remedy in federal court need not await any subsequent state action"); *D.A. Realestate Inv., LLC v. City of Norfolk*, 126 F.4th 309, 318 (4th Cir. 2025) (property owner may challenge a municipality's pretextual and unconstitutional use of eminent domain in a civil rights action in federal court).

Their Complaint asserts claims for violations of the Fifth Amendment's Public Use Clause, the Fourteenth Amendment's Due Process Clause, the federal Civil Rights Act of 1871 (42 U.S.C. § 1983), the Rhode Island Constitution's Public Use Clause, and a claim that the Town has not been delegated the authority under Rhode Island law to use eminent domain to forcibly acquire the Santoro Property and its actions are *ultra vires*. Plaintiffs' Complaint for Violation of Constitutional and Civil Rights (ECF 1) ("Compl.").

The ink was barely dry on the federal summons—and service of the Complaint on the Defendants was barely accomplished—when on March 12, 2024, acting without any apparent authority under Rhode Island law, the Town purported to physically oust the Santoros from their property and seize their legal title. Despite

4

knowing the precise identities of the owners of the Santoro Property, knowing the family was represented by counsel, knowing the family had already challenged as unconstitutional and *ultra vires* any purported exercise of eminent domain by the Town, and having been in communication and actually in the same room as the family's lawyers, the Town and its lawyers affirmatively withheld notifying either the family or their attorneys that the Town had filed a petition in a local Rhode Island court to approve the Town making a deposit with the court clerk. The Town also scheduled an *ex parte* hearing on its request. Having no notice and no knowledge of the Town's petition or the *ex parte* court proceedings, neither the Santoros nor their lawyers could show up in court to object, and the Rhode Island court authorized the deposit. Importantly, that court did not authorize the taking or condemnation of the Santoro Family's property or authorize the Town to register title to the land. It only approved a deposit.

As noted above, only when the deed was already done did the Town's lawyer tell the Santoros that in the Town's view, it now owns their land. Having taken these actions *after* the federal Complaint was filed, the Town may believe it has accomplished its stated goal: the Santoro Family's affordable housing plans have "ground to a halt." Not only has the Town prevented the family from continuing to move forward with their affordable housing plans, it is telling them (and the public records reflect) that they no longer even own their land. But that is accurate only if the Town's actions go unrestrained by this Court.

## PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER

Plaintiffs Santoro Family, pursuant to Fed. R. Civ. P. 65(b) and LR Cv 9, move for an order to preserve the status quo, temporarily restraining Defendants the Town of Johnston, Mayor Joseph M. Polisena, Jr., the Town Council and the Town Clerk, and their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with the Defendants from taking any action to implement, carry out, enable, execute, or perform under the purported authority of Resolution 2025-10, Resolution 2025-17, Resolution 2025-18, or to undertake any other actions or continue or initiate any other processes related to property located at 178 and 200 George Waterman Road, Johnston, Rhode Island, also known as Assessor's Plat 37, Lots 63, 193 (formerly recognized as lots 1-10, and 193) and Assessor's Plat 35, Lot 2 (together "Santoro Property"), including but not limited to:

1.      Taking any action to prevent or otherwise interfere with the Santoro Family entering, using, and occupying the Santoro Property, or which are consistent and in accord with the Santoro Family's rights as the lawful owners of the Santoro Property; and

2.      Taking any action to enter, use, occupy, transfer, convey, encumber, or trespass upon the Santoro Property; and taking any action inconsistent with or in contravention of the Santoro Family's rights as the lawful owners of the Santoro Property; and

3.      Ordering removal, revocation, or deletion of the Town's March 12, 2025, recording or submission in the Town of Johnson Land Evidence Records any and all

documents by which the Town purported to transfer ownership and title of the Santoro Property from the Santoro Family to the Town, and restoring the Santoro Property to its ownership state as it was on March 10, 2025.

4.    Ordering Defendant Vincent P. Baccari, Jr., in his official capacity as Town Clerk, to certify that the above has been completed on the same day this Court issues the temporary restraining order.

5.    Taking any action to further alter, substitute, amend, change, or otherwise affect the registered or title owner from the Santoro Family to the Town on the title to the Santoro Property registered with the Town of Johnston Land Evidence Records, or taking any action in contravention of or inconsistent with the Santoro Family's rights as the lawful title owners and owners of record; and

6.    Undertaking any other action that alters the status quo as of the date and time this Court enters a temporary restraining order, until the forthcoming motion "for preliminary injunction can be fully briefed, heard, and resolved[,]" or until further order of this Court. *See Soscia Holdings, LLC v. Rhode Island*, 684 F.Supp.3d 47, 50 (D. R.I. 2023).

## LOCAL RULE CV 7(c) STATEMENT

In accordance with LR Cv 7, counsel states that oral argument is requested, and estimates that 40 minutes (20 minutes per side) will be required.

## STATEMENT OF FACTS

### I.    The Santoro Property

The Santoro Family owns, in fee simple absolute, approximately 31 acres of undeveloped property located at 178 and 200 George Waterman Road, Johnston, Rhode Island. Declaration of Lucille Santoro ("Santoro Dec."); Compl. ¶21. The property, zoned for medium-to-high-density residential development, was specifically identified by the Town's Comprehensive Community Plan as "targeted for large-scale affordable housing development." Compl. ¶24; *see also* Goal 2, *Comprehensive Community Plan, Town of Johnston, Rhode Island*, at 10-50 (2004). A true and correct copy of the relevant portions of the Town Comprehensive Community Plan is attached as Exhibit "B." The parcels are not blighted nor are they identified for redevelopment.  Santoro Dec.; Compl. ¶¶29-32.

### II.    Rhode Island's Response to the Affordable Housing Crisis

Recognizing Rhode Island's dire need for affordable housing, the state legislature passed a Low and Moderate Income Housing statute, which establishes a "[p]rocedure for approval of construction of low-or-moderate-income housing," and requires, among other things, towns to streamline their approval process for developers of low-to-moderate income housing." *See Governor McKee Signs Housing Legislative Package into Law*, https://tinyurl.com/5fw2z6au; Compl. ¶33. The statute authorizes a statutory density bonus, whereby a private developer proposing to build affordable housing would be allowed more units than might otherwise be permitted. *See* R.I. Gen. Laws § 45-53-4(b)(1)(iii); Compl. ¶36.

### III.    The Santoro Family Plans to Build Desperately-Needed Affordable Housing

Responding to this crisis, the Santoro Family began planning to build a 100% low-to-moderate-income home project on their land. *See* Santoro Dec.; Compl. ¶38. Construction of such a project would take the Town from less than eight percent (8%) affordable housing to the State of Rhode Island's requisite ten percent (10%). *See* Declaration of Kelley M. Salvatore ("Salvatore Dec."); Compl. ¶2. In April 2023, they met with Town officials, including the mayor, to discuss these plans. Santoro Dec.; Salvatore Dec.; Compl. ¶40. During the meeting, the mayor vocally opposed affordable housing plans. *Id*. Nonetheless, counsel for the Santoro Family met with the Town Planner, Thomas Deller ("Deller"), and his staff to discuss a 216-unit, 100% affordable housing development proposal. Santoro Dec.; Salvatore Dec.; Compl. ¶41. Deller agreed that a development proposal for a pre-application meeting should be submitted for additional review. *Id*.

On October 25, 2024, the Santoro Family submitted to the Town's Planning Department a description of their proposed affordable housing project, including a conceptual site plan and density analysis, along with a request for a pre-application conference.  Santoro Dec.; Compl. ¶42. The proposed affordable housing includes an apartment complex with 254 units in five buildings, entirely devoted to low-to-moderate-income housing as defined by the State's Low and Moderate Income Housing statute. Santoro Dec.; Compl. ¶43. A pre-application meeting was scheduled for December 3, 2024. Santoro Dec.; Compl. ¶44.

## IV.    Mayor Polisena Threatened to "Use All the Power of Government That I have to Stop" the Santoro Family

But hours before that meeting, Mayor Polisena wrote a letter authored on Town letterhead addressed "To Whom It May Concern," and signed officially as "Mayor Joseph M. Polisena, Jr." ("Mayor's Dec. 3, 2024 Letter"). A true and correct copy of the Mayor's Dec. 3, 2024 Letter as posted on Facebook is attached as Exhibit "C." *See* Salvatore Dec.; Compl. ¶47.   He sent the letter to the planning board to consider during the meeting. Compl. ¶ 47. The Mayor's Dec. 3, 2024 Letter lambasted the Santoro Family's affordable housing plans as "destructive" and asserted that the proposed affordable housing would cause "[i]ncreased traffic, drainage problems, and a sudden influx of new students overwhelming [the Town's] school system." Salvatore Dec.; Compl. ¶48. He characterized the proposed project as a "trifecta of chaos." *Id*. The letter was accepted into the record and read aloud during the Town's planning board. Compl. ¶47.

The letter also proclaimed that the Town has the "right to fight back". Salvatore Dec.; Compl. ¶49. He vowed to "use all the power of government" that he has "to stop it." Salvatore Dec.; Compl. ¶¶50-51. The letter promised, however, that if the Santoro Family abandoned their affordable housing plans and instead agreed to build suburban-style single-family homes, the Town would "roll out the red carpet to guide you through the planning process[.]" Salvatore Dec.; Compl. ¶52. At the December 3, 2024, board meeting, other planning board members came out against the project. Santoro Dec. at __X; Salvatore Dec.; Compl. ¶54; *see also Rhode Island planning board member faces backlash over housing comment*" (Dec. 4, 2024),

10

https://tinyurl.com/mwzayfb5. One member, Robert Pingitore, opined the Santoro Family's project would be "the next Chad Brown" of Johnston, derogatorily referencing a Providence housing development known as home to many minority residents. *Id.*

## V.    A Never-Before Planned New Municipal Campus?

A month later, the mayor published a press release on Facebook announcing the Town would take the Santoro Family's property by eminent domain to relocate the Town's government buildings to a new municipal campus to be built on the Santoro Property. *See* Salvatore Dec.; Compl. ¶57; Town of Johnston, Rhode Island, *Mayor Joseph Polisena, Jr. Announces Taking of 31-Acre Low-Income Housing Site by Eminent Domain for Public Safety Complex* (Jan. 27, 2025). A true and correct copy of the press release is attached as Exhibit "D." The Town Council followed suit, and on January 28, 2025, in a special session it adopted Resolution 2025-10 which resolved:

> Now Therefore, the Town Council for the Town of Johnson hereby resolves that the Town of Johnston should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter of the Town of Johnston, to take title to 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 193 for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building.

Resolution 2025-10, at 2 (italics omitted). A true and correct copy of Town of Johnson, Resolution 2025-10 (Jan. 28, 2025) is attached as Exhibit "E." Salvatore Dec.; Compl. ¶¶61-65. However, no Town Charter can enable a Town to take private property by eminent domain in the absence of a delegation of such power from the State. *See*

*O'Neill v. City of E. Providence*, 480 A.2d 1375, 1379-80 (R.I. 1984) (where municipality's eminent domain procedures differ from state statutes, the state statutes control); *City of Newport v. Newport Water Corp.*, 57 R.I. 269, 189 A. 843, 846 (1937).

Until the Santoro Family proposed to build affordable housing, the Town had no plans to construct this newly proposed municipal campus. Santoro Dec.. Before October 2024, when the Santoro Family's affordable housing plans became known, the Town had not:

1. Publicly proposed building a municipal campus;
2. Determined if private property would need to be acquired for a municipal complex;
3. Informed the public or publicly discussed the use of eminent domain to acquire any property for a municipal campus;
4. Budgeted or set aside money or otherwise planned to budget for a municipal campus;
5. Sought the public's input on whether monies slated to be used to build a new high school were to be used instead to build a municipal campus, and the Town's existing high school only renovated;
6. Undertaken studies to determine the financial feasibility of building a municipal campus, or whether a municipal campus would burden the Town's taxpayers;
7. Created a Municipal Public Building Authority, a prerequisite to the use of eminent domain to acquire property for a municipal public building. R.I. Gen. L. § 45-50-12(16);
8. Held any public hearings regarding a new municipal campus;
9. Created or commissioned any building plans or other plans for a municipal campus;

10. Formulated a land use plan or any similar long range plans showing a new municipal campus or evincing an intent to acquire property for a new municipal campus;

11. Considered whether any other locations or properties may be suited for a municipal campus;

12. Considered whether repair and redevelopment of the Town's existing facilities was feasible or desirable; and

13. Considered whether relocating existing municipal services from their central location to the edge of the Town was sensible, and desirable to the public.

Salvatore Dec. at _X; Santoro Dec.; Compl. ¶76.

## VI. The Town Made Up a Process to Condemn the Santoro Property and Declare the Town the Owner Without Notice, Without Process, Without a Jury, and Without Paying Just Compensation

To further this scheme, the Town Council next passed Resolution 2025-17, which purports to adopt the procedures the Town would follow to take the Santoro Property. A true and correct copy of Town of Johnson, Resolution 2025-17 (Mar. 10, 2025) is attached as Exhibit "F." Salvatore Dec.; Compl. ¶82. This Resolution asserted that "the process contained in this resolution conforms with the Town Charter and State Law and should be followed if it is determined that the above-referenced property should be condemned for public use." *Id.*

A cursory review of the procedures adopted by the Town reveals the glaring absence of any of the usual indicators that an exercise of eminent domain is for public use, purpose, or necessity, or the usual accompanying notice and due process protections:

1. The process the Town adopted in Resolution 2025-17 is *ad hoc* (it was adopted only after the Santoro Family moved forward with its affordable housing plans, and it purports only to govern the Santoro Property taking).

2. It purports to permit the Town to take *ownership* of the property without any pre-transfer notice whatsoever to the Santoro Family.

3. It purports to allow the Town to seize *ex parte* immediate ownership of the property and record the Town as the owner of the Santoro Property merely by filing a copy of a Town resolution, a description of the land, and a plat in the Town's Land Records office.

4. It sets forth no procedures whereby the Santoro Family is afforded notice, an opportunity to respond, to appear at any hearing, to contest the taking or object to the seizure or the Town's unilateral and unverified "estimate" about the amount of Just Compensation the Town must provide.

5. There's *zero* judicial process recognized, with the Rhode Island court's only role to confirm that the Town made a deposit. No response, no motions, no hearing, no trial.

6. And nothing even resembling a jury trial to determine the amount of just compensation the Town is obligated to provide. *Cf.* R.I. Gen. Laws § 45-32-24.2(m); § 24-1-8.

7. Only after the seizure is complete and *fait accompli* and ownership and title transferred, does the Resolution say that the Santoros are to be given any sort of notice.

Minutes after the Town adopted Resolution 2025-17, it also adopted Resolution 2025-18, which invoked the process outlined in 2025-17, and resolved that the Town "should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter of the Town of Johnston, to take title to 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 a/k/a

Lot 193 for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building." A true and correct copy of Resolution 2025-18 (Mar. 10, 2025) is attached hereto as Exhibit "G." Salvatore Dec.; Compl. ¶83.

## VII. The Santoro Family's Federal Constitutional and Civil Rights Challenge to the Town's Seizure

Immediately following the Town's adoption of Resolutions 2025-17 and 2025-18, the Santoro Family challenged in this Court the Town's illegal attempt to take the family's private property. *See* Salvatore Dec.; Compl. (ECF 1). The Complaint asserts claims for violations of the Fifth Amendment's Public Use Clause, the Fourteenth Amendment's Due Process Clause, the federal Civil Rights Act of 1871 (42 U.S.C. § 1983), the Rhode Island Constitution's Public Use Clause, and a claim that the Town has not been delegated the authority under Rhode Island law to use eminent domain to forcibly acquire the Santoro Property and its actions are *ultra vires*. Compl. ¶¶84-148.

## VIII. The Town Responded to the Federal Lawsuit by Rushing to Alter the *Status Quo*

Unbeknownst to the Santoro Family and its counsel (because neither the Town nor its lawyers bothered to tell them), on March 12, 2025, the Town on its own authority per Resolution 2025-17, filed in the Town's land evidence record office a copy of the resolution, a description of the land, a plat, and a statement that the land is taken. Salvatore Dec.. Here are two screenshots of the Town Land Evidence record, obtained a few days later after the Santoro Family learned of the Town's action:



See Declaration of Robert H. Thomas  ("Thomas Dec."). This shows the Town as the record title owner of the Santoro Property with the recording of the title transfer accomplished by the Town on March 12, 205 at 8:52 a.m., the Town identified as both "Grantor" and "Grantee." Thomas Dec.. Neither the Town nor its attorneys provided notice to the Santoro Family that in the Town's view (and in the public record) the Santoro Family no longer owned their land, and it now "belongs" to the Town.

Salvatore Dec.. Given the lack of any notice, obviously, no Just Compensation was adjudicated, much less actually paid.

## IX.    The Santoros Discovered the Town Seized Their Land When the Mayor Tweeted About It

Two days later, on March 12, 2025, after the Santoro Family's federal court challenge was underway and after the Defendants were served Summons and the Santoro Family's federal court Complaint and their lawyers received copies of the federal lawsuit, the Town continued its scheme by filing a Petition in Rhode Island state court, purported under Resolution 2025-17, asking "to deposit into the Registry of the Court, a sum of money not less that [than] the appraisal of the fair market value of the Property[.]" *See* Town Deposit Petition at. 1; Salvatore Dec.. A true and correct copy of the Town Deposit Petition is attached hereto as Exhibit "H".

In the Deposit Petition, the Town for the first time asserted another use or purpose for supporting eminent domain: that it was taking the Santoro Property under the Rhode Island Home and Business Protection Act of 2008 (R.I. Gen. Laws § 42-64.12) for economic development. *See* Town Deposit Petition at 1; Salvatore Dec.. In other words, in a transparent reaction to the Santoro's federal complaint, the Town shifted its rationale supporting the taking from seizing land for public municipal buildings to economic development (even as its real reason—stop the Santoros— remained unchanged). This makes little sense given the limited purpose of the statute. *See* R.I. Gen. Laws § 42-64.12-3 ("The purposes of this chapter are to set forth permissible uses of eminent domain power and to define, limit, and restrict the use of eminent domain for economic development purposes."). The statute does not

contemplate the construction of municipal buildings as economic development. *See* R.I. Gen. Laws § 42-64.8-6 (listing improvements in utilities, roads, sidewalks, sewers; projects to arrest blight and decay, improvements to enhance municipal tax bases and to attract and retain employers).

Even if the Town could articulate some plausible economic benefit related to new municipal offices, the Town has not complied with any of the statute's procedural requirements. Salvatore Dec.. For example, the statute requires the Town to have "a plan for the proposed development, which shall be approved by the governing body of the entity prior to the initiation of eminent domain proceedings[.]" R.I. Gen. Laws § 42-64.12-7(b) (also setting forth the required elements of the pre-taking "plan"). The statute requires "advance notice" to the property owner. R.I. Gen. Laws § 42-64.12-7(c) ("The entity shall give the owner(s) of property that may be acquired by eminent domain advanced notice of the potential taking …"). The statute requires the Town to "provide the [owner the] opportunity to sell the property for a negotiated, mutually agreed upon price." *Id.* Moreover, the statute requires that takings pursuant to R.I. Gen. Laws § 42-64.12 (as the Town's Deposit Petition asserted it is doing) be compensated at "[a] minimum of one hundred fifty percent (150%) of the fair market value of the real property" plus costs incurred by the property owners, including relocation expenses. *See* R.I. Gen. Laws § 42-64.12-8(1)-(3). The Town's own Resolutions and the Deposit Petition show on their face and in the Town's own words show that it deposited only what it estimates as the fair market value of the Santoro Property, without the 50%-over-fair-market-value enhancement, and nothing for

owner costs or relocation expenses. The Town also has no qualifying statutory plan, nor did it provide the required pre-taking notice and opportunity to negotiate a purchase.

In accordance with its established pattern, the Town continued to lay low: it did not provide notice of the filing of the Deposit Petition to the Santoro Family or its counsel and did not provide notice of the hearing that the Town scheduled, and the Rhode Island court apparently held the following day to consider the Town Deposit Petition. Salvatore Dec.

Unbeknownst to the Santoro Family and its counsel, on March 14, 2025, the Town's Deposit Petition was heard *ex parte* by the Rhode Island court. Salvatore Dec.. Importantly, the Town did not ask the Rhode Island court in its Deposit Petition or its Motion to Deposit Money Into Registry, to order condemnation of the property, or otherwise adjudicate any of the issues in a typical eminent domain case (is the taking for a public use? is the compensation "just"?). *See* Town Deposit Petition at 1; Town Motion to Deposit Money into Registry ; Salvatore Dec.. A true and correct copy of the Town's Motion to Deposit Money into Registry is attached hereto as Exhibit "I". The sole request by the Town was for Rhode Island court to allow the Town to "deposit into the Registry of the Court, a sum of money not less that [sic] the appraisal of the fair market value of the Property[.]" Town Deposit Petition at 1; Town Motion to Deposit Money into Registry. The court granted the Town's Deposit Petition, ordering only that the Town could make its deposit, nothing more. Order Granting the Town's Motion to Deposit Money . A true and correct copy of the court's Order Granting the

19

Town's Motion to Deposit Money into the Registry of the Court is attached hereto as Exhibit "J". The court did not order the condemnation of the Santoro Property, allow the Town to take possession, ownership, or title, and did not order payment in whole or in part any just compensation. *Id.; see also*, Salvatore Dec..

As before, neither the Town nor its lawyers bothered to inform either the Santoro Family or its attorneys about this. Salvatore Dec.. But the Mayor immediately crowed about the Town's newest land acquisition on social media:



Text: "At 10:40 a.m. today, through a petition in Providence Superior Court, the Town of Johnston officially acquired ownership of the property at 178-200 George Waterman Road by eminent domain."

Joe Polisena Jr. ("1990s. RIC/RWU Law/PC alum. Current: Syracuse [emoji]. Mayor of Johnston, RI. #RaysUP [emoji], #VegasBorn [emoji]", *X (Twitter)* (Mar. 14, 2025). Counsel for the Santoros only learned of this development after a reporter called and asked for comment. Declaration of Kathryn D. Valois  ("Valois Dec.").

A few hours later, an attorney for the Santoro Family received a letter via email from the Town's lawyer in which he finally informed the Santoros and their lawyers about the Town's recording itself as the new owner of the property, the filing of the Deposit Petition, the Rhode Island court's order granting the Town's request to deposit, and stated that the Town views itself, not the Santoro Family, the owner of the property. *See* Letter from William J. Conley, Jr.; Salvatore Dec.. The letter demanded that the Santoro Family remove their belongings from the Town's land immediately, and threatened to prosecute the Santoros if they did not:

> Enclosed please find a copy of the Petition that was filed in the Providence County Superior Court and an Order which was entered by Judge Christopher K. Smith this morning regarding the condemnation of property formerly owned by your clients SCLS Realty, LLC and Sixty Three Johnston, LLC. Also enclosed please find a copy of the Statement of Taking which was recorded in the Town of Johnston Land Evidence Records on March 12, 2025 at 8:53 AM in Book 3294 Page 223.
>
> Now that title to the above-referenced property has vested with the Town of Johnston, please instruct your clients to remove all vehicles and other personal belongings from the property immediately. If your client's belongings remain on the property by Friday, March 21, 2025, we will have no choice but to serve your clients with a no trespass notice.
>
> Yours truly,
>
> /s/
>
> William J. Conely, Jr.
> wconley@conleylawri.com

*See* Letter from William J. Conley, Jr.

## X.  Notice

Before filing this Motion for Temporary Restraining Order,  when the Deputy Clerk provided a hearing date and time, counsel for Santoro Family notified counsel for the Defendants of the hearing date and time, by email and telephone. Upon filing of this Motion and its supporting documents, counsel for the Santoro Family will provide copies of such documents and notice of the filing to counsel for the Defendants. Salvatore Dec.

### TEMPORARY RESTRAINING ORDER
### LEGAL STANDARD

The legal standard for a Temporary Restraining Order ('TRO') mirrors that of a preliminary injunction, and requires a court to weigh these four factors:

1. likelihood of success on the merits;
2. potential for irreparable injury;
3. balance of the relevant equities; and
4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Belotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). *See also McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001) (same).

"The status quo is the state of affairs that existed before" the complaint. *Soscia Holdings, LLC v. Rhode Island*, 684 F.Supp.3d 47, 50 (D. R.I. 2023) ("For these reasons, the better course at this juncture is to enjoin the parties from actions that would change the status quo until the preliminary injunction issues can be fully briefed, heard, and resolved."). This Court may issue a TRO in anticipation of fuller briefing, presentation of evidence, and arguments. *See Berge v. Sch. Comm. of*

*Gloucester*, 107 F.4th 33, 39 n.9 (1st Cir. 2024) (Suits involving obviously unlawful acts do not land on our docket every day. So a plaintiff will have a harder time finding factually similar caselaw in that scenario than in one involving closer legal questions. And it would be more than a little strange 'if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.'") (citations omitted).

## ARGUMENT

### I.    Success on the Merits

#### A.    First Claim for Relief (Public Use Clause)

The Town's assertion that the taking of the Santoro Property is for a new municipal campus violates the Public Use Clause because the Town's real reason is to stop affordable housing. The Fifth Amendment to the United States Constitution, which limits the power of States and their instrumentalities such as the Town under the Fourteenth Amendment, prohibits the taking of private property unless the taking is "for public use." U.S. Const. amend. V ("… nor shall private property be taken for public use, without just compensation") ("Public Use Clause"). A taking of property must be "for public use"—or at least for "a public purpose"—and thwarting the rightful owners' lawful use of their private property is not a public use or purpose.

Even where the Town's stated use, purpose, and necessity supporting an exercise of eminent domain may appear to be a public use or purpose, courts may inquire into the Town's actual use, purpose, necessity, and motives. *Cnty. of Hawaii v. C & J Coupe Fam. Ltd. P'ship*, 119 Haw. 352, 375, 198 P.3d 615, 638 (2008) ("[T]he *Kelo* majority opinion, consistent with our prior decisions, allows courts to look behind

23

an eminent domain plaintiff's asserted public purpose under certain circumstances."). Here, the Town's actions and its purported taking of the Santoro Property is an extremely unusual and aberrant exercise of government power that raises overwhelming evidence that a non-public purpose is afoot; this Court must view it with a skeptical eye. *See*, *e.g.*, *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F.Supp.2d 1123 (C.D. Cal. 2001), *cited in Kelo v. City of New London*, 545 U.S. 469, 487 n.17 (2005). The taking is unusual and aberrant for the following reasons:

1.      The history and tradition of eminent domain is that taking private property is the *last* step in the process not the first. Here, the Town did not first determine it needed and could afford a new municipal campus, then look for and study sites that might be suitable, determine whether the owners might voluntarily sell their land, and only if the owner refused then exercise the drastic power of eminent domain to forcibly seize the property.

2.      The Town is doing this in reverse—determining first to take the Santoro Property to block an affordable housing development and only then trying to "retcon" its reasons for doing so. *See* "*retcon*," Merriam-Webster's Dictionary ("the act, practice, or result of changing an existing fictional narrative by introducing new information in a later work that recontextualizes previously established events, characters, etc."). The Town's stated use and purposes are *post-hoc* and pretextual. *Pheasant Ridge Assocs. Ltd. P'ship v. Town of Burlington*, 399 Mass. 771, 776-77, 506 N.E.2d 1152, 1157 (1987) (Where the town was "concerned only with blocking the plaintiffs' development,"

24

pretext claims are "not limited to action taken solely to benefit private interests."). The Town's reversal of the usual eminent domain process leads to a very plausible inference that its stated reasons for taking the Santoro Property are false. *Middletown Twp. v. Lands of Stone*, 595 Pa. 607, 617, 939 A.2d 331, 338 (2007) ("the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification.").

3.      The mayor's public statements and actions are inconsistent with the Town's claimed use or purpose. Some members of the public expressed opposition to the Santoro Family's proposed affordable housing. At the December 3, 2024, board meeting, other planning board members came out against the project. Salvatore Dec.; *see also Rhode Island planning board member faces backlash over housing comment*" (Dec. 4, 2024), https://tinyurl.com/mwzayfb5. One member, Robert Pingitore, opined the Santoro Family's project would be "the next Chad Brown" of Johnston, derogatorily referencing a Providence housing development known as home to many minority residents. *Id.* The Town's exercise of eminent domain violates the Public Use Clause because it is in bad faith, and is based on spite, animus, and ill will. *See Earth Mgmt., Inc. v. Heard Cnty.*, 248 Ga. 442, 446, 283 S.E.2d 455, 459 (1981) ("[A] condemning authority may not act in bad faith in the exercise of the right of eminent domain.").

4.      There is a lack of a nexus between the property interests sought and the Town's claimed purpose. The Town's stated use, purpose, and necessity for the taking are atypical of long-range policy decisions for public projects.

5.      The Town engaged in bad faith efforts to compel or coerce changes in, or

abandonment of, the Santoro Family's affordable housing plans before deciding to use eminent domain. *New England Ests., LLC v. Town of Branford*, 294 Conn. 817, 854, 988 A.2d 229, 252 (2010) ("a government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause[.]").

6.      The Town's stated use, purpose, and necessity for the taking are inconsistent with and violate State law. *See* Compl. ¶¶115-148 (Ultra Vires claim). But even assuming the Town has the authority in the absence of express delegation of eminent domain power from the State to adopt its own procedures and standards (including the ability to obtain ownership of property *ex parte* and without payment of just compensation, the Town adopted the condemnation process by resolution, which it cannot do. *See* Resolution 2025-17. Under Rhode Island law, resolutions are not "law," but merely "an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance,[ ] ordinarily ministerial in character[.]" *5750 Post Road Med. Offs., LLC v. E. Greenwich Fire Dist.*, 138 A.3d 163, 169 (R.I. 2016) (quoting 5 Eugene McQuillin, *The Law of Municipal Corporations* § 15:2 at 97–105 (Rev. 3d ed. 2013)).

7.      The Town proposes to pay for the proposed municipal campus by shifting monies previously slated for building a new high school, contrary to the Town's already-approved plans to build a new high school. Prior to its eminent domain announcement, the Town never mentioned needing a new municipal complex. Instead, the Town's publicly stated high priority was building a new high school, which was approved by the Rhode Island Department of Education. *See* https://tinyurl.com/y2dsu6cs (May 29,

2024). Only when the Santoro Family formally announced plans for developing that property with affordable housing did the Town through Mayor Polisena vow to "use all the power of government," including the power of eminent domain, to stop the development and abruptly disregard the planned high school construction to redirect the money to stopping the Santoro's project. *See* Compl. ¶58 (""to fund this project [the new municipal campus], we are going to back to our original intention of renovating the high school."").

For all these reasons, Plaintiffs are likely to prevail on their Public Use claim to invalidate the Town's bad faith exercise of eminent domain.

### B.    Second Claim for Relief (Due Process Clause)

The Fourteenth Amendment to the U.S. Constitution, which limits the power of States and their instrumentalities such as the Town, provides, "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV ("Due Process")

The Santoro Family is likely to succeed on its procedural due process claim because on its face, the Town's made-up eminent domain procedures do not come close to the most basic requirements of due process—the right to notice designed to actually inform someone that their property is about to be seized by eminent domain, and the opportunity to be heard prior to having their property taken. *See Jones v. Flowers*, 547 U.S. 220, 239 (2006) (government must make extra efforts to inform property owners before it takes property).

Even a cursory review of the procedures adopted by the Town reveals the glaring absence of any of the due process procedures which condemnors follow when taking property for a true public use, purpose, or necessity. The unusual no-notice, *ex parte* process the Town adopted in Resolution 2025-17 is *ad hoc* (it was adopted only after the Santoro Family moved forward with its affordable housing plans, and it purports only to govern the Santoro Property taking). *See* Salvatore Dec.; Town of Johnston, Resolution 2025-17. It purports to permit the Town to take *ownership* (not just possession) of the property without any pre-transfer notice whatsoever to the Santoro Family. *Id*. It purports to allow the Town without notice to seize immediate ownership of the property and record the Town as the owner of the Santoro Property merely by filing a copy of a Town resolution, a description of the land, and a plat in the Town's Land Records office. *Id*. It sets forth no procedures whereby the Santoro Family is afforded notice, an opportunity to respond, to appear at any hearing, to contest the taking or object to the seizure, or the Town's unilateral and unverified "estimate" about the amount of Just Compensation the Town must provide. *Id*. There's *zero* judicial process recognized, with the Rhode Island court's only role to confirm that the Town made a deposit. No response, no motions, no hearing, no trial. And nothing even resembling a *jury* trial to determine the amount of just compensation the Town is obligated to provide. Only after the seizure is complete and *fait accompli* and ownership and title already transferred, does the Resolution say that the Santoros are to be given any sort of notice, apparently too late in the view of the Town, to do anything about it. *Id*.

*Brody v. Vill. of Port Chester*, 434 F.3d 121, 132 (2d Cir. 2005), illustrates the essential necessity of notice in eminent domain. There New York law required an owner challenging a taking under the Public Use Clause object in a special procedure to do so within 30 days. The Second Circuit held "where, as here, a condemnor provides an exclusive procedure for challenging a public use determination, it must also provide notice in accordance with the rule established by *Mullane [v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950)] and its progeny. ... [R]easonable notice' under these circumstances must include mention of the commencement of the thirty-day challenge period." *Brody*, 434 F.3d at 132. *Brody* also held that the notice must contain a "conspicuous mention" of the challenge period. *Id*. None of those minimal requirements were present in the Town's purported eminent domain process.

The Town's execution of its scheme makes it even more likely the Santoros will prevail on their due process claim: the Town and its attorneys affirmatively and purposefully withheld notifying the Santoros and their lawyers about the seizure of the Santoro property, even though the Town and its lawyers know exactly who owned it, and that they are represented by counsel. Salvatore Dec.. This Court may infer that the Town and its attorneys' purposeful withholding of notice was designed to keep the Santoro Family in the dark to prevent them from objecting until Town's the taking was a "done deal," too late in the Town's view for anyone, including this Court, to do anything about it. *Id*. In *Brody*, the property owners at least had actual and constructive notice (which the court held irrelevant because the focus in due process analysis is what efforts the government undertook to provide notice, not what the

owner may have known). Here, the Town affirmatively hid the facts from the Santoro Family.

The Town very likely violated the Santoro Family's procedural due process rights because each of the *Mathews* factors cuts in the family's favor. *Lee v. Rhode Island*, 942 F. Supp. 750, 755 (D.R.I. 1996) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Roberts v. Maine*, 48 F.3d 1287, 1292 (1st Cir.1995).

First, fundamental property interests are at stake. The Santoro Family has been deprived of private property—land held in fee simple absolute—not merely some government entitlement. Here, the family has been stripped of title and ownership of their land, and the attendant rights to exclude, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership."), and to enjoy the profits thereof. *See* 1 Edward Coke, *Institutes*, ch. 1, § 1 (1st Am. ed. 1812) ("[F]or what is the land but the profits thereof[?]"); *Green v. Biddle*, 21 U.S. 1, 74-75 (1823) ("The common law of England was, at that period, as it still is, the law of that State; and we are informed by the highest authority, that a right to land, by that law, includes ... [the right] to receive the issues and profits arising from it."); *Ashness v. Burr's Lane Assocs.*, 640 A.2d 522, 523 (R.I. 1994) (full ownership includes "profits of the land"); *Stackpole v. Healy*, 16 Mass. 33, 34 (1819) (the common law rights of property owners include "every use to which the land may be applied, and all the profits which may be derived from it"). The private property interests put at risk by the Town weigh heavily in the Santoro Family's favor.

Similarly, the risk of erroneous deprivation due to the Town's failure to provide pre-deprivation notice and an opportunity to be heard is great. *Lee*, 942 F. Supp. at 755. Resolution 2025-17 on its face reflects zero pre-deprivation notice to the Santoro Family or any type of pre-deprivation hearing. Town of Johnston, Resolution 2025-17. The way the Town put the Resolution's process into action also shows that it purposely withheld notice and an opportunity to be heard, and created the maximum risk the Santoros would be wrongly deprived of their property.

The final *Mathews* factor also weighs heavily in favor of the Santoro Family: A hearing would have exposed the fact that the Town's attempt to exercise eminent domain doesn't even meet the standards required by the very statute the Town claims authorizes the taking. Predeprivation notice and a hearing would have given the Santoros the opportunity to point out that the Town's state court Deposit Petition asserts that the Rhode Island Home and Business Protection Act of 2008 (R.I. Gen. Laws § 42-64.12), provides authority for the seizure, but the Town has not complied with any of the statute's requirements, such as having a preexisting pre-taking "plan for the proposed development," advance notice, or the "opportunity to sell the property for a negotiated, mutually agreed upon price." Gen. Laws § 42-64.12-7(b), (c). Nor did the Town deposit at least 150% of its estimate of the fair market value of the property being seized, nor has it provided costs including relocation costs. R.I. Gen. Laws § 42-64.12-8(1)-(3). Conversely, any burdens on the Town of providing predeprivation notice and hearing would be minimal. A letter, email, or phone call would have sufficed for notice; and if the Town had time for an *ex parte* hearing, it had time for a

noticed hearing with all parties present.

**C.    Third Claim for Relief: 42 U.S.C. § 1983**

The Civil Rights Act of 1871 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. The Town and the other defendants are "persons" and at all times relevant herein acted under color of state law within the meaning of those terms in 42 U.S.C. § 1983. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) ("municipalities and other bodies of local government are 'persons' within the meaning of this statute").

The Santoro Family possess rights, privileges, or immunities secured by the Constitution and laws of the United States, namely the right, privilege, or immunity to possess and keep their private property and not have it seized or threatened by unconstitutional and illegal assertions of eminent domain, and the right, privilege, or immunity to make legal and reasonable use of their land, free of coercion and the arbitrary and capricious exercise of government power. The likelihood of success on the merits of the section 1983 is equally strong in favor of the Santoro Family for the reasons set forth above, as the Town's liability for civil rights violations substantially mirror its liability for violating the Constitution, the primary difference being in relief: in addition to an injunction and declaration, under the Civil Rights Act of 1871, the Santoro Family are entitled to damages, and a jury. *See, e.g.*, *City of Monterey v.*

*Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) ("We hold that a § 1983 suit seeking legal relief is an action at law within the meaning of the Seventh Amendment [jury guarantee].").

### D.    Fourth Claim for Relief: R.I. Public Use Clause

Article I of the Rhode Island Constitution ("Declaration of Certain Constitutional Rights and Principles") prohibits the Town from taking private property except "for public uses."

> Private property shall not be taken for public uses, without just compensation.

R.I. Const. art. I, § 16 ("R.I. Public Use Clause").

Without proper and authorized public use, the Town cannot exercise eminent domain to take private property. *See Rhode Island Econ. Dev. Corp. v. The Parking Co., L.P.*, 892 A.2d 87, 96 (R.I. 2006) ("Although a state's eminent domain authority is not derived from a specific constitutional grant, its exercise is limited by the Constitution. ... These constitutional boundaries are textually imbedded in the Takings Clause, which presupposes governmental power to take private property, but imposes two limitations on the authority: (1) private property may be taken only for public uses; and (2) the taking must be accompanied by just compensation."). A municipal corporation lacks authority to purchase real estate as a tool to compel a taxpayer to abandon or compromise his litigation with the municipality. *Place v. City of Providence*, 12 R.I. 1, 4 (1876) (a legitimate purpose must be the "*sole*" purpose of a city's acquisition of land).

The Town's taking of the Santoro Property is arbitrary, capricious, or in bad faith, and is void under the R.I. Public Use Clause. *Id.* at 103 ("This Court is mindful of the extreme grant of power that rests in an agency vested with eminent domain authority; and if confronted with a showing that the 'agency has exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property, we unhesitatingly will declare it void.'") (citing *Romeo v. Cranston Redevelopment Agency*, 254 A.2d 426, 443 (R.I. 1969)); *Union Station Assocs. v. Rossi*, 862 A.2d 185, 187 (R.I. 2004) (abuse of governmental power to gain bargaining advantage rejected as "municipal thuggery").

### E.    Fifth Claim for Relief: *Ultra Vires* Taking

The Town may not exercise the power of eminent domain unless that power has been expressly and specifically delegated to it and authorized and enabled by the State of Rhode Island. The Town has no power or authority independent of state law to take private property for any use, purpose, or necessity. State law must expressly delegate that authority to local municipalities or agencies. *Balsamo v. Providence Redevelopment Agency*, 84 R.I. 323, 328 (1956). If a local government exceeds that delegated authority, an unconstitutional taking occurs. *See Tech. Invs. v. Town of Westerly*, 689 A.2d 1060, 1062 (R.I. 1997) ("As a general rule a municipality may not enact an ordinance that is inconsistent with a state statute."); *Cahoon v. Shelton*, 647 F.3d 18, 27 (1st Cir. 2011) (without necessary authorization, city's payments were *ultra vires*).

The limited public uses or purposes for which the Town may exercise the delegated power of eminent domain are not coterminous with the scope and extent of the State of Rhode Island's eminent domain or police powers and are limited to the uses and purposes which are identified by state law and expressly delegated to the Town by state law. *Buckhout v. City of Newport*, 68 R.I. 280, 27 A.2d 317, 320 (1942) ("In this state we recognize the distinction between the governmental functions of a city or town and its proprietary functions. In the exercise of the first, the city acts merely as the agent of the state"). The Town may only exercise any ability to take property by eminent domain consistent with the laws of Rhode Island, and consistent with other restrictions and limitations established by law, rule, regulation, or ordinance. *See O'Neill v. City of E. Providence*, 480 A.2d 1375, 1379-80 (R.I. 1984) (where municipality's eminent domain procedures differ from state statutes, the state statutes control).

The State's delegation to the Town of the power to own property and make contracts in R.I. Gen. Laws § 45-2-4 is not a general delegation of the power of eminent domain to the Town, nor is it a delegation or authorization to take the Santoro Property. R.I. Gen. Laws § 45-2-4 establishes no procedures or standards by which cities and towns may take private property by eminent domain.

### 1.    Town Has Not Complied with the Rhode Island Home and Business Protection Act, the Statute Which it Claims Authorized the Taking

The Rhode Island Home and Business Protection Act of 2008 ("R.I. Home and Business Protection Act") restricts how political subdivisions of the state such as the Town may exercise any delegated power of eminent domain. The R.I. Home and

Business Protection Act sets out the permissible uses of eminent domain powers, and the restricted use of eminent domain. R.I. Gen. Laws § 42-64.12.

The R.I. Home and Business Protection Act restricts the exercise of eminent domain for economic development by subjecting such exercises to certain statutory limitations. R.I. Gen. Laws § 42-64.12-7. The Town's stated public use, purpose, or necessity supporting the taking of the Santoro Property is not economic development.

In its Deposit Petition for the first time, the Town claimed it had another use or purpose for the taking: that it may take the Santoro Property under the Rhode Island Home and Business Protection Act of 2008 (R.I. Gen. Laws § 42-64.12). In other words, in a transparent reaction to the Santoros' federal complaint, the Town shifted its rationale supporting the taking from seizing land for public municipal buildings, to economic development (even as its real reason remained unchanged). But the Town did not comply—and even now has not complied with—the requirements of the statute authorizing a town to take property for economic development. *See* R.I. Gen. Laws § 42-64.12-3 ("The purposes of this chapter are to set forth permissible uses of eminent domain power and to define, limit, and restrict the use of eminent domain for economic development purposes."). The Town has not complied with the major requirements of the Home and Business Protection Act. For example, the statute requires the Town have "a plan for the proposed development, which shall be approved by the governing body of the entity prior to the initiation of eminent domain proceedings[.]" R.I. Gen. Laws § 42-64.12-7(b) (also setting forth the required elements of the pre-taking "plan"). The statute requires "advance notice" to

the property owner. R.I. Gen. Laws § 42-64.12-7(c) ("The entity shall give the owner(s) of property that may be acquired by eminent domain advanced notice of the potential taking …"). The statute requires the Town to "provide the [owner the] opportunity to sell the property for a negotiated, mutually agreed upon price." *Id.* Moreover, the statute requires that takings pursuant to R.I. Gen. Laws § 42-64.12 (as the Town asserted it is doing) be compensated at "[a] minimum of one hundred fifty percent (150%) of the fair market value of the real property" plus costs incurred by the property owners, including relocation expenses. *See* R.I. Gen. Laws § 42-64.12-8(1)-(3). The Town's own Resolutions and the Deposit Petition show on their face and in the Town's own words that it has only deposited what it estimates as the fair market value of the Santoro Property, without the 50% increase and with nothing for owner costs or relocation expenses.

### 2. Town May Only Take for Public Municipal Buildings After First Forming a Public Municipal Building Authority, Which it Has Not Done

Moreover, the R.I. Home and Business Protection Act also states that eminent domain may be used to acquire property for "public ownership and use," provided doing so is "consistent with other restrictions and limitations established by law, rule, regulation, or ordinance[.]" R.I. Gen. Laws § 42-64.12-6.

One such restriction and limitation is set forth in Rhode Island General Laws Title 45, Chapter 50 ("Municipal Public Buildings Authorities Law"), which delegates the power to take private property for the use or purpose of construction or operation of judicial, administrative, educational, residential, civic facility, rehabilitative, medical, police, fire and public safety, recreation, transportation, public water supply

system, public sewer system, parks, and other projects that the authority is requested to initiate to provide effective governmental, health, safety, and welfare services in the municipality, from the State of Rhode Island exclusively to a town's Municipal Public Building Authority. R.I. Gen. Laws § 45-50-13. One purpose of the Municipal Public Buildings Authorities Law is to authorize "alternative financing techniques" for the acquisition of property to build municipal public buildings, to avoid municipalities such as the Town from seizing property by eminent domain without any ability, plan, or budget to satisfy a just compensation judgment or pay for a project. R.I. Gen. Laws § 45-50-3.

The Municipal Public Buildings Authorities Law establishes the exclusive procedures by which the Town, acting through a legally constituted Municipal Public Buildings Authority may acquire land, or any interest in it, including development rights, by the exercise of the power of eminent domain, whenever it is determined by the authority that the acquisition of the land, or interest, is necessary for the construction or the operation of any "project." R.I. Gen. Laws § 45-50-13.

The Municipal Public Buildings Authorities Law defines "project" as:

(11) The word "project" means any public facility or public equipment which the authority is authorized to construct, improve, equip, furnish, maintain, acquire, install, or operate under the provisions of this chapter, to provide for the conduct of the executive, legislative, and judicial functions of government, and its various branches, departments, and agencies. These projects may include, but need not be limited to, judicial, administrative, educational, residential, civic facility, rehabilitative, medical, police, fire and public safety, recreation, transportation, public water supply system, public sewer system, parks, and other projects that the authority is requested to initiate to provide effective governmental, health, safety, and welfare services in the municipality.

38

R.I. Gen. Laws § 45-50-9.

The Town's stated public use, purpose, or necessity is for the development of civic facilities, *viz.*, municipal public buildings for uses such as "administrative, educational, residential, civic facility, rehabilitative, medical, police, fire and public safety, recreation, transportation, public water supply system, public sewer system, parks, and other projects that the authority is requested to initiate to provide effective governmental, health, safety, and welfare services in the municipality[,]" and constitute a "project." R.I. Gen. Laws § 45-50-9.

Only a Municipal Public Buildings Authority may exercise the delegated power of eminent domain to take property to be used for municipal public buildings. R.I. Gen. Laws § 45-50-13. *See Mitola v. Providence Pub. Buildings Auth.*, 273 A.3d 618, 621 (R.I. 2022) (showing condemnation following proper procedures under the statute). The Municipal Public Buildings Authorities Law prohibits the Town from exercising the delegated power of eminent domain to take property for the construction of municipal public buildings "unless and until" the town council, by resolution, declares that there is a need for an authority to function in the Town, and the State of Rhode Island's public finance management board approves the creation of the Town's Municipal Public Buildings Authority. R.I. Gen. Laws § 45-50-3.

The Town has never declared, by resolution, that there is a need for the municipal public building authority to function, and the State's public finance management board has not approved the creation of a Town Municipal Public Buildings Authority. Salvatore Dec.. The Municipal Public Buildings Authorities Law

establishes the exclusive procedures by which private property may be taken by eminent domain for a project. R.I. Gen. Laws § 45-50-13 ("Eminent domain proceedings").

The Town, by purporting to use eminent domain to take the Santoro Property is exercising a power delegated by the State of Rhode Island exclusively to a Municipal Public Buildings Authority, without legal authority to do so. The Town Charter[3] does not authorize and empower the Town to take the Santoro Property absent an express delegation of eminent domain power by the State, which the State has not done. The Town's Charter neither establishes nor contains procedures or standards by which the Town may take private property by eminent domain.

The Town Charter does not authorize and empower the Town or the Town Council to create, by resolution or otherwise, eminent domain procedures and rules that must be recognized or followed by a court or any party in an eminent domain lawsuit by the Town. If the Town's Charter authorizes and empowers the Town to create eminent domain procedures and rules, the Town's Charter violates Rhode Island law.

Resolution 2025-17 violates Rhode Island law as its procedure is inconsistent with the State's delegation of eminent domain authority for acquiring land to develop municipal buildings. R.I. Gen. Laws § 45-50-13. The Town's attempt to take the Santoro Property, including but not limited to Resolution 2025-10, Resolution 2025-

---

[3] Available at https://tinyurl.com/3j5xnhxt  (visited Mar. 17, 2025).

17, and Resolution 2025-18, is beyond the delegated powers the Town may exercise, and are void *ab initio*.

## II.    Irreparable Harm

Denying the TRO will result in irreparable harm. *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 357368, at *3 (D.R.I. Jan. 31, 2025) (the plaintiffs "have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request"). In the span of the few days after the Santoro Family filed its Complaint, in an affront to this Court's jurisdiction, the Town rushed to strip the Santoro Family of its land and property rights by a process that was already being challenged. The irreparable harms the family is suffering because of the Town's actions include a 100% deprivation of its most essential private property rights, including the right to exclude others (including the government) from its property. *See Cedar Point*, 594 U.S. at 149 ("The right to exclude is 'one of the most treasured' rights of property ownership.") (citation omitted). By its post-Complaint actions, the Town has turned that right on its head: it has informed the Santoros they are subject to prosecution if they dare enter their own land. The Santoros have also been deprived of their fundamental right to keep and own their own land. *See*, *e.g.*, *Town of Eaton v. Bouslog*, 292 P.2d 343, 344 (Colo. 1956) (en banc) (the power to condemn contravenes "the common right to own and keep property[,] and must be strictly construed against the condemnor); Donald J. Kochan, *Keepings*, 23 N.Y.U. Envt'l L. J. 355, 356 (2015) ("Property law has developed based on the presumption that, more often than not, individuals want to keep what they own."). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582–83. (1952) (owners

challenged President's seizure of steel mills on the grounds that the seizures were "not authorized by an act of Congress or by any constitutional provisions."). The owners sought preliminary and permanent injunctions. *Id*. at 583. The Supreme Court rejected the government's argument that the President's unconstitutional order did not inflict irreparable harm and affirmed the district court's issuance of a preliminary injunction. *Id*. at 584–85, 589.

The injuries to the Santoros and their property rights are irreparable and cannot be remedied after the fact. *See Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019) ("A bank robber might give the loot back, but he still robbed the bank. The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care."). Having the Town seize ownership, possession, and title of their land, the Santoro Family obviously cannot continue to move forward with what were their ongoing plans to build affordable housing. Santoro Dec.. In development projects, timing is essential. *Id*. Things like government land use approvals, the schedules of the development and construction professionals such as land use planners, architects, engineers, land use attorneys, contractors, suppliers, and construction workers (and the costs associated with these professionals) all depend on timing. *Id*. And the timing of when a development project is planned to come to market is absolutely essential in making a development project financially feasible. *Id*. Especially in an unsettled regulatory climate where employment and labor uncertainties may affect a

construction project. *Id*. Timing of the market is especially critical in low-profit, narrow-margin developments like the 100% low- to moderate-income housing such as the Santoro Family is planning. *Id*. Obviously, all of this has been derailed by the Town's unconstitutional and *ultra vires* seizure of the Santoro Family's property.

Moreover, where, as here, there is a deprivation of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (Where there is a "likely constitutional violation, the irreparable harm factor is satisfied" and the remaining factors "favor" a temporary restraining order.). "[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

The irreparable harm factor weighs heavily in the Santoro Family's favor.

## III.    Balancing the Equities

The public is in no way harmed by the issuance of a temporary restraining order that prevents the Town from further acting unconstitutionally and without legal authority, and in violation of state law. *See Tirrell v. Edelblut*, 747 F.Supp.3d 310, 319 (D. N.H. 2024) ("The State 'has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution.'") (citing *Siembra Finca Carmen, LLC v. Sec'y of Dep't of*

43

*Agric. of P.R.*, 437 F.Supp.3d 119, 137 (D. P.R. 2020)). This is especially true where the Town's actions would permanently deprive owners of their private property.

Permitting the Santoro Family to keep what they own and preventing the Town from actively using eminent domain to take the Santoro Family's property without due process during this action harms nobody. The Santoro Family's affordable housing development application remains working its way through the Town's local processes. Salvatore Dec.. There is no risk to the Town that the Santoro Family would actively develop the property without the necessary permits and approvals. *Id*. In contrast, the Town is acting without any legal authority to actively acquire the Santoro Family's property. The Santoro Family seeks only to maintain the status quo to prevent the loss of their property until the courts have an opportunity to rule on the important constitutional claims raised by this suit. Meanwhile, the Town has yet to commence even the most preliminary steps toward the potential construction of a new municipal campus. No one has been harmed or will be harmed, by allowing the Santoro Family to maintain ownership while they pursue this civil rights lawsuit. And even if a TRO is issued, the Town will remain free to exercise its other legal functions, including compliance with the Municipal Public Buildings Authority statute, if it so desires.

The equities tip heavily in favor of leaving the property with the Santoro Family during the course of litigation designed to vindicate the Santoro Family's private property rights. The Town's abhorrent and unconstitutional use of eminent domain in this case raises numerous constitutional questions that deserve judicial

resolution. That resolution would be significantly chilled, if not made impossible, by allowing the Town to acquire and degrade the property before resolution.

## IV.    A TRO to Allow this Court to Consider Substantial Federal Constitutional and Civil Rights Claims Serves the Public Interest

The public interest is at its height when preserving this Court's ability to review a constitutional and civil rights challenge to very plausible allegations the Town is abusing of sovereign government powers. The public interest is also served by ensuring that the federal constitutional and statutory restrictions and limitations of the Town's authority, and federal remedies, are not being mooted by the Town's post-Complaint machinations. *See Berge*, 107 F.4th at 39 n.9 ("Suits involving obviously unlawful acts do not land on our docket every day. So a plaintiff will have a harder time finding factually similar caselaw in that scenario than in one involving closer legal questions. And it would be more than a little strange 'if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.'") (citations and quotations omitted).

## CONCLUSION

This Court should issue a temporary restraining order and restrain the Defendants as requested until further order of this Court.

DATED: March 17, 2025.

Respectfully submitted,

/s/ *Kathryn D. Valois*
KATHRYN D. VALOIS*
Fla. Bar. No. 1010150
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Fax: (916) 419-7747
KValois@pacificlegal.org

ROBERT H. THOMAS*
Cal. Bar No. 160367
Haw. Bar No. 4610-0
AUSTIN W. WAISANEN*
Wyo. Bar No. 8-7023
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
RThomas@pacificlegal.org
AWaisanen@pacificlegal.org

KELLEY M. SALVATORE
Mass. Bar No. 637885
R.I. Bar No. 6025
STACY W. THOMSEN
Cal. Bar No. 274282
Mass. Bar. No. 706742
R.I. Bar No. 10342
DarrowEverett LLP
1 Turks Head Pl., #1200
Providence, RI 02903
Telephone: (401) 453-1200
Fax: (401) 453-1201
ksalvatore@darroweverett.com
sthomsen@darroweverett.com

*Pro Hac Vice*

*Co-counsel for Plaintiffs*

46