

# EXHIBIT A

**CONLEY LAW**
— & ASSOCIATES —

Providence Office
The Hay Building
123 Dyer Street, Suite 2B
Providence, RI 02903

Newport Office
Brick Marketplace
213 Goddard Row,
Newport, RI 02840

**Phone:** 401-415-9835    **Web:** www.conleylawri.com

March 14, 2025

Kelley Morris Salvatore
Darrow Everett LLP
1 Turks Head Place - Suite 1200
Providence, RI 02903
Via Email: ksalvatore@darroweverett.com

RE:    178-200 George Waterman Road
       Condemnation of Property

Dear Attorney Morris Salvatore:

Enclosed please find a copy of a *Petition* that was filed in the Providence County Superior Court and an *Order* which was entered by Judge Christopher K. Smith this morning regarding the condemnation of property formerly owned by your clients SCLS Realty, LLC and Sixty Three Johnston, LLC. Also enclosed please find a copy of a *Statement of Taking* which was recorded in the Town of Johnston Land Evidence Records on March 12, 2025 at 8:53 AM in Book 3294 Page 223.

Now that title to the above-referenced property has vested with the Town of Johnston, please instruct your clients to remove all vehicles and other personal belongings from the property immediately. If your client's belongings remain on the property by Friday, March 21, 2025, we will have no choice but to serve your clients with a no trespass notice.

Yours truly,

William J. Conley, Jr.
wconley@conleylawri.com

# EXHIBIT B

# Town of Johnston, Rhode Island



# Comprehensive Community Plan



07.04.2005

## As modified through January 2, 2007

Original Submission December 1991



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

# Affordable Housing Action Strategies

AH-1    Promote higher density housing development within the villages, where services and other amenities are existing or planned except where there are other criteria which must be met or concerns that conflict with allowing higher density.   Continue to require at least "one acre" minimum lot size per unit (R-40, 40,000 square feet) requirements in outlying areas of the community, where infrastructure, services, and amenities are not available or planned and the preservation of the Town's more rural/semi-rural character is desired by the community at large to be maintained.

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

AH-2    Mill Building Reuse - Support the reuse and rehabilitation of mill buildings for housing use in those locations where access, parking, environmental concerns etc., preclude continued industrial use.

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review Process |

AH-3    Provide additional and continue current incentives for combining open space preservation efforts with new affordable housing construction, such as through density bonuses.

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review Process |

AH-4    Create a new VILLAGE Zoning District in the Manton, Killingly Street, Graniteville, and Thornton sections of the Town that would permit mixed use of residential, both single and multi-family, alongside business, office, and retail development, thereby making use of the existing mixed use land use pattern and infill properties.  The existing zones in these proposed village areas range in the area of 15,000 square feet for residential properties, single family use only, and 10,000 square feet for business uses, depending how a specific property is zoned.  The Town's present Zoning Ordinance (as amended through 2004) requires a defined separation of residential and business zones and their uses, that is, residential uses are not permitted in the business zones and businesses are not permitted in the residential zones.  The new Village Zone would amend the present Zoning Ordinance by permitting a mixture of residential and business uses within a single



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

zoning classification, instead of the historic practice incorporating a defined separation of residential and business uses from each other.

- The lot size for residential uses in the newly created Village Zoning District would be changed to 10,000 square feet and the density increased to two units per structure by right with conditions and three units or more by special use permit with conditions. Business lot sizes and setbacks would remain primarily the same.

- Detailed conditions would be established in the Zoning Ordinance for permitted uses as well as the uses allowed by special use permit. Both business and/or residential uses will be permitted within the Village Zone. In addition, business and residential uses may coexist within a single structure. Detailed criteria will be established in the Zoning Ordinance for this zone by the Affordable Housing Task Force.

- Dimensional requirements will require that any new construction and additions/ renovations shall be at the same height or less as the surrounding, existing neighborhood uses and shall be designed so as to physically blend with surrounding market price units and neighborhoods in terms of height, property coverage, massing, site design, and architectural treatment. New construction and additions/renovations shall be developed only in those areas where there exists the necessary infrastructure to support the specific type of development proposed and where such siting seeks to preserve the existing natural landscape and does not negatively impact upon the environmental features and resources of the site and surrounding neighborhoods.

- Any site created as the result of this strategy shall have sufficient off-street parking to accommodate the new construction and/or expanded use. Extreme hardship and significant benefit to the neighborhood shall be proven before any variance is given for this type of development. The intent of this strategy is to permit construction only on properties that can meet the requirements of the zoning ordinance without variance.

- At least 33% of the units in each new residential structure when constructed as a two- or more multi-family dwelling shall be affordable for a minimum of 30 years. For example, for 2 family dwelling unit structures, at least one of the dwelling units shall be affordable; for 3 family dwelling unit structures, at least one of the dwelling units shall be affordable, and for 4 family dwelling unit structures, at least two of the dwelling units shall be affordable. A zoning certificate will be issued for the "by right" two family structures which will stipulate the affordability restriction of at least one of the two units created. In addition, a deed restriction relative to the required affordability of at least one of the units for at least the next 30 years will be placed on the property when the building permit is issued.

A condition for issuing a special use permit shall be a deed restriction requiring 33% of the three family or more units be affordable units for at least the next 30 years.



**Johnston, Rhode Island Comprehensive Community Plan**
Chapter 10 – Implementation Plan

The owner's unit may be counted as one of the required units if the owner meets the low-moderate income requirements.

Further requirements will be developed to insure the continuance of the affordable dwelling units in each structure. A land lease to insure the continuance of the affordability of the units is being considered as a potential method to insure continued affordability of the units in this strategy.

- Further details will be discussed by the Affordable Housing Task Force to be created and revisions to the Zoning Ordinance and Land Development Regulations proposed to the Town Council by October 1, 2005.

- Affordable Housing in the Village Districts shall be designed to give the residents of such housing as well as their neighbors pride in their homes, integrated with market price units, and so as to appear consistent with the surrounding properties and overall neighborhood.

There are approximately 100 buildable acres in the three areas identified as the Village Zoning District area. This zone would permit approximately 600 dwelling units at full build-out to be constructed over a 15 year period (2005-2020) if density bonuses were incorporated. Of these units, at least 240 of the units would be affordable. The number of dwelling units was determined by analyzing the property size of existing vacant lots and the conservative number of dwelling units that could constructed thereon given the zone minimum requirements in conjunction with environmental constraints such as steep slopes, wetlands, and access.

**Number of LMI Units created:**     **240 units (over build-out) for <80% AMI, mix of family rental and ownership, elderly and support housing.**

Responsibility:        Planning Board, Town Council
Stewardship:        Town Council
Timing:        Priority
Costs:        Costs associated with Review and Public Hearing Process


AH-5    Allow and encourage the development or redevelopment of compatible small-scale affordable housing structures within existing neighborhoods. Small scale shall refer to structures with 4 or less units that are located and/or proposed to be located in a zone in which such multi-units are permitted by the Zoning Ordinance by right or by special use permit.

The Town presently permits the re-division of lots that have been merged, officially or technically, by the contiguous lot provision of the Zoning Ordinance for those owners who purchased these properties as two or more lots prior to the change of the Ordinance to a larger lot size zone. The amendments to the Ordinance adopted in 2003 presently



stipulate that only the original owner of the lot prior to the merger is eligible for this relief.  Approximately 75% of the residential dwelling units in the Town are located in the older neighborhoods east of I-295.  Of the 4,000+ units, approximately 3,000 of the dwellings are now located on properties which have been classified as "non-conforming" in size and setbacks.  When the comprehensive rezoning of the Town occurred in 1979, many of the lots in these older neighborhoods were rezoned to a lower density zone. Anyone owning two or more contiguous lots which did not meet the new zone's minimum size were "technically" merged into one lot for zoning and building purposes.

- This strategy in this Plan proposes to offer this "re-division" option to all owners, regardless of when the merger occurred, as long as at least one new lot or 33% of new multiple lots created are designated as "affordable" for at least the next 30 years , meet the neighborhood conditions, and is eligible for a lower zone classification as the result of the Neighborhood Zoning Designation detailed in the contiguous lot provisions of the Zoning Ordinance.  For properties where the zoning district permits 2-family and multi-family units, or where multiple lots may be created through re-division, at least 33% of the units in the dwelling structure constructed or converted shall be affordable units for at least the next 30 years.  Where only one (1) new lot is created, that lot shall be designated as an "affordable unit" for at least the next 30 years.  For each petition for this provision, a buildable lot determination shall be required and the applicant shall be required to follow the procedures from that determination, as applicable, whether it be the Zoning Board of Review, Planning Board, or some other regulating authority.  A zoning certificate will be issued for the residential structures which will stipulate the affordability restriction of 100% for a single new lot created and at least 33% of the units when multiple lots and/or multi-units are created.  Likewise, when only one (1) new lot is created, the lot must meet the affordability restrictions outlined in the strategy.  In addition, a deed restriction relative to the required affordability of affordable units created for at least the next 30 years will be placed on the property when the building permit is issued.

- Affordable Housing created as a result of this strategy shall be designed to give the residents of such housing as well as their neighbors pride in their homes, integrated with market price units, and so as to appear consistent with the surrounding properties and overall neighborhood.

- Dimensional requirements will require that new construction and additions/ renovations resulting from this strategy shall be at the same height or less as the surrounding, existing neighborhood uses and shall be designed so as to physically blend with surrounding market price units and neighborhoods in terms of height, property coverage, massing, site design, and architectural treatment.

- New construction and additions/renovations shall be developed only in those areas where there exists the necessary infrastructure to support the specific type of development proposed and where such siting seeks to preserve the existing natural



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

landscape and does not negatively impact upon the environmental features and resources of the site and surrounding neighborhoods.

- Any site developed as the result of this strategy shall have sufficient off-street parking to accommodate the new construction.  Extreme hardship and significant benefit to the neighborhood shall be proven before any variance is given relative to any reduction in parking for this infill development.  The intent of this strategy is to permit construction only on properties that can meet the requirements of the zoning ordinance without variance.

Approximately 350 dwelling units could be created by this strategy.  The number of dwelling units was determined by analyzing the property size of existing oversized lots and the conservative number of dwelling units that could be created by redivision and construction thereon given the zone minimum requirements in conjunction with frontage requirements as well as environmental constraints such as steep slopes, wetlands, and access.

| Number of LMI Units created: | **200 units over build-out for <80% AMI, family rental and ownership, elderly and support housing** |
| | **75 units for <50% AMI, family rental and ownership, elderly and support housing** |

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

AH-6  Promote infill development by providing a zoning density bonus to allow scattered site two-family and multi-family dwellings in zones where they are permitted by the Zoning Ordinance by right (R-7 and R-10) and where there are covenants which will maintain 33% of the units as affordable for at least the next 30 years, provided that the underlying zone's regulatory requirements as well as environmental and other design standards are met.  Conditions for this provision shall be established in the Zoning Ordinance whereby very specific criteria shall be met before this type of proposal can be approved.  At the present time, the existing Zoning Ordinance provisions and corresponding Zoning Map provide for only 1.09% of the overall zoned properties as a multi-family designation, that is, zones R-7 or R-10.  The following Strategy 1-H proposes the expansion of these zones into the surrounding area, thereby resulting in a greater percentage than the present 1.09% presently zoned as R-7 or R-10.  Changes to the Zoning Ordinance proposed by this Strategy shall also establish whether or not this provision is permitted outright or by special use permit in the R-7 and R-10 zoning districts when density bonuses are awarded.  Any site created as the result of this strategy shall have sufficient off-street parking to accommodate the new construction or expansion.  Extreme hardship and significant benefit to the neighborhood shall be proven before any variance is given for



**Johnston, Rhode Island Comprehensive Community Plan**
Chapter 10 – Implementation Plan

this infill development. The intent of this strategy is to permit this infill construction only on properties that can meet the requirements of the zoning ordinance without variance.

Dimensional requirements will require that any new construction and additions/ renovations resulting from this strategy shall be at the same height or less as the surrounding, existing neighborhood uses and shall be designed so as to physically blend with surrounding market price units and neighborhoods in terms of height, property coverage, clustering, site design, and architectural treatment. New construction and additions/renovations shall be developed only in those areas where there exists the necessary infrastructure to support the specific type of development proposed and where such siting seeks to preserve the existing natural landscape and does not negatively impact upon the environmental features and resources of the site and surrounding neighborhoods.

Affordable Housing created as a result of this strategy shall be designed to give the residents of such housing as well as their neighbors pride in their homes, integrated with market price units, and so as to appear consistent with the surrounding properties and overall neighborhood.

Approximately 450 dwelling units could be created by this strategy. The number of dwelling units was determined by analyzing the property size of existing vacant lots and the conservative number of dwelling units that could constructed thereon given the zone minimum requirements in conjunction with environmental constraints such as steep slopes, wetlands, and access.

Number of LMI Units created: **50 units for <80% AMI, family rental and ownership and support housing**

**130 units for <50% AMI, family rental and ownership and support housing**

Responsibility:        Planning Board, Town Council
Stewardship:          Town Council
Timing:               Priority
Costs:                Costs associated with Review and Public Hearing Process

AH-7  Investigate the development of additional subsidized, construction, rehabilitation or rental assistance housing for the elderly or families in locations favorable in terms of environmental constraints.

Responsibility:        Planning Board
Stewardship:          Town Council
Timing:               Priority
Costs:                Costs associated with Review

AH-8  Expand range of R-7 and R-10 districts.

*2 January 2007*



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

- These high density zones (R-7 and R-10) represent only 1% of the zoned properties in the Town of Johnston. Adjacent to these areas are properties that prior to 1979 were zoned at this higher density but were then changed to 15,000 square feet minimum lot size to 40,000 square feet lot size. Both the R-7 and the R-10 zones permit multi-family dwellings with conditions and Town approval, as applicable. Currently the requirements for residential housing in an R-7 and R-10 Zone are as follows:

| | | |
|---|---|---|
| R-7 | Single Family | minimum 7,000 sf |
| | Two-Family | minimum 8,500 sf |
| | Duplex | minimum 12,000 sf |
| | Multi-family | minimum 2 acres, 10 units/acre, no off-street parking, additional requirements |
| R-10 | Single Family | minimum 10,000 sf |
| | Two-Family | minimum 12,000 sf |
| | Duplex | minimum 15,000 sf |
| | Multi-family | minimum 2 acres, 5 units/acre, no off-street parking, additional requirements |

- This strategy would expand these districts to a larger area surrounding the existing high density zoned properties as long as they meet specific criteria to be provided in the Zoning Ordinance. A municipal subsidy will be provided for affordable units which will be required to remain affordable for a least the next 30 years as a condition of this subsidy. A zoning certificate will be issued for the residential structures which will stipulate the affordability restriction of at least 33% of the units created. In addition, a deed restriction relative to the required affordability of at least one of the units for at least the next 30 years will be placed on the property when the building permit is issued.

Approximately 200 acres are proposed for change to this zoning designation. It is projected that 200 new units will be created of which at least 33% will be affordable. The number of dwelling units was determined by analyzing the property size of existing vacant as well as oversized lots and the conservative number of dwelling units that could constructed thereon given the zone minimum requirements in conjunction with frontage requirements as well as environmental constraints such as steep slopes, wetlands, and access.

**Number of LMI Units created:**      **80 units over build-out for <80% AMI, family rental rental and ownership, elderly and support housing**

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

AH-9  Establish or participate in an existing Housing Land Trust.



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

A local area Housing Land Trust should be created or the Town should participate in an existing Housing Land Trust for the primary purpose of receiving and managing funds and/or property which have been received by the Town for affordable housing development and preservation. This Trust would serve as the central depository for the receipt, management, and disbursement of funds received from the collection of any monies collected in-lieu-of affordable housing land dedication, unit construction, and the like through inclusionary zoning and other similar regulatory and/or municipal procedures.

The administration of funds will be overseen by the Town's Finance Department and Controller in consultation with the Planning Board. The creation of the Housing Trust, if created, shall be established by Town Council Ordinance.

| | |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

AH-10 Provide density bonus of 25% for redevelopment projects such as Brownfields and intrusive Industrial areas located within and/or adjacent to predominantly residential neighborhoods that include 33% affordable housing yield components and achieve the development of a variety of housing types, including single family, two family, duplexes, accessory apartments, 3 and 4 family structures, congregate housing and other alternatives for persons unable to live with complete independence while at the same time conserving and restoring the natural resources of the site, where applicable.

- A municipal subsidy will be provided for affordable units which will be required to remain affordable for a least the next 30 years as a condition of this subsidy. A zoning certificate will be issued for the residential structures which will stipulate the affordability restriction of at least 33% of the units created. In addition, a deed restriction relative to the required affordability of 33% the new units created (at least one new unit, minimum) for at least the next 30 years will be placed on the property when the building permit is issued.

  Approximately 500 dwelling units could be created by this strategy. Approximately 311 acres of land currently meet this criteria. These properties are located adjacent to the Woonasquatucket River (EPA Superfund designation), Simmons Brook, and the Pocasset River. Also represented in this acreage are pockets of industrial uses adjacent to predominantly residential neighborhoods and include uses such as asphalt plants, "open air" junk yards, metals recycling processing operations, and other heavy industrial uses adjacent to the high density residential areas off George Waterman Road, Greenville Avenue, Killingly Street, Hartford Avenue, Mill Street, Plainfield Street, and Atwood Avenue. Refer to the following Map 4 for a depiction of the locations of these areas. Some if not many of these properties would most probably be classified as "Brownfields" given the historic and existing uses of these properties;



**Johnston, Rhode Island Comprehensive Community Plan**
Chapter 10 – Implementation Plan

scientific environmental testing would be required for classification and eligibility for cleanup funding as a "Brownfields" project. The need to convert these properties to uses compatible with the surrounding neighborhoods is substantial.

**Number of LMI Units created:**      **154 units at build-out for <50% AMI, family ownership, family rental and ownership, elderly and support housing.**

Responsibility:      Planning Board, Town Council
Stewardship:         Town Council
Timing:              Priority
Costs:               Costs associated with Review and Public Hearing Process

AH-11 Continue to allow attached accessory family "in-law" apartments by Special Use Permit; these units shall be reviewed annually per the current Johnston Zoning Ordinance to determine if all conditions of approval are still being met – otherwise the units will be required to be vacated. An annual inspection of each of these units shall be conducted by the Building Department with a status report provided to the Town Council by April 1st of each year. Specific conditions for this Special Use Permit shall be established in the Zoning Ordinance and a policy for implementation as prepared by the Building Department be approved by the Town Council. Strict adherence shall be held that each unit created remains in conformance with the state's definition of an accessory unit.

- A municipal subsidy will be provided for affordable units which will be required to remain affordable for a least the next 30 years as a condition of this subsidy. This subsidy may include a CDBG grant, density bonus, tax relief, other municipal subsidy that may be established by the Town, or some combination thereof. A zoning certificate will be issued for the residential structures which will stipulate the affordability restriction of at least 33% of the units created (50/51% if CDBG funding used per HUD requirements). In addition, a deed restriction relative to the required affordability of these designated units for at least the next 30 years will be placed on the property when the building permit is issued. Only those accessory units that meet these criteria will be included in the count towards the Town's threshold 10% goal.

- Accessory units are required to be approved by the Zoning Board of Review. The Town of Johnston only permits family members to use these units and requires an annual accounting of the use of the granted unit. Each case must initially be presented to the Board and the applicant must submit proof that the resident of the unit is in need of this type of living quarters. As a result, the personal economic hardship and financial circumstances of the potential occupant(s) is one of the determining factors relative to whether or not the accessory use is granted. Consequently, these units are approved for family members who typically meet the LMI requirements because their petition frequently stipulates the person needs to live with their family due to some financial situation or disability. The accessory use ceases to exist upon the death or move of the resident from the premises. A



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

comprehensive database of historic zoning data has not been kept, however, relative to the granting of these units in the past. As a result, the reporting requirement has been unenforceable in the past. The implementation of this strategy involves the maintenance of extensive records as well as the enforcement of the required annual reporting of unit usage.

- The number of dwelling units was determined by analyzing available individual zoning files for legal accessory apartments as well as property tax records created during past revaluations which provide a picture of dwellings and the number of dwelling units in the structure when they are located in a single family zone and constructed after the change of the zone to a single family use. A conservative number of accessory dwelling units was projected in accordance with that past compiled history.

**Number of LMI Units created:**     **50 units over build-out for <80% AMI, elderly and support rental housing**

                               **110 units for <50% AMI, elderly and support rental housing**

Responsibility:     Planning Board, Town Council, Zoning Board of Review
Stewardship:     Town Council
Timing:     Priority
Costs:     Costs associated with Review and Public Hearing Process

AH-12 Target specific Low-Moderate Income Sites in appropriate areas throughout the Town for larger-sized Affordable Housing developments that are sized 10 units or more.

The following properties have been recommended for the location of larger affordable housing developments due to their proximity to the following physical criteria and infrastructure:

- Access to a street that can handle increased volume of traffic

- Public water and public sewer as well as gas service availability and ability to connect to these existing services.

- Adjacent to or in close proximity to a public transportation route

- Near shopping

- Compatible with surrounding neighborhood conditions

- Possess limited to no significant environmental constraints to development

- Possess environmental conditions that are conducive to or will not be negatively impacted by development and/or result in the significant increase in the existing density zoning classification permitted by the property/ies involved.



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

Development Projects proposed for most of these targeted properties/property vicinities shall provide 25% of the units as "affordable units for at least the next 30 years". It is presumed that projects proposed under this strategy will be submitting Comprehensive Permit Applications for these targeted developments. The first project identified in this section, Strategy 2A-1, was determined, however, to be substantially complete pursuant to the 2004 affordable housing legislation and was approved in January 2005 as a comprehensive permit application using the former 20% LMI criterion. These properties will not be rezoned for multi-family development, hence encouraging prospective developers to incorporate the "overlay zone" aspect and subsidy requirements utilized for comprehensive permit applications. If the property owners choose not to develop affordable housing for these targeted parcels, these properties would continue the uses permitted under the Johnston Zoning Ordinance.

In addition, proposed projects and structures will be required to follow in the spirit and character of the neighborhood it is to be located with specific regard to the height, size, and style of other residential structures in the surrounding community. Said structure(s) shall be harmonious and blend with the existing landscape and is not to alter the character of the surrounding neighborhood. The Town of Johnston's residential makeup is predominantly suburban/rural single family dwellings without large housing complexes. Therefore a "campus style" architectural style in a manner similar to the Town's "Cedar Terrace" with multiple structures and open spaces shall be required for large affordable housing developments as opposed to one large building with many units, unless the specific site conditions and surrounding neighboring area within 1,000 feet radius of a specifically targeted piece of property provide a different environment from the typical residential neighborhoods. One large structure with many units has been determined by the Town to not be in character with a majority of neighborhoods in the Town of Johnston.

All developments within this category shall provide sufficient off-street parking for its residents as well as visitors and employees and shall be developed within the confines of the existing landscape and environmental conditions and constraints. For very large developments in the range of 100 units or more, the Town may require the upgrade of the surrounding infrastructure to accommodate the significant increase of units in the area, which may include, but is not limited to, road improvements, public water service upgrade, public sewer service upgrade, and/or drainage improvements as may be needed due to the existing adequacy/inadequacy of these facilities.

The following properties have been targeted for large-scale affordable housing development that are sized 10 units or more.



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

1)  <u>Hartford Avenue - Vacant property area behind the Picerne Property and adjacent to Pocasset Bay Manor along Hartford Avenue.</u>

A private developer is planning to construct a new multi-family apartment complex.  In exchange for required zoning variances and land development waivers, the owner has agreed to set aside 20% of the 300 units proposed under the pre-2004 Comprehensive Permit Application Process.  The site will be connected to public sewer and water.  This site contains approximately 50 acres of which approximately 50% is free of wetlands.  Some of this property is located in the FEMA delineated flood plain of the Pocasset River;  Rhode Island Department of Environmental Management, Freshwater Wetlands, as well as the Rhode Island Emergency Management Flood Plain Coordinator were contacted for approvals.  The site will have access to RIPTA Bus Routes 10 (North Scituate Line) and 28/50 (Hartford Line).  This project was determined to be substantially complete pursuant to the 2004 Affordable Housing legislation and was subsequently approved with conditions for development by the Johnston Zoning Board in January 2005.

**Number of LMI Units created:**      **60 units for <50% AMI, family, elderly, and/or special needs rental**

2)  <u>Plainfield Pike – several large vacant parcels off Rome Avenue/vicinity and Plainfield Pike.</u>

These sites contain an aggregate of approximately 23 acres of which most is free of wetlands.  Some steep slopes are located on the properties but are not significant enough to prevent the properties from being developed.  The properties are surrounded by other multi-family uses as well as community living types of housing;  Allegria Court, Pell Manor, and a large condominium development of several hundred units.  The vacant targeted sites have access to public sewer and water.  The sites also possess access to RIPTA Bus Route 19 (Plainfield/Westminster Line).  None of these properties are located in a FEMA delineated flood plain or the flood plain of the Simmons Brook.  At a conservative estimate of 10 units per acre for a market total of 180 units of which at least 25% would be affordable, it is projected that at least 45 affordable units would be created with the development of these parcels.

**Number of LMI Units created:**      **45 units for <80% AMI, family, elderly, and/or special needs rental**

3)  <u>Mill Street - Old factory building near Ranone Gym or other large abandoned buildings and vacant properties in the vicinity</u>

These sites contain an aggregate of 10 acres of which approximately most is free of wetlands.  The properties are surrounded by other multi-family housing.  The



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

vacant targeted sites have access to public sewer and water. The sites also possess access to RIPTA Bus Route 19 (Plainfield/ Westminster Line). None of these properties are located in a FEMA delineated flood plain or the flood plain of the Simmons Brook, though several are of very close proximity. At a conservative estimate of 10 units per acre for a market total of 100 units of which at least 25% would be affordable, it is projected that at least 25 affordable units would be created with the development of these parcels.

**Number of LMI Units created:    25 units for <80% AMI, family, elderly, and/or special needs rental**

4)      George Waterman Road – former "Vito's"

This site contains an aggregate of approximately 20 acres of which approximately 50% contains wetlands (mill pond). The property vicinity includes other multi-family housing, including a large apartment facility as well as a condominium project. The vacant targeted site has access to public sewer and water. The site also possesses access to RIPTA Bus Route 27 (Providence/Manton Line). This property is not located in a FEMA delineated flood plain or the flood plain of the Woonasquatucket River. At a conservative estimate of 10 units per acre for the wetlands free portion of the property at a market total of 100 units of which at least 25% would be affordable, it is projected that at least 25 affordable units would be created with the development of these parcels.

**Number of LMI Units created:    25 units for <80% AMI, family, elderly, and/or special needs rental**

5)      Atwood Avenue – Vacant property behind Atwood Grille bordering on US Route 6 and Ann Drive.

This site contains an aggregate of approximately 15 acres of which approximately 33% contains wetlands. The vacant targeted site has access to public sewer and water. The site will have access to RIPTA Bus Route 10 (North Scituate Line) and 28/50 (Hartford Line). This property may include some land in the FEMA delineated flood plain of the Pocasset River. If this property is developed, Rhode Island Department of Environmental Management, Freshwater Wetlands, as well as the Rhode Island Emergency Management Flood Plain Coordinator will be contacted for approvals. At a conservative estimate of 10 units per acre for the wetlands free portion of the property at a market total of 100 units of which at least 25% would be affordable, it is projected that at least 25 affordable units would be created with the development of these parcels.



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

**Number of LMI Units created:    25 units for <80% AMI, family, elderly, and/or special needs rental**

6)    <u>Killingly Street – Property located at the intersection of Killingly Street and U.S. Route 6 (express).</u>

This site contains an aggregate of approximately 2 acres.  The property vicinity includes other multi-family housing.  The vacant targeted site has access to public sewer and water.  The site also possesses access to RIPTA Bus Route 27 (Providence/Manton Line).  This property is not located in a FEMA delineated flood plain or the flood plain of the Woonasquatucket River.  At a conservative estimate of 10 units per acre at a market total of 20 units of which at least 25% would be affordable, it is projected that at least 5 affordable units would be created with the development of these parcels.

**Number of LMI Units created:    5 units for <80% AMI, family, elderly, and/or special needs rental**

7)    <u>Cherry Hill Road – PD zoned area known as DePetrillo property and surrounding vicinity.</u>

This site contains an aggregate of approximately 20 acres.  The property vicinity includes other multi-family housing.  The vacant targeted site has access to public sewer and water.  The site also possesses access to RIPTA Bus Route 27 (Providence/Manton Line).  This property is not located in a FEMA delineated flood plain or the flood plain of the Woonasquatucket River, however, contains approximately 50% of its land area in freshwater wetlands.  At a conservative estimate of 10 units per acre for the wetlands free portion of the property at a market total of 100 units of which at least 25% would be affordable, it is projected that at least 25 affordable units would be created with the development of these parcels.

**Number of LMI Units created:    25 units for <80% AMI, family, elderly, and/or special needs rental**

Responsibility:        Planning Board, Town Council
Stewardship:           Town Council
Timing:                Priority
Costs:                 Costs associated with Review and Public Hearing Process

B.  Continue CDBG Home Repair Program for providing grant, loans, and other assistance for home improvements for low and moderate-in-come persons.



**Johnston, Rhode Island Comprehensive Community Plan**
Chapter 10 – Implementation Plan

|  |  |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

C. Develop Inclusionary Zoning Provisions to further the creation of Affordable Housing. Assign this task to the Affordable Housing Task Force to be created as the result of this Affordable Housing Plan. The Task Force shall report back to Town Council by October 1, 2005 with recommendations for the implementation of this strategy.

While the Task Force will determine the actual Zoning Ordinance provisions relating to an Inclusionary Zoning requirement, the Town will be mandating some form of this affordable housing measure. It will include density bonuses as well as an alternate provision for a fee in-lieu-of providing affordable housing within the development as opposed to an on-site construction. In addition, the Town will be incorporating some form of land lease coupled with deed restrictions if the unit(s) are constructed within the residential development.

The inclusionary zoning provision shall apply to all residential developments, regardless of project size, including both subdivisions as well as land development projects and planned development districts. The Town already provides for voluntary inclusionary zoning in its Planned Development district; however, to date no developer has made use of this 100% density bonus provided.

The Town presently has under consideration approximately 500 units of new development residential construction throughout the Town. This number includes both single family as well as multi-family dwelling units. The imposition of mandatory inclusionary zoning would require that these types of projects provide affordable housing within the development and/or pay a fee in-lieu-of providing on-site construction. As stipulated above, the Affordable Housing Task Force will establish detailed provisions for the mandatory program. A targeted inclusion percentage rate will be considered by the Task Force; this mandatory inclusionary rate shall not be less than 10% and shall be higher when density bonuses are granted for the project. The projected number of units created through inclusionary zoning requirements has been estimated based upon this historic and current development activity with the assumption that it will continue over the time period of this plan as the "West End" is developed. A conservative estimate of 100 units to be created either directly on-site and/or indirectly as the result of a fee in-lieu-of land dedication has been projected over 15 years.

**Number of LMI Units created:**    100 units for <80% AMI, family ownership

|  |  |
|---|---|
| Responsibility: | Planning Board, Town Council |
| Stewardship: | Town Council |
| Timing: | Priority |
| Costs: | Costs associated with Review and Public Hearing Process |

AH-13 Homestead Program implementation.



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

Responsibility:     Mayor, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs associated with implementation

AH-14 Continuation of Exemptions for Elderly, Disabled, and other Special Needs Groups.

Responsibility:     Town Council, Tax Assessor's Office
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs for exemptions

AH-15 Removing local barriers to affordable housing development.

Responsibility:     Planning Board, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs TBD

AH-16 Monitor Implementation of the Affordable Housing Plan.

Responsibility:     Planning Board, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs associated with monitoring process

AH-17 Establish an Affordable Housing Task Force.

Responsibility:     Mayor, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs associated with Review and Public Hearing Process

AH-18 Work with the Johnston Housing Authority, Housing Network of Rhode Island, and other non-profit housing agencies to promote citizen awareness of issues relating to affordable housing.

Responsibility:     Planning Board, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs for informational materials

AH-19 Support the Housing Authority's efforts to expand the number of Section 8 certificates through technical or other assistance.

Responsibility:     Planning Board, Town Council
Stewardship:        Town Council
Timing:             Priority
Costs:              Costs negligible



Johnston, Rhode Island Comprehensive Community Plan
Chapter 10 – Implementation Plan

AH-20 Promote appropriate programs of Rhode Island Housing (RIH), Farmer's Home
Administration, and Fannie Mae.

Responsibility:       Planning Board, Town Council
Stewardship:          Town Council
Timing:               Priority
Costs:                Costs negligble

AH-21 Work with the Housing Authority to ensure that existing units are maintained and
modernized as necessary.

Responsibility:       Mayor, Town Council
Stewardship:          Town Council
Timing:               Priority
Costs:                Costs negligible

AH-22 Continue to support and assist the Johnston Housing Authority to identify and secure
parcels for redevelopment and provide additional subsidized housing to the extent State
or federal programs make such development feasible.

Responsibility:       Planning Board, Mayor, Town Council
Stewardship:          Town Council
Timing:               Intermediate
Costs:                Costs negligible

AH-23 Develop partnerships and work with the Johnston Housing Authority, Tri-Town, E.O.C,
as well as the Housing Network of Rhode Island and other non-profit housing agencies to
further the implementation and achievement of affordable housing strategies.

Responsibility:       Planning Board, Mayor, Town Council
Stewardship:          Town Council
Timing:               Priority
Costs:                Costs negligible



# EXHIBIT C

JOSEPH M. POLISENA, JR.
*MAYOR*



TEL: (401) 553-8800
FAX (401) 331-4271

## EXECUTIVE CHAMBERS

TOWN HALL
1385 HARTFORD AVENUE
JOHNSTON, RHODE ISLAND 02919

December 3, 2024

To Whom It May Concern:

As mayor, I have always made it a point to stay out of planning board matters to keep things fair and impartial. The board is an independent body and I have the utmost faith in its members' ability to make thoughtful, unbiased decisions for the good of our town at-large.

However, this project is so destructive to the Town of Johnston that I can't, in good conscience, stay silent. Increased traffic, drainage problems, and a sudden influx of new students overwhelming our school system amounts to a trifecta of chaos.

On April 21st, 2023, I met with the previous property owner, Sal Campagnone, along with his partner, attorneys, Council President Robert Russo and neighbor to the project, and attorney in his own right, Harry Hoopis. During that meeting, both the Council President and I made it abundantly clear that we opposed the proposed plan, which looks an awful lot like the one before the board now. At that time, Mr. Campagnone graciously expressed a willingness to work with the town on a compromise involving single-family homes—a sensible and welcome idea which the town would not only support, but cater to.

Fast-forward to today, and there has been no compromise by the new developer. No dialogue, no collaboration, just an apparent plan to bulldoze ahead under the protection of a state law designed to force-feed towns like ours ill-fitting developments. Sure, it's your right to do so, but it is also our right to fight back.

So let me be crystal clear: If you insist on moving forward with the currently proposed project, I will use all the power of government that I have to stop it. If you think you'll breeze through the newly created Land Use Calendar in Superior Court, I will be forced to challenge the constitutionality of the low-to-moderate income housing law itself and seek an injunction to grind this project to a halt while the courts deliberate on the statute's constitutionality.

If you're assuming I won't follow through because the statute has gone unchallenged for 30 years, you clearly don't know me—or the people of Johnston, whom I proudly represent. I am willing to use every resource necessary to support the will of the residents and have zero care of who I may offend in the process.

JOSEPH M. POLISENA, JR.
*MAYOR*



TEL: (401) 553-8800
FAX (401) 331-4271

## EXECUTIVE CHAMBERS

TOWN HALL
1385 HARTFORD AVENUE
JOHNSTON, RHODE ISLAND 02919

To be clear, no one expects this land to sit idle forever. We're more than willing to support reasonable development, and single-family homes, which are much needed and sought after, remain an excellent option. If you pivot in that direction, I can assure you the town will roll out the red carpet to guide you through the planning process and see the project to completion.

The choice is yours. Bulldoze ahead with your current plan and be prepared to fight a town of 30,000 people in the process. Or, withdraw it and work with us to create something the town can and will support.

Truly,

Mayor Joseph M. Polisena Jr.



# EXHIBIT D



**Mayor Joseph Polisena Jr.**
January 27 · 🌐

• • •

As many of you are aware, there is a 252 unit 100% low-income housing project being proposed off George Waterman Road.  The   developer is using state law to usurp town zoning, ultimately rendering the town powerless to stop the project.  This project would cost our current taxpayers millions, with at least $2 million to educate the kids in our school system.  With that being said, I am hereby announcing the taking of all 31 acres of that land by eminent domain.

Instead of 252 low-income apartments, we will take the land by eminent domain and construct a new municipal complex consisting of a police station, a fire station, and municipal hall.  Our current town buildings are in disarray.  We have police officers working out of closets, rain events causing flooding in the entire downstairs of the police station.

Similarly, firefighters have no fire alarm system at headquarters, have a flooded dispatch room during rain events, and are living right next to the apparatus room, exposing them to hazardous toxins, day and night.  Rather than me telling you about the hazardous working conditions, I feel it more powerful to show you, and I will do that in separate posts.



**THE TOWN OF JOHNSTON, RHODE ISLAND**
1385 Hartford Avenue, Johnston, Rhode Island 02919

**FOR IMMEDIATE RELEASE**
January 27, 2025

**Mayor Joseph M. Polisena Jr. Announces Taking of 31-Acre Low-Income Housing Site by Eminent Domain for Public Safety Complex**

Our police officers and firefighters have endured unsafe and inadequate working conditions for far too long. Firefighters are dealing with the absence of a fire alarm system, a leaking roof, a flooding dispatch room, and no female bathrooms or showers. Their living quarters are dangerously exposed to toxic fumes from the apparatus room, posing serious health and safety risks. Similarly, the police station faces numerous challenges: an outdated electrical system, no toilet in the locker room, no hot water, and working in closets rather than offices. Additionally, the basement floods during rain events, affecting the sally port, cell block, locker rooms, and electrical systems.

Our town hall presents a problem as well. Constructed when just 9,000 people lived in Johnston, there is no handicapped accessibility, senior citizens struggle with the narrow stairs, there are holes in the roof, the HVAC system does not work, and there are now only 8 public parking spaces.

Today, I am announcing my intent to take all 31 acres of land on George Waterman Road, the site of the proposed 252 low-income housing apartment complex, by eminent domain. In this location, the town will construct a public safety municipal complex consisting of a new fire headquarters, police station and municipal hall.

The Johnston Town Council will hold a special meeting on Tuesday, January 28, 2025, at 5:30 p.m. at the Johnston Municipal Court to discuss and vote on Resolution 2025-10, authorizing the eminent domain taking of Assessor's Plat 37, Lot 193. Residents are encouraged to attend.



 236

125 comments   39 shares

 Like       Comment       Send       Share      



**EXHIBIT E**



# Town of Johnston

## RESOLUTION OF THE TOWN COUNCIL

### No. 2025-10

In Favor:                                    Opposed:

_____
Council President                          Date

Be it resolved that:

| | |
|---|---|
| Whereas, | The headquarters for the Johnston Fire Department located at 1520 Atwood Avenue was built in 1968; and |
| Whereas, | The Johnston Fire Department headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, the roof, fire sprinkler system, the dispatch and communications system, as well as other infrastructure and building integrity improvements; and |
| Whereas, | The Johnston Fire Department deserve headquarters that support and enhance their mission, and the citizens of the Town of Johnston deserve 21st century Fire Protection and Emergency Medical Services; and |
| Whereas, | The Johnston Police Department headquarters were built in 1978 at 1651 Atwood Avenue and was originally designed for 34 officers and civilians; and |
| Whereas, | The Police Department now has 79 officers and civilians working in the same headquarters; and |
| Whereas, | The Police Department Headquarters is in need of significant upgrades and improvements including but not limited to the electrical system, the plumbing system, the HVAC system, the roof, the fire alarm and sprinkler system, and the dispatch and communications system; and |
| Whereas, | The Police Department Headquarters building is now prone to repeated flooding issues during significant rain events; and |
| Whereas, | It is in further need of various infrastructure and building integrity improvements; and |
| Whereas, | The Johnston Police Department deserves headquarters that support and enhance its mission and the citizens of the Town of Johnston deserve 21st century Police Department services; and |
| Whereas, | The Town Hall now located at 1385 Hartford Avenue was built in 1939;and |
| Whereas, | The Town Hall building is in need of significant rehabilitation including but not limited to the electrical system, the plumbing system, the HVAC system, the fire alarm and fire sprinkler system; and |
| Whereas, | There is a need to provide greater access for disabled citizens to Town Hall services; and |
| Whereas, | The Town Hall is critical to providing access to municipal services to citizens; and |

Whereas,    The citizens of the Town of Johnston deserve a Town Hall that can provide 21st century municipal services and accessibility; and

Whereas,    Significant economic and operational efficiencies may be achieved by creating a central campus for Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and

Whereas,    The administration has been reviewing sites for such a campus to provide economic and operational efficiencies and 21st century services to the citizens of the Town of Johnston; and

Whereas,    The administration has initiated a review of 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 193 to determine if it is an appropriate site for the location and construction of a municipal campus combining the Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and

Whereas,    It has been determined after review by Police Chief Mark Vieira and Fire Chief David Iannuccilli that it is an excellent location for public safety purposes; and

Whereas,    The administration tasked DiPrete Engineering to review the property to determine if it is an appropriate site for the development of such structures; and

Whereas,    Said review has confirmed that it is an appropriate site for the development and construction of a campus for Public Safety Headquarters and a Town Hall;


Now Therefore, the Town Council for the Town of Johnston hereby resolves that the Town of Johnston should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter of the Town of Johnston, to take title to 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 193 for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building.


_____
Lauren A. Garzone, Vice-President
District 2

_____
Alfred T. Carnevale, Councilman
District 3


_____
Linda Folcarelli, Councilwoman
District 1

_____
Robert V. Russo, President
District 4


_____
Robert J. Civetti, Councilman
District 5


Attest:_____
Vincent P. Baccari, Jr., Town Clerk



# EXHIBIT F



# Town of Johnston

## RESOLUTION OF THE TOWN COUNCIL

## No. 2025-17

In Favor:                    Opposed:

_____
Council President                    Date

Be it resolved that:

Whereas,      The administration has initiated a review of 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 aka Lot 193 to determine if it is an appropriate site for the location and construction of a municipal campus for the Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and

Whereas,      If the Town determines that this location is suitable for condemnation then it must follow the process for condemnation contained in this resolution; and

Whereas,      The Johnston Town Charter authorizes and empowers the Town to take property by condemnation in accordance with Section 1-3 and State law; and

Whereas,      The Town shall pass a resolution authorizing the taking of the property for public use and find that it is necessary and in the public interest; and

Whereas,      The Town shall file in the records of land evidence of the Town, a copy of the adopted resolution, a description of the land, a plat thereof, and a statement that the land is taken pursuant to the provisions of section 1-3 of the Town Charter, which description and statement shall be signed by the president of the Town Council and the Mayor and certified by the Town Clerk; and

Whereas,      The Town shall file in the Providence County Superior Court a statement of the sum of money estimated by the Town, using a state-certified general real estate appraiser, to be just compensation for the property taken; and

Whereas,      The Town shall deposit in Providence County Superior Court, to the use of person(s) entitled to it, the sum established in the statement; and

*Official Document*

*Whereas,*     *After filing said documents in the land evidence records and depositing said sum in the Court, the Town shall serve notice of the taking upon the owner(s) and person(s) having an estate or interest in such property by the Town Sergeant, any town police officer or any constable of the town, by leaving a true and attested copy of such resolution, description, plat and statement with each of such owner(s) or person(s) personally, or at their last and usual place of abode in the State of Rhode Island with some person living there, and in case such owner or person is absent from the State of Rhode Island, and has no last and usual place of abode therein occupied by any person, or in case the whereabouts of any such person is unknown to the person making service, such copy shall be left with person(s), if any, in charge of having possession of such property taken, and another copy thereof shall be mailed to address of such absent owner or person if the same is known to the person making service; and*

*Whereas,*     *The person making service shall attest upon a true copy of the resolution, description, plat and statement the manner in which the notice was given or attempted to be given; and*

*Whereas,*     *After filing of the resolution, description, plat and statement, the town clerk for the Town shall cause a copy of the resolution, description, plat and statement to be published in a newspaper of general circulation in Providence County for three (3) consecutive weeks;*

*Now Therefore, The Town Council for the Town of Johnston hereby resolves that the process contained in this resolution conforms with the Town Charter and State Law and should be followed if it is determined that the above referenced property should be condemned for public use.*

_____          _____
*Lauren A. Garzone, Vice-President*          *Alfred T. Carnevale, Councilman*
*District 2*                                                   *District 3*

_____          _____
*Linda Folcarelli, Councilwoman*              *Robert V. Russo, President*
*District 1*                                                   *District 4*

_____
*Robert J. Civetti, Councilman*
*District 5*

*Attest:*_____
         *Vincent P. Baccari, Jr., Town Clerk*

*Official Document*



**EXHIBIT G**



# Town of Johnston

# RESOLUTION OF THE TOWN COUNCIL

## No. 2025-18

In Favor:                                Opposed:

_____

Council President                                Date

Be it resolved that:

**Whereas,** The headquarters for the Johnston Fire Department located at 1520 Atwood Avenue was built in 1968; and

**Whereas,** The Johnston Fire Department headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, the roof, fire sprinkler system, the dispatch and communications system, as well as other infrastructure and building integrity improvements; and

**Whereas,** The Johnston Fire Department deserve headquarters that support and enhance their mission, and the citizens of the Town of Johnston deserve 21st century Fire Protection and Emergency Medical Services; and

**Whereas,** The Johnston Police Department headquarters were built in 1978 at 1651 Atwood Avenue and was originally designed for 34 officers and civilians; and

**Whereas,** The Police Department now has 79 officers and civilians working in the same headquarters; and

**Whereas,** The Police Department Headquarters is in need of significant upgrades and improvements including but not limited to the electrical system, the plumbing system, the HVAC system, the roof, the fire alarm and sprinkler system, and the dispatch and communications system; and

**Whereas,** The Police Department Headquarters building is now prone to repeated flooding issues during significant rain events; and

**Whereas,** It is in further need of various infrastructure and building integrity improvements; and

**Whereas,** The Johnston Police Department deserves headquarters that support and enhance its mission and the citizens of the Town of Johnston deserve 21st century Police Department services; and

*Official Document*

Whereas,    *The Town Hall now located at 1385 Hartford Avenue was built in 1939; and*

Whereas,    *The Town Hall building is in need of significant rehabilitation including but not limited to the electrical system, the plumbing system, the HVAC system, the fire alarm and fire sprinkler system; and*

Whereas,    *There is a need to provide greater access for disabled citizens to Town Hall services; and*

Whereas,    *The Town Hall is critical to providing access to municipal services to citizens; and*

Whereas,    *The citizens of the Town of Johnston deserve a Town Hall that can provide 21st century municipal services and accessibility; and*

Whereas,    *Significant economic and operational efficiencies may be achieved by creating a central campus for Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and*

Whereas,    *The administration has been reviewing sites for such a campus to provide economic and operational efficiencies and 21st century services to the citizens of the Town of Johnston; and*

Whereas,    *The administration has initiated a review of 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 aka Lot 193 to determine if it is an appropriate site for the location and construction of a municipal campus combining the Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and*

Whereas,    *It has been determined after review by Police Chief Mark Vieira and Fire Chief David Iannuccilli that it is an excellent location for public safety purposes; and*

Whereas,    *The administration tasked DiPrete Engineering to review the property to determine if it is an appropriate site for the development of such structures; and*

Whereas,    *Said review has confirmed that it is an appropriate site for the development and construction of a campus for Public Safety Headquarters and a Town Hall;*

Whereas,    *The Town has engaged Thomas S. Andolfo of Andolfo Appraisal Associates, Inc., a state certified appraiser, to determine the fair market value of the property; and*

Whereas,    *Andolfo Appraisal Associates, Inc., has determined that the fair market value of the property is seven hundred and seventy-five thousand dollars ($775,000); and*

*Official Document*

*Now Therefore, the Town Council for the Town of Johnston hereby resolves that the Town of Johnston should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter of the Town of Johnston, to take title to 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 aka Lot 193 for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building; and*

*Be it further resolved, that for the foregoing reasons this taking is necessary and in the public interest.*

_____  
*Lauren A. Garzone, Vice-President*  
*District 2*

_____  
*Alfred T. Carnevale, Councilman*  
*District 3*

_____  
*Linda Folcarelli, Councilwoman*  
*District 1*

_____  
*Robert V. Russo, President*  
*District 4*

_____  
*Robert J. Civetti, Councilman*  
*District 5*

*Attest:_____*  
*Vincent P. Baccari, Jr., Town Clerk*

*Official Document*



# EXHIBIT H

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 38 of 102 PageID
#: 213

STATE OF RHODE ISLAND                            SUPERIOR COURT
PROVIDENCE, SC

**In re: 178-200 George Waterman Road**
      **Assessor Plat 37, Lot 1**                MP – 2025 –
      **aka Assessor Plat 37, Lot 193**

## PETITION

    Now comes the Town of Johnston, a municipal corporation, with a principal place of
business at 1385 Hartford Avenue, Johnston, RI 02919, and brings this petition pursuant to its
authority under sections 42-64.12 and 45-2 of the Rhode Island General Laws and section 1-3 of
the Johnston Town Charter and all laws appertaining thereto and respectfully represents:

1. The Petitioner, Town of Johnston ("the Town"), is a duly organized municipal corporation
   established under the laws of the State of Rhode Island and by its Town Charter adopted
   by the Johnston Town Charter adopted by the Johnston Town Council on May 10, 1963.

2. SCLS, LLC is a limited liability company organized under the laws of the State of Rhode
   Island and was the owner of certain real estate located at 178-200 George Waterman
   Road, Johnston, RI (Plat 37, Lot 1, aka Plat 37, Lot 193) ("the Property").

3. SIXTY THREE JOHNSTON, LLC is a limited liability company organized under the
   laws of the State of Rhode Island and was also an owner of the Property.

4. On January 28, 2025 and March 10, 2025 the Johnston Town Council passed a resolution
   authorizing the taking of the Property for public use.

5. On March 11, 2025 a description, plat and statement of taking was signed by the Mayor
   of the Town and the Town Council President.

6. On March 12, 2025 the Town Clerk filed in the records of land evidence in the Town, a
   copy of the adopted resolution, a description of the land, a plat thereof, and a statement of
   taking attached hereto as Exhibit A.

7. The Town engaged Thomas Andolfo of Andolfo Appraisal Associates, Inc. ("Andolfo"), a
   state certified real estate appraiser, to determine the fair market value of the property.

8. Adolfo determined that a fair market value for the property is seven hundred and seventy
   five thousand dollars ($775,000.00).

    Wherefore, Petitioner prays for (a) permission to deposit into the Registry of the Court, a
sum of money not less that the appraisal of the fair market value of the Property, (b) that said
sum be deposited into a special account to accumulate for the benefit of SCLS, LLC and SIXTY
THREE JOHNSTON, LLC or any other person making a valid claim for the funds, and (c) such
other and further relief as the Court deems just and proper.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 39 of 102 PageID #: 214

Town of Johnston,
By its attorney,

*/s/ William J. Conley*

_____

William J. Conley, Esq (#2149)
Conley Law & Associates
123 Dyer Street, Suite 2B
Providence, RI 02903
Tel: (401) 415-9835
Fax: (401) 415-9834
wconley@conleylawri.com

## **CERTIFICATION**

I certify that on the 12th day of March, 2025, the within document was electronically filed through the Rhode Island Judiciary Electronic Filing System. This document is available for viewing and/or downloading from the Rhode Island Judiciary Electronic Filing System.

*/s/ William J.Conley*

_____

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

# EXHIBIT A

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:53 PM
Envelope: 5040191
Reviewer: Maureen

Town of Johnston

Bk: 3294 Pg: 219
INST: 00182280

## RESOLUTION OF THE TOWN COUNCIL

## No. 2025-18

In Favor: 5    MAR 11 2025    Opposed: 0

A TRUE COPY ATTEST

_____
Council President          Date

Town Clerk

Be it resolved that:

| | |
|---|---|
| *Whereas,* | *The headquarters for the Johnston Fire Department located at 1520 Atwood Avenue was built in 1968; and* |
| *Whereas,* | *The Johnston Fire Department headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, the roof, fire sprinkler system, the dispatch and communications system, as well as other infrastructure and building integrity improvements; and* |
| *Whereas,* | *The Johnston Fire Department deserve headquarters that support and enhance their mission, and the citizens of the Town of Johnston deserve 21st century Fire Protection and Emergency Medical Services; and* |
| *Whereas,* | *The Johnston Police Department headquarters were built in 1978 at 1651 Atwood Avenue and was originally designed for 34 officers and civilians; and* |
| *Whereas,* | *The Police Department now has 79 officers and civilians working in the same headquarters; and* |
| *Whereas,* | *The Police Department Headquarters is in need of significant upgrades and improvements including but not limited to the electrical system, the plumbing system, the HVAC system, the roof, the fire alarm and sprinkler system, and the dispatch and communications system; and* |
| *Whereas,* | *The Police Department Headquarters building is now prone to repeated flooding issues during significant rain events; and* |
| *Whereas,* | *It is in further need of various infrastructure and building integrity improvements; and* |
| *Whereas,* | *The Johnston Police Department deserves headquarters that support and enhance its mission and the citizens of the Town of Johnston deserve 21st century Police Department services; and* |

*Official Document*

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

BK: 3294 PG: 220
INST: 00182280

**Whereas,** The Town Hall now located at 1385 Hartford Avenue was built in 1939; and

**Whereas,** The Town Hall building is in need of significant rehabilitation including but not limited to the electrical system, the plumbing system, the HVAC system, the fire alarm and fire sprinkler system; and

**Whereas,** There is a need to provide greater access for disabled citizens to Town Hall services; and

**Whereas,** The Town Hall is critical to providing access to municipal services to citizens; and

**Whereas,** The citizens of the Town of Johnston deserve a Town Hall that can provide 21st century municipal services and accessibility; and

**Whereas,** Significant economic and operational efficiencies may be achieved by creating a central campus for Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and

**Whereas,** The administration has been reviewing sites for such a campus to provide economic and operational efficiencies and 21st century services to the citizens of the Town of Johnston; and

**Whereas,** The administration has initiated a review of 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 aka Lot 193 to determine if it is an appropriate site for the location and construction of a municipal campus combining the Fire Department Headquarters, Police Department Headquarters, and a Town Hall; and

**Whereas,** It has been determined after review by Police Chief Mark Vieira and Fire Chief David Iannuccilli that it is an excellent location for public safety purposes; and

**Whereas,** The administration tasked DiPrete Engineering to review the property to determine if it is an appropriate site for the development of such structures; and

**Whereas,** Said review has confirmed that it is an appropriate site for the development and construction of a campus for Public Safety Headquarters and a Town Hall;

**Whereas,** The Town has engaged Thomas S. Andolfo of Andolfo Appraisal Associates, Inc., a state certified appraiser, to determine the fair market value of the property; and

**Whereas,** Andolfo Appraisal Associates, Inc., has determined that the fair market value of the property is seven hundred and seventy-five thousand dollars ($775,000); and

*Official Document*

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

1:25-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 43 of 102 PageID
#: 218

Bk: 3294 Pg: 221
INST: 00182280

Now Therefore, the Town Council for the Town of Johnston hereby resolves that the Town of Johnston should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter of the Town of Johnston, to take title to 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 1 aka Lot 193 for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building; and

Be it further resolved, that for the foregoing reasons this taking is necessary and in the public interest.

Lauren A. Garzone, Vice-President
District 2

Alfred T. Carnevale, Councilman
District 3

Linda Folcarelli, Councilwoman
District 1

Robert V. Russo, President
District 4

Robert J. Civetti, Councilman
District 5

Attest: _____
Vincent P. Baccari, Jr., Town Clerk

MAR 12 2025

VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Mar 12,2025 08:52A

Official Document

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 44 of 102 PageID #: 219

**Joseph Polisena, Jr**
*Mayor*

Bk: 3294 Pg: Vincent P. Baccari Jr.
INST: 00182281 *Town Clerk*



**Office of the Town Clerk**
**Town of Johnston** Bk: 3294 Pg: 222
**1385 Hartford Avenue** INST: 00182281
**Johnston, Rhode Island 02919**
**(401) 351-6618**

## STATEMENT AND DESCRIPTION OF TAKING

*Re:*     *178-200 George Waterman Road, Johnston, RI 02919*
          *Assessor's Plat 37, Lot 1 aka Plat 37, Lot 193*

MAR 12 2025

A TRUE COPY ATTEST_____

*Owner(s):*  *SCLS Realty, LLC*
             *Sixty Three Johnston, LLC*

Kenneth P. Baccari Jr.
Town Clerk

**Statement**

The Town of Johnston has taken title to the real property commonly known as 178-200 George Waterman Road, Johnston, Rhode Island, 02919, Assessor's Plat 37, Lot 1, aka Plat 37, Lot 193 in fee simple absolute free and clear of all encumbrances pursuant to Title 42, Chapter 64.12 and Title 45, Chapter 2 of the Rhode Island General Laws and Section 1-3 of the Johnston Town Charter, described more particularly below, for public use.

**Description**

That certain lot or parcel of land located westerly of George Waterman Road in the Town of Johnston, County of Providence and State of Rhode Island; Said lot is identified as "Parcel 'E'" on the record plat entitled "ADMINISTRATIVE SUBDIVISION; GEORGE WATERMAN ROAD; JOHNSTON, RHODE ISLAND; ASSESSOR'S PLAT 35 LOTS 1, 2, & 223; ASSESSOR'S PLAT 37 LOTS 1-10, 63 & 193; PREPARED FOR; WATERMAN CHENANGO, LLC; CANAVAN & ASSOCIATES CONSTRUCTION SURVEYING, INC.; SCALE 1"=70'; DATE: MAY 3, 2022", recorded in the Johnston Land Evidence records in Map Book 3 at Page 558, and is more particularly described as follows:

Beginning at Station 32+96.47 Left 27.00 on Rhode Island Highway Plat 2022 (George Waterman Road) at the southeast corner of Assessor Plat 35 Lot 2;
Thence S68° 55'18"W a distance of 101.58' to a corner;
Thence S23° 47'12"E a distance 10.91' to a corner;
Thence S70° 57'23"W a distance of 55.00';
Thence S74° 53'28"W a distance of 784.40' to a corner;
Thence N01° 38'11"W a distance of 73.23' to a drill hole (found) in a large boulder;
Thence N69° 11'00"W a distance of 566.38' to a tall stone (found over);
Thence N04° 59'03"W a distance of 315.03' to the northeast corner of Assessor Plat 48 Lot 187;

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/12/2025 4:58 PM
Envelope: 5040191
Reviewer: Maureen D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 45 of 102 PageID #: 220

Thence N04° 07'30"W a distance of 216.42' to the northeast corner of Assessor Plat 48 Lot 285;
Thence S89° 25'13"W a distance of 57.88';
Thence N16° 19'34"E a distance of 40.84';
Thence N30° 04'42"E a distance of 108.11';

Bk: 3294 Pg:    223
INST:    00182281

Thence northerly a distance of 485'± to the northwesterly corner of Assessor Plat 37 Lot 9;
Thence easterly a distance of 295'± to a rebar (found) in the southerly line of Bowen Street;
Thence S68° 43'44"E a distance of 281.93';
Thence S61° 33'07"E a distance of 200.00';
Thence S76° 09'07"E a distance of 164.91' to a point in the southerly line of Dart Street;
Thence N89° 42'43"E a distance of 354.47' to Station 40+96.65 Left 25.00 on Rhode Island Highway Plat 2022 (George Waterman Road);
Thence S00° 08'30"W a distance of 90.23' to a Rhode Island Highway Bound (found) marking Station 40+06.42 Left 25.00 on said Plat;
Thence N89° 51'30"W a distance of 2.00';
Thence S00° 08'30"W a distance of 216.68' to a Rhode Island Highway Bound (found) marking Station 37+89.74 Left 27.00 on said Plat;
Thence with a curve turning to the left with an arc length of 147.85' and a radius of 1027.00' and non-tangential out to a Rhode Island Highway Bound (found) marking Station 36+45.78 Left 27.00 on said Plat;
Thence S87° 11'09"W a distance of 313.18';
Thence S08° 21'22"E a distance of 217.97'; .
Thence S83° 13'29"E a distance of 174.90' to the southwest corner of Assessor Plat 35 Lot 1;
Thence S77° 07'25"E a distance of 198.79' to an iron rod at Station 33+42.82 Left 27.00 on said Plat;
Thence S21° 19'58"E along George Waterman Road a distance 46.35' to the point and place of beginning;
Having an area of 1,348,708 Square Feet, more or less (30.96 Acres).

*Subject to an Easement Agreement dated July 14, 2022 and recorded in the Town of Johnston Land Evidence Records in Book 3112 at Page 92 on July 15, 2022 at 11:00 AM.*

_____    _____
Mayor                        Council President

JOHNSTON CLERK'S OFFICE

Town Clerk

A TRUE COPY ATTEST

MAR 12 2025

VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Mar 12,2025 08:53A

SEAL

ADMINISTRATIVE SUBDIVISION
CANAVAN & Associates
SHEET 1 OF 1
VICINITY MAP
GENERAL NOTES
REFERENCES
LEGEND
NORTH ARROW
APPROVED
TOWN OF JOHNSTON
PLANNING BOARD
GEORGE WATERMAN ROAD
DART STREET
BOWEN STREET
POND
GRAPHIC SCALE
SWEET HILL DRIVE
CONTILLO DR
JOAN DRIVE
JENNIFER DRIVE



A TRUE COPY ATTEST_____    MAR 1 2 2025

Kenneth P. Baccari Jr.

**Town Clerk**

JOHNSTON CLERK'S OFFICE



# EXHIBIT I

STATE OF RHODE ISLAND                          SUPERIOR COURT
PROVIDENCE, SC

In re: **178-200 George Waterman Road**
      **Assessor Plat 37, Lot 1**                    PM – 2025 – 01368
      **aka Assessor Plat 37, Lot 193**

## MOTION TO DEPOSIT MONEY INTO REGISTRY

      Now comes the Petitioner, the Town of Johnston, and moves this Honorable Court for an order pursuant to the provisions of Super.R.Civ.P. 67, to deposit into the Registry of the Superior Court, the sum of seven hundred and seventy five thousand dollars ($775,000) based on an appraisal attached hereto, to be held and invested by the Clerk of said Court and the monies be designated for the benefit and use of SCLS, LLC, and SIXTY THREE JOHNSTON, LLC, Rhode Island limited liability companies and the former owners of the property that is the subject of this petition.

                                      Town of Johnston,
                                      By its attorney,


                                      */s/ William J. Conley*
                                    _____
                                    William J. Conley, Esq (#2149)
                                    Conley Law & Associates
                                    123 Dyer Street, Suite 2B
                                    Providence, RI 02903
                                    Tel: (401) 415-9835
                                    Fax: (401) 415-9834
                                    wconley@conleylawri.com

## CERTIFICATION

      I certify that on the 13th day of March, 2025, the within document was electronically filed through the Rhode Island Judiciary Electronic Filing System. This document is available for viewing and/or downloading from the Rhode Island Judiciary Electronic Filing System.


                                      */s/ William J. Conley*


                                    _____

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 50 of 102 PageID #: 225

# ANDOLFO APPRAISAL ASSOCIATES, INC.

**_REAL ESTATE APPRAISAL_**

*178-200 GEORGE WATERMAN ROAD*

*JOHNSTON, RHODE ISLAND 02919*

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 51 of 102 PageID #: 226

ANDOLFO APPRAISAL ASSOCIATES, INC.

## AERIAL VIEW



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 52 of 102 PageID #: 227

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### _SUMMARY OF SALIENT FACTS AND CONCLUSIONS_

_Location_: 178-200 George Waterman Road, Johnston, Rhode Island 02919

_Assessor's Plat/Lot(s)_: 37 / 1 a/k/a 19

_Requested By/Prepared For_: William J. Conley, Jr., Esq., Town Solicitor

_Owner of Record_: Waterman Chenango, LLC

_Land Area_: 30.97 acres

_Improvements_: N/A - Appraised as residentially zoned vacant land

_Highest and Best Use_: A 15-lot single-family residential subdivision

_Property Rights Appraised_: Fee Simple

_Opinion of Property Value - Cost Approach_: N/A

_Opinion of Property Value - Income Approach_: N/A

_Opinion of Property Value - Sales Comparison Approach_: $775,000

_Final Value Opinion_: $775,000

_Date of Inspection_: February 19, 2025

_Effective Date of Appraisal_: February 19, 2025

_Appraiser_: Thomas S. Andolfo, MAI, SRA, AI-GRS, Certified General Appraiser

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.



# AAA
CCC
## ANDOLFO APPRAISAL ASSOCIATES, INC.

### REAL ESTATE APPRAISERS AND CONSULTANTS
### THE BUSH BUILDING
### 216 WEYBOSSET STREET • PROVIDENCE • RHODE ISLAND 02903
### (401) 273-8989 • FAX (401) 273-2510

February 26, 2025

William J. Conley, Jr., Esq.
Johnston, RI, Town Solicitor
c/o The Hay Building
123 Dyer Street, Suite 2B
Providence, Rhode Island 02903

RE:   178 - 200 George Waterman Road, Johnston, Rhode Island 02919

Dear Attorney Conley:

At your request, I personally conducted from the street an inspection of the above noted subject property, as otherwise designated by the Johnston Tax Assessor as Plat 37, Lot 1 a/k/a Lot 193.  The purpose of my inspection and subsequent analysis was to opine for the "as is" market value of the subject's fee simple interest as of February 19, 2025, based on a Yield Plan that was developed by DiPrete Engineering on February 5, 2025.  The date of property inspection and the effective date of this appraisal are one and the same.

The intended user of this appraisal is Town Solicitor Conley and the Town of Johnston Administration.  This report contains sufficient information to enable the client to understand the report.  Any other party receiving a copy of this report for any reason is not an intended user, nor does receiving a copy of this report result in an appraiser-client relationship.

The intended use of this appraisal is to assist the client with its due diligence in evaluating the subject for its possible acquisition, subject to the appraiser's stated scope of work, reporting requirements as governed by the Uniform Standards of Professional Appraisal Practice, contingent and limiting conditions, extraordinary assumptions and/or hypothetical conditions taken, and the definition of market value as noted herein.  Notably, this report has no other purpose or intent.

Based on the data gathered, the extraordinary assumption and hypothetical condition taken, and the analyses herein, it is my considered opinion that the "as is" market value of the subject's fee simple interest as of February 19, 2025, was:

*SEVEN HUNDRED SEVENTY-FIVE THOUSAND ($775,000) DOLLARS.*

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-CV-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 54 of 102 PageID #: 229

ANDOLFO  APPRAISAL  ASSOCIATES,  INC.

William J. Conley, Jr., Esq.
Page 2
February 26, 2025

Respectfully submitted,

*ANDOLFO APPRAISAL ASSOCIATES, INC.*

*Thomas S. Andolfo, MAI, SRA, AI-GRS*

Thomas S. Andolfo, MAI, SRA, AI-GRS
Certified General Real Estate Appraiser
Rhode Island License CGA.0A00121

Sworn and Subscribed to before
me in the City of Providence,
County of Providence, State of
Rhode Island, this 28th day of
February, 2025.

*Jennifer L. Medeiros*

Jennifer L. Medeiros
Notary Public #770601
My Commission Expires 06/01/2027



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 55 of 102 PageID #: 230

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *TABLE OF CONTENTS*

*CONTINGENT AND LIMITING CONDITIONS* . . . . . . . . . . . . . . . . . . . 1.

*EXTRAORDINARY ASSUMPTIONS / HYPOTHETICAL CONDITIONS* . . . . . . . . . . 4.

*PURPOSE OF THE APPRAISAL* . . . . . . . . . . . . . . . . . . . . . . 5.

*DEFINITION OF MARKET VALUE* . . . . . . . . . . . . . . . . . . . . . 5.

*PROPERTY RIGHTS APPRAISED* . . . . . . . . . . . . . . . . . . . . . 5.

*EXPOSURE / MARKETING TIME PERIODS* . . . . . . . . . . . . . . . . . 6.

*PRIOR SERVICE / SUBJECT PROPERTY RELATIONSHIP* . . . . . . . . . . . 6.

*SCOPE OF WORK* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7.

*TAX AND ASSESSMENT DATA* . . . . . . . . . . . . . . . . . . . . . . 8.

*SALES HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.

*ZONING DATA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.

*FLOOD ZONE DATA* . . . . . . . . . . . . . . . . . . . . . . . . . . 8.

*SOILS/SUBSOILS* . . . . . . . . . . . . . . . . . . . . . . . . . . 8.

*TIMBER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11.

*MINERALS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11.

*EARTHQUAKE HAZARD DATA* . . . . . . . . . . . . . . . . . . . . . . . 11.

*PERSONAL PROPERTY* . . . . . . . . . . . . . . . . . . . . . . . . . 11.

*TOXIC / ENVIRONMENTAL HAZARDS* . . . . . . . . . . . . . . . . . . . 11.

*EASEMENTS / ENCROACHMENTS / RIGHTS-OF-WAY* . . . . . . . . . . . . . 11.

*SPECIAL SIGNIFICANCE* . . . . . . . . . . . . . . . . . . . . . . . 12.

*SPECIFIC GEOGRAPHIC DATA* . . . . . . . . . . . . . . . . . . . . . 12.

*AREA ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.

    *New England* . . . . . . . . . . . . . . . . . . . . . . . . . 13.
    *Rhode Island* . . . . . . . . . . . . . . . . . . . . . . . . 13.
    *Johnston* . . . . . . . . . . . . . . . . . . . . . . . . . . 15.

*JOHNSTON GENERAL INFORMATION* . . . . . . . . . . . . . . . . . . . . 16.

*SUBJECT MARKET ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . 17.

*SITE DESCRIPTION* . . . . . . . . . . . . . . . . . . . . . . . . . 18.

    *Site Plans* . . . . . . . . . . . . . . . . . . . . . . . . . 19.

*HIGHEST AND BEST USE* . . . . . . . . . . . . . . . . . . . . . . . 20.

*THE VALUATION PROCESS* . . . . . . . . . . . . . . . . . . . . . . . 22.

    *SALES COMPARISON APPROACH* . . . . . . . . . . . . . . . . . . 23.

*RECONCILIATION AND FINAL VALUE OPINION* . . . . . . . . . . . . . . 34.

*CERTIFICATION* . . . . . . . . . . . . . . . . . . . . . . . . . . 35.

*QUALIFICATIONS / APPRAISER'S LICENSE* . . . . . . . . . . . . . . . 37.

*GENERAL PRIVACY NOTICE* . . . . . . . . . . . . . . . . . . . . . . 44.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-CV-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 56 of 102 PageID
#: 231

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *CONTINGENT AND LIMITING CONDITIONS*

The certification of Thomas S. Andolfo, MAI, SRA, AI-GRS, ("Appraiser") appearing in the appraisal report is subject to the following conditions and to such other specific and limiting conditions as set forth by said Appraiser in the report:

1. The Appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor does the Appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership and that there are no recorded or unrecorded matters or exceptions that would adversely affect marketability or value.

Insurance against financial loss resulting in claims that may arise out of defects in the subject property's title should be sought from a qualified title company that issues or insures title to real property. The subject property analyzed herein assumes prudent and competent management and ownership.

2. Any sketch in the report may show approximate dimensions and is included to assist the reader in visualizing the property. The Appraiser has made no survey of the property. All areas and dimensions furnished are presumed to be correct. Except as specifically stated, data relative to size or area of the subject and comparable properties has been obtained from sources deemed accurate and reliable.

3. The Appraiser has reviewed available flood maps and has noted in the appraisal report whether or not the subject property is located in a designated flood zone hazard area. The Appraiser and/or Andolfo Appraisal Associates, Inc., is not qualified to detect such areas and, therefore, do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property. The value conclusion is based on the assumption that wetlands are non-existent or minimal.

4. If requested by the client, and as relating to restricted appraisals or appraisal reports, the Appraiser will provide post-appraisal services such as testimony for court, arbitration, mediation, or the like; however, any such activities would be subject to the Appraiser's fee schedule typically associated with such services and separate from the appraisal fee negotiated for this portion of the assignment engagement.

5. Any distribution of the valuation in the report between land and improvements applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other appraisal and are invalid if so used. Any value estimate provided in the report applies to the entire property, and any proration or division of title into factional interests will invalidate the value estimate, unless such proration or division of interests has been set forth in the report.

6. No consideration has been given to personal property as located on the premises. In addition, no consideration has been given to the cost of moving or relocating such personal property. The Appraiser has only considered the real property.

7. The date of value to which any of the conclusions and opinions expressed in this report apply as set forth in the Letter of Transmittal and Certification. Further, the dollar amount of any value opinion herein is based upon the purchasing power of the American Dollar on that date.

1

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 57 of 102 PageID #: 232

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *CONTINGENT AND LIMITING CONDITIONS (Con't)*

8.  The Appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable.  Unless otherwise noted in the report, it is assumed that the existing improvements on the property or properties being appraised are sound and conform to all applicable local, state, and federal codes and ordinances.  The Appraiser anticipates no changes in said regulations or codes.  The Appraiser assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

If questions in these areas are critical to the decision process of the client or reader of the report, then the advice of competent engineering consultants should be obtained and relied upon.  If retained engineering consultants, i.e., structural, mechanical, electrical, civil, or archaeological consultants, should report negative factors of a material nature after the appraisal report is submitted, such information could have a substantial negative impact on the conclusions reported in this appraisal.  Accordingly, the Appraiser reserves the right to amend the appraisal conclusions reported herein.

9.  Information, estimations, and opinions furnished to the Appraiser and contained in the report were obtained from sources considered reliable and believed to be true and correct.  However, responsibility for such conditions, or for engineering or legal counsel such as for zoning matters which might be required to discover such factors, is not intended within the scope of this report.

Unless otherwise specifically noted in the appraisal report, the Appraiser has no reason to believe that any of the data furnished contains any material error.  Since material error could have a substantial impact on the conclusions reported, the Appraiser reserves the right to amend conclusions reported if made aware of any such error.  Accordingly, the client-addressee should carefully review all assumptions, data, relevant calculations, and conclusions within thirty (30) days after the date of delivery of this report and should immediately notify the appraisal company of any questions or errors.

10.  Disclosure of the contents of the appraisal report is governed by the Bylaws and Regulations of the professional appraisal organizations with which the Appraiser is affiliated.  As such, the Appraiser will comply with the Jurisdictional Exception Rule of the Uniform Standards of Professional Appraisal Practice by disclosing factual data obtained from the client or the results of this assignment prepared for the client if authorized to do so by due process of law, or by a duly authorized professional peer review committee of the Appraisal Institute, of which Mr. Thomas S. Andolfo is a designated MAI, SRA, AI-GRS member.

11.  Neither all nor any part of the contents of this report, or copy thereof, shall be used for any purpose by any other party(ies) but the client without the previous written consent of the Appraiser and/or the client; nor shall it be conveyed by any but the client to the public through advertising, public relations, news, sales or other media without the written consent and the approval by the author(s), particularly as to valuation conclusions, the identity of the Appraisers or the firm.  The Appraiser is not responsible for any unauthorized use of this report.

Further, any party receiving a report copy from the client does not, as a consequence, become a party to the appraiser-client relationship.  This report is intended only for the use as stated within the report and not

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-CV-00088-MRD-PAS   Document 9-5   Filed 03/17/25   Page 58 of 102 PageID #: 233

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *CONTINGENT AND LIMITING CONDITIONS (Con't)*

intended for any other purpose. Any third party who may possess this report is advised that they should rely on their own independently secured advice for any decision in connection with this property.

12. On all appraisals, subject to satisfactory completion, repairs or alterations, the appraisal report and value conclusion are contingent upon completion of the improvements in a workmanlike manner. It is assumed that there is full compliance of all applicable federal, state, and local environmental regulations and laws unless non-compliance is stated, defined, and considered in the appraisal report.

13. Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the Appraiser. The Appraiser has no knowledge of the existence of such materials on or in the property. The Appraiser, however, is not qualified to detect such substances.

The presence of substances such as asbestos, radon gas, urea-formaldehyde foam insulation, lead-based paint, contaminated ground water, or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. Please be advised that the value estimated herein is predicated on the assumption that no such hazardous substances exist on or in the property or in such proximity thereto which would cause a loss in value. The client is urged to retain an expert in this field, if desired.

14. The Americans with Disabilities Act (ADA) became effective January 26, 1992. I(we) have not made a specific survey or analysis of this property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. Since compliance matches each owner's financial ability with the cost to cure the property's potential physical character-istics, the real estate appraiser cannot comment on compliance to ADA. A brief summary of physical aspects is included in this report. It in no way suggests ADA compliance by the current owner. Given that compliance can change with each owner's financial ability to cure non-accessibility, the value of the subject does not consider possible non-compliance. Specific study of both the owner's financial ability and the cost to cure any defici-encies would be needed for the Department of Justice to determine compliance. However, please be advised that non-conformity to the various detailed requirements of the ADA could have a negative effect upon the value of the property.

15. The estimate of market value which may be defined within this report is subject to change with market fluctuations over time. The stated value estimate considers the productivity and relative attractiveness of the property, both physically and economically, in an open and competitive market as of the effective date of the appraisal.

Any cash flows included in the analysis are forecasts of estimated future operating characteristics that are predicated on the information and assumptions contained within the report. Since real estate markets are imperfect, any projections of income, expenses, and economic conditions utilized in this report should not be construed as predictions of the future. Rather, they are estimates of current market expectations of future income and expenses where their achievement will be affected by and be dependent upon future economic occurrences that cannot truly be assured. Since actual results may vary from the projections/assumptions considered herein and may be

3

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 59 of 102 PageID #: 234

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *CONTINGENT AND LIMITING CONDITIONS (Con't)*

affected by circumstances beyond current realm of knowledge or control, the Appraiser or Andolfo Appraisal Associates, Inc., does not warrant that these forecasts will occur.

16.  This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

17.  Acceptance and/or use of this report constitutes full acceptance of the Contingent and Limiting Conditions and special assumptions set forth in this report.  It is the responsibility of the client, or client's designees, to read in full, comprehend, and thus become aware of the aforementioned contingencies and limiting conditions.  Neither the Appraiser nor Andolfo Appraisal Associates, Inc., assumes responsibility for any situation arising out of the client's failure to become familiar with and understand the same.

### *EXTRAORDINARY ASSUMPTIONS / HYPOTHETICAL CONDITIONS*

According to Section 2-1, Part C of the Uniform Standards of Professional Appraisal Practice (USPAP), the appraiser is required to disclose any extraordinary assumptions, hypothetical conditions, and/or limiting conditions that directly affect the opinion of market value.  This is a binding requirement.  For the client's information, the following definitions are noted:

Extraordinary Assumption is defined as, "An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.  Comment:  Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."[1]

Hypothetical Condition is defined as, "1) A condition that is presumed to be true when it is known to be false (SVP); and 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.  Comment:  Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."[2]

This appraisal was based on the extraordinary assumption that the site development costs provided by DiPrete Engineering as ranging from $2.1 to $2.2 million dollars were within a reasonable degree of engineering certainty.

---

[1]The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, 2015, Pages 83-84 (USPAP 2016-2017 ed.)

[2]Ibid, Page 113.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 60 of 102 PageID
#: 235

### ANDOLFO APPRAISAL ASSOCIATES, INC.

#### *EXTRAORDINARY ASSUMPTIONS / HYPOTHETICAL CONDITIONS (Con't)*

Further, this appraisal was based on the hypothetical condition that as of the effective date of appraisal, the subject site could be developed with a 15-lot residential subdivision as outlined within the DiPrete Yield Plan, i.e., that such a project had attained all necessary approvals as of the effective date of appraisal.

The appraiser reserves the right to amend this appraisal, for an additional fee, should the client provide near future information that runs contrary to the extraordinary assumption and/or hypothetical condition that were taken herein.

#### *PURPOSE OF THE APPRAISAL*

The purpose of this appraisal was to opine for the "as is" market value of the subject's fee simple interest as of February 19, 2025, based on the extraordinary assumption and hypothetical condition taken.

#### *DEFINITION OF MARKET VALUE*

Market value is, "the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."[3]

#### *PROPERTY RIGHTS APPRAISED*

The property rights appraised are those in fee simple. Fee Simple Estate is defined as, "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."[4]

---

[3]The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, 2015, Page 142. (12 C.F.R. Part 34.42(g); *55 Federal Register* 34696, August 24, 1990, as amended at *57 Federal Register* 12202, April 9, 1992; *59 Federal Register* 29499, June 7, 1994)

[4]Ibid, Page 90.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2525-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 61 of 102 PageID #: 236

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *EXPOSURE / MARKETING TIME PERIODS*

Exposure time may be defined as, "1) the time a property remains on the market; and 2) [The] estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. <u>Comment</u>: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market."[5]

Marketing time is defined as "an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Market time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, 'Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions' address the determination of reasonable exposure and marketing time.)"[6]

Based upon information gathered through the appraiser's sales verification and statistical information about days on market for similar types of property, the appraiser opines that for both exposure and marketing, that such time periods would have been eight months or less based upon the "as is" fee simple market value that has been opined herein.

### *PRIOR SERVICE / SUBJECT PROPERTY RELATIONSHIP*

The appraiser does not have any current or prospective interest in the subject property or the parties involved. Further, the undersigned has not performed any services regarding the subject property within the last three years, as an appraiser or in any other capacity thereto.

---

[5]<u>The Dictionary of Real Estate Appraisal</u>, Sixth Edition, Appraisal Institute, 2015, Page 83 (USPAP 2016-2017 ed.).

[6]Ibid, Page 140.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 62 of 102 PageID #: 237

# ANDOLFO APPRAISAL ASSOCIATES, INC.

## *SCOPE OF WORK*

The format and scope of this report includes the collecting, confirming, analyzing, and reporting of pertinent market data utilizing traditional appraisal methodology; i.e., the Cost Approach, the Income Approach, and the Sales Comparison Approach. The depth and extent of this appraisal have been determined by the significance of the appraisal problem at hand.

The conclusions reached in this analysis were based upon my personal inspection of the subject property and the neighborhood area, in addition to my present knowledge with respect to economic growth data, competition and conditions prevalent in the subject's marketplace as of the effective date of the appraisal.

Additionally, in developing the approaches to market value opinion, the data utilized was collected from Andolfo Appraisal Associates, Inc., office files, other appraisers, Realtors, persons having knowledge of the type of property under appraisal, as well as municipal and state offices.

The subject property was inspected by the appraiser via a street viewing on February 19, 2025, the appraiser's understanding of pertinent site conditions aided by DiPrete Engineering and available on-line (GIS) resources. Additional data as pertaining to the subject property, the neighborhood area, and the town of Johnston in general was obtained from municipal and state resources, as coupled with the appraiser's office files.

There are three traditional valuation approaches available to an appraiser in arriving at a meaningful opinion of market value for a subject property. Those three approaches are Cost, Income Capitalization, and Sales Comparison. While the three approaches were considered by the appraiser in the subject's valuation, only the Sales Comparison Approach was deemed appropriate.

The Cost Approach was not relevant since the subject site was viewed as vacant residentially zoned land and the Income Capitalization Approach was deemed too speculative given the absence of specific developer plans, specifications, and construction budget in which to reasonably assess the overall economic viability of a projected Subdivision Analysis. That type of analysis would need to account for the entwined components of land, labor, capital, and entrepreneurial reward upon project completion, inclusive of market supported rates for absorption and discounting.

In employing the Sales Comparison Approach, the appraiser first analyzed and adjusted in comparison to the subject the best available Johnston-based, large acreage residential land sales by which a per lot unit value was derived. Secondly, the appraiser provided further support via application of the Allocation Method by which lot value was reflected via a ratio analysis of improved property sales and then deducting for DiPrete Engineering's estimated roadway development cost. The two means of deriving an indicated value for the subject's 15-lot residential concept was narrow, the appraiser concluding the "as is" market value near the mid-point of the noted range.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 63 of 102 PageID #: 238

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *TAX AND ASSESSMENT DATA*

As of December 31, 2024, the subject property was assessed to Waterman Chenango, LLC, c/o PO Box 40222, Providence, Rhode Island 02904. The subject was assessed for $277,000 and annual real estate taxes levied thereupon were $4,238.10 based on a full town enacted revaluation which was reflective of values as of December 31, 2022.

### *SALES HISTORY*

The subject property was acquired via Warranty Deed from Ralph Santoro by Birchwood Manor Associates, LLC, on October 27, 2021, for $250,000 (Deed Book 3034, Page 232) and then on November 29, 2022, the subject was conveyed to Waterman Chenango, LLC, for no monetary consideration as recorded in Deed Book 3144, Page 53.

Based on the appraiser's research, it appears that both Birchwood Manor Associates, LLC, and Waterman Chenango, LLC, are inter-related companies as owned by Mr. Salvatore M. Compagnono of All-State Builders, Inc., c/o 41 Shepard Avenue, Providence, RI 02904.

### *ZONING DATA*

The subject site consists of two residential zones, R-15 and R-40, both zones allowing for single-family use and both zones excluding two-family and multi-family use. Both zones also allow for municipal and government buildings, the exception being penal, public works, and utility. The appraiser deemed moot a further discussion of zoning as the valuation herein was based on the DiPrete Engineering Yield Plan, such plan assumed herein as being legal and conforming to the use and dimensional regulations of Johnston's Zoning Ordinance.

### *FLOOD ZONE DATA*

Per the DiPrete concept plan, the subject site possesses a mix of designated FEMA flood zone areas (AE, A, and X), as well as being located within a town regulated Flood Hazard Overlay District. Additionally, the DiPrete plan notes site areas of Heritage, Ground Water Protection, Freshwater Buffers, and Special Management as overseen by the Rhode Island Department of Environmental Management (RIDEM) and the Rhode Island Coastal Management Council (CRMC). DiPrete Engineering's concept plan accounted for these areas whereby the site's useable area was reduced accordingly.

### *SOIL/SUB-SOILS*

The subject site is composed of varied soil types, the predominant of which as approximating 45% of the area is WoB or Woodbridge fine sandy loam. This soil type is noted as being very stony and having zero to eight percent slopes. Following this soil type, water is estimated to cover 17% of the site.

Per the appraiser's copy of the RI Soils Survey Book, WoB soils are suitable for community development activities but a seasonal high water table exists whereby if public sewer is not available, on-site sewage disposal systems need special design and installation. Additionally, roads and streets

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 64 of 102 PageID #: 239

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *SOIL/SUB-SOILS* (Con't)

need careful design to prevent frost heaving and surface stones and boulders are prevalent.  To the appraiser's knowledge, DiPrete Engineering accounted for these noted site conditions in their estimation of the subject's road construction costs. The Soils Map follows:



***SOIL/SUB-SOILS*** ***(Con't)***

Soil Map—State of Rhode Island: Bristol, Kent, Newport, Providence, and Washington Counties

## MAP LEGEND

**Area of Interest (AOI)**
- Area of Interest (AOI)

**Soils**
- Soil Map Unit Polygons
- Soil Map Unit Lines
- Soil Map Unit Points

**Special Point Features**
- Blowout
- Borrow Pit
- Clay Spot
- Closed Depression
- Gravel Pit
- Gravelly Spot
- Landfill
- Lava Flow
- Marsh or swamp
- Mine or Quarry
- Miscellaneous Water
- Perennial Water
- Rock Outcrop
- Saline Spot
- Sandy Spot
- Severely Eroded Spot
- Sinkhole
- Slide or Slip
- Sodic Spot
- Spoil Area
- Stony Spot
- Very Stony Spot
- Wet Spot
- Other
- Special Line Features

**Water Features**
- Streams and Canals

**Transportation**
- Rails
- Interstate Highways
- US Routes
- Major Roads
- Local Roads

**Background**
- Aerial Photography

## MAP INFORMATION

The soil surveys that comprise your AOI were mapped at 1:12,000.

Warning: Soil Map may not be valid at this scale.

Enlargement of maps beyond the scale of mapping can cause misunderstanding of the detail of mapping and accuracy of soil line placement. The maps do not show the small areas of contrasting soils that could have been shown at a more detailed scale.

Please rely on the bar scale on each map sheet for map measurements.

Source of Map: Natural Resources Conservation Service
Web Soil Survey URL:
Coordinate System: Web Mercator (EPSG:3857)

Maps from the Web Soil Survey are based on the Web Mercator projection, which preserves direction and shape but distorts distance and area. A projection that preserves area, such as the Albers equal-area conic projection, should be used if more accurate calculations of distance or area are required.

This product is generated from the USDA-NRCS certified data as of the version date(s) listed below.

Soil Survey Area: State of Rhode Island: Bristol, Kent, Newport, Providence, and Washington Counties
Survey Area Data: Version 24, Aug 30, 2024

Soil map units are labeled (as space allows) for map scales 1:50,000 or larger.

Date(s) aerial images were photographed: Jun 14, 2022—Jul 1, 2022

The orthophoto or other base map on which the soil lines were compiled and digitized probably differs from the background imagery displayed on these maps. As a result, some minor shifting of map unit boundaries may be evident.

USDA Natural Resources Conservation Service — Web Soil Survey, National Cooperative Soil Survey — 1/29/2025, Page 2 of 3

Soil Map—State of Rhode Island: Bristol, Kent, Newport, Providence, and Washington Counties

## Map Unit Legend

| Map Unit Symbol | Map Unit Name | Acres in AOI | Percent of AOI |
|---|---|---|---|
| CB | Canton-Urban land complex | 0.0 | 0.1% |
| ChB | Canton and Charlton fine sandy loams, 0 to 8 percent slopes, very stony | 1.0 | 3.5% |
| ChC | Canton and Charlton fine sandy loams, 8 to 15 percent slopes, very stony | 0.1 | 0.2% |
| MU | Merrimac-Urban land complex, 0 to 8 percent slopes | 0.3 | 1.0% |
| PbC | Paxton fine sandy loam, 8 to 15 percent slopes, very stony | 2.4 | 8.3% |
| PD | Paxton-Urban land complex, 3 to 15 percent slopes | 3.5 | 12.0% |
| Rf | Ridgebury, Leicester, and Whitman soils, 0 to 8 percent slopes, extremely stony | 3.9 | 13.3% |
| W | Water | 5.0 | 17.0% |
| WoB | Woodbridge fine sandy loam, 0 to 8 percent slopes, very stony | 13.1 | 44.5% |
| **Totals for Area of Interest** | | **29.4** | **100.0%** |

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 66 of 102 PageID
#: 241

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *TIMBER*

While the subject site is densely wooded, the local area is not known as a resource for valuable timber production.

### *MINERALS*

To the appraiser's knowledge, the subject has never been publically identified as site that possesses valuable mineral deposits or a site that possesses mine production rights.

### *EARTHQUAKE HAZARD DATA*

Although the New England region may lie on or near a fault line, geologists indicate that the potential of an earthquake affecting the region has very little probability. Despite the fact that earthquakes are rare on the East Coast, the following are some notable occurrences: In 2011 a 5.8 magnitude earthquake in Virginia was felt as far north as New England; in November 2020 a 3.6 magnitude earthquake occurred 30 mile southeast of Providence on the northern shore of Buzzards Bay, Massachusetts; in 2022, three 2.0 magnitude earthquakes occurred under the ocean floor approximately 11 miles off the Narragansett, Rhode Island coast; and in 2024 a 4.8 magnitude earthquake in New Jersey was felt as far north as New Hampshire.

As a result, insurance coverage for earthquake damage is not a factor in appraising real property located within the state of Rhode Island and does not enter into the purchase or renting decisions of prospective buyers/tenants, thereby rendering such a hazard potentially irrelevant for this market area.

### *PERSONAL PROPERTY*

Personal property was not included as a basis for valuation in the formulation of the subject's "as is" fee simple market value.

### *TOXIC / ENVIRONMENTAL HAZARDS*

A Phase 1 Environmental Site Assessment was prepared by Hoffman Engineering, Inc., on behalf of DiPrete Engineering. While the Hoffman report found evidence of probable environmental concerns proximate to the subject site, DiPrete Engineering concluded that based on its review of information and discussions with permitting agencies, that environmental issues would not preclude the subject's development as conceptualized. Thus, as earlier noted, this appraisal was based on the hypothetical condition that the subject site could be so developed as outlined via the DiPrete Engineering Yield Plan.

### *EASEMENTS / ENCROACHMENTS / RIGHTS-OF-WAY*

There were no apparent adverse easements, encroachments, or rights-of-way observed by the appraiser which would negatively affect the marketability and/or use of the subject property.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 67 of 102 PageID #: 242

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *SPECIAL SIGNIFICANCE*

No natural, cultural, recreational, historical, or scientific value is indicated for the subject property.

### *SPECIFIC GEOGRAPHIC DATA*

U.S. Census Tract - 0123
MSA Code - 39300

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 68 of 102 PageID #: 243

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### __AREA ANALYSIS__

**_New England:_**  The State of Rhode Island is part of the six state New England region of the Country, which includes Massachusetts, Connecticut, Maine, New Hampshire, and Vermont.  This region has gone through marked change, the most significant being a shift in 1987 from a manufacturing economy to one that is more service oriented.

The catalyst behind New England's employment shift was a result of its high technology infrastructure, the region capturing a large share of the Nation's federal research and development ("R&D") funding.  This led to a relatively high concentration of durable goods employment in industries such as instrumentation, electronics, and industrial machinery.

Major service employers now include health care, business services, engineering and management, and education.  Computer and data processing, including software, and suppliers of personal services also accounted for a large number of jobs in the business service sector.

The region's concentration of jobs in finance, insurance, and real estate has grown to levels comparable to the Nation.  Given the fact that the fastest growing segments of the New England economy have high proportions of professional, technical, and managerial occupations, demand for highly skilled and well-educated workers has been high.  Historically, this need has been beneficial to the region, given the high concentration of colleges and universities located within.

**_Rhode Island:_**  Rhode Island is the smallest state in the Union, having only 1,045 square miles of land area.  The State is divided into 39 municipalities ranging in size from 1.3 to 64.8 square miles.  The municipalities are organized into five counties - Bristol, Kent, Newport, Providence, and Washington.  Rhode Island ranks forty-third in population nationally, with a population of 1,097,379, a 4.3% increase over the 2010 U.S. Census.

Also, with approximately 1,050.1 people per square mile, the State is ranked second in population density.  Providence, the State's capital, is the third largest city in all of New England, after Boston and Worcester.  The State's population progression over the past 50 years is shown below.



Source: U.S. Census

13

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:23-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 69 of 102 PageID #: 244

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *AREA ANALYSIS (Con't)*

Rhode Island is located in the heart of the New England marketplace, and in a national perspective, the population within 75 miles of Providence is greater than those of the largest metropolitan areas west of New York City, including Chicago and Los Angeles. Within this 75-mile radius live 65% of the New England population, or about 8.5 million people. Boston, Massachusetts, is located 45 miles away; while Worcester, Massachusetts, is 40 miles; Hartford, Connecticut, is 75 miles; and Route 128, the Massachusetts technology highway, is 30 miles away.

Demographic characteristics of the State, as taken from the United States Census Bureau's 2020 census, portray Rhode Island at this time as follows:

| | |
|---|---|
| Resident Population | - 1,097,379 |
| Population % Change, 2010-2020 | - 4.3% |
| Percent Under 18 Years of Age | - 19.3% |
| Percent 65 Years of Age or Older | - 17.7% |
| Median Household Income | - $70,305 |
| Percent Below Poverty | - 10.6% |
| Home Ownership Rates | - 61.6% |
| Total Number of Households | - 414,730 |
| Percent Male | - 48.7% |
| Percent Female | - 51.3% |
| Persons Per Household | - 2.45 |
| Percent Age 25+ that Completed College | - 35.0% |
| Percent Age 25+ with High School Diploma | - 89.2% |

The Rhode Island labor force in March 2024 approximated 583,500 people. The State economy, though it had previously relied on manufacturing, is now making strides to become more of a service oriented one. The breakdown of nonagricultural employment in the State by industry as of March 2024 is shown in the following chart:



## Average Employment by Industry
### Nonagricultural, as of March 2024

- Manufacturing 8.04%
- Transportation & Utilities 2.67%
- Professional & Business Services 14.14%
- Financial Activities 6.80%
- Private Educational Services 5.22%
- Arts, Entertainment, & Recreation 1.73%
- Health Care & Social Assistance 16.61%
- Information 1.09%
- Construction 4.15%
- Government 12.78%
- Natural Resources & Mining 0.04%
- Accomodation & Food Services 10.03%
- Other Services 4.25%
- Wholesale Trade 3.21%
- Retail Trade 9.23%

Source: Rhode Island Department of Labor and Training

The main industry of the economy of Rhode Island is health care and social assistance. This industry comprises over 15% of the State's private sector employment. The State features a world-class medical school and research facilities at Brown University, as well as some of the best teaching hospitals in the country. In addition, there are many new biotech start-up companies, as well as The Slater Center for Biomedical Technology, which takes to the commercial market the innovations developed by Brown University researchers.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 70 of 102 PageID #: 245

**ANDOLFO APPRAISAL ASSOCIATES, INC.**

### AREA ANALYSIS (Con't)

**_Johnston_**: Originally a part of the capital of Providence, Johnston became a separate town and was incorporated in 1759. Throughout its early history, until the middle of the nineteenth century, Johnston was primarily a farming community. However, in the mid to late 1800s, industrial development took over, with the importance of farming being replaced by the manufacturing of jewelry and silverware, fabricated metals, and retail trade establishments. Today, Johnston can best be characterized as a suburban community that is densely developed and populated.

The town of Johnston is essentially a bedroom community of the metro-politan Providence area. The town is bounded to the north by the towns of North Providence and Smithfield, to the south by the city of Cranston, by the city of Providence to the east, and the town of Scituate to the west. Given its central location within the state, Johnston is easily accessible via the interstate highway system and Route 6 (Hartford Avenue), a major east/west connector that essentially dissects the town.

The major commercial/retail trade area of the town is centered along Hartford Avenue, Atwood Avenue, and to a lesser degree, Plainfield Pike/ Plainfield Street. These local commercial arterials are directly accessible via Interstate Route 295 and local Route 6 and as a result, have become the main connectors in the town that have been commercially developed. Retail trade and general commerce on these connectors are represented by both local merchant types and many national and regional franchise types that depend on a densely populated trading area and high vehicular or traffic counts that these connectors offer.

As a bedroom community, the town is improved with many pockets of resi-dential neighborhoods and subdivisions. Older neighborhoods established in the early 1920s are those that are found closer to the Providence, North Providence, and Cranston lines. Newer residential growth has occurred in the western portion of the town, replacing many former agricultural sites and family owned farms. Home pricing within the town is characterized as affordable.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 71 of 102 PageID #: 246

## ANDOLFO APPRAISAL ASSOCIATES, INC.

*JOHNSTON, RHODE ISLAND*
*GENERAL INFORMATION*

TOWN: Johnston

COUNTY:  Providence County

LOCATION: Johnston is bounded partly by the City of Providence and partly by the Town of North Providence on the east, by the city of Cranston on the south, by the town of Scituate on the west, and by the town of Smithfield on the north.

*POPULATION:*    2020 U.S. Census  -  29,568
                 2010 U.S. Census  -  28,769
                 2000 U.S. Census  -  28,195
                 1990 U.S. Census  -  26,542
                 1980 U.S. Census  -  24,907
                 Ranked 11th out of 39 cities and towns

*AREA:*  Total         -  24.38 square miles
         Land Area     -  23.67 square miles
         Inland Water  -   0.71 square miles

*DENSITY:*  1,249 inhabitants per square mile of land area in 2020

*TOTAL HOUSING UNITS:*  2020  -  12,501
                        2010  -  12,439
                        2000  -  11,574
                        1990  -  10,384
                        1980  -   8,758

*CLIMATE:*  Mean Temperature in January  -  29.9 degrees
            Mean Temperature in July     -  72.8 degrees
            Mean Annual Precipitation    -  39.4 inches

*U.S. GEOLOGICAL SURVEY QUADRANGLES:*  Providence and North Scituate

*AERIAL SURVEY PHOTOS:*  On file at Rhode Island Statewide Planning Program Office

*ESTABLISHED:*  1636 (as part of Providence)

*INCORPORATED AS A TOWN:*  1759

*TYPE OF GOVERNMENT:*  Town Administrator and a five member Town Council

*COUNCIL MEETINGS:*  The second Monday of each month at 7:00 PM

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 72 of 102 PageID
#: 247

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *SUBJECT MARKET ANALYSIS*

The subject is located on the westerly side of George Waterman Road (RI Route 128) as bounded by Dart Street (a paper street) to the north and Lena Drive to the south. George Waterman Road is a secondary mixed-used roadway which begins at Greenville Avenue at the south, extending northward to Putnam Pike (U.S. Route 44), just west of the North Providence town-line. Located to the subject's rear are Johnston's Green Valley/Colony Estates residential subdivisions.

The subject's neighborhood area along George Waterman Road is exemplified by an array of modest and older single-family and multi-family uses with light commercial and service provider uses interspersed, with industrial uses located off of George Waterman Road along Railroad Avenue. Overall, the area reflects a suburban to urban character given its central location between the town of North Providence (about one mile north) and the capital city of Providence (less than two miles southeast).

In close proximity to the subject is Our Lady of Grace Roman Catholic Church at the junction of George Waterman Road and Greenville Avenue; the historic Clemence-Irons House at 38 George Waterman Road; and the Highland Memorial Park (Cemetery) located at 1 Rhode Island Avenue. Opposite the subject at 183 George Waterman Road is a neighborhood retail plaza anchored by Strings Bar & Grill and diagonally opposite the subject at 225 George Waterman Road is the Monte Carlo Used Auto Dealership.

George Waterman Road is a two-lane, state-maintained, asphalt roadway that is provided with granite curbing, sidewalks, storm sewer, and overhead street lights. The area is afforded all public utilities, including fiber optic cable. The average daily traffic count along George Waterman Road approximates 10,000 vehicles; posted speed limit is 35 miles per hour; and the roadway is provided with RIPTA bus service.

A review of 2024 Statewide Multiple Listing statistics of 54 single-family home sales in the subject's neighborhood area revealed prices ranging from $252,000 to $685,000, with the median sale price noted at $437,313 for a three-bedroom, two-bathroom, 1,389-square-foot home. Home prices in the older and abutting Green Valley/Colony Estates area (developed circa 1960 to 1980) on smaller lots from 10,000 to 20,000 square feet in size have portrayed a general sale price range of $400,000 to $575,000 since 2022.

Also, per the Statewide Multiple Listing Service, for the entire town of Johnston in 2024 there were 248 single-family home sales upon which the median sale price was noted at $447,000 for a three-bedroom, two-bathroom, 1,353-square-foot home. When analyzing MLS single-family home sales from Third Quarter 2024 (Fourth Quarter results unavailable), Johnston's median sale price was $444,500, while for the entire state, the median single-family sale price was $490,000. Also, per MLS for Third Quarter 2024, median single-family sale prices for the abutting communities of North Providence, Providence, Smithfield, and Scituate were noted at $424,000, $418,500, $526,000, and $555,000, respectively.

Per a review of the Federal Financial Institutions Examination Council (FFIEC), the subject's census tract is a middle income one whereby for 2024, median family income was $113,200 versus that $127,576 for the Metropolitan Statistical Area of Providence-Warwick-Fall River, MA. Further, FFIEC noted that the median age of the housing stock was 54 years and that approximately 80% of housing units were owner-occupied.

17

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS   Document 9-5   Filed 03/17/25   Page 73 of 102 PageID #: 248

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *SITE DESCRIPTION*

The subject site is irregular in shape and level at street grade to George Waterman Road. While sparsely vegetated near the roadway, the site evolves to a heavily wooded nature about 200 feet in, site elevation also rising from about 125 feet above mean sea level at George Waterman Road to about 195 feet above mean sea level at the site's rear as it abuts the Green Valley/Colony Estates residential areas.

As conceptualized, ingress/egress to the subject site will be gained via easement provided along Plat 35, Lot 1 at the southern end of the site. This 80,999±-square-foot lot is identified on the DiPrete Yield Plan as "Parcel F."

As noted, the subject site contains an overall area of 30.97 acres but the presence of the Assapumpset Brook, an on-site pond, associated wetlands and buffer zones, and the conceptualized interior roadway reduces the site's useable or upland area to approximately 13.76± acres. As in the neighborhood area, public utilities would be available to service any prospective development of the subject site. The subject site is identified on the DiPrete Yield Plan as "Parcel E."

As was noted in the Hoffman Engineering Environmental Site Assessment, adjacent to the northeastern end of the site was formerly a circa 1920's commercial building that was used by the Pocasset Ice Company to harvest ice from the pond that had been created via the construction of a man-made dam. While that building was razed prior to 1951/1952, another commercial building was constructed in its place, Town resources noting that in 1992 a 4,022-square-foot building (circa 1955) was functioning as a nightclub-type facility known as "Reflections." Over the ensuing years various other named facilities followed like "Bonnie & Clydes," the most recent use of the building being the "Blazing Repair Shop" and "Nettech Service," an electronics repair/service operation. At present, this building appears to be used by the property owner for construction equipment and materials storage purposes.

With respect to the usage near the site's southeastern portion, Hoffman stated that the area appeared to have been originally utilized for residential and agricultural purposes. Located on Plat 35, Lot 1, there exists the dilapidated remnants of buildings formerly associated with an electroplating business that had commenced operations there during the early 1960's.

To follow will be two site plans, the first plan as developed by Canavan & Associates as depicting the subject site area as assembled via its 2022 Administrative Subdivision and the second plan, that of DiPrete Engineering's Yield Plan which identifies the proposed 15 single-family house lots.

DiPrete calculated that an interior roadway of 1,598 linear feet would be required to develop the 15 house lots, the estimated cost to construct the roadway along with drainage and utility infrastructure as ranging from $2.1 to $2.2 million dollars. Of those residential house lots, 6 lots would each contain site areas of 25,602± square feet and 9 lots would each contain site areas of 49,756± square feet - the development of lots adhering to all RIDEM and FEMA regulations/guidelines.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-PC-25-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 74 of 102 PageID #: 249

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *SITE DESCRIPTION (Con't)*

Following are the Canavan and DiPrete Site Plans:





Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 75 of 102 PageID #: 250

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *HIGHEST AND BEST USE*

Highest and best use is the basis for assignments requiring market value opinions. The essential components of the analysis of highest and best use can be termed as the reasonably probable use of property that results in the highest value. To be reasonably probable, a use must meet certain conditions:

- The use must be *physically possible* (or reasonably probable to render it so);
- The use must be *legally permissible* (or it is reasonably probable to render it so); and
- The use must be *financially feasible.*

Uses that meet the three criteria of reasonably probable uses are then tested for economic *productivity*, and the reasonably probable use with the highest value is a subject's highest and best use.

As noted in <u>The Dictionary of Real Estate Appraisal</u> (Sixth Edition, Appraisal Institute, 2015, Page 109), highest and best use is defined as:

1) The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

2) The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for more alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS)

3) [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions)

<u>The Appraisal of Real Estate</u> (Fourteenth Edition, Appraisal Institute, 2013, Pages 331 – 358) notes that in addition to the four tests of highest and best use, the definition of the term implicitly includes the notion that highest and best use analysis is typically viewed from two perspectives:

1) the use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements; and

2) the use that should be made of a property as it exists (i.e., considering the current improvements).

The highest and best use of land as vacant and the highest and best use of the property as improved are connected but distinctly different concepts. The analysis of land as though vacant focuses on alternative uses, with the appraiser testing each reasonably probable use for legal permissibility, physical possibility, financial feasibility, and maximum productivity. If the appraiser concludes that constructing a building improvement is appropriate for the highest and best use of a parcel of vacant land, then the appraiser should determine and describe the type and characteristics of the ideal improvement to be constructed.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

PC-2025-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 76 of 102 PageID #: 251

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *HIGHEST AND BEST USE* (Con't)

In contrast, when the appraiser applies the four tests in the analysis of the property as improved, the focus on alternative uses considers three possible actions related to the current improvements:

1. Retain the improvements.
2. Modify the improvements in some way, i.e., conversion, renovation, or alteration.
3. Demolish the improvements and redevelop the land.

Implicit within this analysis is the principle of consistent use which holds that land cannot be valued on the basis of one use while improvements are valued based on another use. Existing improvements that do not conform with the ideal improvement may be an *interim use* (i.e., not the highest and best use) that contributes some value or no value or even reduces value if the costs to remove the improvements are substantial.

Against this backdrop, the subject's highest and best use was analyzed as follows:

### *Highest and Best Use of Land As Though Vacant*

Based on assignment conditions, an analysis of the subject's highest and best use was essentially moot since this appraisal was based on DiPrete Engineering's Yield Plan and the associated development costs thereto. As way of recap, the four criteria of highest and best use were accounted for as follows:

*Legally Permissible* - The subject site as comprised of 30.97± acres is zoned residential R-15 and R-40. As earlier noted, the subject site can legally accommodate single-family use.

*Physically Possible* - As noted by the DiPrete Engineering Yield Plan, the subject site could physically support 15 single-family house lots in adhering to RIDEM and FEMA development restrictions.

*Financially Feasible* - DiPrete Engineering has estimated roadway development costs as approximating $2,150,000 or $1,345± per linear foot. As will be seen, this estimated cost was accounted for by the appraiser in his development of the Allocation Technique as a second means by which to value the subject. The resultant value provided secondary support to the appraiser's first analysis of large acreage sales.

*Maximum Profitability* - The appraiser concluded that subject's maximum profitability would rest within its ability to be developed as a 15-lot single-family residential subdivision in accordance with the DiPrete Engineering Yield Plan as no other alternative means of the site's probable development were hypothesized.

### *Most Probable Buyer*

The most probable buyer for the subject site would be a local or regional contractor/developer, the appraiser anticipating effective market demand given the relative scarcity of large acreage lands within the metropolitan Providence area able to support a 15-lot development as the DiPrete Engineering Yield Plan so conceptualizes. The marketing time anticipated to effectuate a sale of the subject property by a competent Rhode Island Realtor at its opined "as is" market value was concluded at eight months or less.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-CV-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 77 of 102 PageID #: 252

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

The valuation process is employed to develop a well-supported opinion of a defined value, which is based on consideration of all pertinent general and specific data. Toward this goal, an appraiser analyzes a property by applying three distinct methods for analyzing data: the Sales Comparison Approach, the Income Approach (if a residential property, the Gross Rental Multiplier Analysis), and the Cost Approach.

All three approaches are applicable to the solution of many appraisal problems. However, depending on the type of property, the use of the appraisal, and the quality and quantity of data available for analysis, one or more of the approaches may have greater significance.

The Sales Comparison Approach is a method of estimating market value whereby a subject property is compared with comparable properties that have sold recently. It is applicable to all property types for which there is a sufficient number of recent, reliable transactions to create value patterns in a market. That is, the appraiser must adjust each comparable to the subject property to impute an indicated value to the subject property. The appraiser then reconciles the multiple value indications that result from the comparables into a single value indication.

The Income Approach is based on the premise that there is a relationship between the income a property can earn and the property's value. For residential properties, the Gross Rent Multiplier Analysis is regarded as the Income Approach, because it is based upon the capacity of the residence to produce rental income. Monthly or annual rental income is translated into an estimate of capitalized value by the use of rent multipliers, which reflect the probable quality and duration of the amenity returns in future years. In utilizing the Income Approach for commercial properties, the valuation process may take the form of Direct Capitalization or a Discounted Cash Flow Analysis.

Direct capitalization is the process by which net operating income is capitalized at an overall rate to arrive at an indicated market value. The capitalization rate utilized may be envisioned as the rate of return on and of capital.

The Discounted Cash Flow Analysis is a process of identifying differences in timing of the projection of cash flows and related expenses attributed to real estate, annually or over some assumed term of ownership. The indicated net operating income for each period is then capitalized to present value and is added to the estimated value of the property at the end of the holding period (reversion value) in order to arrive at an indication of value. Uncertainty or risk is usually reflected in the discount rate employed.

The Cost Approach is based on the principle of substitution in that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus any loss of value (depreciation) from all causes -- physical, functional and external -- plus the value of the site as though vacant and available for its most profitable use. This approach to value is particularly useful for appraising new or nearly new improvements.

Normally, from these three approaches, the appraiser derives separate indications of value for the property being appraised. To conclude the valuation process, these separate value indications are typically reconciled into a final value opinion.

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

As discussed in the Scope of Work section, neither the Cost Approach nor Income Capitalization Approach were deemed applicable to the valuation assignment at hand. Thus, in deriving an indication as to the subject's "as is" market value, the appraiser employed the Sales Comparison Approach.

### *SALES COMPARISON APPROACH*

In employing the Sales Comparison Approach, the appraiser develops an opinion of value by analyzing closed and pending sales of properties deemed similar to the subject. Options to purchase, current listings, and bonafide offers to purchase may also be collected and evaluated. A major premise of the approach, as based on the Principle of Substitution, is that an opinion of market value can be supported by studying market participants' reactions to comparable and competitive properties that offer a similar quality of construction, use, location, amenities, and other considerations characteristic of the subject. When there are sufficient numbers of comparable properties in the market, the resulting pattern as derived via the analysis of those properties is usually the best indication of a subject's market value.

As noted in The Appraisal of Real Estate (Fourteenth Edition, Appraisal Institute, 2013, Page 379), "the principle of substitution holds that the value of property tends to be set by the cost of acquiring a substitute or alternative property of similar utility and desirability within a reasonable amount of time". The appraiser's comparative analysis of transactions and their respective property characteristics, i.e., elements of comparison, focuses on similarities and differences that affect market value.

For this assignment, an extensive search was made by the appraiser to secure comparable sales and supporting evidence for which pertinent data was available. To the best extent when and where possible, the appraiser made efforts to confirm and verify sales data, as well as conduct an exterior drive-by inspection of each comparable property in order to generate a credible comparative analysis of the subject property under appraisal.

Notably, properties that were sold and/or considered similar to the subject were then compared to the subject for the purpose of identifying and measuring differences (if applicable) of:

- *real property rights conveyed*
- *financing terms*
- *conditions of sale*
- *expenditures made immediately after purchase*
- *market conditions (time of sale)*
- *location*
- *physical characteristics*
- *legal characteristics*
- *economic characteristics*
- *non-realty components of value*

The first five elements of comparison in the list are termed as *transactional* adjustments, while the later five are termed as *property* adjustments. The transactional adjustments are first *quantified* by the appraiser in specific sequence while the *qualified* property adjustments are made in no particular order. Dollar or percentage adjustments can be extracted from the market by use of paired sales, statistical analysis,

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:23-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 79 of 102 PageID
#: 254

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

graphic analysis, cost less depreciation analysis, capitalization of income differences, or based upon the appraiser's knowledge and judgement as to market reactions of the varied transactional and/or property differentials taken and the mathematical adjustments thereto.

In cases where inefficiencies exist within the real estate market and there is inherent difficulty in expressing mathematical adjustments, a *qualitative analysis* can be applied by the appraiser, whereby market data is logically analyzed via subjective or descriptive measures. Qualitative analysis techniques can be exemplified by trend, ranking, or relative comparison analyses.

Whether a quantitative or qualitative analysis is performed, most property types are typically adjusted on a *unit price* basis, the appraiser identifying the proper unit of comparison to be used in opining market value via the Sales Comparison Approach.

Upon analysis of the large acreage comparable residentially zoned sales, the appraiser concluded the subject's "as is" value at $51,000 per lot. Therefore, 15 lots x $51,000 per lot = $765,000 opined market value.

The appraiser analyzed the following Johnston-based acreage land sales:

*Sale #1*
ADDRESS:  475 Greenville Avenue, Johnston, RI
PLAT/LOT:  48 / 10 & 232
LAND AREA:  35.87 acres
APPROVED LOTS: 20
ZONING:  R-40 & R-20
GRANTOR:  Barbara Caroline Clemence
GRANTEE:  Masco Holdings
BOOK/PAGE:  3159 / 140
SALE DATE:  March 2, 2023
SALE PRICE:  $1,200,000 - $200,000 allocated to Antique Colonial home (circa 1736/1864/1970) on 1 acre, excluding house lot = $1,000,000
SALE PRICE PER LOT: $50,000
COMMENT:  Site area approved for a 20-lot residential development known as Belknap Farm Drive Extension.



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 80 of 102 PageID #: 255

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

*Sale #2*
ADDRESS:  198 Shun Pike, Johnston, RI
PLAT/LOT:  33 / 63
LAND AREA:  8.10 acres
APPROVED LOTS: 8
ZONING:  R-40
GRANTOR:  Mary Jacavone Estate
GRANTEE:  Trinity Properties of RI, LLC
BOOK/PAGE:  3047 / 74
SALE DATE:  December 3, 2021
SALE PRICE:  $350,000
SALE PRICE PER LOT: $43,750
COMMENT:  Site was permitted by right for an 8
single-family house lot development; however,
Grantee sought and received after purchase,
zoning relief for a 32-unit condominium
development (16 market-rate and 16 affordable
units) known as Western Meadows.  Site located
in proximity to the Central Landfill and the
Cranston city-line.



*Sale #3*
ADDRESS:  1305-1349 Central Pike, Johnston, RI
PLAT/LOT: 43 / 90 & 170
LAND AREA: 38.62 acres
APPROVED LOTS: 26
ZONING: R-40
GRANTOR: T & G Realty, LLC
GRANTEE: Stuart W. Sanderson
BOOK/PAGE: 2889 / 162
SALE DATE: August 28, 2020
SALE PRICE: $860,000
SALE PRICE PER LOT: $33,077
COMMENT: Site proposed for a 3-phase, 26-lot
residential subdivision to be known as
Meadowbrook Estates.  New home construction
prices ranging from $634,000 to $734,000 for a
2,100+-square-foot home on a one-acre home
site.



*Current Listing*
ADDRESS: Atwood Avenue, Johnston, RI
PLAT/LOT: 53 / 42
LAND AREA: 13.11 acres
PROPOSED LOTS: 16
ZONING: R-20
OWNER: Louis Ferri Estate
LIST PRICE: $1,250,000
LIST PRICE PER LOT: $78,125
COMMENT: Site located off of the western side
of Atwood Avenue, behind a single-family home
noted as 1764 Atwood Avenue.  Site access
would require an easement or right-of-way from
Atwood Avenue, the Broker Adam Cardinal
advertising the site as having the potential
for a 16-lot single-family subdivision.



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 81 of 102 PageID #: 256

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### THE VALUATION PROCESS

| Zoning | Subject | Sale #1 | Adj. | Sale #2 | Adj. | Sale #3 | Adj. | Current Listing | Adj. |
|---|---|---|---|---|---|---|---|---|---|
| **TRANSACTIONAL ADJUSTMENTS** | | | | | | | | | |
| Sale Price | N/A | $1,000,000 | | $350,000 | | $860,000 | | $1,250,000 | |
| Sale Price P/Lot | N/A | $50,000 | | $43,750 | | $33,077 | | $78,125 | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing | Conventional | Conventional | | Conventional | | Conventional | | N/A | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | | N/A | |
| Expenditures Made Immediately After Purchase | N/A | N/A | | N/A | | N/A | | N/A | |
| Time of Sale | 02/19/25 | 03/02/23 | 5.75% | 12/03/21 | 9.63% | 08/28/20 | 13.50% | 02/2025 (Listing) | -10.00% |
| Adjusted Sale Price P/Lot | N/A | $52,875 | | $47,963 | | $37,542 | | $70,313 | |
| **PROPERTY ADJUSTMENTS** | | | | | | | | | |
| Location | Average | Average | | Average | | Average | | Superior | -20.00% |
| Land Area (Acres) | 30.97 | 35.87 | | 8.10 | | 38.62 | | 13.11 | |
| Number of Lots | 15 | 20 | | 8 | -15.00% | 26 | 23.54% | 16 | |
| Zoning | R-15/R-40 | R-40/R-20 | | R-40 | | R-40 | | R-20 | |
| Configuration | Irregular | Irregular | | Irregular | | Irregular | | Irregular | |
| Utilities | All Public | All Public | | All Public | | Septic | 10.00% | All Public | |
| | | | | | | | | | |
| Overall Net Adjustment | N/A | | 0.00% | | -15.00% | | 33.54% | | -20.00% |
| | | | | | | | | | |
| Indicated Value of Subject P/Lot | $51,000 | $52,875 | | $40,769 | | $50,134 | | $56,250 | |

### Explanation of Adjustments

*Transactional Adjustments* - As would be anticipated for the subject, Sales #1, #2, and #3 reflected conventional "arms length" conveyances of fee simple property rights. Thus, no adjustments were warranted for those three sales.

However, the appraiser did make a downward adjustment to the Listing as based on the appraiser's market observations that eventual sale prices for large acreage parcels typically transact at price levels less than asking prices. In this case, the appraiser made a downward adjustment of 10%. Notably, while listed as having the potential to support 16 house lots, approvals have yet to be attained.

Lastly, the appraiser accounted for the sales' respective times of sale in relation to the subject's effective date of appraisal. Based on the appraiser's market observations that large acreage parcels have generally exhibited 3% annual appreciation since 2020, the three comparable sales were so adjusted.

*Property Adjustments* - The appraiser deemed the Atwood Avenue locale of the Listing to be superior with respect to neighboring property uses and location as fostered by the fact that the List parcel would be set off from Atwood behind and between 1764 Atwood Avenue and Fairfield Estates. Thus, as noted, a downward adjustment of 20% was made for the listing's location superiority.

Based on the economies of scale principle (law of diminishing returns), the appraiser adjusted Sales #2 and #3 for their lot differentials. With the subject able to support 15 single-family house lots, Sale #2 was adjusted downward by 15% for its 8-lot legal build-out, i.e., prior to its approval for

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 82 of 102 PageID #: 257

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

condominium unit development, and Sale #3 was adjusted downward by 15% for its larger number of house lots. Notably, the principle generally observes that the sale price for larger quantities is typically less than the sale prices for smaller quantities and vice versa. The magnitude of the adjustment was 2.14% for every lot differential.

Lastly, the appraiser adjusted Sale #3 upwards by 10% for not being serviced by public sewer. Notably, the appraiser has observed within the market that buyers view the need to install state approved individual septic designed systems (ISDS) to be an added cost of purchase, with single-family lot systems costing upwards to $20,000 for design and installation. Also, when viewing septic systems versus public sewer, buyers typically equate higher values to lots that are public sewer serviced.

*Overall Net Adjustments* - Overall net adjustments ranged from minus 20% to positive 33.54% with Sale #1 at $52,875 per lot value not reflecting any net adjustments.

*Value Conclusion* - As adjusted, the three sales and listing ranged from $40,769 per lot value to $56,250 per lot value. The mean or average value indicated for the subject was $50,007 per lot while the median value indicated for the subject was $51,504 per lot. Based on these indices, the appraiser concluded the subject's "as is" market value at $51,000 per lot or $765,000 overall.

As a second means in valuing the subject site as land able to create 15 single-family house lots upon which building construction could ultimately take place, the appraiser employed the Allocation Method of land valuation, a technique that is based on the principle of balance and the related concept of contribution - both affirming that there is a normal or typical ratio of land value to property value for specific categories of real estate in specific locations. (Reference to Page 342, The Appraisal of Real Estate, 15th Edition, Appraisal Institute, 2020.)

In employing this technique, the appraiser developed "finished" house lot values for the subject's conceptual 15-lot development based on a percentage allocation of sale prices of recently constructed Johnston single-family homes. The percentage allocation was then applied to the appraiser's opined price point level for a newly built home at this George Waterman Road site (location) and then from that cumulative value deducted DiPrete's estimated roadway costs in arriving at the site's "as is" market value.

As based on credible data taken from several recent sales of newly constructed single-family homes in the town of Johnston, the appraiser observed that finished lot values have typically ranged from 20% to 30% in relation to the sale prices of the overall improved properties. The following examples are now provided:

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:23-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 83 of 102 PageID #: 258

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

---

*Example #1*
Address: 5 Elmgove Avenue, Johnston, RI
Plat/Lot: 51 / 45
Lot Area: 43,560 square feet
Zone: R-40
Lot Sale Date: February 24, 2023
Lot Sale Price: $180,000
Year Home Built: 2023
Finished Property Sale Date: March 1, 2024
Property Sale Price: $549,000
Lot Price/Sale Price Ratio: 33%
MLS #: 1316949



---

*Example #2*
Address: 115 Waterman Avenue, Johnston, RI
Plat/Lot: 16 / 245
Lot Area: 21,780 square feet
Zone: R-15
Lot Sale Date: May 6, 2022
Lot Sale Price: $169,000
Year Home Built: 2022
Finished Property Sale Date: March 24, 2023
Property Sale Price: $549,000
Lot Price/Sale Price Ratio: 30%
MLS #: 1375694



---

*Example #3*
Address; 11 McKinley Street, Johnston, RI
Plat/Lot: 27 / 94
Lot Area: 10,018 square feet
Zone: R-20
Lot Sale Date: December 20, 2023
Lot Sale Price: $166,000
Year Home Built: 2024
Finished Property Sale Date: Pending
Property Sale Price: $650,000 (Pending)
Lot Price/Sale Price Ratio: 25.5%
MLS #: 1374513



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

Case 1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 84 of 102 PageID #: 259

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

*Example #4*
Address: 41 Rosemont Avenue, Johnston, RI
Plat/Lot: 16 / 57
Lot Area: 6,262 square feet
Zone: R-15
Lot Sale Date: November 17, 2022
Lot Sale Price: $125,000
Year Home Built: 2023
Finished Property Sale Date: June 25, 2024
Property Sale Price: $530,000
Lot Price/Sale Price Ratio: 23.58%
MLS #: 1358978



*Example #5*
Address: 53 Orchard Avenue, Johnston, RI
Plat/Lot: 59 / 338
Lot Area: 42,674 square feet
Zone: R-40
Lot Sale Date: May 4, 2023
Lot Sale Price: $181,000 (septic)
Year Home Built: 2023
Finished Property Sale Date: May 17, 2024
Property Sale Price: $915,000
Lot Price/Sale Price Ratio: 20%
MLS #: 1348213



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:23-cv-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 85 of 102 PageID
#: 260

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

<u>*Example #6*</u>
Address: 55 Orchard Avenue, Johnston, RI
Plat/Lot: 59 / 342
Lot Area: 43,000 square feet
Zone: R-40
Lot Sale Date: December 12, 2022
Lot Sale Price: $145,000 (septic)
Year Home Built: 2024
Finished Property Sale Date: May 8, 2024
Property Sale Price: $775,000
Lot Price/Sale Price Ratio: 19%
MLS #: 1354467



*Conclusion*: Based on the above examples and with consideration as to the subject's exposure to interior open or green spaces within a densely developed localized area, the appraiser concluded a lot-to-sale price ratio of 30% in comparison to the subject's $653,000 opined price point level for a finished site improved with a newly constructed home. Thus, the appraiser concluded the subject's finished lot values at $195,900 per or $2,938,500 overall. Accounting for DiPrete's estimated roadway costs of $2,150,000, the "as is" market value of the subject's residential component was reflected at $788,500 via application of the Allocation Method.

The appraiser's opined $653,000 finished property value treated the values of the subject's proposed lot sizes as the same. The opined $653,000 price point level was supported by two means. First, from a new construction viewpoint, the appraiser consulted the Marshall Valuation Cost Service (Section 12, Page 35 as dated August 2024) and estimated the cost to construct a 1,632-square-foot, good quality, Class D, single-family, ranch style home as approximating $250.00 per square foot, inclusive of fireplace, unfinished basement and two-car garage. (A ranch-style home was chosen by the appraiser as Rhode Island's real estate market has shown great demand for one-story living from the aged 55+ cohort of buyers, the effective supply of such homes extremely limited.)

Value support: 1,632 square feet x $250.00 p/sf = $408,000 + entrepreneurial profit on construction @ 12% = $457,000 (rd.) cost to construct + finished lot value @ $195,900 = $653,000 (rounded) finished property value or $400.12 per square foot overall. Again, as was earlier noted, the appraiser's 2024 review of Statewide Multiple Listing statistics revealed that there were 54 single-family home sales in the subject's neighborhood area whereby the sale price range was $252,000 to $685,000, the subject's opined overall or "finished" value reflecting near the top end of the noted range.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 86 of 102 PageID #: 261

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

Further support for the subject's finished opined value of $653,000 or
$400.12 per square foot was provided by the following six Johnston-based
single-family ranch-style home sales:

*Sale #1*
Address: 12 Lake View Court
Plat/Lot: 30 / 1
Site Area: 40,075 square feet
Gross Living Area: 2,020 square feet
Year Built: 2022
Sale Price: $625,000
Date Sold: June 30, 2023
Sale Price P/SF: $309.41
MLS #: 1332640



*Sale #2*
Address: 53 Cross Road
Plat/Lot: 43 / 676
Site Area: 43,560 square feet
Gross Living Area: 2,192 square feet
Year Built: 2023
Sale Price: $675,000
Date Sold: October 2, 2023
Sale Price P/SF: $307.94
MLS #: 1333287



*Sale #3*
Address: 47 Abatecola Way
Plat/Lot: 6 / 178
Site Area: 15,000 square feet
Gross Living Area: 2,074 square feet
Year Built: 2023
Sale Price: $690,000
Date Sold: June 1, 2023
Sale Price P/SF: $332.69
MLS #: 1333086



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

*Sale #4*
Address: 48 Abatecola Way
Plat/Lot: 6 / 176
Site Area: 24,829 square feet
Gross Living Area: 2,061 square feet
Year Built: 2021
Sale Price: $700,000
Date Sold: August 9, 2024
Sale Price P/SF: $339.64
MLS #: 1362192



*Sale #5*
Address: 8 Pico Circle
Plat/Lot: 5 / 4
Site Area: 50,965 square feet
Gross Living Area: 2,196 square feet
Year Built: 2024
Sale Price: $750,000
Date Sold: August 26, 2024
Sale Price P/SF: $341.53
MLS #: 1357458



*Sale #6*
Address: 125 Scituate Avenue
Plat/Lot: 44 / 4
Site Area: 40,358 square feet
Gross Living Area: 2,250 square feet
Year Built: 2023
Sale Price: $750,000
Date Sold: February 20, 2024
Sale Price P/SF: $333.33
MLS #: 1333612



Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 88 of 102 PageID
#: 263

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *THE VALUATION PROCESS*

*Conclusion*: While the six property examples ranged in sale prices from $307.94 to $341.53 per square feet, it is noted that their gross living areas ranged from 2,020 to 2,250 square feet. As the appraiser projected a 1,632-square-foot home for the subject, the economies of scale principle would support for the subject a higher per square foot sale price rate. Notably, the economies of scale (law of diminishing returns) principle holds that larger sized properties will typically transact at lower per square foot sale prices than smaller sized properties and vice versa. Thus, the appraiser concluded that the subject's projected finished sale price of $653,000 for a 1,632-square-foot newly constructed home as situated on a lot ranging from 25,602± to 49,756± square feet was duly supported by the market evidence provided and analyzed.

The appraiser's analysis of residential Johnston land sales as approved for conventional subdivision resulted in a "raw" value of $51,000 per lot. Further, as a secondary means of support, the appraiser provided application of the Allocation Method by which a "finished" lot value of $195,900 was derived based on a 30% ratio applied to improved property sale prices, the subject's forecasted price point at $653,000 based on market observations. Via these two analyses, a value range of $765,000 to $788,500 was indicated, the appraiser concluding the subject's "as is" market value at $775,000 as of the effective date of appraisal.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 89 of 102 PageID #: 264

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### _RECONCILIATION AND FINAL VALUE OPINION_

The valuation indications derived via the three approaches were as follows:

| | |
|---|---|
| *COST APPROACH* | N/A |
| *INCOME CAPITALIZATION APPROACH* | N/A |
| *SALES COMPARISON APPROACH* | $775,000 |

All three market value approaches were considered by the appraiser but in the final analysis, only the Sales Comparison Approach could be employed. Notably, as vacant and unimproved land, neither the Cost Approach nor Income Capitalization Approach had any pertinence to the appraisal assignment at hand.

In developing this appraisal, the appraiser relied on DiPrete Engineering's Yield Plan and the company's house lot development costs as solely pertaining to the installation of a roadway, along with required utilities and infrastructure thereto in deriving an indication as to the subject site's "as is" market value, i.e., "raw" land able to be developed in support of 15 single-family house lots.

In deriving value, the appraiser employed the conventional application of the Sales Comparison Approach in analyzing and adjusting large "raw" acreage Johnston-based sales that could be legally developed with single-family house lots.  As a secondary means of support, the appraiser applied the Allocation Technique, an alternative method of the Sales Comparison Approach, in deriving an indication as to a "finished" house lot value in conjunction with analyses based on probable improved home sale prices and new home construction costs as supported by the appraiser's observations of the Johnston single-family housing market.

A narrow range of market value was indicated for the subject from the two means employed, the appraiser reconciling the subject's "as is" market value near the mid-point of the range.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 90 of 102 PageID #: 265

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### *CERTIFICATION*

I, Thomas S. Andolfo, MAI, SRA, AI-GRS, certify that to the best of my
knowledge and belief:

    1. The statements of fact contained in this report are true and
correct.

    2. The reported analyses, opinions, and conclusions are limited only by
the reported assumptions and limiting conditions and are my personal,
impartial, and unbiased professional analyses, opinions, and conclusions.

    3. I have no present or prospective interest in the property that is
the subject of this report and no personal interest with respect to the
parties involved.

    4. I have performed no services, as appraiser or in any other
capacity, regarding the property that is the subject of this report within the
three-year period immediately preceding acceptance of this assignment.

    5. I have no bias with respect to the subject matter of the report or
to the parties involved with this assignment.

    6. My engagement in this assignment was not contingent upon developing
or reporting predetermined results.

    7. My compensation for completing this assignment is not contingent
upon the development or reporting of a predetermined value or direction in
value that favors the cause of the client, the amount of the value opinion,
the attainment of a stipulated result, or the occurrence of a subsequent event
directly related to the intended use of this appraisal.

    8. My analyses, opinions, and conclusions were developed, and this
report has been prepared, in conformity with the *Uniform Standards of
Professional Appraisal Practice*.

    9. I have made a personal inspection of the property that is the
subject of this report.

    10. No one provided significant real estate property appraisal
assistance to the person signing this certification.

    11. The reported analyses, opinions, and conclusions were developed,
and this report has been prepared, in conformity with the Code of Professional
Ethics and Standards of Professional Appraisal Practice of the Appraisal
Institute.

    12. The use of this report is subject to the requirements of the
Appraisal Institute relating to review by its duly authorized representatives.

    13. As of the date of this report, I, Thomas S. Andolfo, MAI, SRA, AI-
GRS, have completed the continuing education program for Designated Members of
the Appraisal Institute.

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:23-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 91 of 102 PageID
#: 266

# ANDOLFO APPRAISAL ASSOCIATES, INC.

## <u>CERTIFICATION</u> (Con't)

Based on the data gathered, the extraordinary assumption and hypothetical condition taken, and the analyses herein, it is my considered opinion that the "as is" market value of the subject's fee simple interest as of February 19, 2025, was:

*SEVEN HUNDRED SEVENTY-FIVE THOUSAND ($775,000) DOLLARS.*

Respectfully submitted,

*ANDOLFO APPRAISAL ASSOCIATES, INC.*

Thomas S. Andolfo, MAI, SRA, AI-GRS

Thomas S. Andolfo, MAI, SRA, AI-GRS
Certified General Real Estate Appraiser
Rhode Island License CGA.0A00121

Personally Inspected the
Subject Property:

Yes [X]    No [ ]

Sworn and Subscribed to before
me in the City of Providence,
County of Providence, State of
Rhode Island, this 28th day of
February, 2025.



Jennifer L. Medeiros

Jennifer L. Medeiros
Notary Public #770601
My Commission Expires 06/01/2027

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 92 of 102 PageID #: 267

# ANDOLFO APPRAISAL ASSOCIATES, INC.

### QUALIFICATIONS OF THOMAS S. ANDOLFO, MAI, SRA, AI-GRS
### REAL ESTATE APPRAISER AND CONSULTANT
### ASSOCIATED WITH ANDOLFO APPRAISAL ASSOCIATES, INC.

Engaged in the Real Estate Business for 43 years

President, ANDOLFO APPRAISAL ASSOCIATES, INC.

Member of the Appraisal Institute, MAI Designation #10266

Certified General Appraiser, State of Rhode Island #CGA.0A00121

Certified General Appraiser, Commonwealth of Massachusetts #2789

Certified General Appraiser, State of Connecticut #RCG.0001283

Licensed Real Estate Broker, State of Rhode Island #B09263

Graduate of La Salle Academy, Providence, Rhode Island (1969)

Graduate of The College of Holy Cross College, Worcester, Massachusetts (1973)

Certificate in Real Estate, University of Rhode Island (1979)

Affiliations:

  Rhode Island Commercial and Appraisal Board of Realtors

  Rhode Island Association of Realtors - Statewide MLS

  National Association of Realtors

  Rhode Island Commercial and Appraisal Board of Realtors

Authorship:

  New England Real Estate Journal, August 2015, "An Update on the Link District in Providence, RI"

  VALUATION, as published by the Appraisal Institute, Third Quarter 2013, "The 'Mall' in 'Small'"

  New England Real Estate Journal, October and November 2004, "Rhode Island Suburban Medical and Biotech Overview"

  New England Real Estate Journal, November 2003, "A Look at the Valuation of a Telecommunication Facility"

  The Appraisal Journal, July 2001, "Telecommunications:  The Wireless Personal Communications Services (PCS) Industry"

Presentations:

  Transportation Research Board Eminent Domain and Land Use Committee - Workshop on Transportation Law, The Care and Proper Feeding of Expert Witnesses, Panel Discussion, July 13 2010

  Rhode Island Association of Assessing Officers - Commercial Appraisals and the Tax Appeal Process, March 17, 2006

37

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-PM-5-CV-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 93 of 102 PageID #: 268

# ANDOLFO APPRAISAL ASSOCIATES, INC.

Directorships:

Rhode Island Real Estate Appraisers Board - Board Member   - 2003 - 2004
                                           Board Chairman - 2005 - 2009
                                           Board Member   - 2010 - 2013

Chair of the Rhode Island Branch of the Massachusetts and Rhode Island
  Chapter of the Appraisal Institute - December 2012 - December 2013

Board of Directors of the Massachusetts and Rhode Island
  Chapter of the Appraisal Institute - January 2014 - December 2016

Past President of the Holy Cross Club of Rhode Island

Past President of the Rhode Island Chapter, Appraisal Institute (1993, 2007,
  and 2008)

First Night Providence - Second Vice President and Fund Raising Chairman

Trustee of the North Providence Land Trust - 2003 - 2004

Educational Activities:

Member of the National Experience Review Committee for MAI Experience
  Credits
Past Instructor of Real Estate Appraisal - University of Rhode Island,
  College of Continuing Education, and the Rhode Island Board of Realtors

Qualified Expert Witness:

United States Federal Court
Superior Court of Rhode Island
Rhode Island Bankruptcy and Probate Courts
Worcester County Bankruptcy Court
Court Appointed Arbitrator

City of Attleboro, MA, Zoning Board of Appeals
City of Cranston, Zoning Board of Review
City of East Providence, Zoning Board of Review
City of Fall River, MA, Zoning Board of Appeals
City of Pawtucket, Zoning Board of Review
City of Providence, Zoning Board of Review
City of Warwick, Zoning Board of Review
City of Warwick, City Council
City of Woonsocket, Zoning Board of Review

Town of Barrington, Zoning Board of Review
Town of Bristol, Town Council
Town of Bristol, Zoning Board of Review
Town of Burrillville, Zoning Board of Review
Town of Coventry, Zoning Board of Review
Town of Cumberland, Town Council
Town of Cumberland, Zoning Board of Review
Town of East Greenwich, Town Council
Town of Exeter, Zoning Board of Review
Town of Glocester, Zoning Board of Review
Town of Hopkinton, Zoning Board of Review
Town of Johnston, Town Council
Town of Johnston, Zoning Board of Review
Town of Lincoln, Zoning Board of Review
Town of Mansfield, MA, Zoning Board of Appeals

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 94 of 102 PageID #: 269

# ANDOLFO APPRAISAL ASSOCIATES, INC.

Qualified Expert Witness:

    Town of Medway, MA, Zoning Board of Appeals
    Town of Middletown, Zoning Board of Review
    Town of Millbury, MA, Planning Board
    Town of Narragansett, Zoning Board of Review
    Town of North Attleborough, MA, Zoning Board of Appeals
    Town of North Kingstown, Zoning Board of Review
    Town of North Providence, Town Council
    Town of North Providence, Zoning Board of Review
    Town of North Smithfield, Zoning Board of Review
    Town of Portsmouth, Zoning Board of Review
    Town of Richmond, Zoning Board of Review
    Town of Seekonk, MA, Zoning Board of Review
    Town of Smithfield, Town Council
    Town of Smithfield, Zoning Board of Review
    Town of South Kingstown, Zoning Board of Review
    Town of Sutton, MA, Zoning Board of Appeals
    Town of Tewksbury, MA, Planning Board
    Town of Tewksbury, MA, Board of Selectmen
    Town of Tiverton, Zoning Board of Review
    Town of West Greenwich, Town Council
    Town of West Greenwich, Zoning Board of Review
    Town of West Warwick, Town Council
    Town of Westerly, Zoning Board of Review

Appraisals for numerous Attorneys and Property Owners

Appraisals for Banks/Financial Institutions:

    American Bank of Texas, N.A.
    Aurora Bank, FSB
    Bank of America
    Bank Newport
    Bay Coast Bank
    Bluestone Bank
    Bristol County Savings Bank
    Brookline Bank / Bank Rhode Island
    Business Development Company of Rhode Island
    Cape Cod 5
    Capital Crossing Bank
    Central Rhode Island Development Corporation
    Centreville Bank
    Citizens Bank
    Country Bank for Savings
    Dime Bank
    Domestic Bank
    Eastern Bank
    Eastern Funding
    Enterprise Capital, Inc.
    Federal Deposit Indemnity Corporation (FDIC)
    Federal National Mortgage Corporation (FannieMae)
    First Federal Savings Bank of America (FIRSTFED)
    First International Bank
    First National Bank of New England
    Farm Credit East
    First Trade Union Bank
    Flagstar Bank
    Freedom National Bank
    Frontier Community Bank
    GE Capital Mortgage Corporation

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:23-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 95 of 102 PageID #: 270

# ANDOLFO APPRAISAL ASSOCIATES, INC.

Appraisals for Banks/Financial Institutions:

Greenwood Credit Union
HarborOne Bank
Home Loan & Investment Bank
Mansfield Bank
Minority Investment Development Corporation
Navigant Credit Union
Newport Federal Savings Bank
Ocean State Business Development Authority, Inc.
Pace Realty Advisors
Pawtucket Credit Union, n/k/a Coastal1 Credit Union
Peoples Savings Bank
Peoples United Bank
Randolph Savings Bank
Republic Bank
Resolution Trust Corporation (RTC)
Rhode Island Housing (formerly RIHMFC)
Rockland Trust Company
Sabadell United Bank
Salem Five Cents Savings Bank
Savings Institute Bank and Trust Company
Sovereign Bank New England
State Street Bank
TD Bank, N.A.
The Washington Trust Company
United States Department of Housing and Urban Development (HUD)
United States Small Business Administration
Wachovia Small Business Capital
Webster Bank
Wells Fargo Financial
Westerly Savings Bank
Zion First National Bank

Appraisals For:

76 Westminster Street, LLC
A.T. Cross Company
AAA of Southern New England
Achievement First
Alpha Realty Advisors
American Insulated Wire Corporation/Leviton Manufacturing
American Power Conversion
American Shipyard Corporation
Ann & Hope, Inc.
Ballard Exploration Company, Inc.
Beacon Mutual Insurance Company
Beacon Charter School
Bethany Home of Rhode Island
Block Island Conservancy
Blue Cross/Blue Shield of Rhode Island
Brown University
Burrillville Planning Department
Burrillville Sewer Commission
Catholic Family Life Insurance
Charlestown Land Trust
Chelsea Industries, Inc.
City of Central Falls
City of Cranston
City of East Providence
City of Newport

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

PC-2025-CV-00088-MRD-PAS     Document 9-5     Filed 03/17/25     Page 96 of 102 PageID #: 271

# ANDOLFO APPRAISAL ASSOCIATES, INC.

Appraisals For:  (Con't)

City of Providence
City of Warwick
City of Woonsocket
Colliers International
Community College of Rhode Island
Cookson America
Cornish Associates
Cranston Housing Authority
Cranston Print Works
Cumberland Land Trust
D'Ambra Construction
Department of the Army
Gateway Healthcare
General Dynamics - Electric Boat Division
Glocester Land Trust
Granoff Realty II, LP
Greater Providence YMCA
Highlander Charter School
I-195 Redevelopment District
J.H. Lynch & Sons
Johnson & Wales University
Kent County Hospital
Koch Eye Associates
La Salle Academy
Landmark Medical Center
Lifespan Corporation
Marriott International, Inc.
Narragansett Bay Commission
National Grid, n/k/a Rhode Island Energy
National Marine Fisheries Service
National Railroad Passenger Corporation (AMTRAK)
Nationwide Insurance
Northern Rhode Island Conservation District
O.R. Colan Associates, Inc.
OSRAM SYLVANIA, INC.
Pawtucket Redevelopment Agency
Pawtucket Water Supply Board
Providence Planning and Development
Providence Public Building Authority
Providence Public Library
Providence Public Property (Redevelopment Agency)
Providence School Department
Providence Tax Assessment Review Board
Providence Tax Assessor
Providence Water
Providence and Worcester Railroad
Radiation Oncology
Raytheon
Rhode Island Airport Corporation
Rhode Island Attorney General
Rhode Island Department of Administration
Rhode Island Department of Labor and Training
Rhode Island Department of Children, Youth, and Families (DCYF)
Rhode Island Depositors Economic Protection Corporation (RI DEPCO)
Rhode Island Economic Development Corporation
Rhode Island Hospital
Rhode Island Industrial/Recreational Building Authority
Rhode Island Public Radio
Rhode Island Public Transit Authority

41

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2025-CV-00088-MRD-PAS   Document 9-5   Filed 03/17/25   Page 97 of 102 PageID #: 272

# ANDOLFO APPRAISAL ASSOCIATES, INC.

Appraisals For:  (Con't)

      Rhode Island State Police
      Rhode Island Solid Waste Management Corp.
      Rhode Island Water Resources Board
      RI Neurological Institute
      Roger Williams University
      Roman Catholic Diocese of Providence
      Salvation Army of Rhode Island
      Santoro Oil Company
      South County Hospital
      Sprint Spectrum, LP
      Stantec
      State of Rhode Island Building Code Standards Committee - Testimony
      State of Rhode Island, Department of Transportation
      State of Rhode Island, Department of Environmental Management
      Steere House Nursing and Rehabilitation
      Tenent Health Care
      The Audubon Society
      The Episcopal Diocese of Rhode Island
      The Flatley Company
      The Koffler Group
      The Nature Conservancy
      The Trust for Public Land
      Tiverton Power - Caithness Corporation
      Town of Barrington
      Town of Bristol
      Town of Burrillville
      Town of Cumberland
      Town of East Greenwich
      Town of Johnston
      Town of Lincoln
      Town of Middletown
      Town of Narragansett
      Town of North Providence
      Town of Portsmouth
      Town of South Kingstown
      Town of Warren
      Trinity Repertory Theatre
      United Parcel Service
      United States Department of the Interior
      United States Fish and Wildlife Services
      United States Marshal Service, District of Rhode Island
      United States Postal Service
      University Gastroenterology
      University of Rhode Island
      W.D. Shock
      Westerly Hospital
      Women & Infants Hospital

Affiliated Companies:

      President, Andolfo Real Estate, Inc. / MATT Associates, LLC

Web Site / E-Mail:

      www.andolfoappraisal.com   /   tom.andolfo@verizon.net

                                          (Revised 10-25-2023)

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

1:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 98 of 102 PageID #: 273

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### _CERTIFIED GENERAL APPRAISER/REAL ESTATE BROKER LICENSES_



**State of Rhode Island**
**Department of Business Regulation**
**Division of Commercial Licensing**
**Real Estate Appraisers Section**

### CERTIFIED GENERAL APPRAISER

**(In accordance with Title 5, Chapter 20.7 of the General Laws of Rhode Island relating to Real Estate Appraisers)**

Pursuant to the vested authority and having received full payment of the required fee, the Department of Business Regulation has licensed/certified:

**Thomas S. Andolfo**

The person, firm, or partnership named herein, may engage in the business of appraisal practice, provided he/she shall, in all respects, conform to the Provisions of Title 5, Chapter 20.7 of the General Laws of Rhode Island, as amended, and the rules and regulations issued under the authority thereof, beginning **01/01/2024** and ending **12/31/2025** unless this license is suspended, revoked, or voluntarily returned to the Department of Business Regulation, Commercial Licensing, during this period.

Certification No.: **CGA.0A00121**

_Kenneth P. Goss_
**Chairperson, Real Estate Appraisers Board**

---



**State of Rhode Island**
**Department of Business Regulation**
**Division of Commercial Licensing**
**Real Estate Section**

### REAL ESTATE BROKER LICENSE

### Thomas S Andolfo

has complied with all provisions of the law, relative to the Real Estate Broker and is hereby authorized to transact business as **a Real Estate Broker** pursuant to the provisions of **R.I. Gen. Laws § 5.20.5**.

**THIS LICENSE MUST BE PROMINENTLY DISPLAYED IN THE OFFICE OF THE LICENSEE**

License No.: **REB.0009263**    Expiration Date: **04/30/2026**

_William J. DeLuca_
**Real Estate Administrator**

43

Case Number: PM-2025-01368
Filed in Providence/Bristol County Superior Court
Submitted: 3/13/2025 3:42 PM
Envelope: 5041785
Reviewer: J'Lyn D.

2:25-cv-00088-MRD-PAS    Document 9-5    Filed 03/17/25    Page 99 of 102 PageID #: 274

## ANDOLFO APPRAISAL ASSOCIATES, INC.

### *GENERAL PRIVACY NOTICE*

As directed by the Gramm-Leach-Bliley Act of 1999, Andolfo Appraisal Associates, Inc., is committed to protecting our client's personal and financial information.  In the course of providing you with appraisal services, we may need to collect and maintain certain nonpublic information about you.

**What information we collect.**  We collect and use information we believe is necessary to provide you with our appraisal services.  We may collect and maintain several types of personal information needed for this purpose, such as:

•   Information we receive from you on applications, letters of engagement, e-mail or letter correspondence, or conversations, including, but not limited to, your name, address, phone number, social security number, date of birth, bank records, salary information, the income and expenses associated with the subject property, the sale of the subject property, and the details of any financing on the subject property.

•   Information about your transactions with us, our affiliates or others, including, but not limited to, payment history, parties to transactions, and other financial information.

•   Information we receive from a consumer reporting agency such as a credit history, or any information collected through the Internet.

**What information we may disclose and/or share.**  We may disclose the nonpublic personal information about you described above, primarily to provide you with the appraisal services you seek from us.  We will not rent, sell, trade, or otherwise release or disclose any personal information about you.  We will not disclose consumer information to any third party for use in telemarketing, direct mail, or other marketing purposes.

•   We limit the sharing of nonpublic personal information about you with financial or nonfinancial companies, including companies affiliated with us and other third parties to the following:

(i)   We may share information when it is necessary or required to pro-cess a loan or other financial transaction on behalf of financial service providers, such as banks and lending institutions, or nonfinancial companies especially in the performance of residen-tial appraisals;

(ii)   We may share information when it is required or permitted by law, such as to protect you against fraud or in response to a subpoena;

(iii)   We may share information derived from public sources such as property tax records, deeds, easements, or other encumbrances that are recorded on land records or from previous comparable sales.

**You may limit information shared about you.**  If you prefer that we do not disclose nonpublic personal information about you to third parties, you may opt-out of those disclosures.  That is, you may direct us not to make those disclosures (other than those permitted by law).  If you wish to opt-out, you may contact us by mail, telephone, fax, or on-line at the address/numbers provided herein.



# EXHIBIT J

STATE OF RHODE ISLAND                          SUPERIOR COURT
PROVIDENCE, SC

**In re:  178-200 George Waterman Road**
      **Assessor Plat 37, Lot 1**                  PM – 2025 – 01368
      **aka Assessor Plat 37, Lot 193**

## ORDER

      This matter came before this Court on March 14, 2025, the Honorable Judge Christopher
Smith presiding, on Petitioner's Motion to Deposit Money into the Registry of the Court, in the
amount of seven hundred and seventy five thousand dollars ($775,000) based on the appraisal
submitted to the Court and pursuant to Rule 67 of this Honorable Court.  After hearing thereon
and consideration thereof, it is hereby:

### ORDERED, ADJUDGED, AND DECREED

1.  Petitioner's motion is GRANTED

ENTER as an order of this Court:

Enter:                                         By order:

_____                        _____
                                               Sr. Deputy Clerk I

                                               3/14/25

Presented by:

*/s/ William J. Conley Jr.*

William J. Conley, Esq (#2149)
Conley Law & Associates
123 Dyer Street, Suite 2B
Providence, RI 02903
Tel: (401) 415-9835
Fax: (401) 415-9834
wconley@conleylawri.com

## **CERTIFICATION**

I certify that on the 14th day of March, 2025, the within document was electronically filed through the Rhode Island Judiciary Electronic Filing System. This document is available for viewing and/or downloading from the Rhode Island Judiciary Electronic Filing System.

*/s/ William J. Conley Jr.*