**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SCLS REALTY, LLC; SIXTY THREE JOHNSTON, LLC, <br><br> v. <br><br> TOWN OF JOHNSTON, RHODE ISLAND; JOSEPH M. POLISENA, JR., in his capacity as Mayor of the Town of Johnston; LINDA L. FOLCARELLI, LAUREN GARZONE, ALFRED T. CARNEVALE, ROBERT V. RUSSO, ROBERT J. CIVETTI, in their official capacities as Members of the Town Council of the Town of Johnston; and VINCENT P. BACCARI, JR., in his official capacity as Town Clerk of the Town of Johnston | CA No.: 1:25-cv-00088-MRD-PAS |

**TOWN OF JOHNSTON'S
STATEMENT OF UNDISPUTED FACTS**

Pursuant to Fed. R. Civ. P. 56 and LR Cv 56(a), Defendant Town of Johnston (the "Town") submits this Statement of Undisputed Facts (DSUF) in support of the Town's Motion for Summary Judgment, filed concurrently, and the Town's Opposition to the Plaintiffs' Motion for Summary Judgment, ECF No. 42.

**THE TOWN**

1.      The Town of Johnston ("Town") is a municipal corporation located within State of Rhode Island.  Am. Compl., ECF 18, ¶ 10.

2.      On November 6, 1962, the voters of the Town adopted the Town Charter (the "Town Charter").  The following year, on May 10, 1963, the Rhode Island General Assembly ratified the Town Charter, a home rule charter, in accordance with then-Article XXVIII of the Rhode Island Constitution (the "Johnston Charter Validation Act").  **Exhibit 1**, Johnston Charter Validation Act.

1

3.      Pursuant to Article I, Section 3 of the Town's Charter:

The town shall have all the powers granted to towns by the Home Rule Amendment and other provisions of the constitution, general laws of this state and special acts applicable to the town together with all such additional powers as hereafter may be granted to the towns by the laws of the state, together with all powers implied in or incident to the powers expressly granted. The town shall have power to sue and be sued, to enact ordinances and pass resolutions, and to make rules and regulations necessary and proper for carrying into execution its powers, and such ordinances may be made enforceable by the imposition of fines, forfeitures and penalties. The town may enter into contracts with the state or any political subdivision thereof for services and the use of facilities. The town may acquire property within or without its corporate limits for town purposes, in fee simple or any lesser interest or estate, by purchase, lease, gift, devise or **condemnation within the town for public use**, and may hold, manage and control, and may sell, lease, and convey such property as its interests may require. Except as prohibited by the constitution of this state or by laws enacted by the general assembly in conformity with powers reserved to the general assembly by the constitution of this state or as restricted by this Charter, the town shall have and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever. The enumeration of particular powers by this Charter shall not be deemed to be exclusive, and in addition to the powers enumerated herein or implied hereby, or appropriate to the exercise of such powers, it is intended that the town shall have and may exercise all powers which, under the constitution of this state, it would be competent for this Charter specifically to enumerate. All powers of the town shall be exercised in the manner prescribed by this Charter and by state law, or if the manner is not prescribed, then in such manner as may be prescribed by ordinance.

**Exhibit 2,** Town Charter (emphasis added).

4.      Article I, Section 3 of the Town Charter, which grants the Town authority to acquire property by condemnation for public use, has not been amended since the Charter was ratified by the Rhode Island General Assembly in 1963.  *Id.*

## **THE PLAINTIFFS**

5.      SCLS Realty, LLC ("SCLS") is a Rhode Island limited liability company that owns and manages real estate and apartments. **Exhibit 3**, SLCS Articles of Incorporation filed with the Rhode Island Secretary of State.

2

6.      SCLS's members are Salvatore Compagnone, Jr., Lucille Santoro, Suzanne Santoro. **Exhibit 4**, SCLS Interrogatory Response, #2.

7.      Sixty Three Johnston, LLC ("Sixty-Three," and collectively with SCLS, the "Plaintiffs") is a Rhode Island limited liability company. **Exhibit 5**, Sixty Three Articles of Incorporation filed with the Rhode Island Secretary of State.

8.      Sixty-Three was organized on June 16, 2022 for the purpose of buying and holding property located on George Waterman Road, Johnston, Rhode Island. *Id*., *see also* **Exhibit 6**, Deposition Transcript of Ralph Santoro ("Santoro Dep. Tr.") at 95:17-96:4.

9.      Sixty-Three's sole member is Ralph Santoro. *Id.* at 95:5-12.

## MUNICIPAL INFRASTRUCTURE

10.      Prior to authorizing the taking that is the subject of this litigation, the Town faced a pressing and well-documented challenge: its core municipal facilities—including Town Hall, the Police Department headquarters, and the Fire Department headquarters—were decades old and increasingly incapable of meeting modern operational, safety, and accessibility standards.  *See* **Exhibit 7,** Resolution 2025-10 (January 28, 2025); **Exhibit 8,** Resolution 2025-17 (March 10, 2025), **Exhibit 9,** Resolution 2025-18 (March 10, 2025); *see also* **Exhibit 10**, Affidavit of Christopher Correia, Director of Buildings and Grounds ("Correia Aff.") at ¶ 5-17; **Exhibit 11**, Affidavit of Fire Chief David A. Iannuccilli ("Iannuccilli Aff.") at ¶¶ 7-21; **Exhibit 12**, Affidavit of Police Chief Mark Vieira ("Vieira Aff.") at ¶¶ 7-21.

11.      Specifically, the Town Hall located at 1385 Hartford Avenue, Johnston, Rhode Island and originally constructed in 1939, is in need of significant repairs to the heating, ventilation and air conditioning ("HVAC") system, its plumbing and electrical systems, as well as the fire

alarm and sprinkler systems.  Furthermore, the Town Hall does not meet accessibility standards for disabled citizens.  **Exhibit 10,** Correia Aff. at ¶¶ 3-6.

12.     Additionally, the Town Hall experienced significant roof deterioration, including numerous holes in the roof that have resulted in recurring leaks and water damage. *Id*. ¶ 7.

13.     In 2025, the Town Hall was also cited by the Rhode Island State Fire Marshal for multiple fire code violations and was placed on a corrective action plan to bring the building into compliance. *Id*. ¶ 8.

14.     Additionally, the Town Hall has numerous structural issues, including inadequate stairway clearance and insufficient fire separation, which cannot be corrected without significant demolition and rehabilitation work. *Id*. ¶ 9.

15.     These structural issues also uniquely impact citizens with disabilities, including those with mobility impairments, who cannot access all areas of the Town Hall.

16.     Although the Town installed a mobility lift that can lift mobility devices from the foyer to the first floor (which houses the Executive Suite and Clerk's Office), there is no accessible access to the second floor which houses the Taxation Department or the basement level which houses the Board of Canvassers. *Id*. ¶¶ 10-14.

17.     The Town also owns a fire department headquarters (the "Fire Department Headquarters") located at 1520 Atwood Avenue, Johnston, Rhode Island. The Fire Department Headquarters was constructed in 1968 which is in need of significant repair and upgrades. **Exhibit 11**, Iannuccilli Aff. at ¶¶ 3-4.

18.     The Fire Department Headquarters needs significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, fire sprinkler system, the

dispatch and communications system, as well as other infrastructure and building integrity improvements. *Id. in passim.*

19.     Significantly, the Fire Department Headquarters no longer complies with current fire code standards, as the building lacks a fire alarm system or sprinkler system, and contains only a single means of egress in certain areas of the building due to its original construction. *Id*. ¶ 13.

20.     The apparatus area and sleeping quarters are located on the same floor, which is considered a safety hazard for firefighters because the layout does not comply with the National Fire Protection Agency Standards. *Id*. ¶ 14.

21.     The building was constructed with concrete walls, and much of the plumbing runs through those walls, requiring demolition of the concrete to access pipes for repair or maintenance. *Id*. ¶ 9.

22.     Additionally, the Town has three (3) female firefighters, but the Fire Department Headquarters does not have a female shower facility. *Id*. ¶ 10.

23.     The Town owns a police department headquarters (the "Police Department Headquarters") located at 1651 Atwood Avenue, Johnston, Rhode Island.  The Police Department Headquarters was constructed in 1978 and was originally designed to house thirty-five (35) police officers. **Exhibit 12**, Vieira Aff., ¶¶ 3-4.

24.     The Police Department Headquarters needs significant upgrades and improvements including but not limited to the electrical system, the plumbing system, the HVAC system, the roof, the fire alarm and sprinkler system, and the dispatch and communications system. Furthermore, the Police Department Headquarters is prone to frequent flooding during rain events. *Id.* at ¶¶ 8-13, 20.

25.    The electrical system is outdated and prevents the department from expanding the system to support increased energy demands. *Id*. ¶ 8.

26.    The poor condition of the roof has resulted in leaks and water spots in the building on numerous ceilings. *Id*. ¶ 12.

27.    The HVAC is outdated and insufficient to heat and cool the building.  *Id.* at ¶ 11.

28.    The Police Department Headquarters does not contain a fire suppression system. *Id*. ¶ 13.

29.    The Police Department Headquarters' radio dispatch system needs significant upgrades and because of the structure of the building; the communication center (CC) is located centrally, which results in frequent foot traffic and ambient noise.  The existing soundproofing is insufficient for operational needs and creates distraction for CC personnel. *Id*. ¶ 14.

30.    Since the building was designed for a significantly smaller department, there is insufficient space for police functions, meetings, and training. *Id*. ¶ 15-19.

31.    The Police Department Headquarters is now employer to seventy-nine (79) police officers, which greatly exceeds the anticipated capacity of the building. *Id.* ¶¶ 5-6.

32.    Due to the limitations on space, there is no interview room available for use by the Patrol Bureau for sensitive matters, and the Detective Bureau is limited to a single interview room. *Id*. ¶ 21.

33.    To fix the structural issues and make the Town Hall, Police Headquarters, and Fire Department Headquarters functional for their intended purposes and to properly serve all the residents of the Town, the Town's Director of Buildings opines that the three municipal facilities should be torn down and replaced, and that a municipal campus housing these three core municipal

facilities in one location would allow for, among other things, greater efficiency in providing services to Town residents. **Exhibit 10**, Correia Aff. at ¶¶ 16-17.

## THE SEARCH FOR A MUNICIPAL CAMPUS SITE

34.     On January 15, 2023[1], Joseph M. Polisena, Jr. ("Mayor Polisena Jr.") was sworn into office as the mayor of the Town. **Exhibit 13**, Deposition Transcript of Mayor Polisena ("Mayor Polisena Depo. Tr.") at 14:18-23.

35.     After the election and before his inauguration, Mayor Polisena Jr. created a transition team. *Id.* at 100:22-23.

36.     During this transition period, he became aware of the inadequate conditions of the Town Hall, Police Department Headquarters, and Fire Department Headquarters. *Id.* at 100:9-23.

37.     Due to the conditions of the buildings and other factors, it became apparent that new construction was needed, rather than retrofitting. **Exhibit 14**, Deposition Transcript of Dennis DiPrete ("DiPrete Depo. Tr.") at 90:4-13; **Exhibit 13**, Mayor Polisena Dep. Tr. at 91:8-11; **Exhibit 10**, Correia Aff. at ¶¶ 16-17.

38.     Since his inauguration, he made it a goal to locate suitable land to acquire for the construction of a combined municipal campus. **Exhibit 13**, Mayor Polisena Depo. Tr. at 163:11-20; **Exhibit 14**, Deposition Transcript of Dennis DiPrete ("DiPrete Depo. Tr.") at 88:6-18.

39.     This municipal campus would become home to a new town hall, police department headquarters, and fire department headquarters (the "Proposed Municipal Complex"). **Exhibit 10**, Correia Aff. At ¶ 17.

---

[1] Pete Fontaine, *Introducing Johnston's New Mayor*, Johnston SunRise (Jan. 16, 2023), available at https://www.johnstonsunrise.net/archives/topnews/introducing-johnstons-new-mayor-joseph-polisena/article_b8d8d74c-794d-5bb2-ab8d-3c88f7734bb9.html

40.     Mayor Polisena and his staff undertook efforts to identify a suitable site for a municipal complex, but encountered obstacles in doing so.  In the course of those efforts, Mayor Polisena and/or his staff consulted with property owners and/or brokers regarding approximately six (6) potential properties and were advised that each presented limitations related to wetlands, size or availability.  **Exhibit 13**, Mayor Polisena Depo. Tr. at 205:10-208:4.

41.     Extensive review was made into property located at 1307 Hartford Avenue, known as the A&A Wrecking Company site (the "A&A Wrecking Site"), because it was the only property that was viable "through negotiation or feasibility, [which] could house a municipal complex." **Exhibit 13**, Mayor Polisena Depo. Tr. at 202:25-203:2; **Exhibit 15**, Deposition Transcript of Douglas Jeffrey ("Jeffrey Depo. Tr.") at 114:7-21, 116:9-13.

42.     DiPrete Engineering performed due diligence on the site during the investigation and assessment phase. **Exhibit 15**, Jeffrey Depo. Tr. at 119:15-19, 120:5-11; *see also* **Exhibit 16,** Deposition Transcript of Brian Thalmann ("Thalmann Depo. Tr.") at 78:24-79:7; 81:3-9; 69-13-17; **Exhibit 14**, DiPrete Depo. Tr. at 93:1-7.

43.     Over several months, DiPrete Engineering reviewed the site, but "kept presenting negative information on the site to the Town" about its findings. **Exhibit 14**, DiPrete Depo. Tr. at 93:10-12.

44.     The A&A Wrecking Site was determined to contain a large amount of fill with contaminants from the "presence of buried debris" from "dumped dirt and rocks and building demolition on the site". **Exhibit 14**, DiPrete Depo. Tr. at 117:25, 115:11-18. The fill would need to be removed and good soil brought back in. *Id.* at 114:22-24. A cost which would be "[r]aise our eyebrows expensive." *Id.* at 114:15.

45.     Unfortunately, this extensive review led to the conclusion that the A&A Wrecking Site was unsuitable, due to environmental contamination within the property boundaries, as well as concerns regarding traffic control, among other issues. The property would also need significant grading, because it is accessed by a steep hill which is improper for firetrucks. **Exhibit 14**, DiPrete Depo. Tr. at 93:8-16, 118:20-24, 125:17-20; **Exhibit 13,** Mayor Polisena Depo. Tr. at 211:11-23; *see also* **Exhibit 16**, Thalmann Depo. Tr. at 78:24-79:7; 81:3-9.; 69-13-17; 91:1-21; **Exhibit 15**, Jeffrey Depo. Tr. at 118:12-19; **Exhibit 17**, Deposition Transcript of Matthew Tsimikas ("Tsimikas Depo. Tr.") at 46:16-23; 71:3-5. There were also "potential wetland violations associated with the site. That would have to be cured." **Exhibit 14**, DiPrete Depo. Tr. at 115:16-18.

46.     On top of the problems associated with utilizing the A&A Wrecking Site as the site for the proposed municipal campus included that abutting properties would also need to be purchased for the project to be feasible. **Exhibit 16**, Thalmann Depo. Tr. at 76:9-20; 92:1-8, **Exhibit 14**, DiPrete Depo. Tr. at 126:12-17.

## THE GEORGE WATERMAN ROAD PROPERTY

47.     The Plaintiffs own approximately 31-acres of undeveloped property located within the Town at 178 and 200 George Waterman Road (the "Plaintiffs' Property"). Am. Compl., ECF No. 18 at ¶ 22.

48.     The Plaintiffs acquired the property by a series of deeds:

- Special Master John A. Dorsey, Esq. to Sixty Three Johnston, LLC, dated July 14, 2022, recorded on July 15, 2022 at 10:58 AM in the Town of Johnston Land Evidence Records at Book 3112 Page 61. **Exhibit 18**, July 14, 2022 Special Master Deed.
- Quit Claim Deed from Waterman Chenago, LLC and Lucille E. Santoro to SCLS Realty, LLC dated December 23, 2024, recorded on December 24, 2024 at 8:41 AM in the Town of Johnston Land Evidence Records at Book 3281 Page 280, *see* **Exhibit 19**, December 23, 2024 Quitclaim Deed.; and

- Waterman Chenago, LLC and SANCO, LLC. to SCLS Realty, LLC. dated December 23, 2024, recorded on December 24, 2024 at 8:43 AM in the Town of Johnston Land Evidence Records at Book 3281 Page 287. **Exhibit 20**, December 23, 2024 Deed.

49.    Waterman Chenago, LLC (sometimes spelled "Waterman Chenango") is a company that is owned and operated by some of the members of SCLS and Sixty Three. **Exhibit 21,** Deposition Transcript of Salvatore Compagnone ("Compagnone Dep. Tr.") at 50:1-19, 51:5-14, 96:6-8.

50.    It is a Rhode Island limited liability company organized on December 12, 2019. **Exhibit 22**, Rhode Island Secretary of State, Waterman Chenago Entity Summary.

51.    Prior to November 2024, Waterman Chenago had meetings with Town officials and the prior mayor, Joseph M. Polisena, Sr ("Mayor Polisena Sr."), regarding development of the Plaintiffs' Property.  Waterman Chenago had proposed a mixture of market rate and affordable apartments, and a group of condominiums. **Exhibit 23**, History of Events; **Exhibit 21**, Compagnone Dep. Tr. at 152:1-10, 161:1-20; 162:23-163:6, 164:3-25.

52.    These meetings began sometime in February or March of 2022, while Mayor Polisena Sr. was still the Mayor of the Town of Johnston. **Exhibit 21**, Compagnone Depo. Tr. at 151:5-25.

53.    However, Compagnone, a principal of Waterman Chenago, understood that Mayor Polisena, Sr. did not support the proposal. **Exhibit 21**, S. Compagnone Depo. Tr. at 123:7-13.

54.    Over a period of time, one or more representatives of Waterman Chenago met with the Mayor Polisena Sr. and Mayor Polisena Jr. to discuss the Plaintiffs' Property. **Exhibit 21**, Compagnone Depo. Tr. at 123:23-124:6.; **Exhibit 13**, Mayor Polisena Jr. Depo. Tr. at 341:22-24.

55.    While Mayor Polisena Jr. and his staff were "really zeroing in on A&A Wrecking [Site]", the Town had another meeting with a representative of Waterman Chenango regarding the

Plaintiffs' Property.  A member of Waterman Chenago, Town Council President Robert V. Russo ("Council President Russo"), Town Planner Thomas Dellar, an owner of property adjacent to the George Waterman Road property, and Waterman Chenago's legal counsel, met with Mayor Polisena Jr. about the possibility of developing the George Waterman Road site. **Exhibit 13**, Mayor Polisena Jr. Depo. Tr. at 208:20-209:14.

### IDENTIFYING GEORGE WATERMAN ROAD AS A SITE

56.     On October 25, 2024, Waterman Chenago submitted to the Town of Johnston Planning Department a description of a proposed affordable housing project, along with a request for a pre-application conference.  This proposed a 100% affordable low- and moderate-income housing development. **Exhibit 24**, Planning Board Application.

57.     Waterman Chenago also submitted site plans for a 254 dwelling unit development which was proposed to be a 100% low- and moderate-income housing development. **Exhibit 25**, Site Plan.

58.     On December 3, 2024, a pre-application meeting (the "Pre-Application Meeting") was held before the Town of Johnston Planning Board (the "Planning Board"). Am. Compl., ECF No. 18. at ¶ 45.

59.     Mayor Polisena Jr. addressed a letter to the Planning Board. This letter listed concerns he had with the proposal, such as traffic, drainage, and new students joining the school system. He called the project "destructive".  **Exhibit 26**, Mayor Polisena Letter to Planning Board.

60.     Shortly after the Pre-Application Meeting, between December 4-6th, Mayor Polisena Jr. convened his staff for a meeting.  At this meeting, he conveyed to his staff members that he was considering taking the George Waterman Road property by eminent domain for the municipal complex.  **Exhibit 13**, Mayor Polisena Jr. Depo. Tr. at 334:20-335:14.

61.     Since taking office, Mayor Polisena has prioritized the development of a municipal campus and consistently pursued potential sites for that purpose.  Despite engaging in discussions with numerous individuals, those efforted proved unsuccessful due to repeated obstacles.  **Exhibit 13**, Mayor Polisena Jr. Depo. Tr. at 356:13-17.

62.     Due to the needs associated with a municipal campus, such as "public sewer… water; … a certain amount of acreage that is usable" and space to have "the fire station to be separate from the campus", there are very few locations suitable. **Exhibit 14**, DiPrete Depo. Tr. at 205:15-20.

63.     As part of performing due diligence to confirm the site's suitability for a municipal campus, the Town hired DiPrete Engineering to prepare a site map, *see* **Exhibit 13**, Mayor Polisena Jr. Depo. Tr. at 374:22-375:3, met with Rhode Island Department of Environmental Management, *id.* at 389:5-18.

64.     Dennis DiPrete, P.E. ("DiPrete") and Brian Thalmann, P.E. ("Thalmann") of DiPrete Engineering met with Mayor Polisena Jr. on or about December 8, 2025 and discussed the site potentially being used as a municipal campus. **Exhibit 16**, Thalmann Depo. Tr. at 68:18-23, **Exhibit 14**, DiPrete Depo. Tr. 143:12-19, 148:20-25.

65.     Around the time of this meeting, DiPrete Engineering was tasked with performing a feasibility study for a municipal campus. **Exhibit 14**, DiPrete Depo. Tr. 152:17-21; 153:4-7.

66.     DiPrete has a site planner from his firm begin early concept plans. *Id.* at 154:11-17.

67.     From the beginning, DiPrete Engineering found the George Waterman Road site was "a lot easier" to work with compared to the A&A Wrecking Site: "There was no assisting traffic signal that we had to line up. We didn't see potential wetlands violations. There were environmental considerations, but they were all in the front of the site between the wetlands and

the ponds and George Waterman Avenue. There was a lot of information available. People had gone way beyond phase one and produced phase two information. There was a lot of data in the public records on the environmental situation as opposed to Hartford Avenue, which really hadn't been studied." *Id.* at 155:12-24.

68.     DiPrete Engineering's due diligence only found one area of significant concern, as opposed to the A&A Wrecking Company site which found three or four areas of significant concern. The concern at George Waterman was environmental. *Id.* at 157:12-20.

69.     To understand the environmental concerns further, DiPrete Engineering contracted with Hoffman Engineering. *Id.* at 157:25.

70.     Hoffman Engineering reviewed both the George Waterman Road property and an adjacent defunct plating company. *Id.* at 159:9-24, 163:18-19. There were concerns because the plating company could raise issues with groundwater and soil contamination. *Id*. at 163:21-164:6. DiPrete wanted to know the impact and risks associated with the Town due to impact of the defunct plating site, because the George Waterman Road site was downstream from where the leaks at the plating company occurred. *Id*. at 168:23-169:6, 169:19-20.

71.     The conclusion was that the Town should not acquire the plating company site. Due to the contamination, "[t]here might not be enough money in Johnston to do all the remedies that were necessary." *Id.* at 172:11-13, 173:11-12.

72.     A key difference between the George Waterman Road site and the A&A Wrecking Site is that the latter is the source of environmental contamination, while the former suffers from contamination originating at an adjacent site. *Id.* at 196:5-8.

73.     To mitigate risks associated with acquiring the George Waterman Road site, the Town met with Rhode Island Department of Environmental Management ("RIDEM") and obtained a bona fide purchaser status. *Id.* at 183:12-18, 184:22-25.

74.     It was anticipated that the "biggest issue was just going to be the entrance road into the site. It could probably be designed enough to keep most of the utilities up above any contaminated soils, and that it would not change things that much." *Id.* at 196:14-19.

75.     DiPrete Engineering helped the Town estimate the cost to construct a municipal campus on the George Waterman Road site. *Id.* at 210:21-24.

76.     Even with the abutting property's environmental contamination and some challenges, DiPrete Engineering "figured out a way to make the engineering work." *Id.* at 221:2-3.

77.     After this work was completed, a Town Council meeting was scheduled to determine if the Town should acquire the property through eminent domain. **Exhibit 27**, Agenda for January 28, 2025 Town Council Meeting.

## PUBLIC MEETINGS & RESOLUTIONS

78.     The Town's consideration of acquiring Plaintiffs' Property by eminent domain for the purpose of constructing a municipal campus occurred through an open and public process. The proposed acquisition was identified and noticed on the publicly posted agendas for the January 28, 2025 and March 10, 2025 Town Council meetings at which the Property was discussed and action was taken. **Exhibit 27,** January 31, 2024 Meeting Agenda; **Exhibit 28,** March 10, 2025 Meeting Agenda. Both meetings were held in public, and the Town Council's consideration of the Property was conducted openly and on the record. Plaintiffs' counsel attended both the January 28, 2025 and March 10, 2025 Town Council meetings and did not object to the Town Council's

consideration of the Property at either meeting. **Exhibit 29,** Affidavit of William J. Conley, Jr. Plaintiffs were therefore aware of the Town's consideration of the Property and the potential exercise of eminent domain well before the formal taking occurred.

79.    On January 28, 2025, the Town of Johnston Town Council passed a resolution authorizing the taking of the Plaintiffs' Property "for the development and construction of a campus for Public Safety Headquarters and a Town Hall." **Exhibit 7,** Resolution 2025-10 (January 28, 2025).

80.    In Resolution 2025-10, the Town Council identified several deficiencies with respect to the Fire Department Headquarters:

- "The Johnston Fire Department headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, the roof, fire sprinkler system, the dispatch and communications system, as well as other infrastructure and building integrity improvements…" *Id.*

81.    In Resolution 2025-10, the Town Council identified several deficiencies with respect to the Police Department Headquarters:

- "The Johnston Police Department headquarters were built in 1978 at 1651 Atwood Avenue and was originally designed for 34 officers and civilians…"
- "The Police Department now has 79 officers and civilians working in the same headquarters…"
- "The Police Department Headquarters is in need of significant upgrades and improvements including but not limited to the electrical system, the plumbing system, the HVAC system, the roof, the fire alarm and sprinkler system, and the dispatch and communications system…"
- "The Police Department Headquarters building is now prone to repeated flooding issues during significant rain events…" *Id.*

82.    In Resolution 2025-10, the Town Council identified several deficiencies with respect to the Town Hall:

- "The Town Hall building is in need of significant rehabilitation including but not limited to the electrical system, the plumbing system, the HVAC system, the fire alarm and fire sprinkler system…"

- "There is a need to provide greater access for disabled citizens to Town Hall services…" *Id.*

83.     The Town Council then concluded that "[s]ignificant economic and operational efficiencies may be achieved by creating a central campus for Fire Department Headquarters, Police Department Headquarters, and a Town Hall." *Id.*

84.     The Town Council then noted the Town's efforts to review sites for a consolidated municipal campus to house these three (3) core municipal functions, and the Town's review of the Plaintiffs' Property and determination that the site would be an appropriate location for a municipal campus:

- "The administration has been reviewing sites for such a campus to provide economic and operational efficiencies and 21st century services to the citizens of the Town of Johnston…"
- "The administration has initiated a review of 178-200 George Waterman Road, Johnston, Rhode Island, Assessors Plat 37, Lot 193 to determine if it is an appropriate site for the location and construction of a municipal campus combining the Fire Department Headquarters, Police Department Headquarters, and a Town Hall…"
- "It has been determined after review by Police Chief Mark Vieira and Fire Chief David Iannuccilli that it is an excellent location for public safety purposes…"
- "The administration tasked DiPrete Engineering to review the property to determine if it is an appropriate site for the development of such structures…"
- "Said review has confirmed that it is an appropriate site for the development and construction of a campus for Public Safety Headquarters and a Town Hall…" *Id.*

85.     On March 10, 2025, the Town Council unanimously passed Resolution 2025-17, which identified the process that the Town would use to condemn the George Waterman Road property. **Exhibit 8**, Resolution 2025-17 (March 10, 2025).

86.     Resolution 2025-17 stated, in part, that "[t]he administration has initiated a review of 178-200 George Waterman Road…to determine if it is an appropriate site for the location and construction of a municipal campus for the Fire Department headquarters, Police Department

Headquarters, and a Town Hall" and "[i]f the Town determines that this location is suitable for condemnation then it must follow the process for condemnation contained in this resolution". *Id*.

87.    Resolution 2025-17 identified the following steps the Town needed to take to properly effectuate a taking of Plaintiffs' Property:

- "pass a resolution authorizing the taking of the property for public use and find that it is necessary and in the public interest";
- "file in the records of land evidence of the Town, a copy of the adopted resolution, a description of the land, a plat thereof, and a statement that the land is taken pursuant to section 1-3 of the Town Charter, which description and statement shall be signed by the president of the Town Council and the Mayor and certified by the Town Clerk";
- "[t]he Town shall file in the Providence County Superior Court a statement of the sum of money estimated by the Town, using a state-certified general real estate appraiser, to be just compensation for the property taken";
- "[t]he Town shall deposit in the Providence County Superior Court, to the use of person(s) entitled to it, the sum established in the statement";
- "[a]fter filing said documents in the land evidence records and depositing said sum in the Court, the Town shall serve notice of the taking upon the owner(s)…"
- "[t]he person making service shall attest … the manner in which notice was given or attempted to be given"; and
- "[a]fter filing of the resolution, description, plat and statement, the town clerk for the Town shall cause a copy of the resolution, description, plat and statement to be published in a newspaper of general circulation in Providence County for three (3) consecutive weeks".  *Id*.

88.    On March 10, 2025, the Town Council unanimously passed Resolution 2025-18 authorizing the taking of the Property for public use. **Exhibit 9,** Resolution 2025-18 (March 10, 2025).

89.    Resolution 2025-18 recognized that the "Johnston Fire Department headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing and HVAC system, the roof, fire sprinkler system, the dispatch and communications system, as well as other infrastructure and building integrity improvements". *Id*.

90.     Resolution 2025-18 recognized that the Johnston "Police Department Headquarters is in need of significant upgrades including but not limited to the electrical system, the plumbing system, the HVAC system, the wood, the fire alarm and sprinkler system, and the dispatch and communication systems", that the "building is now prone to repeated flooding issues during significant rain events", and that "[i]t is in further need of various infrastructure and building integrity improvements". *Id*.

91.     Resolution 2025-18 also recognized that "[t]he Town Hall building is in need of significant rehabilitation including but not limited to the electrical system, the plumbing system, the HVAC system, the fire alarm and fire sprinkler system" and that "[t]here is a need to provide greater access for disabled citizens to Town Hall services". *Id*.

92.     Furthermore, Resolution 2025-18 recognized that "[s]ignificant economic and operation efficiencies may by achieved by creating a central campus for Fire Department Headquarters, Police Department Headquarters, and a Town Hall".

93.     Resolution 2025-18 also recognized that "[t]he administration has initiated a review" of the George Waterman Road property and "determined after review by Police Chief Mark Vieira and Fire Chief David Iannuccilli that it is an excellent location for public safety purposes" and "DiPrete Engineering" reviewed "the property to determine if it is an appropriate site for the development of such structures" and "confirmed that it is an appropriate site for the development and construction of a campus for Public Safety headquarters and a Town Hall". *Id*.

94.     Resolution 2025-18 also found that "Thomas S. Andolfo of Andolfo Appraisal Associates, Inc., a state certified appraiser" was engaged "to determine the fair market value of the property", and that he "determined that the fair market value of the property is seven hundred and seventy-five thousand dollars ($775,000)". *Id*.

95.    As a result of these findings, Resolution 2025-18, the Town Council resolved "that the Town of Johnston should proceed with eminent domain through the exercise of condemnation as provided for in § 1-3 of the Town Charter…to take title to 178-200 George Waterman Road…for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building". It concluded with "this taking is necessary and in the public interest." *Id*.

96.    Pursuant to the terms of Resolution 2025-17, a certified copy of Resolution 2025-18 was recorded in the Johnston Land Evidence Records on March 12, 2025 in Book 3294 page 219 at 8:52 a.m. (instrument number 00182280).

97.    On March 11, 2025, Mayor Polisena Jr. and Council President Russo executed a "Statement of Taking."

98.    Pursuant to the terms of Resolution 2025-17, the Statement of Taking, containing a metes and bounds legal description, was duly recorded in the Johnston Land Evidence Records on March 12, 2025 at 8:53 a.m. in the Town of Johnston Land Evidence Records in Book 3294 Page 222 (instrument number 00182281).

99.    Pursuant to Resolution 2025-17, on March 14, 2025, a member of the Town of Johnston Police Department served a copy of Resolution 2025-18, description, plat, and statement of taking on SCLS Realty and Sixty Three.  **Exhibit 30**, Proof of Service.

## **JUDICIAL PROCEEDINGS**

100.    On March 12, 2025, the Town filed a Petition in the Providence County Superior Court seeking to deposit the just compensation amount of $775,000.00 into the Court's registry. The case was assigned case number PM-2025-01368 and was captioned *In re: 178-200 George*

*Waterman Road, Assessor's Plat 37 Lot 1 aka Assessor Plat 37, Lot 193*. **Exhibit 31,** Superior Court Petition (March 12, 2025).

101.    On March 13, 2025, the Town filed a motion seeking to deposit the $775,000.00 in just compensation into the Providence County Superior Court register. **Exhibit 32,** Motion to Deposit Just Compensation Funds (March 13, 2025).

102.    The motion was heard before Associate Justice Christopher Smith on March 14, 2025, and an order was entered granting the Town's Motion. **Exhibit 33,** Order (March 14, 2025).

103.    On March 10, 2025, Plaintiffs filed their Complaint in this action. Compl., ECF No. 1.

104.    The Defendants in this action were served by Constable on March 12, 2025. Service Documents, ECF No. 19.

105.    On March 17, 2025, SCLS and Sixty Three filed a motion seeking reconsideration of the March 14, 2025 Order, or in the alternative to abate or stay the action. **Exhibit 35,** Motion for Reconsideration (March 17, 2025).

106.    After hearing thereon, a Consent Order was entered that discharged the "Statement and Description of Taking' dated March 12, 2025, and recorded at Book 3294, Page 222" and established a briefing schedule and date for a status conference. **Exhibit 35,** Consent Order (March 19, 2025).

107.    On March 25, 2025, a Dismissal Stipulation was filed in the Providence County Superior Court, dismissing the action and agreeing that the $775,000.00 held in the Court's registry be released to the Town of Johnston. **Exhibit 36,** Dismissal Stipulation (March 25, 2025).

108.    On March 31, 2025, after a hearing, an order was entered allowing the registry to release the funds. **Exhibit 37,** Order Releasing Funds (March 31, 2025).  The order was corrected

to include the release of interest on the deposit amount and entered on September 5, 2025. **Exhibit 38,** Corrected Order Releasing Funds (September 5, 2025).

Respectfully submitted,

Defendants,
By Their Attorneys,

*/s/ William J. Conley, Jr.*
*/s/ Mario Martone*
*/s/ Sarah F. O'Toole*
William J. Conley, Jr. (#2149)
Mario Martone (#8221)
Sarah F. O'Toole (#9316)
Conley Law & Associates
123 Dyer Street, Suite 2B
Providence, RI 02903
Tel: 401.415.9835
wconley@conleylawri.com
mmartone@conleylawri.com
January 27, 2026                    sotoole@conleylawri.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Kathryn D. Valois
KValois@pacificlegal.org

Robert H. Thomas
RThomas@pacificlegal.org

Austin W. Waisanen
AWaisanen@pacificlegal.org

Kelley M. Salvatore
ksalvatore@darroweverett.com

Stacy W. Thomsen
sthomsen@darroweverett.com

*/s/ Sarah F. O'Toole*
_____