# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SCLS REALTY, LLC; SIXTY THREE JOHNSTON, LLC,<br><br>v.<br><br>TOWN OF JOHNSTON, RHODE ISLAND; JOSEPH M. POLISENA, JR., in his capacity as Mayor of the Town of Johnston; LINDA L. FOLCARELLI, LAUREN GARZONE, ALFRED T. CARNEVALE, ROBERT V. RUSSO, ROBERT J. CIVETTI, in their official capacities as Members of the Town Council of the Town of Johnston; and VINCENT P. BACCARI, JR., in his official capacity as Town Clerk of the Town of Johnston | CA No.: 1:25-cv-00088-MRD-PAS |

### DEFENDANT TOWN OF JOHNSTON'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Defendant Town of Johnston, Rhode Island (the "Town") hereby submits this memorandum of law in support of its Motion for Summary Judgment on all counts in the Amended Complaint filed by Plaintiffs SCLS Realty, LLC and Sixty-Three Johnston, LLC (together, the "Plaintiffs"). *See* ECF No. 18. For the reasons that follow, this court should grant the Town's Motion and dismiss this case.

## INTRODUCTION

In March of 2025, after extensive consideration and formal action by the Town Council, the Town exercised its lawful power of eminent domain to acquire the Plaintiffs' property for a singular and undisputed public purpose: the construction of a new municipal campus to house the Town Hall, Police Department, and Fire Department. The decision came after a finding that the existing facilities serving those essential governmental functions are outdated, physically deteriorating, and inadequate to meet the needs of a growing community. Those facilities were not designed for modern public-safety operations or to accommodate the Town's current staffing

levels or the volume of residents the Town now serves. The Town determined—through a unanimous vote of its five-member Town Council—that modernizing these core municipal facilities was not only prudent, but necessary to better serve the public. The Town Council also determined that a taking of the Plaintiffs' property to serve as the site of a modernized municipal campus was necessary to effectuate that public purpose.

That decision falls squarely within the heart of the Fifth Amendment's Public Use Clause. Few governmental objectives are more paradigmatically public than the construction and operation of municipal buildings that house town government, police, and fire services. The Town Council authorized the taking through duly adopted resolutions, voted on by a supermajority of its members, followed the procedures required by Rhode Island law, recorded the taking, obtained a certified appraisal of the property's fair market value, and deposited the appraised compensation into the registry of the Superior Court for Plaintiffs' benefit. At every step, the Town acted deliberately, transparently, and in strict compliance with governing law.

The Plaintiffs nonetheless challenge the taking, not by disputing that the land is being acquired for a public municipal complex, but by attempting to recast the Town's legislative decision as a "sham" or "pretext" based largely on isolated statements attributed to the Town's Mayor. That theory fails as a matter of law. Federal courts have made clear—repeatedly and emphatically—that where property is taken for a legitimate public use, courts do not engage in speculative inquiries into the subjective motives of individual officials. *Brinkmann v. Town of Southold*, 96 F.4th 209 (2d Cir. 2024); *Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008). Municipal officials act collectively, often for varied and overlapping reasons, and the Constitution does not permit courts to "purify" those motives or to impute the views of certain officials to an entire decision-making body. To do so would unravel decades of settled takings jurisprudence and

improperly transform federal courts into overseers of local political discourse. This case therefore presents no genuine dispute of material fact—only a series of legal claims that collapse under controlling precedent.

All of the Plaintiffs' claims in this case fail. The Plaintiffs' Fifth Amendment public-use claim fails because the taking is objectively and indisputably for a public purpose, rendering any "pretext" theory legally irrelevant. Their substantive due process claim fails because the Takings Clause supplies the specific constitutional framework governing eminent domain, and in any event, the Plaintiffs allege nothing remotely approaching the conscience-shocking misconduct required to sustain such a claim. Their just-compensation claim fails because the Town has provided for compensation by obtaining a certified appraisal and depositing the full appraised value into the court registry—a step taken precisely because the Plaintiffs chose to litigate rather than accept payment. Their § 1983 claim fails because Plaintiffs cannot establish any underlying constitutional violation. Their state-law "bad faith" claim fails for the same reason their federal pretext theory fails: Rhode Island law affords substantial deference to legislative takings for public use and does not permit courts to invalidate such takings based on political disagreement or alleged animus. And finally, their state statute-specific claims fail because neither the Home and Business Protection Act nor the Municipal Public Buildings Authority Law apply to this taking.

At bottom, this case is not about an unlawful, pretextual taking. It is about a municipality making a lawful decision to modernize essential public infrastructure, and corporate property owners who disagree with that decision seeking to frame their opposition as a constitutional violation. Neither the federal nor state law provides a remedy for that disagreement. Because the Town's actions were lawful, procedurally sound, and rationally related to an unquestioned public purpose, summary judgment should enter in the Town's favor on all counts.

## FACTUAL BACKGROUND

**I.    The Town's Existing Municipal Facilities Are Outdated and Inadequate to Serve Johnston's Residents.**

Prior to authorizing the taking at issue, the Town faced a pressing and well-documented challenge: its core municipal facilities—including Town Hall, the Police Department headquarters, and the Fire Department headquarters—were decades old and increasingly incapable of meeting modern operational, safety, and accessibility standards. *See* Statement of Facts ("SUF") at ¶ 10; **SUF Ex. 8-10**, Resolutions 2025-10 (January 28, 2025); 2025-17 (March 10, 2025), 2025-18 (March 10, 2025) (collectively, the "Resolutions"). These deficiencies are not speculative or cosmetic; they are structural, systemic, and directly affect the Town's ability to deliver essential governmental and public safety services to its residents. *Id.* Specifically, the Johnston Town Council made the following detailed findings regarding the condition and inadequacy of the Town's existing municipal facilities, which were memorialized in the resolutions adopted in January and March 2025:

The Fire Department: The Fire Department Headquarters, located at 1520 Atwood Avenue, was originally constructed in 1968 and is currently in need of significant repairs and upgrades. SUF at ¶ 18; **SUF Ex. 18,** Resolution 2025-18. As reflected in formal Town Council findings, the building requires significant upgrades, including to its electrical system, plumbing, HVAC system, roof, fire sprinkler system, and dispatch and communications infrastructure. **SUF Ex. 18,** Resolution 2025-18. The Town Council determined that these deficiencies undermine the Fire Department's mission and fall short of the level of emergency services that Johnston's residents are entitled to receive in the twenty-first century. *Id.* In addition to the deficiencies stated in the Resolutions, the Fire Department Headquarters faces additional issues, including that (1) it no longer complies with current fire code standards, as the building lacks a fire alarm system or

sprinkler system, and contains only a single means of egress in certain areas of the building due to its original construction, (2) the current configuration of the apparatus area and sleeping quarters being located on the same floor does not comply with the National Fire Protection Agency Standards, and (3) although the Town has three (3) female firefighters, there is no female shower facility in the building.  SUF at ¶ 19-22; **SUF Ex.** Iannuccilli Affidavit at ¶¶ 10, 13-14.

The Police Department: Similarly, the Police Department Headquarters, located at 1651 Atwood Avenue, was built in 1978 and needs substantial repairs and modernization.  SUF at ¶ 23; **SUF Ex. 18,** Resolution 2025-18.  Preliminarily, the Police Department Headquarters was originally designed to house approximately thirty-four (34) officers and civilian personnel; today, that same facility accommodates seventy-nine (79) officers and civilians—more than double its intended capacity.  SUF at ¶¶ 23, 31; **SUF Ex. 18,** Resolution 2025-18.  In addition to capacity issues, the building suffers from outdated electrical, plumbing, HVAC, fire alarm, sprinkler, and communications and radio dispatch systems, and is prone to repeated flooding during significant rain events.  SUF at ¶¶ 24-29; **SUF Ex. 18,** Resolution 2025-18.  These conditions pose operational and safety risks that the Town Council concluded could not be adequately remedied through piecemeal renovation. *Id.*

The Town Hall: The Town Hall, located at 1385 Hartford Avenue, was originally constructed in 1939 and likewise requires substantial rehabilitation. SUF at ¶ 11; **SUF Ex. 7,** Resolution 2025-10; **SUF Ex. 9,** Resolution 2025-18.  The building needs significant repairs to its electrical, plumbing, HVAC, fire alarm, and sprinkler systems, and presently does not provide sufficient access for residents with disabilities.  **SUF Ex. 7**, Resolution 2025-10; **SUF Ex. 9,** Resolution 2025-18.  Additionally, the Town Hall has experienced significant roof deterioration, including numerous holes in the roof that have resulted in recurring leaks and water damage.  SUF

at ¶ 12; **SUF Ex. 10**, Correia Affidavit at ¶ 7.  The Town Hall was also cited by the Fire Marshall in 2025 for multiple fire code violations and was placed on a corrective plan to bring the building into compliance. SUF at ¶ 13; **SUF Ex. 10**, Correia Affidavit at ¶ 8.  As the central point of access for municipal services, the Town determined that continued reliance on this facility compromised both public access and administrative efficiency. **SUF Ex. 7**, Resolution 2025-10; **SUF Ex. 9**, Resolution 2025-18.

Faced with these realities, the Town Council concluded that maintaining three separate, aging facilities was neither operationally efficient nor fiscally responsible.  *Id.*  The Town Council further found that consolidating these functions into a single, modern municipal campus would promote public safety, improve accessibility, enhance coordination among departments, and achieve long-term economic and operational efficiencies for the benefit of Johnston residents.  *Id.*

## II.    The Town Council Determined that a Consolidated Municipal Campus was Necessary to Address These Deficiencies.

### a.    The Municipal Campus Concept

In response to these documented deficiencies, the Mayor's Office, in as early as 2023 when the current Mayor was inaugurated into office, initiated a review of potential sites suitable for the development of a consolidated municipal campus housing Town Hall, Police Department headquarters, and Fire Department headquarters.  SUF at ¶¶ 34-39.   After engaging in a lengthy review process for other locations in Johnston for the intended municipal campus, the Town reviewed the property located at 178–200 George Waterman Road, Johnston, Rhode Island (Assessors Plat 37, Lot 193) (hereinafter referred to as the "Property") to determine whether it could appropriately serve as the site for such a campus.  SUF at ¶¶ 41-78.

The Town also engaged DiPrete Engineering to assess the suitability of the property for the development and construction of a municipal campus.  SUF at ¶ 64.  That professional review

confirmed that the site was appropriate for the proposed public safety and municipal facilities. *Id.* Based on these evaluations, the Town Council identified the Property as a viable and advantageous location for a municipal campus designed to address the Town's long-standing infrastructure deficiencies.

### III.  The Town Council Formally Authorized the Taking through Duly-Adopted Resolutions in January and March of 2025.

On January 28, 2025, the Town Council convened a special meeting to consider and adopt Resolution 2025-10, which resolved that the Town "should proceed with eminent domain through the exercise of condemnation" to take the Property "for the public purpose of constructing a municipal campus consisting of a Public Safety Headquarters for the Fire and Police Departments and a Town Hall Building." SUF at ¶ 80; **SUF Ex. 7,** Resolution 2025-10 (January 28, 2025). Legal counsel for the Plaintiffs attended the public hearing wherein this Resolution was discussed, but did not voice an objection on behalf of the Plaintiffs. SUF at ¶ 79; **SUF Ex. 29,** Affidavit of William J. Conley, Jr. This Resolution was ultimately adopted by a supermajority vote, with four (4) members of the Town Council voting to pass the Resolution, and one (1) member of the Town Council absent. **SUF Ex. 7,** Resolution 2025-10 (January 28, 2025).

On March 10, 2025, the Town Council convened to consider and adopt Resolution 2025-17, which set forth the formal legal process the Town was required to follow if it determined that the Property was to be acquired through condemnation. **SUF Ex. 8,** Resolution 2025-17 (March 10, 2025). The resolution confirms that any taking must be authorized by a Town Council vote finding that the acquisition serves a public use and is in the public interest; that all required documents must be executed, recorded, and certified in the land evidence records; and that just compensation must be determined by a state-certified appraiser and deposited into the registry of the Providence County Superior Court for the benefit of affected property owners. *Id.* It further

mandates personal service and published notice of the taking, ensuring transparency throughout the condemnation process.  *Id.*  Legal counsel for the Plaintiffs attended the public hearing wherein this Resolution was discussed, but did not voice an objection on behalf of the Plaintiffs.  SUF at ¶ 79; **SUF Ex. 29,** Affidavit of William J. Conley, Jr.  This Resolution was adopted by a unanimous vote of all five (5) members of the Town Council. **SUF Ex. 8,** Resolution 2025-17 (March 10, 2025).

Also on March 10, 2025, the Town Council convened to consider and adopt Resolution 2025-18.  **SUF Ex. 9,** Resolution 2025-18 (March 10, 2025).  This Resolution reflects the Town Council's legislative findings that Johnston's existing municipal and public safety facilities are outdated, deficient, and no longer capable of supporting 21st-century municipal operations, public safety services, and accessibility needs.  *Id.*  The resolution documents that the Town's core municipal buildings require substantial rehabilitation and modernization and that continued use of those facilities undermines the Town's ability to effectively serve its residents. *Id.*  Based on these findings, the Town Council determined that consolidating municipal and public safety functions into a single, modern municipal campus would promote operational efficiency, improve public safety, enhance accessibility, and better serve the public interest.  *Id.*  The resolution further reflects that the Town undertook a deliberate site-selection process, including reviews by public safety leadership and professional engineering consultants, all of whom concluded that the Property is well-suited for such a campus. *Id.*

Consistent with its constitutional obligations, the Town engaged a state-certified real estate appraiser, who determined the fair market value of the property to be $775,000.  *Id.*  Based on these findings and professional evaluations, the Town Council formally authorized the exercise of eminent domain pursuant to the Town Charter to acquire the property for the public purpose of

constructing a municipal campus housing public safety and municipal services. *Id.* Legal counsel for the Plaintiffs attended the meeting wherein this Resolution was discussed, but did not voice an objection on behalf of the Plaintiffs. SUF at ¶ 79; **SUF Ex. 29,** Affidavit of William J. Conley, Jr. This Resolution was adopted by a unanimous vote of all five (5) members of the Town Council. **SUF Ex. 9,** Resolution 2025-18 (March 10, 2025).

## IV.   **The Town Executed and Recorded the Taking in Accordance with Rhode Island Law.**

Pursuant to its authority under Section 1-3 of the Town Charter and the limitations imposed by the Rhode Island and United States Constitutions, the Town lawfully executed and recorded the taking of the Property. On March 11, 2025, a description, plat, and statement of taking for the Property were executed and signed by the Mayor and the Town Council President, and on March 12, 2025, the Town Clerk recorded in the Town's Land Evidence Records a complete and certified copy of the adopted condemnation resolution, together with the description of the land, the plat thereof, and the signed statement of taking. **SUF Ex. 30**, Recorded Documents and Proof of Service. Copies of the recorded documents were provided to the Plaintiffs. *Id.*

## V.   **The Town Deposited the Designated Funds for Just Compensation into the Superior Court Registry**

In connection with the taking, the Town engaged Thomas S. Andolfo of Andolfo Appraisal Associates, Inc., a state-certified general real estate appraiser, to determine the fair market value of the property. *See* **SUF Ex. 9,** Resolution 2025-18 (March 10, 2025). Based on his professional appraisal, Mr. Andolfo concluded that the fair market value of the property at the time of the taking was $775,000. SUF at ¶ 95.

On March 12, 2025, the Town filed a petition in the Providence County Superior Court seeking authorization to deposit into the Court's registry the sum of $775,000, representing the appraised fair market value of the Property. SUF at ¶ 100. That petition was heard and granted,

and the Town deposited $775,000 into the Superior Court Registry as designated just compensation for the taking of the Property. *Id.* at ¶ 103. Thereafter, on March 17, 2025, the Plaintiffs filed an emergency motion in the Superior Court seeking reconsideration or vacatur of the order authorizing the deposit. *Id.* at ¶ 106. On March 25, 2025, the parties entered into a stipulation of dismissal of the Superior Court action, pursuant to which the funds deposited in the registry were released back to the Town and the state court case was dismissed with prejudice. *Id.* at ¶¶ 108-109.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Specifically, Federal Rule of Civil Procedure 56 provides:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). The First Circuit has explained that "[a]n issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" *Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005) (citing *Poulis-Minott v. Smith*, 388 F.3d 354, 363 (1st Cir. 2004)).

<u>ANALYSIS</u>

I.  **PLAINTIFFS' ULTRA VIRES TAKING CLAIM FAILS AS A MATTER OF LAW BECAUSE THE TOWN COMPLIED ITS CHARTER AND THE FEDERAL AND STATE CONSTITUTIONS.**

Plaintiffs' claim that the Town's taking was unlawful because the Town failed to comply with the Rhode Island Home and Business Protection Act ("BHPA"), R.I. Gen. Laws § 42-64.12-1 *et seq.* and the Rhode Island Municipal Public Buildings Authority Law ("MPBAL"), R.I. Gen Laws § 45-50-1 *et seq.*  This claim fails as a matter of law because neither statute applies to the taking at issue.

The proper analysis begins by identifying the source of the Town's eminent domain authority and then determining the constitutional limits on that authority.  The Town's authority to exercise eminent domain derives from its municipal charter, which was duly enacted by the Town and ratified by the Rhode Island General Assembly.  *See* **SUF Ex. 2**, Town Charter at ¶ 1-3; R.I. P.L. 1963, ch. 187 ¶ 2.  That independent authority is then limited by the public-use and just-compensation requirements set forth in both the Rhode Island and United States Constitutions.  R.I. Const. art. I, § 16; U.S. Const. amend. V.  These independent sources collectively confer and constrain the Town's power to acquire private property for public purposes, and define the full legal framework governing the Town's exercise of eminent domain.

**A.  The Town's Eminent Domain Authority Derives from its Charter.**

Section 1-3 of the Town Charter expressly authorizes the Town to acquire property through the exercise of eminent domain.  The Charter provides that the Town "may acquire property … for town purposes, in fee simple or any lesser interest or estate, by purchase, lease, gift, devise or condemnation … for public use," and grants the Town all powers necessary and incidental to

carrying out that authority. *See* **SUF Ex. 2**, Johnston Town Charter § 1-3. This provision confirms that the Town possesses explicit charter-based authority to condemn property for public purposes.

Importantly, the Town Charter was expressly ratified by the Rhode Island General Assembly in 1963:

> In all other respects in which said Johnston charter may require ratification, confirmation, validation or enactment by the general assembly, but in no other respects, the provisions of said Johnston charter are hereby ratified, confirmed, validated, and enacted. Any act or thing heretofore done or purported to be done under the provisions of said charter is hereby ratified and confirmed.

R.I. P.L. 1963, ch. 187 ¶ 2. Moreover, Rhode Island Supreme Court has explained that "[r]atification of a charter as a whole by the General Assembly has been sufficient to expressly ratify a provision of the charter." *Purcell v. Johnson*, 297 A.3d 464, 469 (R.I. 2023); *see also id.* at 470 ("To require the General Assembly to enumerate each provision of a municipal charter, after stating its express intent to ratify, confirm, validate or enact all of the provisions therein that require it, would be an absurd result."); *Power Test Realty Company Limited Partnership v. Coit*, 134 A.3d 1213, 1222 (R.I. 2016)) (explaining that courts "presume[] that the General Assembly knows the state of existing relevant law when it enacts or amends a statute.").

The Rhode Island Supreme Court has also made clear that municipal charters ratified by the General Assembly—also known as "Home Rule Charters"—carry the full force of law and constitute an independent grant of authority, subject only to limitations imposed by the Rhode Island Constitution and applicable state laws. *See e.g., Hourihan v. Town of Middletown*, 723 A.2d 790, 791 (R.I. 1998). ("When municipalities have adopted Home Rule Charters, those cities and towns are empowered to enact ordinances regulating all purely local matters."); *Bruckshaw v. Paolino*, 557 A.2d 1221, 1223 (R.I. 1989) ("The Rhode Island Constitution grants the authority to every city and town to enact a home rule charter. Once it adopts such a charter, the city or town

has 'the right of self government in all local matters' as long as the charter is 'not inconsistent with this [Rhode Island] Constitution and laws enacted by the general assembly in conformity with the powers reserved to the general assembly.'"); *see also* R.I. Const. art. XIII, §§ 1 and 2.

Accordingly, where, as here, a charter expressly authorizes the exercise of eminent domain, the municipality is not required to trace that authority to—or condition it upon compliance with— unrelated statutory frameworks designed to govern different entities or circumstances. *See id.* at 472; *see also Foster Glocester Reg'l Sch. Bldg. Comm. v. Sette,* 996 A.2d 1120, 1125-26 (R.I. 2010) (finding that a charter ratified by the General Assembly prevails over an inconsistent provision of a law of statewide application).

### B. The Town's Eminent Domain Power is Limited by the Requirements of the United States and Rhode Island Constitutions.

While the Town Charter confers upon the Town the independent authority to take, the Town's exercise of eminent domain power is constrained by the limitations imposed by the Rhode Island and United States Constitutions. *See R.I. Econ. Dev. Corp. v. Parking Co., L.P.*, 892 A.2d 87, 96 (R.I. 2006) ("Although a state's eminent domain authority is not derived from a specific constitutional grant, its exercise is limited by the Constitution.").

The Rhode Island Constitution and the United States Constitution are substantively identical in their treatment of eminent domain, particularly regarding the requirements of public use and just compensation. Both constitutional provisions impose two primary limitations on the exercise of eminent domain: (1) private property may only be taken for public use, and (2) such takings must be accompanied by just compensation. U.S. Const. Amend. V.; R.I. Const. Art. I, § 16. Specifically, Article I, Section 16 of the Rhode Island Constitution explicitly states that "[p]rivate property shall not be taken for public uses, without just compensation." R.I. Const. Art. I, § 16. Similarly, the Fifth Amendment to the United States Constitution provides that "private

property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. These provisions are interpreted as imposing identical requirements, with the Rhode Island Supreme Court consistently recognizing the parallel nature of these constitutional protections. *See R.I. Econ. Dev. Corp.*, 892 A.2d at 96.

<div align="center">* * *</div>

Apart from those constitutional constraints, no additional statutory limitations apply in this case to restrict the Town's exercise of eminent domain.  Plaintiffs attempt to impose such additional requirements by invoking the BHPA and the MPBAL, but that effort fails at the threshold as explained more fully below.  Neither statute governs this taking, and neither limits the Town's charter-based authority to condemn property for core municipal purposes. As explained below, the BHPA applies only to takings undertaken for *economic development purposes*, which is not the case here.  Likewise, the MPBAL establishes an optional, authority-based mechanism for financing and delivering public building projects through a legally distinct municipal public buildings authority; it does not regulate or displace a municipality's independent exercise of eminent domain under its charter.  Because the Town complied with its Charter, the Rhode Island Constitution, and the U.S. Constitution—and because neither statute cited by Plaintiffs applies—Plaintiffs' ultra vires taking claim (Count V) fails as a matter of law and should be dismissed.

### C. The Rhode Island Municipal Public Buildings Authorities Law Does Not Govern, Limit or Condition the Town's Valid, Independent Exercise of Eminent Domain.

Plaintiffs' contention that the Town's condemnation is invalid for failure to comply with the Rhode Island Municipal Public Buildings Authorities Law, R.I. Gen. Laws §§ 45-50-1–45-50-31 (the "MPBAL"), fails as a matter of law.  The MPBAL does not purport to regulate, restrict, or

condition a municipality's independent exercise of eminent domain authority.  Rather, by its plain language, the statute creates a separate public instrumentality—the "municipal public buildings authority"—and provides a supplemental, optional mechanism through which an authority may finance and deliver certain municipal projects.  *See* §§ 45-50-2, 45-50-3(a), 45-50-29; *see also Root v. Providence Water Supply Bd.*, 850 A.2d 94, 98 (R.I. 2004) (explaining that the MPBAL's purpose is "to afford each municipality an alternate financing and administrative mechanism to proceed with certain types of public-building projects.").  Because the Town did not condemn the Property through a municipal public building authority or pursuant to the MPBAL, Plaintiffs' claim under this statute is inapposite and provides no basis to invalidate the taking.

1.  The MPBAL Establishes a Legally Distinct "Authority" and an Alternative Financing Framework; It Does Not Displace Municipal Condemnation Authority.

The MPBAL is, by design, an enabling statute aimed at "alternative financing techniques" for public facilities—particularly the issuance of authority revenue bonds payable from lease revenues.  Section 45-50-3(a) declares the Legislature's finding "that a need exists to authorize" covered municipalities "to possess powers enabling the implementation of alternative financing techniques." Section 45-50-10(a)(1) accordingly empowers "the authority" to "acquire and construct public facilities" and "issue revenue bonds … payable from the revenues derived from leasing of these projects." *See* § 45-50-10(a)(1).  The statute thus focuses on providing an additional project-delivery and financing vehicle—an authority that can build facilities and lease them back to the municipality—rather than regulating how municipalities otherwise acquire property for municipal purposes. *See* §§ 45-50-3(a), 45-50-10(a)(1), 45-50-14.

Consistent with that design, the statute expressly provides that the authority is "an instrumentality and agency of the city or town, *but has a distinct legal existence from the city or*

*town.*"[1] Section 45-50-2 (emphasis added). The MPBAL, therefore, does not convert municipal condemnations into "authority" actions, nor does it impose authority-specific financing or procurement procedures on a municipality acting under separate sources of eminent domain power. *See id.*

### 2. The MPBAL Applies Only When a Municipal Public Buildings Authority Has Been Activated and is Transacting Business Under the Chapter.

The MPBAL further confirms that it is operative only when a municipal public buildings authority is activated through a specific process. An authority "shall not transact any business or exercise any powers under this chapter, unless and until" the town council "by resolution, declares … that there is need for an authority to function" and the Public Finance Management Board "by resolution, approve[s] the creation" of the authority. Section 45-50-3(d). Plaintiffs' theory disregards this statutory gatekeeping. The MPBAL does not automatically govern every municipal acquisition of property for a public building. It governs only projects undertaken by an activated authority exercising powers "under this chapter." *See* §§ 45-50-3(d), 45-50-4. Here, the Town condemned Plaintiffs' Property pursuant to its charter-based authority, not through a municipal public buildings authority created and operating under the MPBAL. *See* **SUF Ex. 2,** Town Charter § 1-3; **SUF Ex. 1,** General Assembly Ratification of Charter; **SUF Exs. 7-9**, Resolutions; **SUF Exs. 30**, Recorded Documents and Proof of Service. For that reason alone, the MPBAL is not implicated.

---

[1] Notably, the MPBAL has been applied in Rhode Island case law in litigation where a municipal public building authority is the named defendant. *See e.g., Mitola v. Providence Pub. Bldgs. Auth.*, 273 A.3d 618 (R.I. 2022); *Gorham v. Public Bldg. Auth.*, 612 A.2d 708 (R.I. 1992); *Mitola v. Providence Pub. Bldgs. Auth.*, 2024 R.I. Super. LEXIS 68, at *1 (R.I. Super. Aug. 16, 2024); *Mitola v. Providence Pub. Bldgs. Auth.*, 2019 R.I. Super. LEXIS 112, at *1 (R.I. Super. Sep. 12, 2019); *Mitola v. Providence Pub. Bldgs. Auth.*, 2016 R.I. Super. LEXIS 222, at *1 (R.I. Super. Mar. 1, 2016); *Providence Pub. Bldgs. Auth. v. Mitola*, 2009 R.I. Super. LEXIS 94, at *1 (R.I. Super. July 31, 2019); see also, *Root v. Providence Water Supply Bd.*, 850 A.2d 94 (R.I. 2004) (appealing from Gorham v. Public Building Authority case, wherein the Providence public buildings authority was a named defendant). The Town is unaware of any case where the MPBAL has been applied against a municipality exercising its eminent domain authority to take land for a public purpose pursuant to its charter-based authority.

3. <u>The MPBAL is Expressly Supplemental and "Alternative," Not Mandatory or Exclusive.</u>

Section 45-50-29 of the MPBAL explicitly confirms that municipalities are not required to follow the Act:

> "This chapter shall be construed to provide a complete, additional, and alternative method for doing the things authorized by this chapter, and shall be regarded as supplemental and in addition to the powers conferred by other laws." § 45-50-29 (emphasis added).

That language is fatal to Plaintiffs' claim. A statute that is, by its text, "additional" and "alternative"—"supplemental and in addition to" other powers—cannot be recast as an exclusive set of mandatory procedures that invalidates municipal action taken under its charter-based authority. *See id.* To the contrary, the Legislature affirmatively preserved other lawful municipal pathways while offering the MPBAL as an optional mechanism. *See id.*

Plaintiffs' reading would effectively convert Chapter 50 into a universal procedural code for any municipal acquisition of property connected to public buildings—despite the Legislature's explicit focus on authority-based financing, revenue bonds, leases, and authority governance. *See* §§ 45-50-3(a), 45-50-10(a)(1), 45-50-11, 45-50-14–45-50-17. It would also nullify § 45-50-29's express statement that the chapter is "additional" and "alternative." § 45-50-29. Courts do not interpret statutes in a manner that renders express statutory language meaningless. *Zarrella Tr. v. Town of Exeter,* No. WC-15-0218, 2016 R.I. Super. LEXIS 80, at *9 (Super. Ct. July 19, 2016).

Because the Town's condemnation was undertaken pursuant to its independent municipal authority—not by a municipal public buildings authority operating under MPBAL—Plaintiffs' claim under this statute fails as a matter of law and cannot support the extraordinary remedy of invalidating a taking. *See* R.I. Gen. Laws §§ 45-50-2, 45-50-3(d), 45-50-13(a), 45-50-29.

**D. The Rhode Island Home and Business Protection Act Does Not Apply Because the Town did not Attempt to Take for "Economic Development" Purposes.**

Similarly, Plaintiffs' contention that the Town's condemnation is invalid for failure to comply with the Rhode Island Home and Business Protection Act, R.I. Gen. Laws § 42-64.12-1 *et seq*. (the "BHPA"), fails as a matter of law.

Preliminarily, as explained above, the Town's exercise of eminent domain is not limited by the BHPA—it is only limited by the public use and just compensation requirements of the state and federal constitutions. However, assuming *arguendo* that the Town was required to comply with the BHPA, the Town did not violate the text of the Act. Rhode Island courts interpreting the BHPA have confirmed that its enhanced procedural and compensation requirements apply only to takings undertaken for economic development purposes, not to takings for traditional public uses enumerated in § 42-64.12-6; *see also* R.I. Gen. Laws § 42-64.12-3 ("The purposes of this chapter are to set forth permissible uses of eminent domain power and to define, limit, and restrict the use of eminent domain for *economic development purposes*.") (emphasis added). For example, in *Kniffer v. Rhode Island Airport Corp.*, the Rhode Island Superior Court squarely addressed whether property taken for a permissible public use could nevertheless be treated as a "restricted" economic development taking requiring payment of 150% of fair market value under § 42-64.12-8. The court answered that question in the negative, holding that "the exercise of eminent domain for one or more permissible use under Section Six *cannot* also be a restricted use under Sections Seven or Eight as a matter of law." No. WC-2016-0121, slip op. at 20 (R.I. Super. Ct. 2023).

Here, assuming the Act applied, the Town's acquisition of the Property to construct a municipal campus housing public safety headquarters and Town Hall facilities falls squarely within § 42-64.12-6's authorization for takings "[p]roviding for public ownership and use" and "[c]orrecting conditions adversely affecting public health [and] safety." Because the taking was not undertaken for economic development purposes, Sections Seven and Eight of the Act—

18

including the 150% compensation provision—are inapplicable as a matter of law. Accordingly, Plaintiffs' claim that the Town was required to comply with the Home and Business Protection Act's economic-development procedures and compensation requirements fails, and summary judgment should enter in the Town's favor on Count Six.

### E. The Town Had the Authority to Act by Resolution, and its Taking Resolution Operated as the Functional Equivalent of an Ordinance.

The Rhode Island Supreme Court has recognized that municipal enactments are judged by their substance and effect, not the label attached to them; where a resolution is intended to regulate municipal affairs and has the practical attributes of a legislative enactment, it is "in substance and effect the functional equivalent of an ordinance." *O'Connell v. Bruce*, 710 A.2d 674, 675, 679 (R.I. 1998) (holding pension plan valid where adopted by resolution because resolution operated as ordinance in substance and effect; "the name given to it is immaterial" when it functions as a permanent regulation).

Here, the Town Council's takings resolutions were not a mere "expression of opinion" or a ministerial motion. *Id.* at 679. They constituted formal legislative acts that (i) declared the public purpose for the acquisition, (ii) authorized the taking, and (iii) set forth the procedures the Town would follow in implementing that authorization. In other words, the Town Council "intended to regulate the affairs of the municipality," and the enactment has the operative effect of law—precisely the circumstance in which Rhode Island courts treat a resolution as the functional equivalent of an ordinance. *O'Connell*, 710 A.2d at 679.

Nor is there any legal defect with the Town's process absent some contrary statutory command. Rhode Island law recognizes that municipalities are creatures of the State and may legislate through their council consistent with their charter and enabling framework; the limiting principle is that municipal enactments may not contravene controlling state law of statewide

application "on the same subject if the Legislature intended that they thoroughly occupy the field." *See e.g., East Greenwich v. O'Neil*, 672 A.2d 104 (R.I. 1992) (reaffirming municipal enactments are subordinate to statewide statutes and may be preempted only where the Legislature has occupied the field). Plaintiffs cannot identify any state statute prescribing an <u>exclusive, mandatory</u> procedure governing the Town's issuance of a taking authorization of this kind—much less one that forbids proceeding by resolution where the enactment otherwise embodies the Council's legislative authorization and does not conflict with state law. Where, as here, there is no conflicting statewide enactment dictating a different procedure, the Town's legislative choice to proceed by resolution is lawful, and the resolutions are valid and effective. *O'Connell*, 710 A.2d 674; *East Greenwich*, 672 A.2d 104.

## II. <u>PLAINTIFFS' FIFTH AMENDMENT PUBLIC CLAIM FAILS AS A MATTER OF LAW BECAUSE THE TOWN COMPLIED WITH THE REQUIREMENTS IMPOSED BY THE STATE AND FEDERAL CONSTITUTIONS.</u>

The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."[2] U.S. Const. amend. V. The Supreme Court has long recognized that this clause places a minimal substantive constraint on eminent-domain power. It does not prohibit takings; rather, it conditions the government's power to take property on two requirements: (1) the taking must be for a public use, and (2) the government must make just compensation available. As explained below, the Town fully complied with these limitations.

### A. The Town's Condemnation of the Property for a Municipal Campus is a Paradigmatic Public Use Under Binding Supreme Court Precedent.

The Public Use Clause is satisfied when a taking is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Critically, the Supreme

---

[2] The Public Use Clause is incorporated against states and municipalities through the Fourteenth Amendment. U.S. Const. Amend. XIV.

Court has instructed for decades that the public use requirement is highly deferential, and courts should not second-guess governmental determinations of public use. *See e.g.*, *Berman v. Parker*, 348 U.S. 26, 32 (1954) ("The role of the judiciary in determining whether [eminent domain] power is being exercised for a public purpose is an extremely narrow one."); *Old Dominion Co. v. United States*, 269 U.S. 55, 66 (1925) (noting that deference to the legislature's "public use" determination is required "until it is shown to involve an impossibility"); *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984) (noting that the Supreme Court "has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use unless the use be palpably without reasonable foundation." (internal citations omitted)). Also, importantly, "it is only the taking's purpose, not its mechanics, that must pass scrutiny under the Public Use Clause." *Midkiff*, 467 U.S. at 244.

Importantly, for our purposes, the Supreme Court recognizes two categories of quintessentially legitimate public uses under the Takings Clause: (1) "takings that transfer private property to public ownership, resulting in the administration of lands for the public good;" and (2) "takings that make property available for use by the general public." *Fideicomiso de la Tierra del Cano Martin Pena v. Fortuno*, 604 F.3d 7, 18 (1st Cir. 2010). In the instant case, the Town Resolution documents make clear that purpose for seizing the Plaintiffs' property is to build a "central campus for Fire Department Headquarters, Police Department Headquarters and a Town Hall." *See* **SUF Ex. 9**, Resolution 2025-18. This is an example of a paradigmatic public use. *See Kohl v. United States*, 91 U.S. 367, 371 (1875) (recognizing the taking of land for government buildings as an original, paradigmatic public use); *see also Saratoga Fire Prot. Dist. v. Hackett*, 97 Cal. App. 4th 895, 898 (2002) (condemnation of land, under California eminent domain law, for use as "firefighters' residence, offices for public safety personnel, public parking, and other

public uses" implicitly upheld as a public use). Because a municipal campus is an indisputable public use under Supreme Court precedent, the public-use requirement is clearly satisfied.

### B. The Town Complied with the Just Compensation Requirement.

The Fifth Amendment does not prohibit the taking of private property for public use; it requires only that just compensation be paid. U.S. Const. amend. V; *see also First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314 (1987) (noting that the Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power."). Notably, "[j]ust compensation in condemnation cases is based on fair market value of land at the time of the taking." *Tenn. Gas Pipeline Co. v. 104 Acres of Land*, 780 F. Supp. 82, 86 (D.R.I. 1991) (citing *J.W.A. Realty, Inc. v. City of Cranston,* 399 A.2d 479, 482 (R.I. 1979)).

1. The Takings Clause Is Satisfied Where the Government Provides an Adequate Mechanism for Just Compensation.

At the outset, Plaintiffs' argument that the Town took the Property without contemporaneously providing just compensation rests on a fundamental misunderstanding of takings law. The Fifth Amendment does not require the government to pay just compensation at the moment property is taken, nor does it require advance payment as a condition precedent to a lawful taking; to the contrary, it has long been settled—by the United States Supreme Court and Rhode Island Supreme Court—that a taking satisfies constitutional requirements so long as the government has, at the time of the taking, established reasonable, certain, and adequate procedures by which the property owner may obtain just compensation. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, (1985) ("Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at

the time of the taking." (internal quotations omitted)); *Knick v. Twp. of Scott*, 588 U.S. 180, 202 (2019) (finding that post-taking compensation remedies are generally sufficient to satisfy the constitutional requirement, and barring government action in the absence of contemporaneous compensation is typically not appropriate); *Newport v. Newport Water Corp*., 189 A. 843, 844 (R.I. 1937) ("Where the taking is by or for the state or one of its municipal corporations, it is not essential that payment should first be made before taking by condemnation, if an adequate and certain remedy for payment is provided against the state or municipality.")

As the United States Supreme Court recently explained in *DeVillier v. Texas*, the availability of a state inverse-condemnation cause of action is sufficient to satisfy the just compensation requirement because such a cause of action provides the property owner with a means to obtain just compensation. *See* 61 U.S. 285, 286 (2024). Rhode Island law provides the Plaintiffs with the ability to assert an inverse-condemnation claim and, thus, the Takings Clause is satisfied. *Id.*; W*illiamson Cty.*, 473 U.S. at 194; *Knick*, 588 U.S. at 202.

2. <u>The Town Attempted to Make Just Compensation Available to the Plaintiffs Contemporaneous with the Taking, Which They Rejected.</u>

Although not required, the undisputed record establishes that the Town attempted to provided just compensation to the Plaintiffs contemporaneous with the taking. The relevant facts are straightforward and undisputed.

On March 10, 2025, the Johnston Town Council adopted Resolution 2025-18 authorizing the taking of Plaintiffs' property for public use. SUF at ¶ 89. On March 11, 2025, a written description of the property and a formal statement of the taking were executed by the Mayor of Johnston and the President of the Town Council. *Id.* at ¶¶ 97-99. On March 12, 2025, the Town Clerk duly recorded the resolutions, description, and statement of taking in the Town's land evidence records. *Id.* at ¶ 100.

Based on an appraisal conducted by a Rhode Island state-certified real estate appraiser retained by the Town to determine the fair market value of the Property at the time of the taking, on March 12, 2025, the Town filed a Petition to deposit the full amount of just compensation into the registry of the Superior Court in order to complete the taking. *Id.* at ¶ 101. The Superior Court allowed that motion on March 14, 2025, and the Town deposited the appraised amount—$775,000—into the court's registry to be held for the benefit of Plaintiffs as just compensation for the intended taking. *Id.* at ¶¶ 102-103. Therefore, on the same day as the taking documents were recorded in the Town's land evidence records, the Town initiated procedures to provide the Plaintiffs with just compensation required by law.

However, on March 17, 2025, the Plaintiffs filed an emergency motion in the Superior Court seeking reconsideration or vacatur of the order authorizing the deposit. *Id.* at ¶ 106. Later, on March 25, 2025, the parties entered into a stipulation of dismissal of the Superior Court action, pursuant to which the funds deposited in the registry were released back to the Town pending the resolution of this federal court action. *Id.* at ¶ 107.

These facts similarly defeat Plaintiffs' claims. Once again, the Fifth Amendment does not require a municipality to tender payment directly to a landowner who has elected to challenge the taking in court. To the contrary, depositing compensation into the court registry while litigation is pending is a well-established and constitutionally sufficient mechanism for ensuring that compensation is available. *See e.g.*, *United States v. 0.707 Acres of Land*, No. l:07-CV-851, 2010 U.S. Dist. LEXIS 111446, at *5 (E.D. Tex. Sep. 16, 2010); *United States v. 74.57 Acres*, No. 12-0239-WS-N, 2012 U.S. Dist. LEXIS 51441, at *5 (S.D. Ala. Apr. 11, 2012). Here, the Town deposited the just compensation amount in the Superior Court Registry for the benefit of the Plaintiffs, and the Plaintiffs challenged the Town's actions and moved for the court to vacate its

decision and return the funds to the Town.  As a result of the above facts, Plaintiffs cannot credibly claim that the Town took their Property without providing just compensation, and summary judgment should enter in the Town's favor.

## III.   PLAINTIFFS' PRETEXT THEORY FAILS AS A MATTER OF LAW BECAUSE THE TAKING SERVES A VALID PUBLIC USE AND IS NOT A PRIVATE TRANSFER.

Plaintiffs' pretext theory rests on a fundamental misunderstanding of the Takings Clause framework.  The United States Supreme Court and circuit courts have made clear that judicial inquiry into alleged governmental motives is exceedingly limited and arises only in the narrow circumstance where a purported public purpose is alleged to mask a transfer of property to a private party.  *See Kelo v. City of London*, 545 U.S. 469 (2005); *Brinkmann v. Town of Southold*, 96 F.4th 209 (2d Cir. 2024).  Where a taking bears a rational relationship to a well-established category of public uses, courts simply cannot probe subjective motives or alleged pretext. *Brinkmann*, 96 F.4th at 214; *Goldstein v. Pataki*, 516 F.3d 50, 58-59 (2d Cir. 2008).

### A. Courts Cannot Inquire into Alleged Motives or Pretext Where the Taking is for a Classic Public Use.

The Second Circuit's recent decision in *Brinkmann v. Town of Southold*, 96 F.4th 209 (2d Cir. 2024), squarely confirms that, when a taking is for a classic public use, the Takings Clause does not permit courts to inquire into alleged "pretexts" or the subjective motives of individual government officials.  That principle forecloses Plaintiffs' sham-taking theory here.

In *Brinkmann*, the plaintiffs alleged that the Town of Southold's decision to condemn their parcel and create a public park was merely a pretext to block their plan to build a big-box hardware store.  96 F.4th at 210–11.  The Second Circuit assumed, for purposes of the motion to dismiss, that the complaint adequately alleged hostility to the plaintiffs' commercial project and a series of regulatory obstacles erected to defeat it.  *Id.* at 210–11.  The sole question on appeal was whether

25

"the Takings Clause is violated when a property is taken for a public amenity as a pretext for defeating the owner's plans for another use." *Id.* at 210–11.

The court's answer was unequivocal: **<u>no</u>**. It held that "when the taking is for a public purpose, courts do not inquire into alleged pretexts and motives." *Id.* at 211. Relying on *Berman, Midkiff*, and *Kelo*, the Second Circuit emphasized that the judiciary's role in reviewing a public-use determination is "extremely narrow," and that, subject to specific constitutional limits, "the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation." *Brinkmann*, 96 F.4th at 212 (quoting *Berman*, 348 U.S. at 32); *see also Midkiff*, 467 U.S. 229, 244 (1984) ("[L]egislatures are better able to assess what public purposes should be advanced by an exercise of taking power.").

### B. Courts Address Pretext Only in the Narrow Circumstance Where the Government Invokes a Public Purpose as a Pretext for a Private Taking.

Critically, *Brinkmann* rejected the very theory Plaintiffs advance here: that a taking violates the Public Use Clause even if the government's public purpose is "real," where the taking was allegedly adopted to stop an owner's preferred use. Specifically, in *Brinkmann*, the plaintiffs proposed a reading of *Kelo* that would "require[] the government's stated objective to be genuine, and not a pretext for some other, illegitimate purpose." *Id.* at 212. The Second Circuit held that this reading of *Kelo* was untenable. *Id.*

Instead, the court explained that *Kelo*'s passing reference to "pretext," addresses only the narrow situation in which government invokes a public purpose as camouflage for an actual **<u>private</u>** taking—"for the sole purpose of transferring [property] to another private party." *Id.* at 211–12 (discussing *Kelo*, 545 U.S. at 477–78; *Midkiff*, 467 U.S. at 245). So long as the actual purpose is public, the Takings Clause is satisfied. *Id.* at 217 (noting that subject to other

constitutional or statutory limits, "the Supreme Court's current pronouncement on 'pretext' concerns only the pretext of non-public (that is, private) use.").

The conclusions reached in *Brinkmann* are reinforced by the Second Circuit's earlier decision in *Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008), which *Brinkmann* quotes at length. Specifically, *Goldstein* rejected a post-*Kelo* invitation to conduct a searching inquiry into the "true" motives behind a redevelopment project, describing a broad pretext-based challenge as having a "dubious jurisprudential pedigree." *Id*. at 62. The court made clear that it did "not read *Kelo*'s reference to 'pretext' as demanding … a full judicial inquiry into the subjective motivation of every official who supported the project," an exercise it described as conceptually fraught and in tension with principles of federalism and separation of powers. *Id*. at 63; *Brinkmann*, 96 F.4th at 213–14 (quoting *Goldstein*). *Brinkmann* reiterated that message: a condemning authority has "a complete defense to a public-use challenge" if, "viewed objectively, the [project] bears at least a rational relationship to … well-established categories of public uses." 96 F.4th at 214 (quoting *Goldstein*, 516 F.3d at 58–59).

\* \* \*

Ultimately, similar to the park in *Brinkmann*, the Town's planned use of the Property is an undisputed public use: a consolidated municipal campus housing a police headquarters, fire headquarters, and town hall. If a passive-use public park is a "public amenity that serves a public purpose," *Brinkmann*, 96 F.4th at 212–13, then essential public-safety and municipal facilities are at the core of what "public use" has always meant. Under *Brinkmann* and *Goldstein*, the Town has a "complete defense" to Plaintiffs' public-use challenge because, viewed objectively, the project is rationally related to well-established categories of public uses—public safety, government administration, and civic services. *Brinkmann*, 96 F.4th 209; *Goldstein*, 516 F.3d 50.

Plaintiffs' allegations do nothing to change that conclusion.  At most, they contend in their Complaint that one Town official opposed their proposed development or preferred a municipal campus over their housing proposal.  But as *Brinkmann* explains, government officials' motives are "fragmented—and rarely, if ever, pure," and "different legislators may vote for a single measure with different goals." 96 F.4th at 214 (quoting *Goldstein*, 516 F.3d at 62–63). Accordingly, Supreme Court precedent "wisely forecloses inquiry into whether a government actor had bad reasons for doing good things."  *Id*.

Under this framework, Plaintiffs' sham-taking theory fails as a matter of law.  They do not allege—let alone adduce evidence—that the Town intends to transfer the Property to a private party or that the municipal-campus justification is a façade for private enrichment.  Their challenge rests entirely on assertions about why Town officials chose this public project over Plaintiffs' preferred use.  That is precisely the kind of motive-sifting *Brinkmann* and *Goldstein* reject.  The only constitutionally relevant question under the Public Use Clause is whether the taking is rationally related to a public purpose.  Here, it plainly is.

Accordingly, under *Brinkmann*, *Goldstein*, *Berman*, *Midkiff*, and *Kelo*, the Town's decision to condemn the Santoro property for a municipal complex is not subject to a pretext challenge. Because the undisputed record shows that the project serves a classic public use and Plaintiffs identify no private beneficiary or non-public end, summary judgment should be granted in the Town's favor.

IV.  **PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM FAILS BECAUSE THE TAKINGS CLAUSE PROVIDES THE EXCLUSIVE CONSTITUTIONAL STANDARD THAT GOVERNS THIS CASE.**

### A. Supreme Court Precedent Forecloses a Substantive Due Process Inquiry Because a More Specific Constitutional Provision Applies.

Substantive due process is not a free-floating constitutional tort.  It is a limited doctrine, to be invoked only when no other specific constitutional provision applies.  *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Where a plaintiff's claim arises from conduct expressly addressed by another constitutional amendment, "that Amendment, not the more generalized notion of substantive due process, must be the guide." *Graham*, 490 U.S. at 395.

That rule is dispositive here.  Plaintiffs challenge the Town's exercise of eminent domain, alleging that the Town took their property "arbitrarily," "oppressively," and "in a manner that shocks the conscience."  Am. Compl. at ¶ 131.  But the Fifth Amendment's Takings Clause provides the precise constitutional framework for evaluating whether a government taking is lawful.  Because the Takings Clause squarely governs the conduct at issue, Plaintiffs may not repackage their dissatisfaction with the condemnation process as a Fourteenth Amendment substantive due process claim.

### B. Courts Routinely Reject Attempts to Repackage Eminent-Domain or Land-Use Disputes as Substantive Due Process Claims.

Even apart from the Supreme Court's directive that specific constitutional provisions displace substantive due process, federal courts consistently hold that plaintiffs cannot transform a takings claim into a substantive due process claim.  Courts reject such efforts for a simple reason: the Takings Clause already supplies the governing substantive standard, and allowing Plaintiffs to

bypass it would improperly expand substantive due process into an all-purpose challenge to property decisions.

The Supreme Court made this principle unmistakable in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 560 U.S. 702 (2010). There, the Court rejected an attempt to recast an alleged taking as a substantive due process violation, explaining that "the first problem with using substantive due process to do the work of the Takings Clause is that we have held it cannot be done." *Id.* at 721. The Court reinforced *Albright's* foundational rule: when the Constitution itself supplies the analytical framework—as the Takings Clause does here—courts may not apply substantive due process in its place. *Id.*

Lower courts uniformly follow this directive. In *Thomas v. City of Detroit*, No. 06-11753, 2007 U.S. Dist. LEXIS 13520 (E.D. Mich. Feb. 29, 2007), the court dismissed a substantive due process challenge to a condemnation because the claim sounded in takings, and therefore the Takings Clause—not substantive due process—controlled. *Id.* at *27-28; *see also id.* at *26 ("[t]he takings clause itself addresses whether and under what circumstances the government may take an individual's property, which is why a number of other circuits have concluded that no room is left for the concept of substantive due process."). Surveying federal precedent, the court noted that substantive due process was not available as a parallel or alternative theory to the plaintiff's Fifth Amendment claim. *Id.* at *27; *see also id.* at *27-28 ("In this case, Thomas property deprivation claims should have been brought under either the Fourth Amendment or the Fifth Amendment Takings Clause."). Courts across the country follow the same rule: where a plaintiff's injury arises from the taking of property, the Takings Clause displaces more generalized due process claims. Similarly, in *Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978 (9th Cir. 2002), the Ninth Circuit held that property-based constitutional claims must proceed under the

Takings Clause, which "provides an explicit source of constitutional protection" in this area. *Id.* at 982. Because plaintiffs alleged that the City's actions deprived them of the economically viable use of their land, the court rejected their substantive due process theory as legally foreclosed.

These decisions reflect a consistent and well-settled rule: when a plaintiff's alleged injury concerns governmental acquisition of property, the Takings Clause—not substantive due process—supplies the exclusive constitutional standard. Allowing litigants to pursue duplicative substantive due process claims would improperly expand the doctrine beyond its intended limits and circumvent the very constitutional provision designed to address property deprivations.

Plaintiffs' allegations here fall squarely within the Takings Clause, and for that reason alone, their substantive due process claim must be dismissed as a matter of law.

### C. Even if Substantive Due Process Applied, Plaintiffs' Allegations Fall Far Short of the "Conscience-Shocking" Standard.

#### 1. The "Conscience-Shocking" Test is Reserved for Truly Egregious or Abusive Government Conduct.

Even assuming arguendo that Plaintiffs could invoke substantive due process on top of their Takings Clause claim, their allegations still fail as a matter of law. "[W]ith a regularity bordering on the monotonous" the First Circuit has clearly stated that "to be liable for a violation of substantive due process rights, a defendant must have engaged in behavior that is conscience-shocking." *Mongeau v. City of Marlborough*, 492 F.3d 14, 19–20 (1st Cir. 2007); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). This standard is exceptionally high and requires proof of egregious, outrageous, or intolerable government behavior. *Lewis*, 523 U.S. at 847 n.8; *Brandywine Village Associates v. East Brandywine Township,* 2020 U.S. Dist. LEXIS 167350, at *1, *20–22 (E.D. Pa. Sept. 14, 2020); *see also Ciampi v. Zuczek*, 598 F. Supp. 2d. 257, 264 (D.R.I. 2009) (explaining that substantive due process allegations "are reserved to render relief

only in the 'truly horrendous situations.'").  As the First Circuit has made clear, "[i]n evaluating the suspect state action, the conduct must be stunning, egregiously unacceptable, outrageous, or conscience-shocking and evidence more than humdrum legal error."  *Ciampi*, 598 F. Supp. 2d at 264 (citing *Amsden v. Moran,* 904 F.2d 748, 754 (1st Cir. 1990)).  Actions motivated by improper purposes or bad faith alone are insufficient unless they bear no reasonable relation to legitimate government objectives or involve extreme misconduct such as corruption or self-dealing. *Brandywine*, 2020 U.S. Dist. LEXIS 167350, at *21-22.

## 2. Political Disagreement Does Not Satisfy the Demanding Substantive Due Process Standard.

Plaintiffs' substantive due process claim must fail because the substantive due process standard is intentionally "reserved for truly egregious conduct"—not ordinary disputes over municipal policy, land-use priorities, or the political dynamics that inevitably accompany local governance.  In the land-use setting, federal courts repeatedly emphasize that substantive due process is not a device for federal courts to referee local decision-making simply because a plaintiff believes the municipality acted for the wrong reasons or reached the wrong outcome.  *See e.g.*, *Skiles v. City of Reading*, 449 Fed. Appx. 153, 157-58 (3rd Cir. 2011) ("Indeed, we have merely recognized that land-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with improper motives." (internal quotations omitted)); *see also id.* at 157 ("In the zoning and land use context, the 'shocks-the-conscience' standard is 'designed to avoid converting federal courts into super zoning tribunals.'").

*Brandywine* is directly instructive on this point. There, the plaintiffs—"disappointed neighbors"— alleged that the township's post-condemnation decisions were so improper that they violated their substantive due process rights.  2020 U.S. Dist. LEXIS 167350, at *1–2.  The court

rejected the attempt to elevate a land-use conflict into a substantive due process claim and reiterated the governing rule: "[o]nly the most egregious official conduct" violates substantive due process, and government action in the land-use context violates substantive due process only when it "shocks the conscience." *Id.* at *21 (quoting *Sutton v. Chanceford Twp.*, 763 Fed. App'x 186, 192 (3d Cir. 2019)).

*Brandywine* also addressed the ordinary hallmarks of legitimate municipal land-use governance that do not give rise to substantive due process violations: local governments holding public hearings, evaluating proposals, revising plans, making, at times controversial, public decisions designed to promote a stated public purpose, and providing just compensation for taking of land consistent with public purpose. 2020 U.S. Dist. LEXIS 167350, at *1–2. Those actions, according to the court, are the opposite of conscience-shocking conduct; it is how local government is supposed to function. *Id.* And importantly, the court recognized that those unhappy with land-use outcomes may pursue remedies through state processes and judicial review, but dissatisfaction does not transform a land-use dispute into a federal substantive due process claim. *Id.* at *1–2, *18–19.

The court also stressed that substantive due process does not turn on motive-sifting or second-guessing the perceived political reasons behind municipal decisions. Instead, the question is whether the challenged action is so extreme—so detached from any legitimate governmental aim—that it can fairly be described as conscience-shocking. *Id.* at *21 ("A government action motivated by an 'improper purpose' or taken in bad faith does not necessarily 'shock the conscience'; rather, the action must bear no reasonable relation to legitimate government objectives."). In the land-use context, that threshold is met only in narrow, exceptional circumstances, such as "corruption or self-dealing," discrimination against a protected group,

interference with constitutionally protected activity, or a truly extraordinary deprivation akin to a "virtual taking" outside the ordinary channels of law.  *Id.* at *21–22.  Plaintiffs allege nothing of that character here.

      3.   <u>Plaintiffs Allege Nothing Approaching the Type of Extreme Misconduct Necessary to Trigger Substantive Due Process Protection.</u>

Plaintiffs' substantive due process theory ultimately reduces to rhetoric: in their complaint, they point to alleged statements by the Town's Mayor and characterize those remarks as evidence of "improper" motives.  But substantive due process is not a vehicle for litigating political disputes, parsing alleged rhetorical flourishes, or imputing the remarks of one official to the collective decisionmaking of municipal government.  *Ciampi*, 598 F. Supp. 2d at 264; *Mongeau*, 492 F.3d at 19–20.  Again, the doctrine is reserved for "only the most egregious official conduct." *Brandywine Vill. Assocs. v. E. Brandywine Twp.*, 2020 U.S. Dist. LEXIS 167350, at *21 (E.D. Pa. Sept. 14, 2020); *Ciampi*, 598 F. Supp. 2d at 264.

Here, the Town acted through established procedures, adopted formal resolutions, and exercised its eminent domain authority to advance a legitimate public purpose.  *See* Resolutions. The alleged statements of a single municipal official cannot be divorced from that collective process, nor can they transform a lawful, deliberative governmental action into the type of extreme, abusive, or corrupt conduct substantive due process is meant to police.  Because Plaintiffs allege neither conscience-shocking misconduct nor action untethered from legitimate governmental objectives, their substantive due process claim fails as a matter of law, and summary judgment should be granted in the Town's favor.

**V.    PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS AGAINST THE TOWN FAILS AS A MATTER OF LAW BECAUSE THERE IS NO UNDERLYING CONSTITUTIONAL VIOLATION.**

42 U.S.C. § 1983 supplies a private right of action for persons deprived of rights secured by the Constitution or federal law; it states, in pertinent part: "every person who, under the color of a statute, ordinance, regulation, custom or usage…subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Notably, "[s]ection 1983 does not create substantive rights but is rather a procedural mechanism for enforcing constitutional or statutory rights." *Educadores Puertorriquenos v. Rey Hernandez*, 508 F. Supp. 2d 164, 180 (D.P.R. 2007) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)); *see also Rodriguez Garcia v. Municipality of Caguas*, 354 F.3d 91, 99 (1st Cir. 2004) (noting that 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred… by the United States Constitution and federal statutes."). Thus, the first step in any such claim is to identify the specific constitutional right allegedly infringed. *Albright*, 510 U.S. at 271.

Here, as set forth above, Plaintiffs have failed to establish any underlying constitutional violation. The Complaint alleges violations of the Fifth and Fourteenth Amendment. However, as established above, both claims fail as a matter of law because (1) the Town's acquisition of Plaintiffs' property satisfies the Public Use Clause and provides for just compensation and (2) Plaintiffs' substantive due process claim is improper because the Fifth Amendment supplies the exclusive constitutional standard. Because Plaintiffs cannot demonstrate the deprivation of any right secured by the Constitution, their § 1983 claim fails as a matter of law and summary judgment must enter in the Town's favor.

## VI.  THE PLAINTIFFS' "BAD FAITH TAKING" CLAIM UNDER THE RHODE ISLAND CONSTITUTION FAILS AS A MATTER OF LAW.

### A. Under Rhode Island Law, Legislative Determinations of Public Use Are Entitled to Deference and Will Be Upheld Unless the Use Is Obviously Private.

Under Article I, Section 16 of the Rhode Island Constitution, the Takings Clause imposes two limits on eminent domain: (1) property may be taken only for a public use, and (2) the taking must be accompanied by just compensation. *See R.I. Econ. Dev. Corp. v. The Parking Co.*, 892 A.2d 87, 96 (R.I. 2006).

Rhode Island courts recognize that while the judiciary retains authority to determine whether a taking serves a public use, the necessity, expediency, and wisdom of a taking are legislative questions that are not subject to judicial second-guessing absent extraordinary circumstances. *Id.* ("However, in contrast to establishing the nature of the use, the necessity and expediency of the taking to further the public use is purely a legislative question in which the courts do not engage." (citing *Paiva v. Providence Redevelopment Agency*, 356 A.2d 203, 206 (R.I. 1976) and *Golden Gate Corp. v. Sullivan*, 314 A.2d 152, 154 (R.I. 1974)).

Importantly, when the condemning authority identifies a public purpose, that determination is entitled to weight and deference and will be upheld unless the purported public use is "obviously of a private character." *R.I. Econ. Dev. Corp.*, 892 A.2d at 101.  Although the Court will declare void a taking shown to exceed delegated authority through "arbitrary, capricious or bad faith" conduct, *id.* at 103-104, that doctrine is a narrow backstop reserved for extreme circumstances—such as where condemnation is used as a pretextual device to obtain a private advantage rather than to advance a bona fide public project. *Id.* at 105–08.

The Rhode Island Supreme Court's decision in *Rhode Island Economic Development Corp. v. Parking Co.* underscores how exceptional and rare bad-faith takings are under Rhode Island

law.  In *RIEDC*, the court invalidated a condemnation only after concluding that the taking bore no genuine relationship to a legitimate public use and was instead employed to achieve private ends.  *Id.*  There, a state agency invoked eminent domain to seize control of a privately owned airport parking garage—not to construct a public facility or provide public infrastructure, but to displace a private operator, gain revenue advantages, and circumvent a preexisting contractual arrangement that already governed the parties' rights.  *Id.* at 104–08. The Court emphasized that the taking was not part of a public plan, was economically motivated, and functioned as a de facto transfer of control of a profitable private enterprise.  *Id.*

Notably, the *RIEDC* court made clear that judicial invalidation is warranted only where an agency's actions amount to an arbitrary or bad-faith abuse of eminent domain authority.  *Id.* Indeed, the Court reaffirmed that legislative declarations of public use are entitled to deference and will control unless the asserted use is "obviously of a private character."  *Id.* at 101 (quoting *Opinion to the Governor*, 69 A.2d 531, 535 (1949)).  Moreover, where a public purpose clearly exists, "judicial approval is mandated whether or not 'there will be an incidental benefit to private interests.'"  *R.I. Econ. Dev. Corp.*, 892 A.2d at 104 (quoting *Advisory Op. to the Governor*, 324 A.2d 641, 646 (1974)).

Measured against that standard, this case falls well outside the narrow category of condemnations Rhode Island courts have found unlawful.  As explained above in *supra* Section I, the Town exercised eminent domain to acquire property for a core governmental purpose—the construction of a municipal campus housing public safety headquarters and Town Hall facilities. That use is not merely public in character; it is a paradigmatic public use.  Having established a valid public use, judicial approval is mandated here.

**B. The Town's Taking Bears None of the Hallmarks of Arbitrary, Capricious, or Bad-Faith Conduct.**

Even if the Court were to evaluate the taking under an arbitrary, capricious, or bad-faith standard, Plaintiffs' claim would still fail as a matter of law. Nothing about the Town's actions remotely resembles the extraordinary circumstances that have warranted judicial intervention in the past. *See RIDEC*, 892 A.2d at 104–08 (taking invalidated where condemning authority used eminent domain to reallocate control of a private commercial enterprise, evade contractual obligations, and extract economic leverage); *Capital Props., Inc. v. State*, C.A. No. 88-1654, C.A. No. 98-2525, C.A. Nos. 97-4199, 98-5202, C.A. No. 98-6254, 1999 R.I. Super. LEXIS 24, at *14 (Super. Ct. July 13, 1999) (finding that the City of Providence's condemnation of a parcel of land was arbitrary, capricious, and done in bad faith where the City failed to make the requisite findings of fact to support the conclusion that the area was blighted and required redevelopment).

To the contrary, as reflected in the undisputed factual record, the Town exercised its eminent domain authority through a structured, deliberative, and transparent legislative process. The Town Council adopted multiple formal resolutions supported by documented findings regarding the deteriorated condition of existing municipal facilities and the need for modernized public safety and municipal infrastructure. **SUF Exs. 7-9,** Resolutions. The Town engaged professional engineers and public safety leadership to evaluate site suitability, and it retained a state-certified appraiser to determine fair market value. *Id.* The taking was authorized by a multi-member legislative body acting within its delegated authority and pursuant to established procedures—not as a unilateral or ad hoc decision. *Id.*

Moreover, allegations concerning isolated statements by individual municipal officials cannot convert this record into one of arbitrary or bad-faith conduct. What matters under Article I, Section 16 of the Rhode Island Constitution is whether the taking serves a legitimate public use

and whether the condemning authority acted within its lawful powers.  Both requirements are satisfied here.  In short, this case presents the very type of municipal action that Rhode Island law protects from judicial second-guessing.  Because the Town's taking was undertaken for a bona fide public purpose, through a lawful and deliberative process, and without any indicia of arbitrariness, capriciousness, or bad faith, the Plaintiffs' state constitutional claim fails as a matter of law.

## **CONCLUSION**

For all of the foregoing reasons, the Town's condemnation of the Property is lawful as a matter of federal and Rhode Island law.  The undisputed record establishes that the taking is for a classic public use—the construction of a consolidated municipal campus housing Town Hall, Police Department, and Fire Department facilities—and thus satisfies the Public Use Clause under controlling precedent.  Plaintiffs' effort to reframe that legislative determination as "pretextual" is legally irrelevant where, as here, the objective purpose is indisputably public.

Plaintiffs' remaining constitutional claims likewise fail.  The Takings Clause supplies the exclusive constitutional standard governing eminent-domain challenges, foreclosing Plaintiffs' substantive due process theory; and, in any event, Plaintiffs identify no conduct that remotely approaches the "conscience-shocking" standard required for such a claim.  Plaintiffs' just-compensation claim also fails because the Town attempted to provide (and remains committed to providing) for compensation consistent with the Constitution and applicable law.  Without any underlying constitutional violation, Plaintiffs' § 1983 claim necessarily fails.  Plaintiffs' state constitutional "bad faith" claim fails for the same reasons: Rhode Island law affords substantial deference to legislative takings for bona fide public uses, and nothing in the record supports the extraordinary showing required to invalidate a municipal condemnation.  Finally, Plaintiffs'

statutory claim fails because the statutes they invoke do not apply to this taking and do not limit the Town's charter-based authority to condemn property for core municipal purposes.

Accordingly, the Town respectfully requests that the Court grant its Motion for Summary Judgment in full and enter judgment in the Town's favor on all counts of the Amended Complaint, together with such other and further relief as the Court deems just and proper.

<div style="margin-left: 50%;">

Respectfully submitted,
Defendants,
By Their Attorneys,

*/s/ William J. Conley, Jr.*
William J. Conley, Jr. (#2149)
Mario Martone (#8221)
Sarah F. O'Toole (#9316)
Conley Law & Associates
123 Dyer Street, Suite 2B
Providence, RI 02903
Tel: 401.415.9835
wconley@conleylawri.com
mmartone@conleylawri.com
sotoole@conleylawri.com
</div>

January 27, 2025

## **LOCAL RULE CV 7(c) STATEMENT**

In accordance with LR Cv 7, counsel for the Town states that a hearing is requested, and estimates that 90 minutes (45 minutes per side) is sufficient.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Kathryn D. Valois
KValois@pacificlegal.org

Robert H. Thomas
RThomas@pacificlegal.org

Austin W. Waisanen
AWaisanen@pacificlegal.org

Kelley M. Salvatore
ksalvatore@darroweverett.com

Stacy W. Thomsen
sthomsen@darroweverett.com

*/s/ Sarah F. O'Toole* _____