UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| SCLS REALTY, LLC, et al.,<br>    Plaintiffs,<br><br>    v.<br><br>TOWN OF JOHNSTON, RHODE<br>ISLAND, et al.,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 1:25-cv-88-MRD-PAS

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

Eminent domain is undoubtedly among the most powerful tools a government possesses. *Kohl v. United States*, 91 U.S. 367, 368 (1875) (eminent domain authority is "essential to its independent existence and perpetuity"). Courts have long recognized it as a fundamental attribute of sovereignty, one that can override the wishes of any private owner when the public interest demands it. *See United States v. Jones*, 109 U.S. 513, 518 (1883); U.S. Const. amend. V. The Court does not question the exercise of that authority, but power and process go hand in hand. The Town of Johnston possesses the authority to exercise the power of eminent domain. That much is clear. It is equally apparent that the Town opposes the development of low-income housing on the property at issue. When a municipality elects to invoke the power of eminent domain, it must proceed in the manner prescribed by law, and the Town did not do so here.

Before the Court is Plaintiffs SCLS Realty, LLC, and Sixty Three Johnston, LLC's Motion for Partial Summary Judgment (ECF No. 42), and Defendants' (who are all related to the Town of Johnston)[1] Motion for Summary Judgment (ECF No. 49). For the reasons stated below, Plaintiffs' motion is granted in part and denied in part, and the Defendants' motion is denied without prejudice.

## I.   BACKGROUND

### A.   Factual Scenario

Plaintiffs own approximately 31-acres of property ("the Property") of undeveloped land located at 178 and 200 George Waterman Road in Johnston, Rhode Island. ECF No. 51 ¶¶ 15, 47. The Property is owned and controlled by members of the Santoro family and their longtime business associate.[2] *Id.* ¶ 1. The Property is zoned for residential development and had long been identified in the Town's Comprehensive Community Plan as a suitable location for large scale affordable housing. *Id.* ¶¶ 18-19. The Town's planning documents projected that development of the site could generate at least twenty-five affordable housing units and noted the Property's access to utilities, public transportation, and surrounding multi-family housing developments. *Id.* ¶ 22. In 2023 and 2024, the Property owners began

---

[1] In addition to the Town of Johnston, the named Defendants include Mayor Joseph Polisena, Jr., Town Council Members Linda L. Folcarelli, Lauren Garzone, Alfred T. Carnevale, Robert V. Russo, and Robert J. Civetti, and Town Clerk Vincent P. Baccari's (in their official capacities).

[2] The "Santoro Family" includes Lucille Santoro, Ralph Santoro, Suzanne Santoro, and Salvatore Compagnone – all are members of the family-owned homebuilding companies SCLS Realty, LLC, and Sixty Three Johnston, LLC. ECF No. 18 ¶ 1. The individual members of the Santoro Family are not plaintiffs in this cause of action. *Id.* ¶¶ 8-9.

pursuing plans to build a substantial, low-to-moderate income housing project on the site, including conceptual plans for more than two hundred apartment units. *Id.* ¶¶ 27-29.

In late 2024, counsel for the Property owners submitted development materials to the Town and requested a pre-application conference with planning officials. *Id.* ¶ 30. A pre-application meeting took place before the Town Planning Board on December 3, 2024. *Id.* ¶ 31. On the same day, the Town's mayor issued a public letter condemning the proposed housing development as destructive and warning that the Town would "fight back" using "all the power of government" available to stop the project. *Id.* ¶ 35. The Mayor further stated his intention to challenge the constitutionality of Rhode Island's low-to-moderate income housing laws and publicly stated that the Town would support alternative development consisting of single-family homes instead. *Id.* ¶ 37. The Town later published these statements on social media, where the Mayor reiterated his intention to use every level of government authority to oppose the proposed affordable housing project. *Id.* ¶¶ 40-41.

On January 28, 2025, the Town Council convened a special meeting and adopted Resolution 2025-10 authorizing the Town to proceed with an exercise of eminent domain over the Property. *Id.* ¶ 43. The resolution recited that Town officials, including the police chief and fire chief, had reviewed the George Waterman Road site and determined it was an excellent location for public safety purposes. *Id.* ¶ 44. It also stated that the Town had retained DiPrete Engineering to evaluate the Property and that the engineering review confirmed the site was appropriate for

3

construction of a new municipal complex. *Id.* Based on those findings, the Town Council resolved that the Town should proceed with condemnation of the Property for the public purpose of constructing a campus consisting of police headquarters, fire headquarters, and town hall building.[3] *Id.* ¶ 45.

On March 10, 2025, the Town adopted Resolution 2025-17, which established the procedural framework the Town intended to use to complete the condemnation. *Id.* ¶ 47. The resolution outlined the steps required for the Town to acquire the Property through an exercise of its eminent domain authority, including filing resolutions and land descriptions in the municipal land evidence records, obtaining an appraisal from a state certified appraiser, depositing estimated just compensation into the registry of the Rhode Island Superior Court, and serving notice of the taking on individuals or entities with an ownership interest in the Property. *Id.* Resolution 2025-17 also authorized publication of notice of the taking in a newspaper of general circulation and stated that the procedures outlined in the resolution complied with the Johnston Town Charter Section 1-3 ("the Town Charter") and Rhode Island law. *Id.* The Town characterized the resolution as a procedural mechanism necessary to implement the contemplated condemnation if the Town ultimately determined the Property should be acquired for public use. *Id.*

---

[3] On March 24, 2025, the Rhode Island Attorney General determined that the Town violated the Rhode Island Open Meetings Act by approving Resolution 2025-10 without providing adequate public notice that it would discuss and vote on the use of eminent domain to acquire the Property for the construction of new public buildings. *Id.* at 42. The Attorney General permitted the Town to cure the violation through re-notice and subsequent vote, and, on April 3, 2025, the Town re-adopted Resolution 2025-10 in substantially identical form. *Id.* at 42-43.

4

That same day, the Town Council also adopted Resolution 2025-18, which expanded upon the factual findings supporting the proposed taking and formally approved the condemnation. *Id.* ¶ 48. The resolution described in detail the alleged deficiencies of the Town's existing public buildings, including aging electrical, plumbing, HVAC, fire suppression, dispatch, and communications systems in both the fire and police headquarters, as well as flooding and infrastructure problems affecting the police department facility. *Id.* The resolution further stated that the current town hall, originally constructed in 1939, required extensive rehabilitation and lacked adequate accessibility for disabled residents. *Id.* It concluded that Johnston residents deserved modern, 21st century public safety and municipal service facilities and that consolidating those functions into a single campus would improve efficiency and governmental operations. *Id.* Resolution 2025-18 also stated that the Town had retained a certified appraiser, Andolfo Appraisal Associates, Inc., which valued the Property at $775,000. *Id.* The Town Council ultimately resolved that acquisition of the Property through eminent domain was necessary and in the public interest for construction of a municipal campus. *Id.*

### B.    Procedural History

#### 1.   Commencement of This Action

On March 10, 2025 (the same day as the 2025-17 and 2025-18 Resolutions), Plaintiffs filed their Complaint in this Court against Defendants, challenging the taking through a variety of claims alleging Constitutional and Civil Rights Violations. ECF No. 1.

## 2.  State Court Proceedings

On March 12, 2025, the Town recorded documents in the Johnston Land Evidence Records transferring title to the Property to itself by eminent domain.  ECF No. 51 ¶ 51.  The recorded Statement and Description of Taking stated that the Town had taken fee simple title to the Property pursuant to various provisions of Rhode Island law and the Town Charter for the stated public purpose of constructing a municipal complex.  *Id.* ¶ 54.  That same day, the Town filed a petition in Rhode Island Superior Court seeking permission to deposit estimated just compensation into the court registry.  *Id.* ¶ 53.  According to Plaintiffs, neither they nor their counsel received constitutionally adequate notice of the filing, the transfer of title, or the proceedings in state court before the transfer was recorded.  *Id.* ¶ 52.

On March 13, 2025, the Town, acting through counsel, filed an *ex parte* "Motion to Deposit Money Into Registry" in the Rhode Island Superior Court.  *Id.* ¶ 55.  In that motion, the Town requested "an order pursuant to the provisions of Super. R. Civ. P. 67, to deposit into the Registry of the Superior Court, the sum of seven hundred and seventy-five thousand dollars ($775,000) based on an appraisal attached hereto . . . "  *Id.*

The Superior Court held a hearing on the motion the following morning.  *Id.* ¶ 56.  Plaintiffs allege they were not provided notice of the hearing and were not present when the motion was heard.  *Id.* ¶ 57.  The Superior Court granted the Town's motion and authorized the deposit of funds into the court registry.  *Id.* ¶¶ 58-59.  Later that day, Mayor Polisena publicly announced on social media that the Town

6

had officially acquired ownership of the Property through eminent domain.  *Id.* ¶ 60. Hours later, counsel for the Town emailed Plaintiffs' counsel copies of the condemnation filings, the state court order, and correspondence demanding that Plaintiffs immediately remove all vehicles and personal property from the premises or face trespass enforcement.  *Id.* ¶¶ 62-63.

### 3.  Temporary Restraining Order (TRO)

Upon Plaintiffs' motion, this Court entered a TRO on March 19, 2025, restraining Defendants from taking any further action to interfere with Plaintiffs' ownership or possession of the Property or from entering or using the Property.  ECF No. 14; ECF No. 51 ¶ 65.  On March 24, 2026, Plaintiffs filed an Amended Complaint to add a claim for violation of Rhode Island statutory requirements to effectuate a lawful taking.  ECF No. 18.  Approximately two weeks later, the Court entered an order converting the TRO into a Preliminary Injunction.  ECF No. 20.

### 4.  Discovery & Dispositive Motions

On September 18, 2025, the Town filed a motion for protective order seeking to limit the scope of third-party subpoenas issued by Plaintiffs to Verizon and T-Mobile.  ECF No. 28.  The Town argued that the subpoenas were not reasonably tailored to the claims or defenses in the case and instead constituted an improper intrusion into the private lives of public officials.  *Id.* at 1. Specifically, the subpoenas sought personal cellphone records belonging to the Mayor, the Mayor's chief of staff, and other Town officials.  *Id.*  According to the Town, the requests were overly broad,

disproportionate to the needs of the case, and sought information unrelated to the underlying eminent domain dispute. *Id.* at 1-2.

Subsequently, Plaintiffs filed various motions to compel the Town to produce documents, and Defendants moved to compel deposition testimony of Ralph Santoro. ECF Nos. 31, 33, and 38. Following referral of the discovery motions (ECF Nos. 28, 31, 33, and 38) to Magistrate Judge Sullivan, but prior to the hearing scheduled on the motions, the parties asked the Court to stay discovery pending the resolution of anticipated dispositive motions. ECF No. 41. Magistrate Judge Sullivan granted the stay (Text Order 11/25/2025), and Plaintiffs filed the now-ripe Motion for Partial Summary Judgment (ECF No. 42). On January 12, 2026, the parties requested an extension of the stay pending resolution of the pending discovery motions. *See* ECF No. 45 at 2. Magistrate Judge Sullivan denied the discovery motions without prejudice, concluding that each motion was likely to become either stale or moot by the resolution of the pending dispositive motion. *See* Text Order 1/12/2026. Judge Sullivan did, however, extend the stay on discovery deadlines. *Id.*

Two weeks later, Defendants opposed Plaintiff's Motion for Partial Summary Judgment and filed its own Motion for Summary Judgment on all counts of Plaintiffs' Amended Complaint. ECF No. 49.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be

resolved in either party's favor at trial. *See Estrada v. Rhode Island*, 594 F.3d 56, 62 (1st Cir. 2010) (citing *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009)). A fact is "material" if it could sway the outcome under applicable law. *Id.* (citing *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008)).

In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." *Id.* The court will not credit conclusory allegations or speculation. *See Meuser*, 564 F.3d at 515; *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 54 (1st Cir. 1998).

## III.  DISCUSSION

Plaintiffs move for summary judgment on two of their claims against the Town of Johnston: (1) a claim under 42 U.S.C. § 1983 asserting that Town's condemnation of their property violated their substantive and procedural due process rights and constituted an uncompensated taking (Claim 4), and (2) a claim that the taking was ultra vires because the Town lacked any legal authority to condemn the property outside the Rhode Island Municipal Public Buildings Authority Law ("MPBAL"), R.I. Gen Laws § 45-50-1 et seq., and the Town Charter neither delegates eminent domain authority from the State nor may be construed to do so "*sub silentio*" without creating a "facial constitutional infirmity" (Claim 6).  ECF Nos. 42 at 1, 52 at 6.  Plaintiffs initially argued that Rhode Island law delegates eminent domain power to municipalities only through discrete, statute specific grants and that the MPBAL is the only such grant applicable here. *Id.* at 14-15.  They also argued that the Town's

9

failure to proceed under the MPBAL rendered the taking without lawful authority and, as a result, without adequate process or compensation.  *Id.* at 17-18.

The Town responded that its eminent domain authority derives independently from its Charter, as ratified by the General Assembly, and is limited only by the public use and just compensation requirements of the Rhode Island and United States Constitutions.  ECF No. 49-1 at 1-2.  They argue that the MPBAL is an optional financing mechanism rather than an exclusive source of condemnation authority, and that Plaintiffs received all the process and compensation to which they were constitutionally entitled.  *Id.* at 9-10, 21-23.

The Court will limit its discussion to the Ultra Vires Claim.

### A.  Ultra Vires Taking (Claim 6)

In support of their motion for summary judgment on their ultra vires claim, Plaintiffs initially urged that the MPBAL provides the exclusive statutory authority for municipal takings for public building projects, and that the Town never activated the MPBAL or obtained the approval of the State Public Finance Management Board required to do so.[4]  ECF No. 42 at 44-50, 60.  Plaintiffs also argue that R.I. Gen. Laws § 45-2-4 does not independently delegate eminent domain power because it lacks the required compensation and enforcement provisions.[5]  *Id.* at 54-60.  As such, they

---

[4] According to Plaintiff's counsel's representations at the hearing, the MPBAL was a tool available to the Town, and that it, along with other means available to them, were valid means by which the Town could acquire the Property.

[5] Section 45-2-4 provides that cities and towns "may *take*, purchase, and hold real and personal property, and alienate and convey the property; and may also take, hold, and manage the property in trust for any charitable, other than religious, uses, and may make all contracts, including lease or lease purchase agreements of real and

argue that the Town Charter cannot supply the missing authority because eminent domain is a state power requiring express or implied delegation. *Id.* at 48. Plaintiffs state that, because the Town bypassed the MPBAL and had no alternative source of authority, the condemnation was ultra vires. *Id.* at 83.

As previewed above, the Town disagrees, pointing to its Charter, as ratified by the General Assembly, as independently authorizing the exercise of eminent domain, subject to the public use and just compensation requirements listed in the Rhode Island and United States Constitutions. ECF No. 47 at 1-2. The Town contends that the MPBAL is an optional, supplemental method of exercising authority, not an exclusive source of power, and that its procedural requirements apply only to public buildings authorities created under that statute. *Id.* at 10. The Town reiterates that its Charter-based authority is limited only by constitutional public use and just compensation requirements, which it satisfied. *Id.* 3-4. The Town foregoes any mention of R.I. Gen. Laws § 45-2-4 in its response.

In reply to this counterargument, Plaintiffs ultimately acknowledged that this Court need not determine whether the MPBAL constituted the sole available means by which the Town was authorized to acquire the Property for purposes of a municipal building project. ECF No. 50 at 12. Setting the MPBAL red herring aside, the crux of Plaintiff's Ultra Vires claim is that the Town lacked the inherent or delegated

---

personal property, necessary and convenient for the transaction of the business of the city or town." R.I. Gen. Laws § 45-2-4 (emphasis added).

eminent domain authority to take the Property.  ECF No. 42 at 11-12.  This Court agrees.

Eminent domain is an inherent power of the sovereign.  *R.I. Econ. Dev. Corp. v. The Parking Co., L.P.*, 892 A.2d 87, 96 (R.I. 2006).  A municipality is not in and of itself a sovereign and it possesses only such portion of the State's sovereignty as a state legislature has conferred upon it.  *Star Mfg. Emps. Fed. Credit Union v. Araujo*, 164 A.2d 309, 310, 91 R.I. 412, 414 (1960).  Because eminent domain is an inherent attribute of sovereignty, a municipality may exercise that power only to the extent the General Assembly has delegated it by statute.  *Joslin Mfg. Co. v. City of Providence*, 262 U.S. 668, 678-79 (1923) (upholding Rhode Island's statutory delegation of eminent domain authority to the City of Providence and recognizing that the General Assembly determines the scope of municipal condemnation authority); *Trs. of Rsrvs. v. Stockbridge*, 348 Mass. 511, 514 (1965) (under Massachusetts law, as under Rhode Island law, eminent domain authority is not inherent in municipalities but must be derived from legislative authorization; grants of such authority are strictly construed).

Rhode Island courts have applied this rule consistently for nearly 150 years. A delegation of sovereign taking power "must be exercised in strict conformity with the terms of its delegation, or otherwise the exercise will be invalid." *Howland v. Sch. Dist. No. 3*, 15 R.I. 184, 184 (1885).  These principles are not contested by either party. In fact, the parties agree the Town possesses authority to acquire the Property through eminent domain.  ECF No. 49-1 at 9; ECF No. 50 at 26.  Instead, the dispute

12

concerns whether the Town's exercise of that authority complied with the constitutional and statutory requirements governing the taking.

Still, a valid statutory delegation of eminent domain power must do more than authorize a taking in general terms. As the United States Supreme Court has instructed, and as the Rhode Island Supreme Court has acknowledged, a delegating statute must: (1) pledge the public faith and credit to provide just compensation, and (2) supply adequate and definite procedures through which the property owner may enforce that pledge. *Joslin Mfg. Co.*, 262 U.S. at 677; *Remington Realty Co. v. City of Providence*, 89 R.I. 102, 106 (1959). No particular formula is required, but the legislature must make payment "certain and definite" and must "unequivocally provide a remedy for enforcement," such that "funds are set aside, that payment therefrom is obligatory, and that a procedure is available to the property owners for obtaining such payment." *Remington Realty Co.*, 89 R.I. at 106. In practice, courts applying this standard look past a statute's general grant of condemnation authority and ask whether compensation is guaranteed as a matter of law, rather than left to later legislative or administrative discretion, and whether the owner has a specified mechanism, such as an appropriation, a dedicated fund, or a claims process, for actually collecting what is owed. *Id.* When a statute merely authorizes a taking and leaves the timing, source, or availability of payment to future action, the delegation is incomplete because the owner has no enforceable right at the moment the property is taken. *Id.* at 105-06. Accordingly, a statute that delegates the power in general language but omits these requirements is constitutionally defective and cannot

13

support a taking. *Id.* at 107 (holding the delegation invalid because the enabling statute authorized condemnation but failed to identify any fund from which compensation would be paid or any procedure by which the owner could compel payment).

       1.     The Town Charter

The Town's primary argument is that the Town Charter, ratified by the General Assembly through R.I. P.L. 1963, ch. 187, independently authorizes the exercise of eminent domain. ECF No. 47 at 1-2. The Town focuses on Section 1-3 of the Town Charter, which states, in relevant part, that the Town "may acquire property within or without its corporate limits for town purposes . . . by purchase, lease, gift, devise or condemnation within the town for public use." ECF No. 42, Ex. N, Town Charter ¶ 1-3. The Town argues that, because the General Assembly ratified the Charter as a whole, this condemnation language constitutes a valid legislative delegation. ECF No. 47 at 1-2. In support, it relies on *Purcell v. Johnson*, 297 A.3d 464, 469 (R.I. 2023), and *Foster Glocester Reg'l. Sch. Bldg. Comm. v. Sette*, 996 A.2d 1120, 1125-26 (R.I. 2010), for the proposition that a ratified charter provision prevails over an inconsistent general law of statewide application. The argument is unpersuasive at each step because the Town is ignoring the part of the common law which instructs that a delegating statute must, at minimum, pledge the public faith and credit to provide just compensation and supply adequate and definite procedures through which the property owner may enforce that pledge. *See Joslin Mfg. Co.*, 262 U.S. at 677. In the Court's view, however, these cases do not address

14

the sovereign delegation problem in a way that makes the Town's reliance on its Charter Section 1-3 as an adequate basis of authority for its exercise of its eminent domain.

*Purcell* involved a dispute over who the Richmond Town Council was required to appoint to a school committee vacancy under the Richmond Home Rule Charter versus the Chariho Act. 297 A.3d at 467. The Rhode Island Supreme Court held that the Richmond Charter, once ratified by the General Assembly, prevailed over the conflicting appointment procedure in the Chariho Act because the charter addressed a matter of local self-governance. *Id.* at 469-72. *Sette* similarly addressed a local governance question: whether the Glocester Town Council had authority under its ratified charter to remove members of a regional school building committee. 996 A.2d at 1122-23. Neither case involved the exercise of a sovereign power, and neither holds that ratification of a charter provision transforms that provision into a constitutionally adequate legislative delegation of sovereign authority. The Town's reliance on these cases conflates two analytically distinct doctrines: the charter as local law principle and the sovereign delegation principle.

More significantly, the Rhode Island Supreme Court addressed a closely analogous question to that raised here in *Newport Amusement Co. v. Maher*, 92 R.I. 51, 56 (1960). There, the Rhode Island Supreme Court held that the Home Rule Amendment "does not take away from the legislature its exclusive power" to delegate sovereign powers to municipalities, even those that have adopted home rule charters. *Id.* "The power to regulate occupations and businesses by licensing . . . is an attribute

15

of sovereignty. It is not an incident of municipal administration and may not be exercised by municipalities except where it is lawfully delegated to them in particular instances expressly or by necessary implication." *Id.* The same logic applies with equal, if not greater, force to eminent domain, which the Rhode Island Supreme Court has recognized as a more fundamental and direct exercise of sovereign power than licensing. *See R.I. Econ. Dev. Corp*, 892 A.2d at 96. A municipality cannot bootstrap a charter provision into a sovereign delegation simply by having the General Assembly ratify the charter as a whole. *Maher* forecloses that theory. 92 R.I. at 56-57 (rejecting the argument that a home rule charter's general grant of authority over "local laws relating to its property, affairs and government" could itself supply the necessary delegation of a sovereign power, explaining that reading the general language that way "would be a strained construction having little if any relation to its plain, ordinary meaning").

In *Maher*, the Court rejected the argument that home rule status, once ratified by the General Assembly, operates as a general grant of whatever sovereign powers a charter happens to recite. *Id.* Had ratification of a charter been sufficient by itself to delegate a sovereign power, the express-or-necessary-implication requirement the Court articulated would have been surplusage; there would have been no need to ask whether licensing authority was delegated "in particular instances" if the charter's adoption and the General Assembly's ratification of it had supplied the delegation. *Id.* Instead, the Court treated the inquiry as instance-specific, asking whether this particular sovereign power – licensing – had been delegated expressly or by necessary

16

implication, independent of the charter's ratification as a unitary instrument. *Id.* at 56.

The General Assembly's ratification of a home rule charter as a unitary instrument means only that the charter governs local affairs not inconsistent with state law. R.I. Const. art. XIII, § 1. It is not a subject matter specific delegation of each sovereign power the charter mentions.

Even setting aside the sovereignty problem, the Town Charter facially fails a constitutional adequacy test that the Rhode Island Supreme Court set out long ago. In *Remington Realty Co.*, the City of Providence acted under a state statute authorizing it to acquire property "by purchase, condemnation, gift, contribution, lease, bequest, devise or grant" for off-street parking facilities, and the city council had gone so far as to pass an ordinance authorizing the issuance of municipal bonds to fund the project. 89 R.I. at 103. Despite that legislative authorization and the accompanying bond ordinance, the Rhode Island Supreme Court struck the statute down as constitutionally invalid because it contained no pledge of the public faith and credit, no identified fund from which compensation was to be paid, and no procedure by which a condemnee could enforce the right to just compensation. *Id.* at 106-07. As the Court explained, the legislature need not use any statutory formula, but it must make payment of compensation certain and definite, set aside funds for that purpose, and provide an enforcement procedure. *Id.*

Section 1-3 of the Town Charter fares no better. Like the City of Providence in *Remington*, Section 1-3 of the Town Charter simply states that the Town "may

17

acquire property . . . by . . . condemnation." ECF No. 42, Ex. N, Town Charter ¶ 1-3. But it establishes no compensation procedures, identifies no fund, pledges no credit, and provides no enforcement remedy. It is, therefore, on its face, more deficient than the statute struck down in *Remington*. Under long settled Rhode Island constitutional law, that deficiency is fatal. *See Remington*, 89 R.I. at 106. A property owner facing condemnation under the Town Charter provision has no statute or ordinance to consult to understand how their compensation will be determined or how they can enforce their right to it. That is precisely the constitutional defect identified in *Remington* and *Joslin*.[6]

The Town has offered no limiting principle under which a one-sentence charter provision that uses the word "condemnation" could satisfy constitutional requirements that the Rhode Island Supreme Court found missing from a multi-section statute with financing mechanisms. *See Remington*, 89 R.I. at 106-07. Nor has the Town cited a single Rhode Island decision holding that a municipal charter provision, standing alone, constitutes an adequate statutory delegation of eminent domain authority. In the absence of any such authority, and in the face of *Remington* and *Joslin's* directly controlling holdings, the Court concludes that the Town Charter

---

[6] *Joslin* involved a challenge to a Rhode Island statute authorizing Providence to condemn land for a municipal water supply before paying compensation. *Joslin Mfg. Co.*, 262 U.S. at 670. The Supreme Court upheld the statute, holding that a taking need not be accompanied or preceded by payment so long as (1) the public faith and credit are pledged to a reasonably prompt ascertainment and payment of compensation, and (2) adequate and definite procedures exist for enforcing that pledge. *Id.* at 677.

18

Section 1-3 is not a constitutionally adequate independent delegation of eminent domain power as applied to the taking of the Property in question here.

And so, the Town proceeded to condemn the Property relying on nothing more than a charter provision that, standing alone, cannot bear the constitutional weight the Town has placed on it.  Because Section 1-3 of the Town Charter supplies no fund, no pledge of credit, and no enforcement mechanism, the Town's purported exercise of eminent domain authority over the Property was constitutionally deficient at the moment it was undertaken.  The Town never possessed constitutionally adequate authority to condemn the Property, which means the taking itself was ultra vires and ultimately void from its inception.

Because the question presented by Claim 6 is a legal one (with no genuine dispute of material fact), this discussion resolves the claim.  Fed. R. Civ. P. 56(a).  The Court finds therefore that Plaintiffs are entitled to summary judgment on their Ultra Vires Claim (Claim 6).

Given this conclusion, the Court need not and does not decide the merits of Plaintiffs' Civil Rights Act Claim (42 U.S.C. § 1983) at this summary judgment stage. In addition, the Court will defer ruling on the Town's motion for summary judgment until the conclusion of the discovery process.  The Court is satisfied that further development of the factual record is necessary before considering the merits of Claim 4 as well as the other remaining claims.

19

## IV.    CONCLUSION

Plaintiffs' motion is GRANTED as to Claim 6.  The Defendants' motion is denied without prejudice.



IT IS SO ORDERED.

_____

Melissa R. DuBose
United States District Judge


July 28, 2026