**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SCLS REALTY, LLC; SIXTY THREE JOHNSTON, LLC,<br>v.<br>TOWN OF JOHNSTON, RHODE ISLAND; JOSEPH M. POLISENA, JR., in his capacity as Mayor of the Town of Johnston; LINDA L. FOLCARELLI, LAUREN GARZONE, ALFRED T. CARNEVALE, ROBERT V. RUSSO, ROBERT J. CIVETTI, in their official capacities as Members of the Town Council of the Town of Johnston; and VINCENT P. BACCARI, JR., in his official capacity as Town Clerk of the Town of Johnston | CA No.: 1:25-cv-00088-MRD-PAS |

**DEFENDANTS TOWN OF JOHNSTON'S MOTION TO REOPEN**
**THE DEPOSITION OF RALPH SANTORO AND COMPEL HIS TESTIMONY**

Pursuant to Rule 30 and 37 of the Federal Rules of Civil Procedure and Local Civil Rule 7, Defendant Town of Johnston, Rhode Island (the "Town") hereby submits this memorandum of law in support of its Motion to Reopen the deposition of Ralph Santoro, a principal of SCLS Realty, LLC ("SCLS") and sole owner of Sixty Three Johnston, LLC ("Sixty Three"), and Compel him to answer questions truthfully.

The deposition of Plaintiffs' principal, Ralph Santoro ("Mr. Santoro"), was a masterclass in evasion. Over the course of a full day of testimony, Mr. Santoro refused to answer straightforward, factual questions about his own conduct and the events giving rise to this lawsuit. His answers—when he gave any—consisted almost entirely of two words: "*attorney advice.*"

The refrain was invoked across virtually every major area of inquiry, including: (1) SCLS' formation; (2) the motivations and decision-making process underlying the purchase of the Property; (3) his understanding of whether the proposed development on the Property required zoning or planning approvals; (4) the valuation of the Property and the decision to record a deed listing $1 as consideration; (5) his reasons for purchasing a parcel abutting the Property; (6) his

understanding of price discrepancies among related parcel transfers; (7) the strategic decision to wait until after the municipal election before moving forward with the proposed development; (8) his response to the Mayor's statements in a meeting and his failure to seek clarification; (9) the purpose of meetings with Town officials; (10) discussions regarding potential uses of the Property and participants in such discussions; (11) why and when the project became characterized as an affordable-housing proposal; (12) his knowledge of affordable housing requirements; (13) his own due diligence and understanding of whether the proposal met applicable development standards; (14) his use and understanding of the terms "sham" and "pretext" in describing the Town's actions in this lawsuit; (15) the nature and extent of damages Plaintiffs seek in this action; and (16) whether he personally verified the truth and accuracy of the allegations contained in the Complaint. Notably, even when pressed to provide a "single fact" that he relied on to file this lawsuit, Santoro refused to answer and testified "it's my lawyer's job to give you those facts." **Exhibit A**, Deposition Testimony of Ralph Santoro ("Santoro Dep.") at 193:1-13. The transcript reads less like sworn testimony, and more like a broken record. Just about every question—no matter how straightforward or factual—was met with a blanket invocation of counsel's involvement as a shield to refuse to answer substantive questions.

Compounding the problem, in one instance where Mr. Santoro appeared poised to provide a substantive answer, Plaintiffs' counsel interjected a coaching objection that steered him back to silence. *See id.* at 150:2-7 ("Q. What is the significance of deciding to wait until after election? MS. SALVATORE: I caution you not to talk about anything privileged. A. That was with the attorney, attorney advice.").[1] Such interventions improperly prevented inquiry into plainly factual matters that are not shielded by privilege.

[1] Even if Mr. Santoro's decision to "wait until after the election" was discussed with counsel, such communications are likely not privileged. *See e.g.*, *LULAC*, 342 F.R.D. at 232 ("Communications to a

The Federal Rules of Civil Procedure do not permit witnesses to replace testimony with invocations of "attorney advice," nor does it permit counsel to obstruct discovery through suggestive objections. *See LULAC v. Abbott*, 342 F.R.D. 227, 232 (W.D. Tex 2022) ("the attorney-client privilege protects only communications, not the underlying facts…information is not 'cloaked with the lawyer-client privilege just because it was 'passed from client to lawyer.'"); Fed. R. Civ. P. 30(c)(2) (requiring that objections be stated "concisely and in a non-argumentative and non-suggestive manner").

The Town is entitled to a meaningful deposition of the individual most knowledgeable about Plaintiffs' actions and motivations. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"). Because the first deposition yielded almost no substantive information on sixteen (16) key areas of inquiry, the Court should compel Mr. Santoro to reappear for his deposition and to provide full, responsive testimony and direct counsel to refrain from obstructive or suggestive objections during that proceeding.

## RELEVANT BACKGROUND

Mr. Santoro is a principal of SCLS and the sole owner of Sixty Three—the two Plaintiffs in this action. **Exhibit A**, Santoro Dep. at 10:1-11:1; 155:16-21. As one of SCLS's owners and decision-makers and Sixty Three's sole owner, Mr. Santoro was personally involved in key events giving rise to this lawsuit.

Mr. Santoro was deposed on August 29, 2025. *Id.* at 1. Despite his central involvement in the events at issue, Mr. Santoro refused to provide meaningful testimony on nearly every factual

---

lawyer that do not pertain to the rendering of legal services are not privileged, nor is a lawyer's advice on political, strategic, or policy issues shielded from disclosure." (internal quotations omitted) (citing *Perez v. Perry,* No. 5:11-cv-360, 2014 U.S. Dist. LEXIS 93294, 2014 WL 3359324, at *1 (W.D. Tex. July 9, 2014)).

topic; instead, he invoked "attorney advice" or refused to answer the question presented in response to factual inquiries that plainly called for his own knowledge or understanding. In addition to his invocation of counsel's involvement as a shield to responding to substantive questions, Mr. Santoro was consistently evasive, combative, and uncooperative throughout the deposition, and often appeared intent on frustrating the discovery process rather than assisting it. On several occasions, he professed confusion over simple questions or responded in a manner that was plainly disingenuous. For example, when asked to confirm that his sister, Lucille, is also an owner of SCLS, Mr. Santoro responded, "Who is my sister?" *See* **Exhibit A**, Santoro Dep. at 12:18-20. Later, when asked whether he had reviewed the complaint carefully prior to filing, he replied, "I don't know what you mean by carefully." *Id.* at 203:18-204:1. He also repeatedly qualified his answers with phrases such as "to my understanding" or "I believe so," prompting deposing counsel at one point to ask whether the intent of these qualifications was to avoid being held accountable for his testimony. *Id.* at 127:25-128:2. Taken together with his repeated "attorney advice" responses, Mr. Santoro's conduct reflects a pattern of obstruction and non-cooperation that deprived the Town of a fair opportunity to obtain factual information within his personal knowledge.

Below are a few representative examples in which Mr. Santoro gave non-responsive answers or blindly invoked the attorney-client privilege in response to straightforward factual questions. These examples illustrate the pervasive nature of the Mr. Santoro's refusal to provide testimony on matters plainly within his personal knowledge or understanding. They do not capture every instance in which Mr. Santoro failed to answer; to do so would require inserting nearly the entire transcript into this Motion. Accordingly, the Town has attached **Appendix A**, which identifies all of the specific questions and corresponding areas of inquiry in which Mr. Santoro

invoked "attorney advice," refused to answer, or otherwise offered non-responsive testimony. The Town has also attached the full transcript of Mr. Santoro's deposition at **Exhibit A** for the Court's convenience. The following six excerpts that appear are provided to give the Court a representative sense of Mr. Santoro's conduct during the deposition:

**EXCERPT 1**

Q. Which individuals were meeting, not your lawyer, but which individuals were meeting to discuss the potential uses of the property.
MS. SALVATORE: Objection.
A. Attorney advise, attorney-counsel.

*Id.* at 161:6-11.

**EXCERPT 2**

Q. And as a result of speak with your attorney, I'm not asking what you said to your attorney or what your attorney said to you, as you sit here today, what damages are you seeking from the Town of Johnston?
A. I spoke with my attorney.

*Id.* at 200:19-24.

**EXCERPT 3**

Q. Before attending that meeting, did you have knowledge of what the requirements, the legal requirements, are for an affordable housing proposal in the State of Rhode Island.
A. Attorney advice.

*Id.* at 172:10-15.

**EXCERPT 4**

Q. Okay. Did it strike you as peculiar that three parcels of land on George Waterman Road were sold for no value at all and then when you bought this parcel, you had to pay the Special Master 250,000 for it?
MS SALVATORE: Objection.
A. Attorney advice.
Q. I didn't ask if it struck your lawyer as peculiar, I asked you if it struck you as peculiar.
A. Attorney advice.

*Id.* at 102:2-12.

**EXCERPT 5**

Q. Why was it that you wanted SCLS Realty, LLC to own the property on George Waterman Road in the Town of Johnston.
A. Attorney advice.
Q. Why did you want to do it.
A. I listened to my attorney.

*Id.* at 45:19-24.

**EXCERPT 6**

Q. So you didn't need any relief from any land use regulation in the Town of Johnston in order to build that, right?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. Attorney advice.

*Id.* at 51:22-52:2.

**THE LAW**

## I. The Attorney-Client Privilege Protects *Communications* with Counsel Made for the Purpose of Seeking or Providing Legal Advice.

The attorney-client privilege protects communications made in confidence between a client and their attorney for the purpose of seeking or providing legal advice. *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 22 (1st Cir. 2003). The First Circuit applies a multi-part test for determining whether a communication is privileged:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002). The party asserting the privilege has the burden of proving its applicability. *XYZ Corp.*, 348 F.3d at 22 ("[T]he party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and

that it has not been waived."); *see also Flagstar Bank, FSB v. Freestar Bank, N.A.*, Civil No. 09-cv-225-SM, 2009 U.S. Dist. LEXIS 104414 (D.N.H. Nov. 9, 2009).

## II. The Attorney-Client Privilege Does Not Shield from Disclosure Underlying Facts, Non-Legal Advice, or Deliberately Disclosed Information.

Notably, there are two (2) categories of answers that are not protected by the attorney-client privilege that are relevant here. First, the attorney-client privilege applies only to the disclosure of communications and not to the disclosure of underlying facts. *Upjohn Co. v. United States*, 449 U.S. 383, 395-396 (1981) ("The protection of the privilege extends only to *communications* and not to facts"); *see also Fine v. Sovereign Bank*, No. 06-11450-NG, 2008 U.S. Dist. LEXIS 130949, at *10 (D. Mass. Mar. 7, 2008). As a result, a client cannot "refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Upjohn*, 449 U.S. at 396 (citing *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp. 830, 831 (ED Pa. 1962)); *see LULAC v. Abbott*, 342 F.R.D. 227, 232 (W.D. Tex. 2022) ("information is not 'cloaked with the lawyer-client privilege' just because it was 'passed from client to lawyer'").

Second, a statement is only privileged if it was for the primary purpose of seeking legal advice. *Cavallaro*, 284 F.3d at 245. Communications to a lawyer that do not pertain to the rendering of legal advice—such as business, strategic, or political considerations—are not shielded from disclosure. *LULAC*, 342 F.R.D. at 232 ("nor is a lawyer's advice on political, strategic, or policy issues…shielded from disclosure"); *Manufacturers Hanover Trust Co.*, 144 F.R.D. 170, 175 (D. Mass. 1992) (explaining that communications made for the purpose of obtaining business advice rather than legal advice are not privileged). Moreover, the privilege cannot be expanded to shield a witnesses' strategic rational, motives or process-based reasoning from discovery. *LULAC*, 342 F.R.D. at 232-233, 235.

The *LULAC v. Abbott* case is instructive and closely parallels the circumstances here. *See* 342 F.R.D. 227. In *LULAC*, the court granted the defendant's motion to reopen a deposition and compel a witnesses' answers where the witness improperly refused to answer a broad range of fact-based questions by invoking the attorney-client privilege. *Id.* at 231, 237 (noting that, at his deposition, the witness refused to provide substantive answers and "often responded with a single-sentence claim that any answer would compromise his attorney-client privilege"). The deposition transcript reflected hundreds of invocations of "privilege," with the witness repeatedly declining to answer questions about his personal knowledge, reasoning, and decision-making processes. *Id.* at 231-234.

The court found that such blanket assertions of privilege were improper, explaining that the attorney-client privilege protects only confidential communications made for the purpose of obtaining legal advice, not the underlying facts discussed in connection with those communications. *Id.* at 232-233; *see id.* at 233 (noting that questions inquiring exclusively about a witnesses' "personal knowledge [and] his actions (or inaction)" are not protected from disclosure). Additionally, the court explained that questions that appear to call for a witnesses' "legal perspective that might have been informed by conversations with attorneys" are proper inquiries because "[w]hile a lay witness's opinion about the legal ramifications of a particular action may or may not be admissible at trial, this does not make his beliefs privileged." *Id.* at 235-236. Lastly, the court reemphasized that factual inquiries do not fall within the scope of the privilege merely because attorneys were present or consulted. *Id.*

[REMAINDER OF PAGE INTENTIONALLY BLANK]

# DISCUSSION

**I. The Court Should Grant the Town's Motion and Compel Mr. Santoro to Reappear for a Deposition in Light of his Nonresponsiveness and Improper Invocation of the Attorney-Client Privilege.**

A. Mr. Santoro's Blanket Invocations of "Attorney Advice" Do Not Establish a Valid Claim of Privilege.

To the extent Mr. Santoro intended to invoke the attorney-client privilege by responding "attorney advice" and refusing to answer factual questions, Plaintiffs have failed to carry their burden of establishing that the privilege applies. As courts have made clear, the burden of proving the applicability of a privilege rests with the party asserting it, and the proponent must make a particularized showing that the privilege applies to each specific communication withheld. *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 22 (1st Cir. 2003); *LULAC v. Abbott*, 342 F.R.D. 227, 232-233 (W.D. Tex 2022). A blanket assertion of privilege is insufficient. *Id.* If Plaintiffs maintain that any portion of Mr. Santoro's testimony is protected, they must substantiate that claim for each specific question and area of inquiry identified in **Appendix A**, identifying the specific communication, its participants, and how it satisfies the multi-part test articulated in *Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002). Absent that showing, the privilege does not attach.

Moreover, the attorney-client privilege does not extend to a witness's factual knowledge. The privilege protects only confidential communications made for the purpose of seeking or providing legal advice—it does not bar discovery of the underlying facts within the witness's own knowledge. *Upjohn Co*, 449 U.S. at 395-396; *Fine*, 2008 U.S. Dist. LEXIS 130949, at *10. None of the questions asked by counsel and listed in **Appendix A** asked Mr. Santoro to reveal the content of any communications with legal counsel. Rather, they sought factual information about his decisions, motivations, and understanding—matters squarely within his personal knowledge. The

mere fact that an attorney was present during, or later discussed, those events does not transform those facts into privileged material. *LULAC*, 342 F.R.D. at 232. These questions sought the *what, when, and why* of Mr. Santoro's conduct—not the substance of any attorney-client communication.

To the extent Plaintiffs suggest otherwise, the First Circuit's framework makes clear that the privilege does not operate as a blanket shield over all information connected to counsel. The rule protects communications—not the facts underlying them—and it is Plaintiffs' burden to explain why any particular exchange qualifies as a privileged communication under that test. *Cavallaro v. United States*, 284 F.3d at 245.

B. The Question Concerning Mr. Santoro's Decision to Wait Until After the Election was Fact-Based and Not Privileged, and Counsel's Coaching Objection Was Improper.

One instance in which counsel appeared to coach Mr. Santoro not to answer concerned a document produced by the plaintiffs during discovery called "Johnston George Waterman Rd History of Events," which provided an overview of purchases, news clippings, plans, and notations regarding meetings, among other things. *See* **Exhibit B,** P001772-1787. During the deposition, counsel inquired about a page of the document that contained notations memorializing a July 14, 2022 meeting with Town officials. The notations contained the phrase "decide to wait until after the election." When asked, "What is the significance of deciding to wait until after the election?" counsel interjected, "I caution you not to talk about anything privileged," after which Mr. Santoro responded, "That was with the attorney—attorney advice." **Exhibit A**, Santoro Dep. at 150:2–7.

First, this question plainly sought factual information about the meaning of this notation. It did not call for the substance of any confidential communication with counsel. However, if legal counsel advised Mr. Santoro to wait until after the election, such advice would constitute political or strategic advice that is not shielded from disclosure. *See LULAC*, 342 F.R.D. at 232 (noting that the attorney-client privilege does not protect against "a lawyer's advice on political, strategic,

or policy issues."). The question at issue here concerned the context and significance of the statement contained in the "History of Events," a factual matter well within his personal knowledge. Even if his attorney later discussed that topic with him, that does not convert the underlying fact—the decision to defer action until after an election—into a privileged communication. The Court should therefore compel a full, responsive answer to this question.

Second, counsel's objection during this exchange reflects a violation of Rule 30(c)(2)'s mandate that objections be stated in a "nonsuggestive manner." For example, in *McDonough v. Douglas*, No. 97-CV-290-JD, 1998 U.S. Dist. LEXIS 20446, at 23–26 (D.N.H. Nov. 3, 1998), the court found that plaintiff's counsel violated Rule 30 through witness-coaching and speaking objections. The court explained that such objections were improper because they suggested how the witness should answer and, in practice, shaped the testimony itself. *Id.* As the court noted, the effectiveness of attorney coaching "is clearly demonstrated when the plaintiff subsequently adopts his lawyer's coaching and complains of the broadness of the question," repeating counsel's characterization almost verbatim. *Id.* at *24-25. The same pattern occurred here: when counsel cautioned Mr. Santoro "not to talk about anything privileged," he immediately echoed that instruction, refusing to answer and responding only that the matter "was with the attorney—attorney advice." **Exhibit A**, Santoro Dep. at 150:2–7. This exchange demonstrates precisely the type of suggestive objection and coached testimony that Rule 30(c)(2) forbids.

C. Questions Regarding Mr. Santoro's Knowledge of Legal Concepts or Case-Related Issues are Proper and Not Privileged.

Several questions in Mr. Santoro's deposition sought to explore his understanding of the legal concepts and claims made in this litigation—for example, his use of the terms "sham" and "pretext," his belief that the Town's actions were unlawful, and also his understanding of the legal requirements for affordable-housing proposals. In *LULAC*, the court addressed a similar scenario

and held that even when a deponent's understanding of legal concepts may have been informed by conversations with counsel, such inquiries remain proper: "While a lay witness's opinion about the legal ramifications of a particular action may or may not be admissible at trial, this does not make his beliefs privileged." *Id.* at 235–36. The court further explained that questions directed at the witness's understanding of legal concepts do not automatically compel disclosure of attorney-client communications. *Id.* at 236.

Here, questions aimed at eliciting Mr. Santoro's personal knowledge and understanding of these legal concepts were both proper and well within the scope of discovery. In particular, questions regarding his understanding of the requirements an affordable-housing development would need to meet were directed at factual information central to his role as the developer of the project. **Exhibit A**, Santoro Dep. at 64:17-19. Those questions sought to test what Mr. Santoro himself knew about the governing standards—information plainly within his personal knowledge and not dependent on any privileged communication. Similarly, questions concerning the legal concepts underlying Plaintiffs' claims, including his use of the terms "sham" and "pretext," properly probed the factual bases for those allegations. It is essential for the Town to understand what Mr. Santoro believes supports his assertions that the Town's actions were pretextual or a sham, and what facts he contends give rise to those claims. These inquiries seek Mr. Santoro's understanding of the case he authorized as a principal of SCLS and the sole owner of Sixty Three, not the content of his communications with counsel, and therefore fall squarely within the permissible bounds of discovery.

In sum, Mr. Santoro's repeated invocation of "attorney advice" was not a valid assertion of the attorney-client privilege. Plaintiffs have not demonstrated that any of the withheld information constitutes a confidential communication made for the purpose of obtaining legal

advice, as required by *Cavallaro* and *XYZ Corp.* Instead, the record reflects precisely the sort of broad, unsubstantiated invocation of privilege that the court in *LULAC* previously rejected. The Town therefore respectfully requests that the Court compel Mr. Santoro to reappear for deposition and provide full, responsive answers to the factual questions set forth in **Appendix A**.

## CONCLUSION

For all of the reasons set forth above, Mr. Santoro's repeated invocation of "attorney advice" and refusal to answer factual questions were improper and have deprived the Town of meaningful discovery from one of the key decision-makers in this case. The attorney-client privilege cannot be used as a blanket shield to avoid answering questions about facts, motives, or understanding—particularly where, as here, none of the disputed questions sought the substance of confidential communications with counsel. The deposition transcript demonstrates a pattern of obstruction that warrants corrective relief. Accordingly, the Town respectfully requests that the Court grant this motion, reopen the deposition of Mr. Santoro, and compel him to provide full, responsive testimony on the questions identified in **Appendix A** and reasonable follow-up questions within their scope. The Town further requests that the Court direct counsel to refrain from suggestive or speaking objections, require that any future privilege assertions be supported with the specificity required by law, and award the Town its reasonable expenses and attorneys' fees incurred in bringing this motion pursuant to Federal Rule of Civil Procedure 37.

## LOCAL RULE CV 7(c) STATEMENT

In accordance with LR Cv 7, counsel states that a hearing is requested, and estimates that 30 minutes (15 minutes per side) is sufficient.

Respectfully submitted,
Defendants,
By Their Attorneys,

*/s/ William J. Conley, Jr.*

William J. Conley, Jr. (#2149)
Mario Martone (#8221)
Sarah F. O'Toole (#9316)
Conley Law & Associates
123 Dyer Street, Suite 2B
Providence, RI 02903
Tel: 401.415.9835
wconley@conleylawri.com
mmartone@conleylawri.com
sotoole@conleylawri.com

August 24, 2026

## CERTIFICATION UNDER RULE 37

Defendants hereby certify that they have made a good faith attempt to confer with the Plaintiffs regarding the matters contained herein without court action.

/s/ Sarah F. O'Toole

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Kathryn D. Valois
KValois@pacificlegal.org

Robert H. Thomas
RThomas@pacificlegal.org

Austin W. Waisanen
AWaisanen@pacificlegal.org

Kelley M. Salvatore
ksalvatore@darroweverett.com

Stacy W. Thomsen
sthomsen@darroweverett.com

*/s/ Sarah F. O'Toole*

# APPENDIX

## CATEGORY 1: SCLS's Formation

Q. And how did it come to be that you decided to form that corporation?
A. On the advice of our attorney.

*Id.* at 20:2-4.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**CATEGORY 2: The Motivations and Decision-Making Process Underlying the Purchase of the Property**

> Q. Why was it that you wanted SCLS Realty, LLC to own the property on George Waterman Road in the Town of Johnston.
> A. Attorney advice.
> Q. Why did you want to do it.
> A. I listened to my attorney.

*Id.* at 45:19-24.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 3</u>: Understanding of Whether the Proposed Development Required Town Approvals**

Q. So you didn't need any relief from any land use regulation in the Town of Johnston in order to build that, right?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. Attorney advice.

*Id.* at 51:22-52:2.

* * *

Q. When you went to that meeting, did you understand that you could build that project without any approvals from the Planning Board?
A. The Mayor indicated that he was fully supportive of our changes.
MR. CONLEY: Objection. Nonresponsive. May I have my question read back, please.
(QUESTION READ BACK)
THE WITNESS: Tom Dellar of the Planning Board was there and he stated he was 100 percent behind the proposal.
MR. CONLEY: Objection. Nonresponsive.
Q. At the time of that meeting, did you understand that you could build the project you were proposing without any relief from the Town of Johnston Planning Board?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. The people at that meeting voiced 100 percent support behind the project.
MR. CONLEY: Objection to the answer as nonresponsive.

*Id.* at 137:9-138:8.

* * *

Q. When you proposed this to the Mayor, when you showed the Mayor this map, did you have an understanding that with this map, what you showed in this map, that you could build this development without any approvals from the Town of Johnston Planning Board?
A. I believe I answered that already.
MR. CONLEY: Objection. Nonresponsive.
Q. When you presented the proposal that appears on Page 1781, identified as proposed residential development, 178 and 200 George Waterman Road, did you understand that you could build that without any approvals from the Town of Johnston Zoning Board of Review?
MS. SALVATORE: Objection.
A. I believe I answered the question already.
MR. CONLEY: Objection to the response as being nonresponsive.

*Id.* at 142:21-143:16.

* * *

Q. Did you understand at that meeting, and there are some words on this note that says, "Purpose to final schedule before the Board," that you could build the project at that you were proposing at that time, July 14, 2022, without any approval from the Town of Johnston Planning Board?
MS. SALVATORE: Objection.
A. I believe I answered that question already.

MR. CONLEY: Objection. Nonresponsive.

Q. Did you believe at that time that you could build your project that you were proposing on July 14, 2022 without any approval from the Town of Johnston Zoning Board of Review?

MS. SALVATORE: Objection.

A. I believe I answered that question already.

MR. CONLEY: Objection. Nonresponsive.

*Id.* at 148:15-149:11.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**CATEGORY 4: The Valuation of the Property and The Decision to Record a Deed Listing $1 as Consideration**

Q. Then why did you put $1 as the value of the property on this deed on December 18, 2024?
A. On the advice of my attorney.

*Id.* at 91:23-92:1.

* * *

Q. And you told your company that the value of it was $1 on that date, right?
A. Attorney advice.

*Id.* at 94:18-20.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 5</u>: Reasons for The Purchase of Abutting Property**

Q. What caused you to purchase this property?
A. Attorney advice.

*Id.* at 101:6-8.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**CATEGORY 6: Price Discrepancies Among Related Parcel Transfers**

> Q. Okay. Did it strike you as peculiar that three parcels of land on George Waterman Road were sold for no value at all and then when you bought this parcel, you had to pay the Special Master 250,000 for it?
>
> MS SALVATORE: Objection.
>
> A. Attorney advice.
>
> Q. I didn't ask if it struck your lawyer as peculiar, I asked you if it struck you as peculiar.
>
> A. Attorney advice.

*Id.* at 102:2-12.

* * *

> Q: When you did that deed in which you conveyed to your company those three parcels of land for no value, did you think wait a minute, two years ago I paid $250,000 for this other piece of property?
>
> A. Attorney advice.

*Id.* at 103:11-16.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 7</u>: The Decision to Wait Until After the Election Before Moving Forward With the Proposed Development**

> Q. What is the significance of deciding to wait until after election?
>
> MS SALVATORE: I caution you not to talk about anything privileged.
>
> A. That was with the attorney, attorney advice.

*Id.* at 150:1-7.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 8</u>: Lack of Inquiry into the Mayor's Alleged Statements in a Meeting**

> Q. Before we do that, since you didn't know what it meant when the Mayor said this would be political suicide, or claimed this would be political suicide, since you didn't understand that, why didn't you ask him what he meant by it.
>
> A. Attorney advice.

*Id.* at 151:17-23.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 9</u>: The Purpose of Meetings with Councilman Russo**

Q. What was the purpose of those meetings?
A. Attorney-client privilege.
Q. I didn't ask you to tell me anything that was communicated between you and your lawyer. I'm simply asking you what the purpose of that meeting is?
A. I wasn't at the meeting, so I can't tell you.
MR CONLEY: Objection to the answer being nonresponsive.

*Id.* at 154:19-155:4.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 10</u>: Discussions Regarding Potential Uses of the Property and the Participants in Such Meetings**

Q. Which individuals were meeting, not your lawyer, but which individuals were meeting to discuss the potential uses of the property.
MS. SALVATORE: Objection.
A. Attorney advise, attorney-counsel.
MR CONLEY: Objection. Nonresponsive.

*Id.* at 161:6-13.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**CATEGORY 11: Why and When the Project Became Characterized as an Affordable Housing Proposal**

Q. Whenever it was that you thought about this proposal, this project becoming an affordable housing proposal, what caused you to think about it as an affordable housing proposal.
A. Attorney advice.
Q. So there was some legal reason that caused you to think about it as an affordable housing proposal?
MS. SALVATORE: Objection.
MR CONLEY: You may answer
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.

*Id.* at 165:1-14.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 12</u>: Knowledge of Affordable Housing Requirements**

Q. Before attending that meeting, did you have knowledge of what the requirements, the legal requirements, are for an affordable housing proposal in the State of Rhode Island.
A. Attorney advice.
MR. CONLEY: Objection. Nonresponsive.

*Id.* at 172:10-16.

* * *

Q. How did your proposal that you presented to the Planning Board at the pre-application conference meet the requirements of that standard?
MS. SALVATORE: Objection. Calls for a legal conclusion you may answer.
A. I'm not qualified to answer that question.
Q. It's your proposal, isn't it?
MS. SALVATORE: Objection.
MR CONLEY: You may answer.
A. Yes.
Q. And you want your proposal to meet all the requirements of Rhode Island law, right?
A. Legal counsel.
Q. No, you. You didn't care whether or not it met the requirements of Rhode Island law?
MS. SALVATORE: Objection.
MR CONLEY: You may answer.
A. Yes.
Q. So did you care about it meeting the requirements of Rhode Island law. Did you look at your proposal and make a determination that it did?
MS. SALVATORE: Objection.

MR CONLEY: You may answer.

A. I rely on my attorneys for the legal aspects.

MR. CONLEY: Objection. The answer is not responsive.

*Id.* at 178:7-179:11.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 13</u>: Due Diligence and Understanding of Whether the Affordable Housing Proposal Met Applicable Development Standards.**

Q. Tell me how your proposal integrated low and moderate income housing units throughout the development; tell me how you did that?
MS. SALVATORE: Objection. Calls for a legal conclusion. You may answer.
Q. You're the developer, you can answer that.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection to the answer as being nonresponsive.

*Id.* at 180:2-11.

* * *

Q. What did you do to determine the compatibility and scale and architectural style to the market rate units within the project?
MS. SALVATORE: Objection. Mischaracterizes the proposal and calls for a legal conclusion.
MR. CONLEY: You may answer.
A. I rely on my legal advice.
MR. CONLEY: Objection. The answer is nonresponsive.

*Id.* at 180:19-181:4.

* * *

Q. So what diligence did you do so that your units would be built and occupied prior to or simultaneous with the

construction and occupancy of any of the market rate units?

MS. SALVATORE: Objection. Misrepresents the proposal and calls for a legal conclusion. You have may answer.

A. Again, I rely on legal counsel.

MR. CONLEY: Objection. The answer is n onresponsive.

*Id.* at 181:12-21.

* * *

Q. "There will be no significant negative impacts on the health and safety of current or future residents of the community, in areas including, but not limited, safe circulation of pedestrian vehicular traffic, provision of emergency services, sewerage disposal, availability of potable water, adequate surface water runoff, and the preservation of natural, historical or cultural features that contribute to the attractiveness of the community." Did I read that correctly?

A. Yes.

Q. What diligence did you do after your proposal to make sure that it would meet that required standard?

MS. SALVATORE: Objection. Calls for a legal conclusion, among other things.

MR. CONLEY: I'm asking what diligence he did, I'm not asking for any conclusions, but go ahead.

A. I'm not qualified to answer that question.

MR. CONLEY: Objection. The answer is nonresponsive.

*Id.* at 182:9-183:8.

* * *

Q. Number (V), "All proposed land developments and subdivision lots will have adequate and permanent physical access to a public street in accordance with the requirements of Section 45-23-60(a)(5)." Do you see that?
A. Yes.
Q. What diligence did you do to make sure your proposal would meet that requirement?
MS. SALVATORE: Objection. Calls for a legal conclusion, among other things.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection to the answer as being nonresponsive.

*Id.* at 183:11-25.

* * *

Q. It says, "The proposed development will not result in the creation of individual lots with any physical constraints to development that building on those lots, according to pertinent regulations and building standards, would be impracticable, unless created only as permanent open space or permanently reserved for public purpose on the approved, recorded plans." Do you see that?
A. Yes.
Q. What diligence did you do to ensure that your proposal would meet that standard?
MS. SALVATORE:· Calls for a legal conclusion, among other I things. You may answer.
A. I'm not qualified to answer that question.

> MR. CONLEY: I object to the answer as being nonresponsive.

*Id.* at 184:5-24.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 14</u>: Understanding of the Terms "Sham" and "Pretext" in Describing the Town's Actions in this Lawsuit**

Q. I'm asking you what the sham is, that's all I'm asking. You used the term, it's your lawsuit. You used that term. I'm not trying to put words in your mouth. Tell me what you meant when you said sham.

MS. SALVATORE: Objection. Asked and answered. You can answer.

MR. CONLEY: You can answer.

A. I discussed that with my attorney.

Q. When you say you discussed that with your attorney, is that another way of saying what you said a lot of times today, advice of counsel?

A. Yes. I spoke with my attorney.

MR. CONLEY: Objection. The answer is nonresponsive.

*Id.* at 187:11-188:2

* * *

Q. Tell me what the pretext is that you're alleging in your lawsuit?

MS. SALVATORE: Objection. Calls for a legal conclusion. You may answer.

A. It's a legal term and I don't know how to respond to that.

Q. It's your lawsuit, right?

A. Yes.

Q. And the lawsuit alleges that the Town engaged in a pretext when it took the property, right; you agree with that?

A. Yes.

Q. When you used those words, what did you mean, sir?

MS. SALVATORE: Objection.

A. Again, those were with discussions with my attorney.
MR. CONLEY: Objection to the answer as being nonresponsive.

*Id.* at 188:9-189:2.

* * *

Q. And when you use the term pretext, you realized you had to prove that as well, right?
A. Yes.
Q. And what were you going to prove?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I'm thinking of your question. You're asking me legal terms to comment on and I don't feel that I'm qualified. That's why I rely on my lawyers when I speak with them.
MR. CONLEY: Objection as nonresponsive.

*Id.* at 189:13-25

* * *

Q. Tell me what facts you're going to prove to support your contention that the taking was a pretext?
MS. SALVATORE: Objection. Calls for a legal conclusion.
A. I'm not a lawyer and I can't answer that question. My lawyers will deal with that.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. So you don't intend to prove anything, do you?
MS. SALVATORE: Objection.
A. I have spoken with any lawyers, that's. why I hire lawyers.

Q. What facts did you rely on when you used the word sham?
MS. SALVATORE: Objection.
A. Answered.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. What facts did you rely on when you used the word pretext?
MS. SALVATORE: Objection.
A. Answered.

*Id.* at 191:1-192:2.

* * *

Q. You're not going to tell me a single fact today that you relied on when you filed the lawsuit that said that the Town's exercise of eminent domain in taking your property was a sham, are you?
MS. SALVATORE: Objection. Mischaracterization of his testimony.
MR. CONLEY: That's a question. Go ahead.
A. It’s the job of my lawyers to do that.
MR. CONLEY: Objection. The answer is nonresponsive.

*Id.* at 192:3-14.

* * *

Q. Give me a single fact, one, that you relied on when you filed this lawsuit that said it was a sham?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. I already answered the question.

MR. CONLEY: Objection. The answer is nonresponsive.
Q. Give me a single fact, just one, that you relied on when you filed this lawsuit that claims the Town of Johnston exercised eminent domain with regard to your property as a pretext?
A. I spoke with counsel.
Q. Say that again?
A. I spoke with my lawyers.
Q. What facts -- I'm not asking what you spoke about, give me one fact, sir, if you can?
A. It's my lawyers job to give you those facts.
MR. CONLEY: Objection to the answer as nonresponsive.

*Id.* at 192:16-193:15

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**<u>CATEGORY 15</u>: The Nature and Extent of the Damages Plaintiffs Seek in this Action**

Q. In this lawsuit that you filed against the Town of Johnston, are you seeking any damages beyond the fair market value of your property?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I have spoken with my lawyer.
Q. And what damages are you seeking?
A. I have not discussed that.
MR. CONLEY: Objection. The answer is nonresponsive.
Q. Are you seeking damages?
A. I don't know.
MR. CONLEY: Objection. The answer is not response.
MS. SALVATORE:· He doesn't like the answer.
Q. You're here today and you know it's a deposition for your case. What damages are you seeking from the Town of Johnston as we sit here today?
MS. SALVATORE: Objection. Asked and answered.
A. I have spoken with my attorney about that.
Q. And as a result of speak with your attorney, I'm not asking what you said to your attorney or what your attorney said to you, as you sit here today, what damages are you seeking from the Town of Johnston?
A. I spoke with my attorney.

*Id.* at 199:17-200:24

**CATEGORY 16**: **Personal Verification of the Truth and Accuracy of the Allegations in the Complaint**

Q. You stand behind each and every word in that complaint; you approved each and every word in that complaint, didn't you?
MS. SALVATORE: Objection.
MR. CONLEY: You can answer.
A. My lawyer prepared the document and I feel that I can stand behind it.
Q. Does that mean you can stand behind every word in that complaint?
MS. SALVATORE: Objection. You can answer.
A. I think that's a legal question, so I don't feel qualified, but I feel that we did a good job.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. VALOIS: Mr. Conley doesn't like the answer.
Q. It's your lawsuit, right?
A. Yes.
Q. You would want to make sure that lawsuit was accurate and truthful as to every word in it, right?
MS. SALVATORE: Objection. You can answer.
A. Again, that's a legal question, but yes, I would hope so.
Q. What is legal about whether or not a word is accurate and truthful?
MS. SALVATORE: Objection.
A. I don't understand the question.
Q. I'm going to ask it as plain as I can.
A. Okay.
Q. If there are words in this question that you don't understand, tell me what words you do not understand.
A. Okay.

Q. When you read that complaint that was going to be filed in Federal Court on your behalf, you read it before you approved it, right?
A. Yes.
Q. When you read it, you wanted to be sure that every word in that complaint was truthful, right?
MS. SALVATORE: Objection. You can answer.
A. Based on my discussions with my lawyer, yes.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. VALOIS: Mr. Conley does not like the answer.
Q. You wanted to make sure that every word in that complaint is accurate, right?
MS. SALVATORE: Objection. Asked and answered.
A. Based on discussions with my lawyer, as I said, I feel everything is right, yes.
MR. CONLEY: Objection. The answer is nonresponsive.

*Id.* at 204:15-206:25