Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SCLS REALTY, LLC;
SIXTY THREE JOHNSTON, LLC

CIVIL ACTION NO.: 1:25-CV-00088-MRD-PAS

VS.

TOWN OF JOHNSTON, RHODE ISLAND; JOSEPH M. POLISENA, JR., IN HIS OFFICIAL CAPACITY AS MAYOR OF THE TOWN OF JOHNSTON; LINDA L. FOLCARELLI, LAUREN GARZONE, ALFRED T. CARNEVALE, ROBERT V. RUSSO, ROBERT J. CIVETTI, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE TOWN COUNCIL OF THE TOWN OF JOHNSTON; AND VINCENT P. BACCARI, JR., IN HIS OFFICIAL CAPACITY AS TOWN CLERK OF THE TOWN OF JOHNSTON

------------------------------------------

DEPOSITION OF

RALPH SANTORO

AUGUST 29, 2025

9:00 A.M.

PROVIDENCE, RI 02903

BARBARA J. WARNER, RPR

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS, SCLS REALTY, LLC; AND SIXTY THREE JOHNSTON, LLC:
PACIFIC LEGAL FOUNDATION
KATHRYN D. VALOIS, ESQUIRE
4440 PGA BLVD.
SUITE 307
PALM BEACH GARDENS, FL 33410
561-691-5000
Kvalois@pacificlegal.org

FOR THE PLAINTIFFS, SCLS REALTY, LLC; AND SIXTY THREE JOHNSTON, LLC:
DARROWEVERETT, LLP
KELLEY MORRIS SALVATORE, ESQUIRE
1 TURKS HEAD PL.
SUITE 1200
PROVIDENCE, RI 02903
401-453-1200
Ksalvatore@darroweverett.com

FOR THE DEFENDANTS, TOWN OF JOHNSTON, RHODE ISLAND, ET AL.:
CONLEY LAW & ASSOCIATES
WILLIAM J. CONLEY, JR., ESQUIRE
SARAH O'TOOLE, ESQUIRE
123 DYER STREET
SUITE 2B
PROVIDENCE, RI 02903
401-415-9835
Wconley@conleylawri.com
Sotoole@conleylawri.com

Page 3

INDEX OF EXAMINATION


| WITNESS | PAGE |
|---|---|
| RALPH SANTORO | |
| EXAMINATION BY MR. CONLEY........... | 4 |


EXHIBITS


| NO. | DESCRIPTION (DEFENDANTS') | |
|---|---|---|
| EXHIBIT K | NOTICE OF DEPOSITION........ | 15 |
| EXHIBIT L | 12-9-2019 QUITCLAIM DEED.... | 61 |
| EXHIBIT M | 11-17-2022 QUITCLAIM DEED... | 63 |
| EXHIBIT N | 10-9-2019 QUITCLAIM DEED.... | 65 |
| EXHIBIT O | 12-23-2024 QUITCLAIM DEED... | 67 |
| EXHIBIT P | 12-23-2024 QUITCLAIM DEED... | 79 |
| EXHIBIT Q | 12-23-2024 QUITCLAIM DEED... | 83 |
| EXHIBIT R | 12-18-2024 QUITCLAIM DEED... | 87 |
| EXHIBIT S | SPECIAL MASTER'S DEED....... | 99 |
| EXHIBIT T | TITLE 45 TOWNS AND CITIES CHAPTER 53 LOW AND MODERATE INCOME HOUSING.............. | 175 |


Page 4

(DEPOSITION COMMENCED AT 9:05 A.M.)
RALPH SANTORO
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your name and spell your last name for the record.
THE WITNESS: Ralph Santoro, S-A-N-T-O-R-O.
EXAMINATION BY MR. CONLEY
Q. Good morning.
A. Good morning.
Q. My name is Bill Conley and I represent the Town of Johnston. I'm actually the Town solicitor for the Town, so I represent them in this litigation.
Sitting next to me is Sarah O'Toole, she's an associate in the office who also represents the Town of Johnston in this litigation.
A. Nice to meet you guys.
Q. Before we get started, I want to touch upon a couple of simple things regarding how a deposition goes forward. And as I do that, feel free, if I'm not clear about what I'm

Page 5

saying, to ask me to explain or repeat it or ask you another question, okay?
A. Okay.
Q. You understand that you're under oath, so you'll answer all of your questions truthfully today, right?
A. Yes.
Q. Thank you. You need to give verbal answers to all of the questions. The stenographer cannot record a nod of the head or a gesture or um-hum. It needs to be yes or no, maybe, you just need to answer all questions orally.
A. Yes.
Q. Thank you. As I said a moment ago, I don't always ask the best question in the world.
If I ask you a question that you don't understand, please tell me that you don't understand it so I can ask the question better; is that okay?
A. Yes.
Q. Any time you need a break, just let me know. If you need a break, the only request I have is if I have a question pending, that

Page 6

you answer the question before you take a break, that's the only rule about breaks; is that okay?
A. Yes.
Q. I'm going to be showing you some documents as we go through our discussion this morning.
Also, if I ask you a question and on your own, you want to see a document to help refresh your memory to answer the question, tell me that, okay?
A. Yes.
Q. If I have it, I'll provide it to you. If I don't have it, we'll figure out how we can get it; is that okay?
A. Yes.
Q. Although I try to ask the best question I can, occasionally the lawyers representing you will object to the question that I ask.
When they object, you still need to answer the question. Their objection gets the on record and we'll deal with those objections later, but you still need to answer the question; do you understand that?

Page 7

A. I have a question.
Q. Yes, sir.
A. I'm not very familiar with this process. If they object, they state why they are objecting and what their reasoning is before I answer the question, correct?
Q. That's up to them. They'll make that decision; is that okay?
A. Yes.
Q. Are you taking any medications today or anything that would affect your ability to testify today and finish this deposition today?
A. No.
Q. I appreciate that. Now, in preparing for this deposition today, what did you do for that preparation?
A. Can you be specific?
Q. Everything you did, you tell me. I'm not going to put any words in your mouth. Anything you say today will be your words and your words alone.
A. I did nothing.
Q. Did you confer with your attorneys about this deposition? And don't tell me

Page 8

anything you and your attorneys talked to each other about, I don't want to know any communications.
Did you have a conversation with your attorneys about this deposition before appearing here today?
A. I'm not sure I understand, so if you can explain that question, I would appreciate it.
Q. You're here at a deposition, right?
A. Yes.
Q. And before you came to the deposition, did you talk to any of your lawyers about this deposition?
A. Only that I would be having a deposition.
Q. Beyond the fact that you were scheduled to have a deposition today, did you talk to your lawyers -- strike that. How long did that discussion last?
A. I don't recall.
Q. Was it five minutes?
A. I don't recall.
Q. Was it 30 minutes?
A. I don't recall.

Page 9

Q. When did you have the discussion?
A. Maybe last week.
Q. So you had a discussion with your lawyers last week, correct?
A. About a week ago.
Q. And over the period of about a week, you cannot even remember approximately how long that discussion was?

MS. SALVATORE: Objection. You may answer.
MR. CONLEY: You may answer.
A. I don't recall.
Q. This is going to be a long deposition. Did you talk to anybody else about the fact that you were having a deposition today?
A. No.
Q. Did you review any documents in regard to this case before this deposition today?
MS. SALVATORE: Objection. You can answer.
A. No.
Q. Did you bring anything with you in preparation for this deposition today?
A. No.

Page 10

Q. Are you familiar with a company called SCLS Realty, LLC? Did you ever hear of that company before?
A. What's the paper about?
Q. I'm asking if you've ever heard of that company before?
A. Yes. I'm asking you what the paper is about because maybe I need to see the paper before I answer the question.
Q. What papers do you think you need to see to refresh your memory as to whether or not you've ever heard of SCLS Realty, LLC?
A. Whatever you may have to show me.
Q. Tell me what your understanding of SCLS Realty, LLC is?
A. It's a real estate company.
Q. Are you a part of that company?
A. I am.
Q. What's your role in that company?
A. I'm one of the partners.
Q. When you say that you're one of the partners, what do you understand by the term partner?
A. An owner.
Q. So you're an owner of the company?

Page 11

A. One of them.
Q. Who are the other owner?
A. Sal Compagnone, Lucille Santoro and my wife Suzanne.
Q. So there are four owners of that company?
A. Yes.
Q. And who is Sal Compagnone?
A. One of the owners of the company.
Q. Besides being an owner of the company, how do you know Mr. Compagnone?
A. We're partners.
Q. Besides being partners, how do you know Mr. Compagnone?
A. I have known him all my life.
Q. How have you known him all of your life?
A. My father and him worked together.
Q. How did they work together?
A. My father was a plastering contractor and did work for his father, who was a general contractor.
Q. Your father was a plastering contractor did I understand you to say?
A. Yes.

Page 12

Q. When you say they did work together, did they have any companies together?
A. They owned an apartment house or two together.
Q. Back to SCLS Realty, LLC, do I understand your testimony to be that there are four owners of that company; is that correct?
A. Correct.
Q. What is your ownership share?
A. My attorney has that paperwork.
Q. Do you know how much of that company you own?
A. I do not.
Q. How much of the company does Sal Compagnone own?
A. I'm not sure.
Q. And did you say your sister is also an owner?
A. Who is my sister?
Q. You tell me. What's your sister's name?
A. Lucille.
Q. And is Lucille an owner as well?
A. Yes.

Page 13

Q. And how much of the company does she own?
A. The attorney would know that.
Q. You don't know?
A. The attorney did the paperwork.
Q. I'm asking you if you know.
A. And I'm telling you the attorney did the paper work.
MR. CONLEY: I'm not asking you who did the paperwork. Could we have the question read back, please.
(QUESTION READ BACK)
Q. I'm asking you how much of the company she owns. Do you want to try answering my question?
MS. SALVATORE: Objection. You may answer.
MR. CONLEY: You may answer.
A. I'm trying, sir.
Q. You're not.
MS. SALVATORE: Objection.
A. The attorney set the paperwork up. I would have to refer to the paperwork to see what the ownership interest in.
Q. So is your answer this morning, as you

Page 14

sit here today, that you don't know how much she owns in that corporation?
A. Correct.
Q. Okay. Who is the next owner?
MS. SALVATORE: Objection. You can answer.
A. Sal Compagnone.
Q. You said him. Go ahead, who else?
A. Myself.
Q. Who else?
A. Suzanne Santoro.
Q. How much of the company does Suzanne Santoro own? Listen carefully to the question so you can answer. How much of the company does Suzanne own?
MS. SALVATORE: Objection.
A. I believe I answered that already.
Q. No, you have not.
A. I said the attorney would have the paperwork and I would have to refer to the attorney.
MR. CONLEY: May I have the question read back.
MS. SALVATORE: Can we take a break after this question?

Page 15

MR. CONLEY: Yes.
(QUESTION READ BACK)
THE WITNESS: I would have to refer to my attorney's paperwork.
Q. Is the answer you don't know?
A. I don't.
MR. CONLEY: Do you want to take a break.
MS. SALVATORE: Yes.
(OFF THE RECORD)
MR. CONLEY: Back on the record. Mark this as Exhibit K.
EXHIBIT K MARKED FOR IDENTIFICATION
Q. Mr. Santoro, please take a moment to review this document. When you're done reviewing it, please let me know.
(WITNESS PERUSES DOCUMENT)
A. Yes.
Q. Have you ever seen this document before?
A. Let me just read it and then I'll answer you.
Q. I want you to you review it first, go right ahead.
A. Thank you.

Page 16

(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay. Yes.
Q. This has one blank page in between and a blank page attached to it.
I'm directing your attention to the pages with print on them, okay?
A. Okay.
Q. Do you recognize this document?
A. I do.
Q. Did you see it before you came here this morning?
A. I did.
Q. And did you understand that document to mean that you would appear for a deposition, and it states that the deposition will take place at the Johnston Town Hall, right?
A. Yes.
Q. And you understand as a result of a communication that took place between my office and your attorneys at the deposition, instead it's taking place here at my office at 123 Dyer Street, Providence, Rhode Island, Suite 2B, right?
A. Yes.

Page 17

Q. And you understood that when you got this notice of deposition to appear and you came here this morning, that I was going to ask you questions, right?
A. Yes.
Q. And you understood that you have a good-faith obligation to answer those questions truthfully and accurately, correct?
A. Yes.
Q. Okay. You understand that you cannot essentially not answer a question simply by saying I don't remember, when you actually remember, right?
THE WITNESS: Can you rephrase that question.
MR. CONLEY: No. Can I have it read back, please. Listen carefully.
(QUESTION READ BACK)
A. I will answer a question if I remember something, but I can't answer a question if I don't remember.
Q. So you're agreeing that you can't simply say you don't remember in response to a question when you actually know the answer, right?

Page 18

A. I think it's a question that's not asking a question. I will answer a question if I can remember it. I will not answer something if I really don't remember it.
Q. Do you also understand that you can't simply use the phrase I don't recall in response to a question when you actually know the answer to the question, right?
A. Again, I think I answered that question.
MR. CONLEY: No, you didn't. Listen carefully. Can you read it back, please.
(QUESTION READ BACK)
MS. SALVATORE: Objection. I think he did answer the question, just not with yes or no. He told you he will answer if he remembers or recalls, and he will say he doesn't remember or doesn't recall if he doesn't. Asked and answered.
MR. CONLEY: It's not, and you're not allowed to coach the witness through your objections, so please don't try to do that.
MS. SALVATORE: I'm not, I put my objection on the record.

Page 19

MR. CONLEY: You did more than that, and you coached the witness. You know you can't do that.
MS. SALVATORE: I did not coach the witness.
MR. CONLEY: You did. May I have the question read back. Listen to the question and answer it.
(QUESTION READ BACK)
MS. SALVATORE: Objection. Asked and answered. You may answer.
MR. CONLEY: It calls for a yes-or-no answer.
THE WITNESS: Yes, if I recall.
Q. As we go forward with this deposition, you understand that you have to answer the rest of my questions accurately and truthfully, right?
A. Yes.
Q. When was SCLS Realty formed as a company?
A. I don't recall exactly. I think it was approximately 2 1/2 years ago.
Q. And you were one of the original owners at the time it was formed?

Page 20

A. Yes, I was.
Q. And how did it come to be that you decided to form that corporation?
A. On the advice of our attorney.
Q. What was the reason for forming the corporation?
A. It was for ownership of some of the land on George Waterman Road.
Q. When you say it was for some of the land on George Waterman Road, what do you mean by the corporation was formed for some of the land on George Waterman Road; can you explain that?
A. It was for the property that we held on George Waterman Road as we consolidated the property.
Q. When you say the property we held on George Waterman Road, who is the we?
A. The four people in SC -- I don't even remember the name of the corporation. What were the initials again, please?
Q. So you formed the corporation when?
A. About 2 or 2 1/2 years ago, maybe.
Q. And you're an owner of the corporation?

A. Yes.
Q. And today you don't even know the name of the corporation; is that right?
MS. SALVATORE: Objection. You can answer.
A. I'm being honest with you. The initials are initials that we came up with. I always have a hard time remembering them. They're right on the paper. I was just asking you to refresh my memory, that's all.
Q. And the property on George Waterman Road, where is that property on George Waterman Road?
A. The address itself?
Q. Yes, sir.
A. I believe it's 180.
Q. And what town in George Waterman Road located in?
A. Johnston, Rhode Island.
Q. Now, the four people that you have identified by name as the owners of that corporation, were they all owners of the corporation at the time the corporation was created?
A. I believe so, yes.


Q. Are they still the owners of that corporation?
A. Yes.
Q. And are there any other new owners of the corporation?
A. No.
Q. Do you have personal insurance?
MS. SALVATORE: Objection. You can answer.
A. Clarification. What do you mean by personal?
Q. In your own name. In other words, not in the name of your business, your corporation, that we've been talking about. In your name, do you have insurance?
A. Car insurance, house insurance.
Q. Okay, tell me.
A. Yes.
Q. You do?
A. Yes.
Q. Who is your house insurance with?
A. I believe that's Amica.
Q. And do you have liability coverage on your house insurance?
A. I would have to check the policy.


Q. Do you know how much your coverage is on that insurance policy?
A. Can you clarify that?
Q. Yes. How much did you insure -- through that insurance policy, it has a value, it tells how much you're insured for, correct?
A. For my house?
Q. Yes.
A. Replacement cost, I believe it is.
Q. And how much do you have it insured for?
A. I don't know.
Q. Do you have liability coverage in a specific amount on that policy?
A. I'm not sure. I believe so.
Q. Your car insurance, do you have liability insurance on that?
A. Yes, I believe so.
Q. How much liability insurance coverage do you have on that policy?
A. I don't know right now.
Q. In your name, do you have any other kind of insurance coverage?
A. I don't think so.


Q. Are you familiar with the term umbrella policy?
A. I have heard of it, yes.
Q. Do you have umbrella insurance?
A. I believe the Amica policy has an umbrella policy.
Q. How much is the umbrella policy for?
A. I don't recall at this time.
Q. Does SCLS Realty, LLC have an insurance policy?
A. I don't know.
Q. Do you have coverage through an insurance policy for your ownership interest in SCLS Realty, LLC?
A. I do not.
Q. I understood one of your prior answers to be that the reason for forming the SCLS Realty, LLC company was in relation to the property you have identified on George Waterman Road in Johnston, Rhode Island; is that correct?
A. Correct.
Q. And what was the relationship between or what was the relationship of that property to SCLS Realty, LLC, that caused you to form

Page 25

that corporation?
A. Our attorney.
Q. Did you own the property on George Waterman Road prior to SCLS Realty being formed?
MS. SALVATORE: Objection. You may answer.
A. I'm trying to remember if we owned all of it or not and I can't remember that timeline, to be honest.
Q. When you say all of it, does that mean you owned a portion of the property at the time SCLS Realty, LLC, was formed?
A. Yes.
Q. And when SCLS Realty, LLC was formed, did you convey your ownership interest in that property to SCLS Realty, LLC?
A. I believe so.
Q. And at the time that you conveyed your property interest in that property on George Waterman Road to SCLS Realty, LLC, what was the value of the property?
A. We did not place a value on it.
Q. You simply just conveyed the real estate, the property, to the corporation?

Page 26

A. Correct.
Q. When did you do that?
A. Approximately that time frame of whenever we set up the corporation.
Q. If I suggested to you that was in October of 2024, would you agree with that?
A. Again, I don't remember the timeline.
Q. For the tax year in which you conveyed the real estate to SCLS Realty, did you do a personal tax return?
A. I'm sure I did.
Q. When you did that tax return, did you include a value of the real estate that you conveyed to SCLS Realty, LLC?
A. I don't recall.
Q. As an owner of SCLS Realty, LLC, did SCLS Realty, LLC do a tax return for the year in which it was created?
A. I don't recall.
Q. You don't even know if you did a tax return? Remember you agreed with me a little while ago that you are going to truthfully and accurately answer the questions, you're just not going to say I don't recall when you can really answer the question?

Page 27

MS. SALVATORE: Objection. You may answer.
A. I don't recall.
Q. So you don't even know if the corporation which you and three other people own, two of whom are family members and one is a lifelong friend, you don't even remember if that company did a tax return in the year it was formed?
MS. SALVATORE: Objection. Asked and answered.
Q. I want to make sure I'm giving you a chance to really answer the question.
A. I don't recall.
Q. Do you recall if SCLS Realty ever did a tax return?
A. I don't recall.
Q. So as you sit here today, I want to make sure understand your answer, you cannot even tell me if this company, of which you are one of the owners with two family members and a lifelong friend, you have ever even done a tax return for it?
MS. SALVATORE: Objection. Asked and answered. You may answer.

Page 28

A. I don't recall.
Q. Do you know if SCLS Realty, LLC ever put a value on the George Waterman Road property for purposes of a tax return?
A. No.
Q. Before the property was conveyed to SCLS Realty, and when I use the short term SCLS Realty, can we agree that's the company that we have been talking in about of which you are one of four members?
A. Yes.
Q. Did you, in your own name, ever take out any loan with any financial companies?
A. Can you clarify that question?
Q. Sure. You have testified to me that you own the property on George Waterman Road prior to conveying it to SCLS Realty, right?
A. Yes.
Q. So I'm talking about the time period, any time period, prior to the moment when you conveyed your real estate ownership interest in the George Waterman Road property to SCLS Realty; is that clear?
A. Yes.
Q. During that time period, did you ever

take out any loans with any financial institutions of any kind?
A. No.
Q. So you have no loans in your name of any kind prior to 2024?
A. No.
Q. No, meaning you don't or no, they are not any loans?
A. No, there are not any loans.
Q. Poor question. Thank you for that answer.
Did you have any other real estate companies that you were an owner in prior to the formation of SCLS Realty, LLC?
A. Yes.
Q. What were the names of those companies?
A. Alumni Realty.
Q. Say it again.
A. Alumni Realty.
Q. Alumni Realty?
A. Yes.
Q. Is that an LLC as well?
A. Yes.
Q. Who are the owners of Alumni Realty?



A. Myself and Andrew Lemoi.
Q. Besides Alumni Realty, any other real estate companies that you had, or any other companies of any kind, that you had an ownership interest in prior to the conveyance of the George Waterman Road property to SCLS Realty?
A. Yes.
Q. What were the names of those companies, please?
A. TruCare Medical.
Q. TruCare?
A. Yes.
Q. Is that an LLC?
A. Yes.
Q. And what kind of company is TruCare Medical?
A. Medical practice.
Q. What kind of medical practice?
A. Internal medicine.
Q. Who are the owners of TruCare Medical?
A. I am.
Q. Sole owner?
A. Yes.
Q. And as TruCare Medical during that



time period, the time period prior to 2024, have you ever taken out any loans or had any loans with any financial institutions?
A. No.
Q. So there are no loans, no finance agreements in the name of TruCare Medical, ever?
A. Line of credit when we first started, which has been paid off.
Q. When did you take out the line of credit?
A. Approximately 2018.
Q. How much was that for?
A. I don't recall right now, maybe 75 to 150 at that time.
Q. And that time would be 2018?
A. Right. Yes.
Q. So you can remember that in 2018 TruCare Medical took out a line of credit for approximately $75,000 to $150,000, right; is that true?
A. Yes.
Q. And you cannot remember today whether SCLS Realty has ever even filed a tax return since you created it; is that true?



MS. SALVATORE: Objection. You can answer.
A. Yes, that's true.
Q. Who is the financial institution that TruCare Medical took out the loan with?
A. Navigant Credit Union.
Q. And in taking out that line of credit with Navigant Credit Union, did you give them information about assets that you owned?
A. I don't recall.
Q. And was that line of credit in the name of TruCare Medical?
A. I believe it was.
Q. Is there any chance that that line of credit was in your name personally?
A. No.
Q. Did you sign a personal guarantee for that line of credit with Navigant?
A. I don't recall.
Q. Do you remember listing the George Waterman Road property as an asset that you owned at the time that you took out that line of credit with Navigant Credit Union?
A. No, because I didn't own it at the time.

Q. When did you come into ownership of George Waterman Road?
A. That's a tough question. Probably about 2 1/2 or 3 years ago.
Q. And 2 1/2 or 3 years ago, you came into the ownership of George Waterman Road in your own name before you conveyed it to SCLS Realty, right?
A. Yes.
Q. How did you acquire ownership of the property on George Waterman Road?
A. I'm not sure I understand that question.
MR. CONLEY: Please read back the question.
(QUESTION READ BACK)
THE WITNESS: The land was for sale and I purchased it.
Q. Who did you buy it from?
A. There was -- what was that old man's name? It was an older gentleman and I can't remember the name right now.
Q. When did you buy it?
A. Maybe 2 1/2 or 3 years ago, or maybe even a little bit longer than that.



Q. And you can't remember the name of the person who sold you the property?
MS. SALVATORE: Objection. Asked and answered.
A. I do not.
Q. What did you pay for it?
A. I don't recall.
Q. So you bought the property 2 1/2 or 3 years ago?
A. Approximately.
Q. And as you sit here today, you cannot remember what you paid for it?
MS. SALVATORE: Objection. Asked and answered. You may answer.
MR. CONLEY: You may answer.
A. I don't.
MR. CONLEY: We're going to take a break. Off the record.
(OFF THE RECORD)
MR. CONLEY: Back on the record.
Q. Mr. Santoro, how old are you?
A. 67.
Q. Where did you grow up?
A. Providence.
Q. Where did you go to school when you



were growing up in Providence?
A. St. Ann's and then it was Monsignor Bove.
Q. Where is Monsignor Bove?
A. Branch Avenue.
Q. Is that still there?
A. Is it San Miguel?
Q. I think it's San Miguel now.
A. I think, maybe.
Q. Where did you go after that; where did you go to school after that?
A. La Salle Academy.
Q. What year did you graduate from La Salle?
A. 1977.
Q. Where did you go to school after La Salle?
A. University of Vermont.
Q. What did you major in at UVM?
A. Biology and I ended up with a degree in Zoology.
Q. Did you end up with a degree in Biology and Zoology?
A. Technically, it's supposed Zoology. And a year after you complete medical school,



it switches to Biology.
Q. Where did you go to medical school?
A. University of Rome.
Q. Of Rome?
A. Yes.
Q. In Italy, right?
A. Yes.
Q. What caused you to go to Italy to go to medical school?
A. I'm Italian and I wanted to live in Italy for a while.
Q. How was it?
A. Fabulous.
Q. When did you get your medical degree?
A. I believe it was 1994.
Q. Are you sure of that?
A. Yes.
Q. When you said I believe, I thought you were qualifying it.
A. No, 1994.
Q. After you got your medical degree in 1994 in Rome, what did you do next with regard to your medical degree?
A. I came back. I worked for a while because I was broke. Then I took my boards

Page 37

and did my residency.
Q. So you came back and you worked for a while; what did you do when you were working?
A. Plastering.
Q. How long was the time period between when you started plastering and you took your boards?
A. A couple of years.
Q. When you say you took your boards, that's your medical boards in order to practice in Rhode Island?
A. Yes.
Q. And you passed your boards?
A. I did.
Q. Where did you do your residency?
A. Brown.
Q. What did you do your residency in?
A. Internal medicine.
Q. When you were at Brown doing your residency, what hospitals did you do your residency in?
A. I worked primarily at Memorial Hospital and the Veterans Administration.
Q. How long is the residency for internal medicine?

Page 38

A. Three years.
Q. After you did your residency, did you do a fellowship?
A. I thought about it.
Q. You didn't do it?
A. I was offered a pulmonary critical care fellowship.
Q. Say that again.
A. Pulmonary critical care.
Q. Primary?
A. No, pulmonary.
Q. Pulmonary critical care fellowship?
A. Yes.
Q. When you were offered the pulmonary critical care fellowship, what did you do with that?
A. I decided not to do it.
Q. Okay. That's pretty prestigious to get offered that fellowship, right?
A. I'm not sure. I don't know.
Q. What caused you to decline it?
A. I was getting old and I wanted to start a family.
Q. How old is old?
A. I was in my 40s when I did my

Page 39

residency. It was time to start a family.
Q. And when you were starting your family, what did you do in regard to your medical practice? You continued practicing medicine; is that right?
A. Yes.
Q. How did you continue practicing medicine?
A. I went to work at Kent as a primary care physician.
Q. At Kent Hospital?
A. Correct.
Q. Did you go to Kent Hospital as an employee of Kent Hospital or did you go there as an affiliated practitioner?
A. I was an employee.
Q. How long did you work as an employee at Kent Hospital?
A. I think until about 2012.
Q. And what was your role as a doctor at Kent Hospital?
A. Primary tare physician.
Q. As a primary care physician, what did you do?
A. Took care of patients in the

Page 40

community.
Q. And what kind of care? When you say you took care of patients, what kind of care were you giving patients in the community practicing as a primary care?
A. Preventative medicine.
Q. And when you say preventative medicine, what does that involve?
A. Managing their medical issues, whether they be hypertension, diabetes, et cetera.
Q. Did a point in time come when you left the employ of Kent Hospital as a physician and started your own practice?
A. I was recruited by another hospital initially.
Q. What was the other hospital?
A. Roger Williams and Fatima.
Q. And where are Roger Williams and Fatima?
A. In Providence; Providence for Roger Williams and Fatima is in North Providence.
Q. As a result of that recruitment, did you go to work for them?
A. I did.
Q. In what capacity did you work for

them?
A. As a primary care physician.
Q. How long did you work as a primary care physician at those facilities?
A. Approximately six years.
Q. After six years, what did you do next?
A. I decided to start my own practice.
Q. And what caused you to decide you wanted to start your own practice?
A. I felt I could be more successful and make more money.
Q. And do you recall what year you started your own practice?
A. 2018.
Q. Is that when you took out the line of credit from Navigant?
A. Yes.
Q. And where did you set up your practice?
A. We were on -- let me just make sure. Cranston.
Q. In the City of Cranston?
A. Yes.
Q. You said we, who is the we?
A. I mean me.


Q. It was a solo practice?
A. I have other practitioners who work for me.
Q. Did they work for you in 2018?
A. They did.
Q. And when you say other practitioners, are they other doctors or physician assistants?
A. Both.
Q. How many doctors do you have working for you?
A. We have three other doctors right now.
Q. Who are they?
A. Dr. Vera Depalo, Dr. Thomas Millerick and Dr. Shahzad Khurshid.
Q. And how about PAs?
A. We have two NPs working for us right now.
Q. What do those initials stand for?
A. Nurse practitioner, sorry.
Q. That's okay. I just want it for the record. What are their names?
A. Andrea Demers and Jillian Degraide.
Q. Have all of these same folks been working for you since you opened your


practice?
A. Everybody has except for Dr. Thomas Millerick. He joined us approximately a year ago. And Jillian Degraide is an NP who joined us almost to years ago, maybe a little bit longer, approximately.
Q. I'm going to go back and ask you a few more questions about the George Waterman Road property when you acquired it before you conveyed it to SCLS Realty, LLC, okay?
A. Yes.
Q. When you acquired it, I understand you're not sure who you bought it from, right?
A. I'm not.
Q. Are you aware of a company called Waterman Chenago, LLC?
A. I am.
Q. Can you tell me how you're aware of a company called Waterman Chenago, LLC?
A. That was Sal Senior and I think my sister Lucille who were involved in that, I believe.
Q. When you say Sal Senior, can you tell me who Sal Senior is?


A. Sal Compagnone, Senior.
Q. How do you know Sal Compagnone Senior?
A. Since I was a little kid.
Q. Almost your whole life?
A. Basically my whole life.
Q. And obviously you have known your sister basically your whole life as well, right?
A. Yes.
Q. And you understand that they were owners of a company called Waterman Chenago, LLC?
A. Yes.
Q. What is that understanding based on?
A. I knew they owned a property. Other than that, I don't know much about it.
Q. They owned a property, did I understand you correctly?
A. Yes. I think it was in regards to a property that they owned.
Q. And what was that property?
A. I think it was Waterman Chenago.
Q. Was that the name of the company or is that what you're calling the property?
A. I think -- I don't know. My

Page 45

understanding would be that Waterman referred to a piece of land on George Waterman in Johnston and a piece on Chenago in North Providence.
Whether my sister was active in that or not or if it was just Sal Senior's, I don't know.
Q. Okay. That's fair. Did you ever have any ownership interest in a company known as Waterman Chenago, LLC?
A. No.
Q. Do I understand from your testimony that you, as an owner of SCLS Realty, LLC, participated in the creation of the corporation for the purposes of owning the property on George Waterman Road in the Town of Johnston?
A. Yes.
Q. Why was it that you wanted SCLS Realty, LLC to own the property on George Waterman Road in the Town of Johnston?
A. Attorney advice.
Q. Why did you want to do it?
A. I listened to my attorney.
Q. What was your intention --

Page 46

A. I'm not sure I understand that.
Q. Okay, I didn't finish the question.
A. I'm sorry.
Q. That's okay. I probable paused too long. What was your intention in owning the property on George Waterman Road?
A. Again, just clarify a little bit more. What do you mean by that?
Q. Why did you want to own the property on George Waterman Road?
A. I wanted to develop it.
Q. And when you purchased the property because you wanted to develop it, how did you want to develop it?
A. We wanted to do apartment houses.
Q. When you say we, who is the we?
A. The four members.
Q. And all four members wanted to develop apartment houses on the property, correct?
A. Yes.
Q. Why did you want -- why did you want to develop apartment houses on the property?
A. I love doing it.
Q. Had you developed other apartment houses?

Page 47

A. I worked with my dad when he was doing that and I enjoyed it.
Q. When was that?
A. When my father was alive.
Q. When was that?
A. He passed away in 1987.
Q. So you were involved in development projects with your father up through 1987?
A. Correct.
Q. What development projects were you involved in?
A. He built some apartments in North Providence that I assisted with.
Q. An in what way did you assist him in developing those apartments in North Providence?
A. Anything he wanted me to do, I did.
Q. What did do you?
A. I worked with my dad day and night.
Q. What did you do when you worked day and night?
A. Anything from plastering to changing a doorknob to renting an apartment.
Q. Were you involved in the actual development of the property, as opposed to

Page 48

doing the nuts and bolts things that you've described?
MS. SALVATORE: Objection. You may answer.
A. My father involved me in everything. My father was my best friend. My father passed away when I was in Italy. I get very emotional when I speak about my dad.
He was the smartest person I ever knew and my best friend. My dad taught me things every day of the week.
Q. Tell me what you did in the development aspect of that property?
A. Everything from helping him design them, helping him with the plans and the drawings.
Everything from shuffling stone into the foundation to putting I curbing in the parking lots.
Q. So you feel pretty knowledgeable about what's involved in developing apartment houses?
A. It's not my professional, but I did grow up with it and I did this a long time ago, and I have some knowledge. I'm not an

Page 49

expert.
Q. Okay. When you bought the property on George Waterman Road, you bought it for the purpose of developing apartment houses.
What kind of diligence did you do to determine whether or not that property could be developed as you wanted to?
A. We hired an attorney.
Q. And what kind of due diligence did you do besides hiring an attorney?
A. The attorney --
Q. Don't tell me anything you talked about with your attorney.
A. That's the problem. The attorney and us talked about all of these things and set the game plan going forward for everything we did.
Q. Without telling me what you and your attorney talked about, tell me what your game plan was?
A. Our game plan was to establish multi-family apartments there. That was our game plan.
Q. And did you look at the property itself and determine that you could develop

Page 50

apartment houses there?
A. Yes.
Q. And what was your conclusion?
A. I concluded it was an ideal site and it was an ideal site for the apartment houses we wanted to put there.
Q. What apartment houses did you want to put there?
A. We wanted to put a number of buildings on the property. The plans changed a few times. And we did due diligence and that was it.
Q. Tell me the due diligence that you did?
A. Looked at the site, how we could structure the site and where we could put the buildings.
Q. How many?
A. It changed over time. I think we came up with -- how many buildings did we talk about? There were about eight or nine buildings.
Q. In those eight or nine buildings, how many individual residential units would you put in those buildings?

Page 51

A. Anywhere from 24 to 37. I'm trying to be specific, but the plans changed a number of times as we did redid things.
I think eight or nine, anywhere from 24 to 36 units and I think one was as large as 42 or two as large as 42.
Q. So how many in total in terms of units when you do the math on that?
A. 254.
Q. And you were sure that when you developed this plan for those buildings and those number of units that you had the right as a matter of law to build it, right?
A. Again, that was attorney advice.
Q. What did you think? I'm not asking what your attorney told you. Did you have an understanding that you could go and get your permits and put up those buildings?
MS. SALVATORE: Objection. You may answer.
A. Yes.
Q. So you didn't need any relief from any land use regulation in the Town of Johnston in order to build that, right?
MS. SALVATORE: Objection.

Page 52

MR. CONLEY: You may answer.
A. Attorney advice.
Q. I'm not asking you what your attorney told you, I'm trying to finish this deposition efficiently and as quickly as possible.
Just as I told you earlier today, you cannot use the words I don't know and I don't recall, you also cannot answer a question simply by saying attorney advice when I'm not asking you for attorney advice; do we understand that?
A. I do understand. I'm trying to answer you that that was done with the assistance of our attorney in meetings.
Q. And I'm not asking you about that. I'm asking you did you have an understanding that those buildings and those units, some 256 units of residential, that you did not need any relief from any land use regulations in the Town of Johnston in order to build that complex?
MS. SALVATORE: Objection. You may answer.
A. Again, this was done through a series

Page 53

of meetings with our attorney, based on the advice and his interpretation which he gave us.
Q. And I'm not asking you for that. Please listen the question and try to answer it.
A. I am.
MR. CONLEY: May I have the question read back.
(QUESTION READ BACK)
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
THE WITNESS: My understanding from what my attorney had done was that we were proposing a good project.
Q. That's not -- I'm not asking if you had a good project or not. You have to answer the question whether you want to or not.
A. I'm trying.
Q. No, you're not.
MS. SALVATORE: Objection.
A. I am.
MR. CONLEY: I'm not asking you whether it's a good project or not. Listen

Page 54

to the question one more time, please. May I have it read back.
(QUESTION READ BACK)
THE WITNESS: Again, I relied on my attorneys to interpret those laws. And with his meetings, he felt the project was moving forward. That's the best way I can answer the question.
Q. I'm not asking if the project was moving forward. You have to answer the question.
A. My understanding, from what my attorney does, was that the project was reasonable and would be accepted by the Town.
Q. Does that mean, when you say it was reasonable and accepted by the Town, that you had the right to build that complex, that 256-unit complex, without any zoning relief from the Town of Johnston?
MS. SALVATORE: Objection.
MR. CONLEY: You can answer.
A. I have.
Q. You have what?
A. I have answered.
Q. That's the best answer you have?

Page 55

A. That is my answer.
Q. So you're not going to answer my question?
MS. SALVATORE: Objection.
A. I answered your question, sir.
MS. VALOIS: Objection.
Q. By the way, have you remembered yet who you bought the property from?
A. I don't recall.
Q. I thought you told me a few minutes ago that Salvatore Compagnone Senior was someone you knew your whole life?
A. Yes.
Q. I thought you told me a little while ago that you knew that Salvatore Compagnone Senior was also an owner in a company known as Waterman Chenago, LLC?
A. I believe so. I answered that question.
Q. I thought you told me before that your father was also a long-time business partner with Salvatore Compagnone, Senior; is that right?
A. I don't recall saying that.
Q. Is that true?

Page 56

A. They owned a couple of buildings together.
Q. May I call Sal Compagnone Senior, Sal Senior so we can shorten that?
A. Yes.
Q. So do you know if Sal Senior and your father owned a property on George Waterman Road together?
A. I would have to go back because that time frame when my father passed away, I don't remember if they purchased that beforehand or if after he passed away, Sal Senior and my sister purchased that. I can't specifically tell you. It was a long time ago.
Q. Do you remember sort of providing statements about this project and about the history of the project to reporter Steve Ahlquist?
A. I don't remember him specifically. There were a number of reporters that approached us.
Q. So you don't remember if you gave a statement to Steve Ahlquist?
A. I don't recall.

MR. CONLEY: Can we show the witness Exhibit J, please. CAN we agree that is Exhibit J?
MS. VALOIS: Yes.
MS. SALVATORE: Yes.
Q. Is that your picture?
A. Yes.
Q. Where were you when you took that picture?
A. On George Waterman Road.
Q. Who is that standing next to you?
A. Salvatore Compagnone, Jr.
Q. Do you see there's a bold headline and there's a leading quote at the top of the page?
A. Yes.
Q. Do you see it says Steve Ahlquist underneath that?
A. I do now.
Q. And it says March 19, 2025; is that right?
A. Yes.
Q. How many months ago was that?
A. About five months ago now.
Q. And you couldn't remember that five



months ago, you gave a statement to Steve Ahlquist?
MS. SALVATORE: Objection.
MR. CONLEY: You can answer.
A. I said I did not recall. I mean, I also said there were a number of reporters. I don't know who was writing down what.
Q. Flip over three pages to the fourth page, please.
A. Okay.
Q. Do you see your name in the middle of that page in bold print?
A. Yes.
Q. On March 19, 2025, do you remember telling Steve Ahlquist that your father purchased the property back in the 1980s; do you see that?
A. Yes.
Q. So you were there with your wife Suzanne and your sister Lucille and your lifelong friend Sal Compagnone, and that's Sal Compagnone, Jr., correct?
A. Correct.
Q. And you told him, meaning Steve Ahlquist, that together, your fathers



purchased the property back in the 1980s, right?
A. Yes.
Q. And you couldn't remember today when I asked you that question, could you?
MS. SALVATORE: Objection.
MR. CONLEY: You can answer.
A. I don't recall saying that. I just clarified. I said my mind is foggy for that time period.
Our parents were our mentors. I can't remember if we purchased it before my father's death or not.
Q. How foggy was your mind on March 19, 2025?
MS. SALVATORE: Objection.
A. Again, I'm stating because our parents were our mentors and they were the ones that started all of this.
Q. So your mind is foggier today about these matters than it was on March 19, 2025, right?
MS. SALVATORE: Objection.
A. No.
Q. Didn't you just say you couldn't



answer my questions before because these matters were foggy to you?
A. That's not exactly correct.
Q. Tell me what is correct.
A. I told you we purchased the property and I can't remember exactly what year it was. And it's hard for me because I was a kid at the time to remember if my father was still alive. My father and Sal's father started this company; this is their legacy.
Q. So on March 19, 2025, you remembered that your fathers purchased the property back in the 1980s, but when I asked you who purchased the property from a couple of years ago you can't remember, right?
MS. SALVATORE: Objection.
MR. CONLEY: You can answer.
A. You were asking about the additional land we bought adjacent to the property.
Q. No, I'm not.
A. That was my understanding.
Q. No, it wasn't.
MS. SALVATORE: Objection. There's no question.
Q. Remember, you're under oath and you

Page 61

have to answer truthfully and accurately?
A. I am attempting to.
Q. Not very hard.
MS. VALOIS: Objection.
MS. SALVATORE: Objection.
Q. If I suggested to you that -- does the name Comp Realty, LLC mean anything to you?
A. It doesn't mean anything to me. It might have been one of Sal Senior's and Sal Jr.'s company.
Q. Why do you say it was one of Sal Senior's or Sal Jr.'s companies?
A. Because Comp is part of their last name, so I'm not sure.
MR. CONLEY: Mark this as Exhibit L.
EXHIBIT L MARKED FOR IDENTIFICATION
Q. I'm going to go ask you to take a look at that document. When you're finished taking a look at it, let me know.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Have you ever seen this document before?

Page 62

A. I have not.
Q. Look at the second page of the document. Do you see Exhibit A on the second page?
A. Exhibit A on the second page?
Q. Yes.
A. I see it now.
Q. Do you see where it says Exhibit A?
A. I do know.
Q. It's about 25 percent of the way down?
A. Yes.
Q. And next to it, it has book and page numbers and instrument numbers; do you see that?
A. I do.
Q. When you looked at that and read that, is that a legal description for the piece of property identified at the bottom, George Waterman Road Johnston, Rhode Island, Assessor's Plat 37, Lot 9? Is that the property that you ultimately owned and conveyed to SCLS Realty?
A. This is legal gibberish to me. I can't tell you because it's hard for me; I've never seen this document.

Page 63

This is legal gibberish to me. It is what it is, but a layperson like myself, to understand what piece of property this pertains to, I can't tell you for sure.
Q. You can put that aside. Does Lor-Sher, Inc. mean anything to you?
A. I believe it's one of Sal's company.
Q. Sal Compagnone?
A. Yes.
Q. Senior or Junior?
A. It was Senior, but I guess it's Junior now, since he has passed.
MR. CONLEY: Mark this as Exhibit M.
EXHIBIT M MARKED FOR IDENTIFICATION
Q. Please take a look at that and when you're finished looking at it, let me know.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Have you seen this document before?
A. I have not.
Q. Looking at the second page, Exhibit A, it is a legal description and it identifies the property address and it has 200 George

Page 64

Waterman Road, Johnston, Rhode Island Assessor's Plat 37, Lot 193.
When you look at that, can you tell me if that's property that you came to own and conveyed to SCLS Realty, LLC?
MS. SALVATORE: Objection. You can answer.
A. Again, with the description here, it's hard for me to determine what parcel of land it is.
I do not recognize this and I do not recognize that, for clarification.
I believe that may have been for the consolidation of all of the properties, but I didn't see these documents. I'm not involved in that.
Q. So you have some experience as a developer, right?
A. Some. Again, I'm not an expert.
Q. As a developer, you've looked at lots of legal descriptions, right?
A. Again, legalese, for me, it's hard to understand.
Q. That's not what I asked you. I asked if you looked at lots and legal descriptions?

Page 65

A. I look at lots physically and addresses physically. The legalese, I don't understand. I don't want to say yes or no to something I don't understand.
Q. You're a developer, you've looked at lots and legal descriptions; we agree on that?
A. Yes.
Q. You're a highly educated person, right?
A. Somewhat.
Q. And as a developer, it's really important to understand legal descriptions, right?
MS. SALVATORE: Objection.
A. No.
Q. No, okay. And it's beyond your capacity as a developer with the education that you have to understand legal descriptions, right?
A. I rely on my attorneys for that.
MS. SALVATORE: Objection.
MR. CONLEY: Mark this as Exhibit N.
EXHIBIT N MARKED FOR IDENTIFICATION

Page 66

Q. Please take a look at that document and let me know when you're done.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Have you ever seen this before?
A. I have not.
Q. Looking at the second page, Exhibit A, do you see that?
A. No.
Q. You don't?
A. I'm sorry, were you asking if I have seen it before?
Q. No. Do you see it right now?
A. I do, yes.
Q. And underneath the legal description, it has property address George Waterman Road Assessor's Plat 37, Lot 10; do you see that?
A. Yes.
Q. Is that a description of the property on George Waterman Road that was later conveyed to you and then to SCLS Realty?
MS. SALVATORE: Objection. You may answer.
A. I don't quite understand that from

Page 67

reading the document.
Q. Does the company Sanco, LLC mean anything to you?
A. No.
Q. You've never heard of it before?
A. I've heard of it, but it doesn't mean anything to me.
Q. How did you hear of it?
A. I think that was a company that was years ago for George Waterman Road. I don't think it exists anymore.
Q. How do you know it was a company years ago for George Waterman Road?
A. I don't even recall how I know that.
Q. We established several times over this morning that you are an owner in SCLS Realty, LLC, right?
A. I am.
Q. And we established that you recognize Waterman Chenago LLC, right?
A. I do.
MR. CONLEY: Mark this as Exhibit O.
EXHIBIT O MARKED FOR IDENTIFICATION
Q. Take a minute look through that,

Page 68

please.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Are you all set?
A. I am.
Q. Very good. Looking at the first page of this, it's a quitclaim deed, right, it says that right at the top?
A. Yes.
Q. What's the date on the quitclaim deed?
A. The 23rd day of December, 2024; is that correct?
Q. It says --
A. I want to make sure which date you're referring to.
Q. Let's look at the date on the deed, the date it was signed, the date on the deed and the date in the notary clause, that date.
A. This one on the second page?
Q. Look at the first page.
A. Okay.
Q. Does it say Quitclaim Deed at the top?
A. Yes.
Q. What's the date on that page for this

Page 69

deed?
A. I'm looking at the bottom of the page, and I want to make sure I'm reading it right, and it says December 23, 2024?
Q. Right. And look at the signatures. I'll ask if you recognize them, but the date of the signatures is December 23, 2024, right?
A. Over what signatures?
Q. The signatures on the first page.
A. There's not a date over them. I just want to be clear because sometimes notaries put a stamp and the date over that.
Q. Look at the first page.
A. I am.
Q. Do you see signatures appearing above and appearing below, Waterman Chenago, LLC and appearing above the name, Salvatore Compagnone, Jr. Member; do you see that?
A. I do.
Q. Right underneath that, Sanco, LLC. Appearing below that, but appearing above Lucille Santoro member, it says Lucille Santoro, right?
A. Yes.

Page 70

Q. Right above that it has the words, "Witness its hands and seals this 23rd day of December 2024." Do you see that?
A. Yes.
Q. Can we agree that they were signed on December 23, 2024 now?
A. Yes.
Q. That wasn't too difficult, was it?
MS. SALVATORE: Objection.
A. I was asking for clarification because notary public's sometimes put a seal and I wanted to be sure, that's all.
Q. At that time, you were one of the owners in SCLS Realty, LLC, one of four owners, right?
A. Yes.
Q. You were familiar with Waterman Chenago, LLC?
A. Yes.
Q. Who were the owners?
A. From this document, it looks like, if I understand this correctly -- but I'm not sure because it lists two different companies.
Q. You told me earlier today who the

Page 71

owners were of Waterman Chenago, same owners, right?
A. What did I say before?
Q. You don't even know?
MS. SALVATORE: Objection. That's not a question.
Q. I'll ask you another question.
A. I feel like I'm being confused.
Q. No, I think you're acting confused.
MS. VALOIS: Objection.
MS. SALVATORE: Objection.
Q. You're familiar with the company Waterman Chenago, LLC?
A. I know of it.
Q. Do you know -- let's make sure, because you've been foggy this morning. Do you know Salvatore Compagnone, Jr.?
A. As I said earlier, I thought it was Sal Senior's company. When Sal Senior passed away --
Q. That's not my question. Listen to the question.
A. I'm trying to answer the question.
Q. No, you're not. You're avoiding the question.

Page 72

MS. SALVATORE: Objection.
Q. Do you know Sal Compagnone, Jr., yes or no?
A. Do I know Sal Compagnone Jr.; is that what you're asking?
Q. Yes. You've known him your whole life, right?
A. I have.
Q. Do you know Lucille Santoro?
A. Yes.
Q. How do you know Lucille Santoro?
A. She's my sister.
Q. You've known her your whole life?
A. I have.
Q. These are very close people to you; lifelong friend and sister, right?
A. Yes.
Q. Very truthful people?
A. Yes.
Q. Do you know what consideration is when you buy a piece of property?
MS. SALVATORE: Objection.
MS. VALOIS: Objection.
A. I do not.
Q. Let's look at the first sentence.

Page 73

Right below quitclaim deed, it says, "Waterman Chenago, LLC, a Rhode Island limited liability company, and Sanco, LLC." Do you see that?
A. I do.
Q. And Sal Compagnone signed on behalf of Waterman Chenago, right?
A. Yes. I see that now.
Q. And Lucille Santoro signed on behalf of Sanco, LLC, right?
A. Yes.
Q. And you know them to be honest people, right?
A. Yes.
Q. And it says, "For consideration paid of $1 grant to SCLS Realty, LLC." Do you see that?
A. I do.
Q. You an owner in SCLS Realty LLC, right?
A. Yes.
Q. And so SCLS Realty paid $1 for that property; is that true?
A. Yes. From this document, yes.
Q. Well, you're the owner of SCLS Realty,

Page 74

LLC, right?
A. Yes.
Q. So you know how much SCLS Realty paid for the property, right? Did they pay $1 for this property?
A. Did who pay? I'm a little confused here. Are you saying the original owners, Waterman Chenago and Sanco?
Q. This is a deed representing Waterman Chenago and Sanco, LLC conveying the property to SCLS Realty, LLC; can we agree on that?
A. Yes.
Q. We just established who the owners are of each company and how they know each other, right?
A. Yes.
Q. This says that SCLS Realty, LLC paid $1 for the property; doesn't this deed say that?
A. Yes.
Q. And wasn't it signed by Sal Compagnone, Jr. and Lucille Santoro who you know to be honest people?
A. Yes.
Q. And you're an honest person, right?

Page 75

A. Yes.
Q. So can we agree that SCLS Realty paid $1 for this property on December 23, 2024?
A. But this says referred to with the consolidation of the properties. You asked this earlier.
Q. Listen to my question. Answer my question.
A. I did.
Q. No. Yes or no, did SCLS Realty, LLC pay $1 for the property that is the subject of this deed on December 23, 2024 to Waterman Chenago and Sanco LLC, yes or no?
A. It was the consolidations of the property of SCLS Realty.
Q. Yes or no? Is that a lie on this document or is it the truth?
MS. MORRIS SALVATORE: Objection.
MR. CONLEY: You may answer.
A. From what I understand, it was the consolidation of the properties.
Q. That's not my question.
A. That's my answer.
Q. Whether you consolidated it or not, did SCLS Realty, LLC pay $1 for this

Page 76

property?
A. As I said, it's the consolidations of properties, from what I understand.
Q. So you can't answer my question?
A. I don't know how to answer it.
Q. It's a pretty straightforward question. Can I have it read back. Try to give me a yes-or-no answer.
A. I cannot.
THE WITNESS: I'm getting a motion to compel on this witness. He's refusing to answer simple questions that he knows the answer to, that he has the information in front of him in black and white, because he does not want to be truthful in this deposition.
MS. SALVATORE: We object to that. That's not true; he's being truthful. He may not understand your question.
MR. CONLEY: The question is real simple.
Q. Let me ask you some more questions. You're developer, you owned property. You know that when a deed says consideration paid, that is the amount of money that was

Page 77

paid from the buyer to the seller, right?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. I don't know.
Q. Do you know this deed says that SCLS Realty, LLC paid $1 to Waterman Chenago and Sanco, LLC for the property that is the subject of the deed?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. I answered already.
Q. You may answer again?
A. I answered already.
MR. CONLEY: We're taking a break.
(OFF THE RECORD)
MR. CONLEY: Back on the record.
Q. Looking at Exhibit O, the deed, is it your understanding, as an owner in SCLS Realty, when this property that is the subject of the deed was conveyed to you that its value was $1?
A. I don't know.
Q. Okay. A moment ago, we looked at the

Page 78

line that said witness its hands and seals this is 23rd day of December 2024 when we were talking about the signatures; do you see that?
A. Yes.
Q. Do you see above that in bold print, "This transfer is such so that no documentary stamps are required and no withholding is required under RIGL Section 44-30-71.3"? Do you see that?
A. Yes.
Q. Do you have an understanding or do you know -- you're a developer, you're the owner of the property that was the grantee under this deed.
Do you understand that when property is conveyed in Rhode Island, that taxes have to be paid, transfer taxes have to be paid based on the value of the property?
MS. SALVATORE: Objection. You can answer.
A. I don't know.
Q. You don't know that; is that right?
A. I don't know that.
Q. Do you know if you agreed, through

Page 79

SCLS Realty with Salvatore Compagnone, Jr. and Lucille Santoro, to value this transaction at $1 in order to avoid paying those taxes for the transfer of the property?
MS. SALVATORE: Objection.
A. No.
Q. Do you know what the value of the property was on December 23, 2024?
MS. SALVATORE: Objection.
A. I don't know.
Q. Did you ever have any valuations done on the property?
A. No.
Q. Does the name of the company Birchwood Manor Associates, LLC mean anything to you?
A. Yes.
Q. What does that mean to you?
A. It was a property that Sal Compagnone Senior, my sister and a third party owned.
MR. CONLEY: Mark this as Exhibit P.
EXHIBIT P MARKED FOR IDENTIFICATION
Q. Please take a look at this document and let me know when you've finished reviewing it.

Page 80

A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. When you look at the signature -- this is a quitclaim deed; you agree with that, right?
A. Yes.
Q. When you look at the signature over Birchwood Manor Associates, LLC, it says Salvatore Compagnone, Jr., right?
A. Yes.
Q. And can we agree he signed the deed on December 23, 2024?
A. Yes.
Q. And this is the same honest Sal Compagnone, Jr. that we were talking about a few moments ago, right?
A. Yes.
Q. And this Birchwood Manor Associates, LLC is conveying property to SCLS Realty, LLC on that date, right?
A. Yes.
Q. And you're still the owner, on that date, of SCLS Realty, LLC, right?
A. Yes.

Page 81

Q. And Birchwood Associates is conveying the property that's the subject of this deed to SCLS Realty, LLC for $1, right?
A. I don't know.
Q. Okay. What does it say on the deed?
A. It says that on the deed, but I went present at the time.
Q. What does is say on the deed?
A. It says $1.
Q. You know Mr. Compagnone to be an honest fellow, right?
A. Yes.
Q. Do you think he lied on that deed?
A. No.
Q. So do you think it's $1?
A. I wasn't there; I don't know.
Q. So do you think that Sal lied?
A. No.
Q. Okay. Do you see it has the same language about the documentary stamps?
A. Yes.
Q. Was $1 put on the value of that deed in order to avoid paying those transfer taxes due to the State of Rhode Island on that deed?

Page 82

MS. SALVATORE: Objection.
A. No.
Q. Was $1 put on the deed because it represented the value of the property at the time of the transfer?
MS. SALVATORE: Objection.
A. No.
Q. So why was $1 put on that deed?
A. I don't know; I wasn't there.
Q. You accepted the deed on behalf of SCLS Realty, LLC, right?
MS. SALVATORE: Objection.
A. I don't know.
Q. You don't know if you accepted it or not?
A. I don't know; I wasn't there.
Q. When SCLS Realty acquired this property, did you see the deed?
A. No.
Q. You never even saw it?
A. No.
Q. Go to the second page where it says Property Description.
A. Okay.
Q. Do you see that, Exhibit A?

Page 83

A. Yes.
Q. And it says, "For reference only George Waterman Road, Johnston, Rhode Island Assessor's Plat 37, "Lot 1." Is that right?
A. Yes.
Q. Do you have any reason to believe that is not the property that's the subject of this deed that gave it a value of $1?
A. From the description, I can't tell you.
MR. CONLEY: Mark this as Exhibit Q.
EXHIBIT Q MARKED FOR IDENTIFICATION
Q. Please take a look at the deed, sir, and when you're finished reviewing it, let me know.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. We can agree this is a quitclaim deed?
A. Yes.
Q. Can we agree the date of this deed, when signed, was December 23, 2024?
A. Yes.
Q. And we can agree that Sal Compagnone,

Page 84

Jr. signed it on behalf of Waterman Chenago and Lucille E. Santoro signed on as well?
A. Yes.
Q. And Lucille E. Santoro is your sister, right?
A. Yes.
Q. And you see that Waterman Chenago and Lucille E. Santoro conveyed this property to SCLS Realty, LLC, of which you are an owner, on that day, right?
A. Yes.
Q. And again, Sal Compagnone and Lucille E. Santoro are people known to you as honest people, right?
A. Yes.
Q. And you see that this deed says that Waterman Chenago and Lucille E. Santoro sold the property to your company, SCLS Realty, LLC for $1, right?
A. I don't know; I wasn't there.
Q. What does the seed say?
A. It says $1.
Q. Do you think that Sal Compagnone and Lucille E. Santoro both lied on that deed?
A. No.

Q. So they told the truth?
A. Yes.
Q. And when they signed it that it was for $1, they were telling the truth?
A. Yes.
Q. Now, did you understand, on behalf of SCLS Realty, LLC, when that property was conveyed to you on December 23, 2024 through this deed, that the value of that property was $1?
MS. SALVATORE: Objection.
A. I don't know.
Q. What did you understand the value of the property to be?
A. I don't have a value of the property.
Q. Did you not have a value of the property on December 23, 2024 or do you not have a value of property today as you sit here in front of me?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I don't know.
Q. You don't know the value of the property today?
A. I do not know the value of the



property.
Q. Have you had any appraisals done on it?
A. No.
Q. Do you see in the deed where it says that same language about the documentary stamps?
A. Yes.
Q. And it says that no such stamps are required, doesn't it?
A. Where does it say that?
Q. The bold print.
A. Yes.
Q. Right?
A. Yes.
Q. And documentary stamps are stamps that show the taxes owed for the transfer of the property, right?
MS. SALVATORE: Objection.
A. I don't know.
Q. And when a property is conveyed, those taxes have to be paid to the State of Rhode Island for the transfer of that property, right?
MS. SALVATORE: Objection.



A. I don't know.
Q. When this deed says the consideration for the conveyance was $1, was that done to avoid paying the taxes to the State of Rhode Island for the transfer of this property?
A. No.
Q. Then why was $1 put on it?
A. I don't know.
Q. Does that $1 represent the value of the property?
MS. SALVATORE: Objection.
A. I answered that.
Q. I don't remember; what was your answer?
A. No.
MR. CONLEY: Mark this as Exhibit R.
EXHIBIT R MARKED FOR IDENTIFICATION
Q. Please take a look at Exhibit R and let me known when you've finished.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Have you ever seen this document before?



A. Yes.
Q. This is a quitclaim deed, right?
A. Yes.
Q. Looking at the language where the document identifies itself as a quitclaim deed, it says, "Ralph Santoro, Lincoln, Rhode Island?
A. Yes.
Q. And you're that Ralph Santoro, are you not?
A. I am.
Q. And it says, "For consideration paid of $1 grants to SCLS Realty, LLC." Right?
A. Yes.
Q. And you're the owner of SCLS Realty, LLC, right?
A. Yes.
Q. One of four?
A. Yes.
Q. This is you, as an individual, conveying real estate to your company, right?
A. Yes.
Q. Now, let's go to the second page.
A. Okay.
Q. It says Property Description and it

Page 89

has two parcels, right?
A. Yes.
Q. You saw this description that went to the deed as well, right, these two descriptions, right?
A. Parcel I and Parcel II, yes.
Q. Now, going back to the first page, "Witness my hand and seal 18 December 2024," that's your signature right there that says Ralph Santoro, right?
A. Yes.
Q. And you carefully reviewed this document before you signed it, right?
A. Yes.
Q. You made sure all of the information in it, including the descriptions for Parcel I and Parcel II, were accurate, they're the properties you wanted to convey from you to your company, right?
MS. SALVATORE: Objection.
A. I don't know.
Q. You don't know? So you don't know if this is the property you wanted to convey in your own name that you owned to the company that you owned; that's your testimony today?

Page 90

A. Again, the descriptions, I can't legally say this identifies the properties or not. I don't understand the legal aspect of it.
Q. So you have reason to doubt today that this is the property that you wanted to convey from Ralph Santoro to SCLS Realty, LLC? You have reason to doubt that's the property you wanted to convey; is that what you're telling me?
A. I'm telling you that I don't understand the writing. I recognize the first page. I can't remember the pieces of land and what the document says they are. I can't match the two.
MS. SALVATORE: I just want to note for the record that Mr. Conley continues to laugh at the deponent when he doesn't like the answers that are being given.
MR. CONLEY: And I'll disagree with that.
Q. So where it says that you conveyed this property to SCLS Realty on the first page for $1, that's you saying that, right, that's you?

Page 91

A. Yes.
Q. Did SCLS Realty pay Ralph Santoro $1 for this property on December 18, 2024?
A. I don't recall.
Q. How long ago was this?
A. Approximately nine months ago.
Q. And you can't recall; is that accurate?
A. That's accurate.
Q. On December 18, 2024, when you said that you conveyed property to your company for $1, did you understand that to be the value of property for this conveyance?
MS. SALVATORE: Objection.
A. No.
Q. What did you think the value was?
A. I don't know.
Q. Did you sign this deed saying that you paid $1 for it to avoid paying taxes due to the State of Rhode Island for the transfer of this property?
A. No.
Q. Then why did you put $1 as the value of the property on this deed on December 18, 2024?

Page 92

A. On the advice of my attorney.
Q. When you did your personal -- let me ask you. Have you done your personal tax return yet for tax year 2024?
A. I don't know if I'm on extension or not this year. I would have to check with my CPA.
Q. You don't know if you filed a tax return yet?
MS. SALVATORE: Objection.
A. My accountant takes care of that.
Q. Would you be surprised if you filed a tax return for tax year 2024?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I don't know how to answer that.
Q. How about SCLS Realty, LLC, has SCLS Realty, LLC filed a tax return for tax year 2024?
A. I don't know.
Q. You're one of the owners, right?
A. I am.
Q. And you don't know if you filed a tax return or not?
A. My accountant take care of that.

Page 93

Q. Who is your accountant?
A. Timothy Murray.
Q. Is Mr. Murray your personal accountant?
A. Yes.
Q. And is he also the accountant for SCLS Realty, LLC?
A. I don't know.
Q. Who is the accountant for SCLS Realty, LLC?
A. I'm not sure.
Q. Where is Mr. Murray's office located?
A. He's on Broadway in Providence.
Q. Let's look at the third page on this deed.
A. Okay.
Q. Do you see that?
A. I do.
Q. It's Parcel III, correct?
A. Yes.
Q. And it says, "For reference only." And it says, "Assessor's Plat 37, Lots 6 and 7." Do you see that?
A. Yes.
Q. And that's the George Waterman Road

Page 94

property, right?
A. I believe so.
Q. On the second page, there's Parcels I, Plat 37 Lots 4 and 5, agreed?
A. Yes.
Q. Parcel II is Plat 37, Lot 8; can we agree on that?
A. Yes.
Q. And Parcel III is Assessor's Plat 37, Lots 6 and 7; can we agree on that?
A. Yes.
Q. On December 24 -- excuse me, on December 18, 2024, you conveyed property to your company that consisted of Plat 37, Lots 4, 5, 6, 7 and 8 on George Waterman Road in Johnston, Rhode Island, right?
A. Yes.
Q. And you told your company that the value of it was $1 on that date, right?
A. Attorney advice.
MS. SALVATORE: Objection.
Q. So your answer to the question of the value of that property is that you decided it upon attorney's advice; do I understand?
A. No.

Page 95

Q. Explain your answer to me.
A. My attorney advised -- again, appreciate attorney's recommendations, this is what we did.
Q. Are you familiar with the company Sixty Three Johnston, LLC?
A. Yes.
Q. How are you familiar with that company?
A. I'm the owner.
Q. Is there anybody else that's an owner?
A. No.
Q. When you say you're the owner, do you understand that you're the owner through that company, Sixty Three Johnston, LLC?
A. Yes.
Q. And do you know when you created that company?
A. That may have been about four years ago, maybe.
Q. Why did you create that company?
A. To purchase a lot.
Q. What lot did you purchase?
A. Just by the company name, that's the name of the lot, the number of the lot.

Page 96

Q. Where was that located?
A. Johnston.
Q. Where in Johnston?
A. Off of George Waterman Road.
Q. Now, that lot that you just described off George Waterman Road, how does that compare in size with Parcel I on Exhibit R?
A. Which one are you referring to?
Q. Look at Exhibit R, that's the deed in which you conveyed to your company three parcels of land. We just agreed on that, right?
A. Yes.
Q. And it has three parcels on it; is that right?
A. Yes.
Q. You just told me that Sixty Three Johnston, LLC was set up to buy another parcel on George Waterman Road, right?
A. Yes.
Q. And the parcel that you set up Sixty Three Johnston. LLC to buy, where was that in relation to Parcels I, II and III on Exhibit R?
MS. SALVATORE: Objection.

Page 97

A. I can't tell you specifically. I would have to look at the Plat lot to tell you, but it's off George Waterman Road.
Q. Does it abut any of these lots?
A. I'm not sure.
Q. How far away is it from any of these lots?
A. I'm not sure.
Q. So the lot that you set up Sixty Three Johnston, LLC to buy, how does that compare in size with Parcel I on Exhibit R?
MS. SALVATORE: Objection.
A. I don't know.
Q. How does it compare in size with Parcel II on Exhibit R?
MS. SALVATORE: Objection.
A. I don't know.
Q. How does it compare in size with Parcel III on Exhibit R?
MS. SALVATORE: Objection.
A. I don't know.
Q. How does it compare in size, it meaning the parcel that you set up Sixty Three Johnston, LLC, to buy, how does it compare in size with Parcels I, II and III

Page 98

combined?
MS. SALVATORE: Objection.
A. I don't know.
Q. Is it smaller?
A. I couldn't tell you.
MS. SALVATORE: Objection.
Q. Is it larger?
MS. SALVATORE: Objection.
A. I couldn't tell you.
Q. Is it about the same?
MS. SALVATORE: Objection.
A. I don't know.
Q. Does Sixty Three Johnston have insurance?
A. I don't know.
Q. You're the sole owner?
A. I am.
Q. And you don't know if the company has any insurance or not?
A. I don't.
Q. Do you have any insurance, you in your capacity as the owner of Sixty Three Johnston, LLC?
A. I don't know.
MR. CONLEY: Mark this as Exhibit

Page 99

S.
EXHIBIT S MARKED FOR IDENTIFICATION
Q. Please take a moment to look through this document and let me know when you've finished reviewing it.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. I'm not going to ask you to go through all 32 pages of this exhibit. Do you see on the first page where it says Special Master's deed?
A. Yes.
Q. And if you go in the first paragraph to Lines 9 and 10.
A. Okay.
Q. This is a Special Master's deed. Can we agree that it's conveying some real estate for $250,000 which is paid by Sixty Three Johnston, LLC; do you see that?
A. Yes.
Q. You're essentially Sixty Three Johnston, LLC, right?
A. Yes.
Q. You can agree that Sixty Three

Page 100

Johnston, LLC, paid $250,000 for the property that's the subject of this deed, right?
A. Yes.
Q. Do you remember this?
A. Yes.
Q. And if you flip over two pages and go to the third page, it says Exhibit A?
A. Okay.
Q. And it says, "Part of Assessor Plat 37, Lot 63." Right?
A. Yes.
Q. Do you see that?
A. Yes.
Q. And this is part of Assessor Plat 37, Lot 63 on George Waterman Road in Johnston, Rhode Island, right?
A. Yes.
Q. Having seen that, does that refresh your recollection at all on where this lot is located in relation to the parcels on Exhibit R?
A. It helps a little bit.
Q. So where is it located?
A. That borders the body of water. It travels down to the back of the old building

Page 101

that's on George Waterman Road which is the old plating company.
Q. Does that abut the property that's the subject of the deeds?
A. It abuts that property, correct.
Q. What caused you to purchase this property?
A. Attorney advice.
Q. Now, the $250,000 that Sixty Three Johnston, LLC paid for this property, was that in a bank account for Sixty Three Johnston, LLC?
MS. SALVATORE: Objection.
A. I don't know what you mean.
Q. You don't know what it means to have money in a bank account?
MS. SALVATORE: Objection.
A. I don't know what you're asking.
Q. Now that you know where it is and you know the property that's the subject of the deed, does that also help you remember the size of it in relation to the three parcels that were the subject of the deed that is Exhibit R?
MS. SALVATORE: Objection.

Page 102

A. Not really.
Q. Okay. Did it strike you as peculiar that three parcels of land on George Waterman Road were sold for no value at all and then when you bought this parcel, you had to pay the Special Master 250,000 for it?
MS. SALVATORE: Objection.
A. Attorney advice.
Q. I didn't ask you if it struck your lawyer as peculiar, I asked you if it struck you as peculiar?
A. Attorney advice.
Q. Did you ask your attorney why you were paying $250,000 for it or did you tell your attorney you were paying $250,000 for it?
MS. SALVATORE: Objection. That calls for privileged communications.
MR. CONLEY: I'll withdraw it.
Q. Now the date on this deed, if you go to the second page, and we can agree you may not be able to read the signature, but the document says it's signed by John A. Dorsey, Esquire in his capacity as a Special Master, right?
A. Yes.

Page 103

Q. And we can agree that date is July 14, 2022?
A. Yes. It could be a 19, but yes.
Q. We can agree that this happened in 2022 and the conveyance by you of those three parcels to SCLS Realty happened in December of 2024, right?
A. Yes.
Q. More than two years after this deed?
A. Yes.
Q. When you did that deed in which you conveyed to your company those three parcels of land for no value, did you think wait a minute, two years ago I paid $250,000 for this other piece of property?
A. Attorney advice.
Q. I didn't ask you what your attorney advice was. I asked did you think, oh, my goodness --
A. Attorney advice.
Q. Do you know if Sixty Three Johnston, LLC did a tax return for tax year 2022?
A. I would have to ask my accountant.
Q. By the way, do you know if Sixty Three Johnston, LLC is on a fiscal year or a

Page 104

calendar year for its tax year?
A. I don't know.
Q. How about SCLS Realty?
A. I don't know.
Q. I'm going to go into another area.
A. Okay.
Q. I'm showing you Exhibit I and I will ask you to take a moment, and I'm going to ask you questions about everything in this exhibit, so you can go through the whole thing.
A. Okay.
(WITNESS PERUSES DOCUMENT)
THE WITNESS: Okay.
Q. Have you ever seen Exhibit I before?
A. I have seen some of this, but not all of this. I have seen some of the drawings for the apartments and I do remember the article in the newspaper.
Q. Did you assist in the preparation -- since you have seen some of it, did you assist in the preparation of Exhibit I?
A. I did not.
Q. How do you recall seeing it?
A. No. I said I saw portions of it.

Page 105

Q. How do you recall seeing portions of it?
A. The article for the Zoning Board is from years ago when we initially went in for the 60 units, so it was in the Providence Journal when I saw it.
The renderings were from an art rendering we did for the original 60 units at the time we went before the Zoning Board.
These I remember seeing with Sal when the engineer was laying out the project.
Q. What are the these that you're referring to?
A. I'm referring to the sketches of layout of how the buildings would be placed.
Q. We can agree that whoever prepared this document entitled it Johnston George Waterman Road History of Events, right?
A. Yes.
Q. Flip the page over and what I'm going to do that would be helpful for the record and for you hopefully, in the bottom right-hand corner of each page, you will see some numbers.
Go back to the first page. I'm

Page 106

trying to help you and help me do this in an organized way. Do you see in the bottom right happened corner it say P001772?
A. Correct.
Q. For the sake of clarity, I will reference the number in the bottom of the page as we go through them for you, okay?
A. Okay.
Q. As we flip over, the number for the page is 1773, right?
A. Yes.
Q. It says at the top George Waterman Road Johnston, Rhode Island, right?
A. Yes.
Q. Now, it has a date of May 23, 2000. You agree that those numbers represent that as a date?
A. I don't recall. I don't recall the date.
Q. I'm not asking if you recall the date. Listen to my question.
I'm asking can we agree that the entry 5/23/2000 represents a date.
A. It represents a date, yes.
Q. And what date does that represent to

Page 107

you?
A. It doesn't represent anything to me because I can't remember.
Q. Although you agree it's a date, you can't agree with me that that's a date that represents May 23, 2000?
A. Well, yes, I said yes to that.
Q. No, you didn't. Lor-Sher, Inc., what does that mean to you?
A. I believe I answered that earlier.
Q. What does it mean to you on this document? What does Lor-Sher, Inc., on this document mean to you?
A. It was, I believe, one of Sal Compagnone's and his father's companies.
Q. When you say one of their companies, you believe both had an ownership share in that company?
A. I don't know that in particular.
Q. How about Sanco, LLC, does that mean anything to you?
A. I believe that is one of my sister's companies at that time, but I'm not sure.
Q. Let's just go down to the bottom of that, the last entry on this page, where it

Page 108

says, Sanco, LLC." Do you see that, it has an equal sign? It says, "Lucille Santoro and Ralph Santoro." Do you see that?
A. Yes.
Q. Does that refresh your memory as to anything about who the owners of Sanco, LLC are?
A. No.
Q. You don't ever recall being an owner of Sanco, LLC?
A. I don't recall.
Q. Now, let's go back up top under the entry of May 23, 2000. And it says, "Purchase land." Right?
A. Yes.
Q. Do those words have a common meaning to you, purchase land?
A. Yes.
Q. What is the common meaning of those words to you?
A. What it says.
Q. Which is what?
A. Purchase land.
Q. And underneath that is 200 George Waterman Road, Johnston, Rhode Island. Do

Page 109

you understand that entry to mean that the words purchased land reference 200 George Waterman Road, Johnston, Rhode Island?
A. Yes.
Q. And it says from Albert E. Parente, Jr. Does that mean anything to you?
A. I think that was the prior owner of it, yes.
Q. Underneath that, it has 9/21/2001; is that right?
A. Yes.
Q. When you read that, what does that mean to you?
A. It's a date.
Q. And what date is it?
A. 9-21-2001.
Q. Can we agree the date is for September 21, 2001?
A. Yes.
Q. And it has written next to it the words, "Lor-Sher, Inc. and Sanco, LLC." Right?
A. Yes.
Q. And underneath that it has, "Purchased land adjacent to." Correct?

Page 110

A. Yes.
Q. And do those words, purchased land adjacent to, have a common meaning to you?
A. What it says.
Q. And what is the common meaning of those words?
A. Purchase land adjacent to.
Q. What does purchase mean?
A. Purchase.
Q. What does adjacent mean?
A. Adjacent usually means next to.
Q. And it identifies 200 George Waterman Road, right?
A. Yes.
Q. When you read that, do you understand that to mean that this entry says on September 21, 2001, Lor-Sher, Inc. and Sanco, Inc. purchased land adjacent to 200 George Waterman Road?
A. I don't know.
Q. You don't understand what those words mean?
A. I don't know because this is the first time I'm seeing this document. I don't know and I don't recall the dates.

Page 111

Q. I'm not asking for your recollection. I'm asking what you think the words mean on that paper and your answer is you don't know, right?
A. I don't know.
Q. It says from Edward J. Mitson, Jr.?
A. Yes.
Q. Does that mean anything to you?
A. The name is familiar.
Q. And how are you familiar with it?
A. I think he was the owner of a parcel of property next to George Waterman Road.
Q. Back on September 21, 2001, Sanco, LLC, you were the owner of Sanco, LLC on that date, right?
A. That's my sister, not me.
Q. Down the bottom it has your name; are you saying that's wrong?
MS. SALVATORE: Objection.
A. I'm saying my name appears at the bottom.
Q. And you're saying that on September 21, 2001, you were not an owner in Sanco, LLC; is that correct?
A. I don't recall.

Page 112

Q. Let's go to the next Page 1774; do you see that?
A. Yes.
Q. Summer of 2001, do you see that entry?
A. Yes.
Q. What is the common meaning of that word to you?
A. Which word?
Q. Summer.
A. Summertime, a season.
Q. In 2001, what is the plain meaning of that entry on this page to you?
A. Summer of 2001.
Q. And what is the plain meaning of that; is 2001 a year?
A. Yes.
Q. And it says, "Proposal heard by Planning Board. Construct 60 apartments." Do you see that?
A. Yes.
Q. What is the plain meaning of those words to you?
A. Planning Board construction for 60 apartments.
Q. Say that again.

Page 113

A. Planning Board construction for 60 apartments.
Q. And the words, proposal heard by Planning Board, construct 60 apartments, that means to you Planning Board?
A. You're asking me and I believe from what I'm reading, it was a Planning Board meeting.
Q. And do you agree that the Planning Board meeting was held in the summer of 2001?
A. I don't recall.
Q. Let's go down to the middle of the page. Do you see the entry 1/14/2002; do you see that?
A. Yes.
Q. What does that mean to you?
A. It means a meeting occurred for a zone change.
Q. When?
A. It looks like 1/14/2002.
Q. Is that January 14, 2002 as a year?
A. I believe so.
Q. Do you doubt that? You said you believe, so you're qualifying it, and I want to give you an opportunity to explain why

Page 114

it's so difficult for you to understand.
MS. SALVATORE: Objection. That's not a question.
Q. What don't you understand about the entry 1/14/2002?
A. I don't recall the dates. I can't say yes to something that I don't recall.
Q. And I'm not asking you to recall. I'm asking what the date means to you on that page?
A. It means it was a date on 1/14/2002.
Q. Okay. A couple of lines, down there's a phrase, "Town would receive more than six acres." Do you see that?
A. Yes.
Q. Does that have any meaning to you?
A. I believe at the time, we offered to give six acres of land to the Town.
Q. Who is we?
A. Well, Sal and my sister Lucille.
Q. You were not part of that?
A. I was not part owner at the time.
Q. You said we?
A. Well, I'm sorry. It's a generic term. It's just a pronoun that I use.

Page 115

Q. Do you understand this to mean that in 2021 (sic), there was a proposal for 60 apartments? On January 14, there was a meeting to request a zone change on 14 acres; isn't that what it says?
MS. SALVATORE: Objection.
A. Yes.
Q. So you would understand that to mean in that 2002, in order to build the 60 apartments on that parcel, you needed Planning Board approval and you needed a zone change from the Town Council; is that right?
A. I don't know.
Q. What don't you know from those words? Why don't you tell me what you don't know from those words?
MS. SALVATORE: Objection.
A. I don't know.
Q. Let's go to 1776.
A. Yes.
Q. Now, it appears that there's a copy of a map of sorts with little yellow Post-it notes on it and handwriting; do you see that?
A. Yes.
Q. The top Post-it note says, "Year:

Page 116

2002."
A. Yes.
Q. Do you understand that writing, that those words mean that it's the year 2002; is that plain enough?
A. Yes.
Q. And it says, "60 units," right?
A. Yes.
Q. What do you understand the 60 units entry to be?
A. A proposal for 60 units of apartments on the property.
Q. And in the yellow square below what we just looked at says, "All members of Planning was passed."
Do you understand that to mean that the proposal had to get approval from the Planning Board?
A. I don't recall that.
Q. It says, "Zoning total rejection." What do you understand that to mean?
A. Zoning total rejection.
Q. And what does that mean to you, anything?
A. That they approached the Zoning Board.

Page 117

Q. I'm sorry?
A. That they approached the Zoning Board.
Q. Who's they?
A. It was Sal and my sister at the time.
Q. And they approached the Zoning Board?
A. They had a meeting.
Q. They meaning the Zoning Board had a meeting?
A. Yes.
Q. And on the map shown with the yellow Post-its on it, does that map mean anything to you?
A. I believe it was the proposed building.
Q. Looking at that map, there's a block at the bottom of the page. Within it says Seven Twenty-One Associates; do you see that?
A. Yes.
Q. Does that mean anything to you?
A. No.
Q. Please go to 1777.
A. Yes.
Q. Is that a picture of the proposal back at that time, at the time that the proposal was presented to the Planning Board that

Page 118

we've been talking about?
A. I believe so.
Q. On this one, you'll see the page numbers over here, 1778, okay?
A. Yes.
Q. Is that essentially the same map we looked at on Page --
A. And that's 1778.
Q. Yes, sir.
A. They appear to be the same.
Q. The next depiction is a depiction of the project back at that time?
A. I believe so.
Q. Let's go to Page 1780.
A. Okay.
Q. "December of 2020 get acquainted with Attorney Tom Moses." Do you see that?
A. Yes.
Q. Can we agree that the entry of December of 2020 means the month of December and the year 2020?
A. Yes.
Q. It says, "Get acquainted with Attorney Tom Moses." Were you getting acquainted with Attorney Tom Moses at that time?

Page 119

A. I don't remember the specific date that I may have met him.
Q. Was it around that time?
A. I don't remember if I met him later than that or not.
Q. It says, "Thru Sam Hanna (banker)." Do you see that?
A. Yes.
Q. Who is Sam Hanna?
A. He's a friend of Sal, Jr.'s we had build a home for.
Q. And it says banker; was Mr. Hanna involved in any financial matters in regard to this project?
A. No, not that I recall.
Q. What was your understanding of Mr. Hanna's involvement?
A. As a friend he, introduced Sal Senior and Junior at the time to an attorney who might be able to assist us.
Q. It says, "Give Moses retainer." I'm not asking what the retainer was, but can you tell me, does that mean that at that time, you engaged Attorney Tom Moses regarding this matter?

Page 120

A. Yes.
Q. And it says, "In discussions relative to the development of GW Road." Is that the George Waterman Road property in Johnston, Rhode Island?
A. I believe so.
Q. You say you believe so, do you have a reason to doubt it?
A. No. I mean, I want to be very clear about what I answer, and I believe GW is the initials for that. I can't fell you for sure what it's intended to be, I didn't prepare the document.
Q. "End of 2020." What do those words mean to you?
A. The end of the year 2020.
Q. It says, "NOV give deposits." Do you see that?
A. I do.
Q. Do you know what that means?
A. I do not.
Q. It says, "Sal Senior becomes aware by Realtor Rao land adjacent to 200 GW Road for sale." Do you see that?
A. Yes.

Page 121

Q. What do you understand that to mean?
A. I believe a Realtor approached Sal Senior at that time because the land adjacent to the property was available for sale.
Q. Did you have any involvement in that?
A. I met the Realtor, yes.
Q. Who was the Realtor?
A. If I remember correctly, his name is Dominic. I'm not sure if R-A-O is correct, it may be R-E-O.
Q. And you met him?
A. I did.
Q. Did you talk about a piece of property that was for sale?
A. Yes.
Q. Tell me about what you and he discussed?
A. He told me land was available. I can't remember the figures he gave me, and we began to negotiate about purchasing that land.
Q. Without remembering -- you said you don't remember the figures he gave you, but what prices were you negotiating; do you remember what you negotiated?

Page 122

A. I really don't recall.
Q. It wasn't for zero, was it?
A. No.
Q. Did you ever talk to that Realtor about property in Burrillville, Rhode Island?
A. I did, but I don't recall when.
Q. Does the company JDL Enterprises mean anything to you?
A. I don't recall.
Q. Did you ever purchase any property through -- did you or either of your companies, actually, you have three, Sanco, Sixty Three Johnston or SCLS Realty, did you or any of your companies ever purchase property through JDL Enterprises?
A. I don't recognize that name.
Q. Did you end up buying any property from Mr. Reo?
A. He was a Realtor.
Q. Yes. He was approaching you about a sale, you said?
A. Yes.
Q. You were negotiating a price with him?
A. Yes.
Q. Did you end up buying it?

Page 123

A. Where?
Q. The piece of property that you were negotiating with him, where was it located?
A. That was George Waterman Road.
Q. Did you end up purchasing that property?
A. Yes.
Q. How much did you pay for it?
A. I don't recall.
Q. Do you recall if you purchased it personally or did you purchase it through one of your companies?
A. I don't recall.
Q. You do recall that it was George Waterman Road property, right?
A. I do.
Q. The next line says, "We sell 12-unit apartment building May Street, North Providence April 2021." Do you see that?
A. I do.
Q. Were you part of that sale?
A. I was not.
Q. It says, "Decide to use funds from above sale to purchase additional land GW Road." Do you see that?

Page 124

A. I do.
Q. Were you part of that decision?
A. I was not.
Q. The next line is, "Feb/Mar." Can we agree that means to anyone reading it February and March?
A. Yes.
Q. "Plan six buildings times 36 units equals 216, plus 12 condos." Do you see that?
A. Yes.
Q. What do those words mean to you?
A. The initial discussions about units for George Waterman Road.
Q. What was your role in that?
A. Just discuss how many we would like to put up and what we can do?
Q. And when you say we, are you referring to go your company, SCLS Realty, LLC?
A. I'm referring to Lucille, Sal, myself and my wife.
Q. Okay. And did you -- strike that. Can we agree that based on the handwriting on the side that's kind of a scratch-out of 2021 and a handwritten 2022, can we agree that

Page 125

that references to February and March of 2022?
A. I believe so.
Q. The next entry says, "Meeting at Town Hall." Right?
A. Yes.
Q. Beneath that, there's a combination of handwriting and typed entries. I'm going to ask you some questions about both, okay?
A. Yes.
Q. You see that the typed entries are names of persons, right?
A. Yes.
Q. And is it your understanding, in looking at this, that those are the names of the people who were at a meeting at Town Hall?
A. I believe so.
Q. And Town Hall in Johnston; is that right?
A. Yes.
Q. It says Mayor Polisena, Senior; do you know who that is?
A. Yes.
Q. Who is that?

Page 126

A. He was the Mayor of the Town of Johnston at the time.
Q. It also says Bob Russo?
A. Yes.
Q. Who is that?
A. I believe he's the Town Council president.
Q. At the time of the meeting; is that right?
A. I believe so.
Q. Did you also come to understand that the land was located in the Council District that Mr. Russo represents?
A. I'm not sure if I was aware of that at the time or not.
Q. Are you aware of that now?
A. Now that you told me.
Q. I asked if you were aware; I didn't tell you. John Dorsey Special Master; do you see that.
A. Yes.
Q. Is that the same John Dorsey Special Master that you purchased that piece of property for $250,000?
A. Yes.

Page 127

Q. It says Tom Delar; who is Tom Deller?
A. Town planner, I believe is his title.
Q. Sal Senior, who is that?
A. Sal Compagnone, Senior.
Q. What's his role in this?
A. He was one the owners of the property at the time.
Q. Ralph Santoro, that's you?
A. Yes.
Q. What is your role in this meeting?
A. I was an interested party.
Q. And what was your role as an interested party?
A. To discuss what we wanted to do with our property.
Q. When you say what we wanted to do with your property, the property on George Waterman Road?
A. Correct.
Q. And is it fair to say, based on this, what you wanted to do with the property was six buildings times 36 units for 216 units plus 12 condos?
A. I believe at that time, yes.
Q. You say I believe a lot; is that a way

Page 128

of qualifying your answers so that later you don't have to accept them?
MS. SALVATORE: Objection.
MS. VALOIS: Objection.
A. No.
Q. Why do you use that word all of the time?
A. The manner in which I speak.
Q. Are you speaking in that manner in order to qualify all of your answers?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. No.
Q. So when you use the word believe in response to a question, I can understand that to mean what follows the words I believe, is the truth?
MS. SALVATORE: That's not a question.
MR. CONLEY: Yes, it is. Please read it back.
(QUESTION READ BACK)
MS. SALVATORE: Same objection. That's not a question.

Page 129

MR. CONLEY: You can answer.
A. I understand that as a statement on your part.
Q. When you use the word believe, may I understand from you that the words that follow believe are the truth?
MS. SALVATORE: Objection. You can answer.
A. Yes.
Q. Throughout this deposition, every time you have qualified an answer with the words I believe, every single one of those answers are the truth?
MS. SALVATORE: Objection.
A. I already answered.
Q. And what is your answer?
THE WITNESS: Can you read my answer back?
MR. CONLEY: No, because I have a question pending.
THE WITNESS: I already answered.
Q. So when we go back and read this transcript, after every time you use the words I believe, will you own those words as the truth in response to those questions?

Page 130

A. I already answered the question.
Q. No, you didn't.
A. I did.
Q. You're going to have to answer the question or we're going to suspend the deposition and go to court so that you have to answer the questions.
A. I believe I answered the question.
Q. So you used the word believe again; are you qualifying your answer?
A. No.
MR. CONLEY: It's 12:25. We'll take a lunch break.
(Lunch recess taken from 12:25 P.M. to 1:00 P.M.)
MR. CONLEY: Back on the record.
Q. Welcome back.
A. Thank you.
Q. Thanks for making it through the rainstorm back to the rest of this deposition. Do you know Tippy Torres?
A. That name doesn't mean anything to me.
Q. Okay. There was a lot of newspaper coverage in this case; you spoke about talking to a lot of reporters about it, right?
A. Yes.
Q. Do you think the Providence Journal is anti Italian-American?
A. I don't have a basis to answer that question. I don't feel qualified to answer a question like that.
Q. You shared part of the history of your Italian heritage with me, which was interesting. Thank you for that. And that you when to Rome, so I thought you might have an opinion on that.
A. No.
Q. Can we go back to the exhibit we were looking at and we were on Page 1780, right?
A. Yes.
Q. And we were looking at the names that appear on that page and that are typed in on the page, among a lot of the handwriting on it, right?
A. Yes.
Q. Do you see that?
A. Yes.
Q. And you were at that meeting. And I was asking you questions about your role at that meeting; do you remember?
A. Yes.
Q. It also says that Tom Moses was at the meeting. That was the lawyer that you all had retained with regard to your proposed development, right?
A. Yes.
Q. And it says Attorney Kerwin; does that name mean anything to you?
A. Yes.
Q. Can you tell me what that name means to you?
A. She was an attorney that worked with Tom Moses.
Q. Now, there are some handwritten notes on this and I want to ask you some questions about that.
A. Okay.
Q. Let's start at the highest handwritten note on the right-hand side of the page where it says request:; do you see that?
A. Yes.
Q. It says, "Following adjustments. Condos side by sign equals redesign." Did I read that correctly?

Page 133

A. Yes.
Q. What does at that mean to you?
A. The Mayor, I believe -- the Mayor, I know, requested that we do condos side-by-side in the front, on the front piece of property.
Q. "Turnaround for emergency vehicles." What does that mean to you?
A. The planner wanted to make sure that in the development, that the turnaround for emergency vehicles what adequate.
Q. On the left-hand side, underneath where John Dorsey's name as Special Master is typed in, it says, "Dorsey," with an arrow pointing to the right, "Possible sale of Town planning." What does that mean to you?
A. I know that -- I don't remember Mr. Dorsey's first name.
I remember that he was -- the property for Towne Plating, from what I know, was delinquent taxes. They were looking for someone to purchase that property.
Q. Going over to the right-hand side, there's a note that says 11-15-2021; what does that mean to you?

Page 134

A. I know that at that time, we worked with Mr. Dorsey and a potential buyer had come forward for Towne Plating.
Q. Objection. Nonresponsive answer. What does November 15, 2021 -- strike that. I'm putting words in your mouth and I don't mean to.
I'm asking this as simple and as straightforward as I can. 11/15/2021, what does that mean to you, sir?
A. A date.
Q. And what date does it mean?
A. 11-15-2021.
Q. And is that November 15, 2021, the year 2021?
A. I believe I already answered that. Yes.
MR. CONLEY: Objection as nonresponsive.
Q. "$25,000 paid to Dorsey land purchase." Do you see that?
A. Yes.
Q. What does that mean?
A. It means that a check was given to Mr. Dorsey for the purchase of a piece of land.

Page 135

Q. What piece of land?
A. The land that you referred to earlier; I believe it's Lot Number 63.
Q. The one you ultimately paid $250,000 for; is that correct?
A. Yes.
Q. Going back to -- underneath that, do you see the number 7/14/22?
A. Yes.
Q. What does that mean to you?
A. It means July 14, 2022.
Q. And then can you read, "$227644 buy land"?
A. Yes.
Q. What does that mean to you?
A. Purchase of a piece of land.
Q. What piece of land?
A. Lot 63, I know.
Q. It says -- I'm sorry. Let's go to the other side of the page where you see the word "Mayor:". Do you see that?
A. Yes.
Q. The words, "Get Towne Plating back on tax roll plus adjustments." Do you know what that -- strike that. What does that mean to you?

Page 136

MS. SALVATORE: Objection.
Q. Does that have a meaning to you?
A. I'm not sure what you're asking.
Q. What do those words mean to you?
MS. SALVATORE: Objection. You can answer.
A. That the Mayor had requested that Towne Plating come back on the tax rolls.
Q. Underneath that it says, "Requested by Tom Deller - this will clean up area." What do those words mean to you?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I know that the site had a lot of graffiti. There were questions of homeless people living in there. There were questions of younger people partying in there. I do not own that property.
Q. And, "Mayor gives thumbs up." What does that mean to you?
A. The Mayor was fully supportive of our proposal.
Q. And what proposal is that?
A. To build our apartment houses.

Page 137

Q. Now, did you go to the Mayor because you understood that your proposal for the six buildings, times 36 units, for 216, plus 12 condos, needed land use relief from the Planning Board in the Town of Johnston?
MS. SALVATORE: Objection.
A. No. We went to be conscientious property owners.
Q. When you went to that meeting, did you understand that you could build that project without any approvals from the Planning Board?
A. The Mayor indicated that he was fully supportive of the changes.
MR. CONLEY: Objection. Nonresponsive. May I have my question read back, please.
(QUESTION READ BACK)
THE WITNESS: Tom Deller of the Planning Board was there and he stated he was 100 percent behind the proposal.
MR. CONLEY: Objection. Nonresponsive.
Q. At the time of that meeting, did you understand you could build that project you

Page 138

were proposing without any relief from the Town of Johnston Planning Board?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. The people at that meeting voiced 100 percent support behind the project.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. Nine months -- I'm going to read the next section of the handwritten area.
A. Okay.
Q. "Nine months later new plan incorporates Deller's adjustments." What does that mean to you?
A. It means that the adjustments for the condos and the turnaround had been addressed.
Q. It says underneath that, "204 units, plus 12 condos." What does that mean to you?
A. It means the number of units, as well as the condos.
Q. Next to that handwriting, it says, "Meeting with Mayor Senior - Russo- Tom Moses - Sal Senior - Ralph." Do you see that?
A. Yes.
Q. Are you that Ralph?

Page 139

A. I am.
Q. And does that represent another meeting -- does that note represent that there was another meeting with the Mayor and the other parties identified in that note?
A. Yes.
Q. So there was another meeting, Mayor Senior, Russo, is that the same Bob Russo you identified as the president of the Council?
A. Yes.
Q. Sal Senior is Sal Compagnone, Senior?
A. Yes.
Q. And you're the Ralph?
A. Yes.
Q. When you went to that meeting, meaning the meeting that's part of this note, did you understand or did you think that you could develop your project? Strike that whole thing. I'm sorry, that's a mess?
When you went to that meeting that is being referenced in this note that we just reviewed, did you think at that time that you could build your project of 204 units, plus 12 condos on George Waterman Road without any approval from the Town of Johnston Planning

Page 140

Board?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I already did.
Q. You did not. This is a new meeting. Objection nonresponsive.
"Mayor claims that he cannot go through with this. It would political suicide." Do you see that note?
A. Yes.
Q. What does that mean?
A. That's exactly what the Mayor said to us.
Q. "Towne Plating sold." What does that mean?
A. It means we accomplished the goal of having the Town sell the property and getting it back on the tax rolls, as we had been requested by the Mayor.
Q. Underneath that it says, "November 22." And it partially, to me, looks like November 22 equals election, even though the word election seems to be partially obliterated at the bottom of the letters.
A. Yes. I can't answer that question

Page 141

because I can't see the full writing.
Q. Okay. Go to the next page, 1781 at the bottom?
A. Okay.
Q. Again, this appears to be depicting a map that says, "Proposed resident development," but it has a yellow Post-it note in the upper right-hand corner of the map; do we agree with that?
A. Yes.
Q. It says, "First meeting with Mayor Senior." Is that right?
A. I believe so. I know so, yes.
Q. And "Units 6 times 36 units equals 2016; do you see that?
MS. SALVATORE: Objection. That's not what it says.
MR. CONLEY: You can look at it. You can either agree with me or disagree with me. Your lawyer doesn't tell you how to testify.
A. Yes, I see it.
Q. What does it say?
A. "6 times 36 units equals 216."
Q. Is that the number of resident units

Page 142

that were proposed?
A. The number of apartment units.
Q. Is it?
A. Yes.
Q. And condos equals 12; is that the number of condominium units being proposed?
A. Yes.
Q. So the total would be the 216 plus the 12; is that right?
A. Yes.
Q. And this was shown to Mayor Polisena at the first meeting?
A. Yes.
Q. Looking at this proposal, it says, "Proposed residential development for 178 and 200 George Waterman Road." Right?
A. Yes.
Q. It identifies a series of lots with within Assessor's Plat 35; is that right?
A. Yes.
Q. When you proposed this to the Mayor, when you showed the Mayor this map, did you have an understanding that with this map, what you showed in this map, that you could build this development without any approvals

Page 143

from the Town of Johnston Planning Board?
MS. SALVATORE: Objection.
A. I believe I answered that already.
MR. CONLEY: Objection. Nonresponsive.
Q. When you presented the proposal that appears on Page 1781, identified as proposed residential development, 178 and 200 George Waterman Road, did you understand that you could build that without any approvals from the Town of Johnston Zoning Board of Review?
MS. SALVATORE: Objection.
A. I believe I answered the question already.
MR. CONLEY: Objection to the response as being nonresponsive.
Q. Please turn the page. This one is 1782.
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is that the same development we were just looking at, but had the yellow Post-it note over it?
A. I believe it is.

Page 144

Q. Flip to 1784 in the bottom right-hand corner.
A. Okay.
Q. So you see at the top it says, "Result: Tom Deller requests the following adjustments." Do you see that?
A. Yes.
Q. Right underneath that, it has some hash tags with words written after them. And if you come three down below that, there is an entry that says, "IE fire truck." Do you see that?
A. Yes.
Q. Do you know what that means?
A. It was the adjustment they requested to make sure a fire truck could enter and exit the property.
Q. And then you go down a couple of more lines and it says, "Important to Mayor." Do you see that?
A. Yes.
Q. What do you understand that entry to mean?
A. It was important to the Mayor to get Towne Plating back on the tax roll.

Q. On the left-hand side is a handwritten entry that says, "2021." Do you see that?
A. Yes.
Q. It has an arrow pointing to the right that says, "Nine months later."
A. Yes.
Q. Does that represent the second meeting, the nine months later?
A. I don't recall how many meetings we had with him, so I don't know.
Q. Going down a couple of lines from there, you'll see it says, "12 condos." Do you see that?
A. Yes.
Q. It says "-D'Amico-Canavan."
A. Yes.
Q. What do those names mean to you?
A. D'Amico is an engineer. Canavan, I don't recall that name right now.
Q. What is the significance of D'Amico being an engineer in this context?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. Project design.
Q. Did D'Amico do project design work on



this?
A. Yes.
Q. What other diligence did you do with D'Amico Engineering in regard to this project?
A. I don't recall.
Q. Did you do any environmental assessments of the property?
A. I would have to check the records.
Q. What records?
A. Whatever David D'Amico did.
Q. Do you have records regarding environmental assessments done of this property?
A. My engineer would.
Q. Would that engineer be D'Amico?
A. That would be D'Amico.
Q. Canavan doesn't mean anything to you?
A. I don't recall that name.
Q. The phrase, "Other work is taking place the entire time," what's the other work?
A. I don't know; I don't want to speculate.
Q. So you have no idea what other work



had taken place?
A. I don't know.
Q. Skip down a line and there's a phrase that says, "Next meeting: Visit Mayor: Purpose final to schedule before the board." Is that right?
A. Yes.
Q. Is that yet another meeting with the Mayor?
A. Yes.
Q. You were present at that meeting?
A. Yes.
Q. And does the reference to Russo mean that Bob Russo was present at that meeting?
A. Yes.
Q. And Tom Moses was the attorney; is that right?
A. Yes.
Q. Now, and when we say the Mayor, we're talking about Mayor Senior, right?
A. Yes.
Q. And it has 7/14/2022 typed in and somebody underlined it by hand; do you see that?
A. Yes.



Q. Can we agree that that's a note for a meeting of July 14, 2022 with the Mayor?
A. Yes.
Q. "The purpose final to schedule before the Board." What do you understand those words to mean?
A. That we complied with all of the Mayor's requests to proceed forward.
Q. You're in attendance at that meeting, right?
A. Which meeting are we talking about now.
Q. 7-14-2022.
A. Yes.
Q. Did you understand at that meeting, and there are some words on this note that says, "Purpose to final schedule before the Board," that you could build the project at that you were proposing at that time, July 14, 2022, without any approval from the Town of Johnston Planning Board?
MS. SALVATORE: Objection.
A. I believe I answered that question already.
MR. CONLEY: Objection.

Nonresponsive.
Q. Did you believe at that time that you could build your project that you were proposing on July 14, 2022 without any approval from the Town of Johnston Zoning Board of Review?
MS. SALVATORE: Objection.
A. I believe I answered that question already.
MR. CONLEY: Objection. Nonresponsive.
Q. It says, "We decide to wait until election date." Do you see those words?
MS. SALVATORE: Objection.
A. Yes.
Q. Who is the we?
A. Our attorney and the rest of us.
Q. And decide to wait until -- I did misread it and I will read it correctly. "Decide to wait until after election." Election date is underneath that, so I do need to clarify that.
"We decide to wait until after election" is the phrase that I'm pointing your attention to. The we is whom?


A. Our attorney.
Q. What is the significance of deciding to wait until after election?
MS. SALVATORE: I caution you not to talk about anything privileged.
A. That was with the attorney, attorney advice.
Q. That has no significance to you, other than --
MR. CONLEY: Objection. Nonresponsive.
Q. Right above the notes we were just looking at, there's also a sentence that says, "Mayor claims he cannot go through with this and states: This would be political suicide!" Do you see that?
A. Yes.
Q. What do you understand that to mean?
A. That's exactly what the Mayor said to us.
Q. And what did you understand that to mean? I'm asking what you understood it to mean, not what the Mayor said.
A. I don't know; I didn't make the statement.


Q. So it doesn't have any meaning to you, you don't know, right?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I don't know.
MR. CONLEY: Objection. Nonresponsive.
Q. And that note is about the discussion that took place on July 14, 2022, right?
A. From what I'm reading on this page, it's 7-22, not the 7-14 meeting.
MR. CONLEY: Objection. Nonresponsive.
Q. Flip over a few pages until you get to 1787.
A. Okay.
Q. Before you do that, since you didn't know what it meant when the Mayor said this would be political suicide, or claimed this would political suicide, since you didn't understand that, why didn't you ask him what he meant by it?
A. Attorney advice.
MR. CONLEY: Back to attorney advice.


Q. Let's go to 1787.
A. Yes.
Q. It says, "Polisena Junior equals new Mayor at the top." Do you see that?
A. Yes.
Q. Over on the left-hand side, there's a column of what appears to be dates, I'll be interested to see what you think they are. It says, "2023." Do you see that?
A. Yes.
Q. Do you think that's a year?
A. Yes.
Q. It says, "Meeting," and it has one of those squirly handwriting icons. And it says, "Planning Board office." Do you see that?
A. Yes.
Q. What do you understand that to mean?
A. A meeting which occurred at the Planning Board office.
Q. And based on looking at this document, do you understand this document to be memorializing the date of that meeting?
A. What do you mean by memorializing?
Q. You see underneath where it says 2023;

do you see 1/31?
A. Yes.
Q. What do you think that means?
A. 1/31.
Q. Do you think that's a date?
A. Yes.
Q. Do you think it means a meeting took place at the Planning Board office on January 31?
A. I believe I already said yes.
MR. CONLEY: Objection. The answer is nonresponsive.
Q. Now, it says 100 Irons Avenue, Johnston, right?
A. Yes.
Q. It identifies or it writes, "Tom Moses, Tom Deller, David D'Amico." Do you see that?
A. Yes.
Q. Do you understand that to mean that on January 31, 2023, there was a meeting at the Planning Board office on 100 Irons Avenue in Johnston attended by Tom Moses, Tom Deller and David D'Amico?
A. Yes.


Q. There's an entry below that that says February 9. The handwriting is that it substantiates the sale of Towne Plating bullet point 50-foot portion conveyed. Do you see that?
A. Yes.
Q. Do you have an understanding of what that notation means?
A. That a portion of 63, I believe, was given to Towne Plating in order for the Town to complete their sale.
Q. "February 22, Moses' office in process of scheduling meeting with Councilman Russo." Do you agree that I read that correctly?
A. Yes.
Q. What do you understand that to mean?
A. That our attorney was scheduling meetings.
Q. What was the purpose of those meetings?
A. Attorney-client privilege.
Q. I didn't ask you to tell me anything that was communicated between you and your lawyer. I'm simply asking you what the purpose of that meeting is?


A. I wasn't at the meeting, so I can't tell you.
MR. CONLEY: Objection to the answer being nonresponsive.
Q. On February -- do you know if a meeting took place on February 22?
A. I don't know.
Q. Let's go to left-hand column that says 3/6; does that mean anything to you?
A. No.
Q. That doesn't mean March 6 to you?
A. Yes.
Q. Now it says, "Explain purpose of: Sixty Three Johnston, LLC." Right?
A. Yes.
Q. Now, Sixty Three Johnston, LLC is your company; is that right?
A. Yes.
Q. You're the only owner of Sixty Three Johnston, LLC, correct?
A. Yes.
Q. What do you understand the explain purpose of Sixty Three Johnston, LLC to mean? It's your company.
MS. SALVATORE: Objection.


A. I don't know.
MR. CONLEY: Objection. Nonresponsive?
Q. "? Meeting Russo + Harry Hoopis." Do you know what that notation means?
A. That Russo was the Councilman and I know that Harry Hoopis is a neighbor.
Q. A neighbor to the property?
A. Yes.
Q. 3/27, can we agree that that means March 27?
A. Yes.
Q. "Notice Russo also wants to include Mayor in meeting." Do you see that?
A. Yes.
Q. What do you understand that to mean?
A. That Councilman Russo requested that the Mayor be in attendance at the meeting.
Q. 4/4, can we agree that that's April 4?
A. Yes.
Q. The words next to that are, "Meeting Friday, April 21 at 10:00 a.m." Do you see that?
A. Yes.
Q. Did you have an understanding of what

the meeting on Friday April 21 at 10:00 a.m. was for?
A. Yes.
Q. What was it for?
A. To meet with the Mayor to discuss our project.
Q. And when you say our project, what is that?
A. The apartment houses we were wishing to develop on George Waterman Road.
Q. How many?
A. I don't recall right now.
Q. Was this the meeting where you were going to propose your affordable housing project?
A. No.
Q. 4/17; do you see that?
A. Yes.
Q. Can we agree that means April 17?
A. Yes.
Q. Next to that it says, "Bring to meeting: Plan that shows the new layout of the project - 'similar to what you brought to the meeting with Tom Deller.'" Do you see that?


A. Yes.
Q. Do you have an understanding of what that entry means?
A. That we were going to show to Mayor Polisena our project.
Q. When it says similar to what you brought to the meeting with Deller, do you have an understanding of what the reference to similar means?
A. That it was similar to the prior project.
MR. CONLEY: Objection. Nonresponsive.
Q. Do you see to the left of that entry, it has a couple of asterisks?
A. Yes.
Q. That usually denotes somebody is bringing special attention to something. Do you understand what the asterisks right there mean?
MS. SALVATORE: Objection.
A. I do not.
Q. And this reference to a project similar to what you brought to the meeting with Tom Deller, was that because any of the


units that were being proposed would be what you would characterize as affordable housing units?
A. No.
Q. Let's go all the way down to the next entry of 4/21; do you see that?
A. Yes.
Q. It writes, "Mayor Junior will not support the project," doesn't it?
A. Yes.
Q. Mayor Junior, I understand that to mean there has been an election. Mayor Senior is Joseph Polisena, Senior and Mayor Junior is Joseph Polisena, Jr.; is that correct?
A. Yes.
Q. Is this a first meeting with Mayor Polisena, Jr., regarding this project?
A. I don't know.
Q. At that meeting of 4-21, did you propose this project as being -- strike that. Did you propose this project as an affordable housing project?
A. No.
Q. When I ask you affordable housing


project, can you tell me what you understand an affordable housing project to mean?
A. Rents which are reasonable for people to afford to live.
Q. Does it have any significance besides having reasonable rents?
A. I'm sorry, I didn't catch that all.
Q. I apologize. Does it have any significance other than reasonable rents?
A. Not that I'm aware of.
Q. Underneath that, it says 5/4; can we agree that that's May 4?
A. Yes.
Q. And the entry is "Potential uses for this property." Is that right?
A. Yes.
Q. Can you tell me what that entry means, potential uses for that property?
A. What the property could potentially be used for.
Q. And what potential uses were being considered?
MS. SALVATORE: Objection. You can answer.
A. That was with our attorney to discuss.

Page 161

Q. Which companies were meeting regarding potential uses for the property?
A. I don't understand the question.
MR. CONLEY: Objection. Nonresponsive.
Q. Which individuals were meeting, not your lawyer, but which individuals were meeting to discuss the potential uses of the property?
MS. SALVATORE: Objection.
A. Attorney advice, attorney-counsel.
MR. CONLEY: Objection. Nonresponsive.
Q. Did you have any discussions with Sal Compagnone, Jr., with your sister Lucille about the potential uses of the George Waterman Road property?
A. In the presence of our attorney.
Q. You had no discussions about it outside of the presence of your attorneys?
A. No.
Q. You never called up your sister and said, this is what I'm thinking about for that property?
A. We relied on our attorney to make

Page 162

recommendations.
MR. CONLEY: Objection. Nonresponsive.
Q. Did you ever have Sunday dinner with your sister and have a discussion about the potential uses of this property?
MS. SALVATORE: Objection. Asked and answered several times. You can answer, Ralph.
A. No.
Q. Did you ever have a cup of coffee with Sal Compagnone and discuss with him the potential uses of the property?
MS. SALVATORE: Objection. Asked and answered. You can answer, Ralph.
A. No.
Q. Besides your lawyer, did you ever have any discussions with anyone else regarding potential uses of the property?
A. No.
Q. How about Dave D'Amico, did you ever have any conversations with him about potential uses of the development of the property?
A. No.

Page 163

Q. Looking back at the entry on the left hand-side, it looks like 10-18; do you see that?
A. Yes.
Q. Can we agree that's October 18?
A. Yes.
Q. One of the bullet points is "Contact engineers, re: Comprehensive permits." Do you see that?
A. Yes.
Q. And did you know that to be David D'Amico?
A. I can't recall.
Q. Did you ever work on this project with anyone else besides Dave D'Amico?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
Q. This is October of 2023 that we're talking about; is that right?
A. Yes.
Q. We're in August of 2025; is that right?
A. Yes.
Q. You put in a lot of time and effort on

Page 164

this proposal for this project; is that right?
A. Yes.
Q. And you don't remember if you've ever worked with any other engineer besides David D'Amico on this project, right?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. Yes.
Q. There's a note here -- strike that. As of October 18, 2023, were you considering an affordable housing proposal for this development project?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
Q. When did you first think about an affordable housing proposal for this project?
A. When we went with an attorney.
Q. When was that?
A. I'm trying to remember now. I can't remember.
MR. CONLEY: Objection. Nonresponsive.

Q. Whenever it was that you thought about this proposal, this project becoming an affordable housing proposal, what caused you to think about it as an affordable housing proposal?
A. Attorney advice.
Q. So there was some legal reason that caused you to think about it as an affordable housing proposal?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
Q. On that same Page 1787, in October of 2018, did you think you -- strike that.
Whenever it was that you thought you were going to go make this an affordable housing proposal, did you think that you could move forward with an affordable housing proposal without any approval from the Town of Johnston Planning Board?
A. I don't know.
Q. Did you think that you could essentially go forward on your proposed



development as an affordable housing proposal as a matter of law, that the Town had to allow you to do it?
MS. VALOIS: Objection.
MS. SALVATORE: Objection.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection. Nonresponsive.
Q. When you decided to move forward with an affordable housing proposal, did you do that because you thought that the Town had to give you approval for your affordable housing proposal?
A. No.
Q. Looking at the last note on this Page 1787, it says, "Monitor land use court." Do you see that?
A. Yes.
Q. What was your understanding of monitoring the land use court?
MS. SALVATORE: Did you say what was or what is?
Q. What was your understanding of monitoring the land use court?



MS. SALVATORE: Objection.
A. I don't know.
MR. CONLEY: Objection. Nonresponsive.
Q. What is your understanding as you sit here today of the words monitoring the land use court?
A. I don't know; I didn't prepare the document.
Q. Those words have no meaning to you?
A. No.
Q. What words don't you understand in that sentence? Do you know what the word monitor means?
MS. SALVATORE: Objection.
A. Yes.
Q. What does the word monitor mean?
A. Monitor means that you watch something.
Q. And it says land use court; is that right?
A. Yes.
Q. We'll start with land. What do you not know what the word land means?
MS. SALVATORE: Objection.



A. I don't know.
Q. What does the word use mean?
MS. SALVATORE: Objection.
A. I don't know.
Q. What does the word court mean?
A. I don't know.
MR. CONLEY: I'm going to object to all of those answers as being nonresponsive.
Q. You were already starting to monitor the land use court back in October of 2018, correct?
MS. VALOIS: Objection.
MS. SALVATORE: Objection.
A. No. And it's also the wrong date. This says 2023, you referred to October '18.
THE WITNESS: You said October of 2018.
MS. CONLEY: I'll correct myself. October 18, 2023.
MS. SALVATORE: Are you withdrawing all of your objections?
MR. CONLEY: Absolutely not. He hasn't responded to anything since we came in from the rainstorm.

Page 169

MS. VALOIS: He's answering, you just don't like the answer.
MR. CONLEY: I've heard more advice of counsel on things that have nothing to do with legal things than I've ever heard in my 40 years of practicing law.
MS. SALVATORE: Oh, come on.
MS. VALOIS: He met with counsel and he told you that, that's it.
Q. Now, a point in time came when you decided to proceed with what you would call an affordable housing proposal for your project? That's badly worded, but you know what I mean, right?
A. Yes.
Q. You don't recall when?
A. I don't remember the specific date.
Q. Did you do any research to determine what an affordable housing proposal would require in the State of Rhode Island?
A. I discussed that with our attorney.
Q. Did you discuss it with any consultants?
A. I think we had one consultant, yes.
Q. Who was that consultant?

Page 170

A. I think that was Michael Lapinski.
Q. And what did Michael Lapinski tell you about the requirements for an affordable housing proposal in the State of Rhode Island?
A. I don't recall.
Q. What did you ask Michael Lapinski to do for you as a consultant?
A. Just evaluate the project.
Q. And evaluate it in what way, what kind of an evaluation?
A. If it was a reasonable request.
Q. Reasonable by what standards?
A. Location.
Q. Did you get a report from that consultant regarding the providing of those consulting services?
A. I don't remember.
Q. This was a pretty important project for you, right?
A. Yes.
Q. You asked a consultant to do an evaluation for you of the project, right?
A. Yes.
Q. And now you don't even remember if you

Page 171

got a report?
MS. SALVATORE: Objection.
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: You just don't like the answer.
Q. When -- strike that. Did Mr. Lapinski provide you with an analysis for the financial viability of the project?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: Mr. Conley doesn't like the answer; I want that on the record.
MR. CONLEY: I didn't mean to step over you. I do apologize.
Q. Did Mr. Lapinski give you a valuation on what the legal requirements are for an affordable housing proposal in the State of Rhode Island?
A. Our attorney did.
Q. Now, a point in time came when the Town of Johnston was presented with a proposal for an affordable housing project on

Page 172

the property we've been discussing on George Waterman Road, right?
A. Yes.
Q. And that proposal ultimately resulted in a pre-application meeting being held in the Town of Johnston on that proposal, right?
A. Yes.
Q. Did you attend that meeting?
A. I did, yes.
Q. Before attending that meeting, did you have knowledge of what the requirements, the legal requirements, are for an affordable housing proposal in the State of Rhode Island?
A. Attorney advice.
MR. CONLEY: Objection. Nonresponsive.
Q. Before attending that pre-application meeting for your affordable housing proposal, did you have a financial viability analysis done for the proposal?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: Mr. Conley doesn't

Page 173

like the answer.
Q. Did you have any analysis done of your proposal that you presented at the pre-application meeting regarding traffic, for instance?
A. I believe so, yes.
Q. Who did that for you?
A. I don't remember his name.
Q. Okay.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: Again, Mr. Conley just doesn't like a good answer, a good and truthful answer.
MR. CONLEY: I love good and truthful answers. You can say I don't like answers that are nonresponsive, but I love good and truthful answers.
MS. SALVATORE: That was a truthful answer.
MS. VALOIS: I don't think you're allowed to object as nonresponsive as the questioning attorney. You can ask more questions, but you can't object.
MR. CONLEY: I can. I can.

Page 174

MS. VALOIS: We'll see.
MR. CONLEY: We will.
Q. In presenting that proposal at the pre-application meeting, did you have any analysis done regarding drainage and stormwater for the project?
A. I believe the engineer had all of that, yes.
Q. Which engineer?
A. David D'Amico.
Q. That analysis for the traffic, the drainage and the stormwater, did Mr. D'Amico provide you with those reports?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. VALOIS: Again, you just don't like the answer.
Q. Prior to the application, the pre-application meeting that we've been talking about, what steps did you take to determine the requirements for an affordable housing proposal in the State of Rhode

Page 175

Island?
A. I relied on my attorney.
MR. CONLEY: Mark this as Exhibit T.
EXHIBIT T MARKED FOR IDENTIFICATION
Q. I'm showing you a document entitled Title 45. It says Town and Cities on it. Chapter 53 Low to Moderate Income Housing. Do you see that?
A. Yes.
Q. Have you ever seen this before?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: Mr. Conley doesn't like the answer.
MR. CONLEY: In stereo.
Q. I'm going to draw your attention to three pages in.
A. Okay.
Q. Now, when you presented your proposal at a pre-application conference for the affordable housing project, was it your understanding that you were entitled, that the Town of Johnston had to approve it for

Page 176

you?
A. I don't know.
MR. CONLEY: Objection. Nonresponse.
MS. SALVATORE: He didn't like the answer.
Q. On the page I called your attention to, you'll see the Capital E in parentheses, and it says "Required findings for approval." Do you see that?
A. Yes.
Q. Now, do you see a Capital I there, a Capital Roman Numeral I in parentheses?
A. Yes.
Q. It says, "The proposed development is consistent with local needs as identified in the local comprehensive community plan with particular emphasis on the community's affordable housing plan and/or has satisfactorily addressed the issues where there may be inconsistencies." Do you see that?
A. Yes.
Q. Please tell me, in the proposal that you presented in that pre-application meeting

Page 177

how it met that requirement?
MS. SALVATORE: Objection. Calls for a legal conclusion. You may answer.
A. Affordable housing is a crisis in the State of Rhode Island. There's virtually no community in the State of Rhode Island that has met their 10 percent quota.
Q. So that's your answer as to how your specific proposal would meet that specific requirement, right?
MS. SALVATORE: Objection. Calls for a legal conclusion.
MR. CONLEY: You may answer.
A. I'm not qualified to answer that.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: He didn't like the answer.
Q. Look at (II); do you see that?
A. Yes.
Q. It reads, "The proposed development is in compliance with the standards and provisions of the municipality's zoning ordinance and subdivision regulations and/or where adjustments are requested by the

Page 178

applicant that local concerns have been affected by the relief granted do not outweigh the state and local need for low and moderate income housing." Do you see that?
A. Yes.
Q. How did your proposal that you presented to the Planning Board at the pre-application conference meet the requirements of that standard?
MS. SALVATORE: Objection. Calls for a legal conclusion you may answer.
A. I'm not qualified to answer that question.
Q. It's your proposal, isn't it?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. Yes.
Q. And you want your proposal to meet all of the requirements of Rhode Island law, right?
A. Legal counsel.
Q. No, you. You didn't care whether or not it met the requirements of Rhode Island law?

Page 179

MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. Yes.
Q. So you did care about it meeting the requirements of Rhode Island law.
Did you look at your proposal and make a determination that it did?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I rely on my attorneys for the legal aspects.
MR. CONLEY: Objection. The answer is not responsive.
MS. SALVATORE: And Mr. Conley doesn't like the answer.
Q. Let's look at III.
A. Okay.
Q. It reads, "All low and moderate income housing units proposed are integrated throughout the development; are compatible in scale and architectural style to the market rate units within the project; and will be built and occupied prior to or simultaneous with the construction and occupancy of any market rate units." Do you see that?

Page 180

A. Yes.
Q. Tell me how your proposal integrated low and moderate income housing units throughout the development; tell me how you did that?
MS. SALVATORE: Objection. Calls for a legal conclusion. You may answer.
Q. You're the developer, you can answer that.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection to the answer as being nonresponsive.
Q. The next section of III says, "Are compatible in scale and architectural style to the market rate units within the project." Do you see that?
A. Yes.
Q. What did you do to determine the compatibility and scale and architectural style to the market rate units within the project?
MS. SALVATORE: Objection. Mischaracterizes the proposal and calls for a legal conclusion.

MR. CONLEY: You may answer.
A. I rely on my legal advice.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. SALVATORE: Mr. Conley does not like the answer.
Q. And it also says, "Will be built and occupied prior to or simultaneous with the construction and occupancy of any market rate units." Do you see that?
A. Yes.
Q. So what diligence did you do so that your units would be built and occupied prior to or simultaneous with the construction and occupancy of any of the market rate units?
MS. SALVATORE: Objection. Misrepresents the proposal and calls for a legal conclusion. You have may answer.
A. Again, I rely on legal counsel.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. SALVATORE: Mr. Conley doesn't like the answer.
Q. How many market rate units did you have in your proposal?



A. Zero.
Q. So all of them, every unit that you were proposing was going to be affordable housing; is that right?
A. Yes.
Q. Now (IV), do you see that, the next one?
A. Yes.
Q. "There will be no significant negative impacts on the health and safety of current or future residents of the community, in areas including, but not limited, safe circulation of pedestrian vehicular traffic, provision of emergency services, sewerage disposal, availability of potable water, adequate surface water runoff, and the preservation of natural, historical or cultural features that contribute to the attractiveness of the community." Did I read that correctly?
A. Yes.
Q. What diligence did you do after your proposal to make sure that it would meet that required standard?
MS. SALVATORE: Objection. Calls



for a legal conclusion, among other things.
MR. CONLEY: I'm asking what diligence he did, I'm not asking for any conclusions, but go ahead.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. SALVATORE: Mr. Conley doesn't like the answer.
Q. Number (V), "All proposed land developments and subdivision lots will have adequate and permanent physical access to a public street in accordance with the requirements of Section 45-23-60(a)(5)." Do you see that?
A. Yes.
Q. What diligence did you do to make sure your proposal would meet that requirement?
MS. SALVATORE: Objection. Calls for a legal conclusion, among other things.
A. I'm not qualified to answer that question.
MR. CONLEY: Objection to the answer as being nonresponsive.



MS. SALVATORE: Mr. Conley doesn't like the answer.
Q. Roman Numeral (VI); do you see that?
A. Yes.
Q. It says, "The proposed development will not result in the creation of individual lots with any physical constraints to development that building on those lots, according to pertinent regulations and building standards, would be impracticable, unless created only as permanent open space or permanently reserved for public purpose on the approved, recorded plans." Do you see that?
A. Yes.
Q. What diligence did you do to ensure that your proposal would meet that standard?
MS. SALVATORE: Calls for a legal conclusion, among other I things. You may answer.
A. I'm not qualified to answer that question.
MR. CONLEY: I object to the answer as being nonresponsive.
MS. SALVATORE: And I'm going to

Page 185

say that Mr. Conley doesn't like the answer.
MR. CONLEY: We can take a break right here. Off the record.
(OFF THE RECORD)
MR. CONLEY: Back on the record.
Q. You've heard of the word sham before, right, S-H-A-M?
A. Yes.
Q. What does the word sham mean to you?
A. Something false.
Q. Okay. A sham is -- strike that. You're familiar with the word pretext; is that right?
A. Somewhat.
Q. What does the word pretext mean to you?
A. Well, in the world we live in right now, if you think about a text before you send it, I don't know. Doing something, but not really wanting to do it, maybe.
Q. Now, you know that you carefully reviewed the complaint, the lawsuit that was filed in this matter, right? Before it was filed, it was reviewed and filed with your approval; is that right?

Page 186

A. Yes.
Q. And do you remember that you alleged in that lawsuit that when the Town of Johnston took your property by the process of eminent domain, that you characterized that as a sham?
MS. SALVATORE: Objection. You may answer.
A. I discussed that with my attorney, yes.
Q. I'm sorry?
A. I discussed that with my attorney.
Q. And tell me, what was the sham?
A. Please clarify the question.
Q. You allege there was a sham; you agreed with me that you alleged that. Tell me what the sham was?
MS. SALVATORE: Objection.
A. I feel the Town had no prior thought of tacking my land.
Q. What do you mean by no prior thought to taking your land?
A. I don't think the Town ever intended to take my land.
Q. The Town did, right?

Page 187

A. They tried to.
Q. Okay. And so they had to have an intent if they tried to, right?
A. I can't tell you what they're thinking.
Q. Why do you say it was a sham if you can't tell what they're thinking?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I can't tell you what's in their mind.
Q. I'm asking you what the sham is, that's all I'm asking.
You used the term, it's your lawsuit. You used that term. I'm not trying to put words in your mouth. Tell me what you meant when you said sham.
MS. SALVATORE: Objection. Asked and answered. You can answer.
MR. CONLEY: You can answer.
A. I discussed that with my attorney.
Q. When you say you discussed that with your attorney, is that another way of saying what you said a lot of times today, advice of counsel?
A. Yes. I spoke with my attorney.

Page 188

MR. CONLEY: Objection. The answer is nonresponsive.
MS. SALVATORE: Mr. Conley does not like the answer.
Q. I asked you a moment ago what the word pretext means, right? Do you remember I asked you that question just a moment ago?
A. Yes.
Q. Tell me what the pretext is that you're alleging in your lawsuit?
MS. SALVATORE: Objection. Calls for a legal conclusion. You may answer.
A. It's a legal term and I don't know how to respond to that.
Q. It's your lawsuit, right?
A. Yes.
Q. And the lawsuit alleges that the Town engaged in a pretext when it took the property, right; you agree with that?
A. Yes.
Q. When you used those words, what did you mean, sir?
MS. SALVATORE: Objection.
A. Again, those were with discussions with my attorney.

Page 189

MR. CONLEY: Objection to the answer as being nonresponsive.
Q. When you file a lawsuit, you know that you have to prove what you say in the lawsuit, right?
A. Yes.
Q. When you said it was a sham, what did you intend to prove?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. That they were just trying to block our project.
Q. And when you use the term pretext, you realized you had to prove that as well, right?
A. Yes.
Q. And what were you going to prove?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I'm thinking of your question. You're asking me legal terms to comment on and I don't feel that I'm qualified. That's why I rely on my lawyers when I speak with them.
MR. CONLEY: Objection as nonresponsive.

Page 190

MS. SALVATORE: Mr. Conley doesn't like the answer.
Q. So when that complaint was filed and you approved it, you didn't know what pretext meant?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. We filed because we felt our land was being taken when it shouldn't have been.
MR. CONLEY: Objection to the answer as nonresponsive.
MS. SALVATORE: Mr. Conley does not like the answer, the truthful answer.
Q. Tell me what you're going to prove in this lawsuit to support your allegation that it was a sham?
MS. SALVATORE: Objection. Calls for a legal conclusion.
A. I don't know how to answer that question.
MR. CONLEY: Objection to the answer as nonresponsive.
MS. SALVATORE: Mr. Conley does not like the truthful answer to that question.

Page 191

Q. Tell me what facts you're going to prove to support your contention that the taking was a pretext?
MS. SALVATORE: Objection. Calls for a legal conclusion.
A. I'm not a lawyer and I can't answer that question. My lawyers will deal with that.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. So you don't intend to prove anything, do you?
MS. SALVATORE: Objection.
A. I have spoken with any lawyers, that's why I hire lawyers.
Q. What facts did you rely on when you used the word sham?
MS. SALVATORE: Objection.
A. Answered.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. What facts did you rely on when you used the word pretext?
MS. SALVATORE: Objection.
A. Answered.

Page 192

MR. CONLEY: Objection. The answer is nonresponsive.
Q. You're not going to tell me a single fact today that you relied on when you filed the lawsuit that said that the Town's exercise of eminent domain in taking your property was a sham, are you?
MS. SALVATORE: Objection. Mischaracterization of his testimony.
MR. CONLEY: That's a question. Go ahead.
A. It's the job of my lawyers to do that.
MR. CONLEY: Objection. The answer is nonresponsive.
MS. VALOIS: Mr. Conley doesn't like the answer.
Q. Give me a single fact, one, that you relied on when you filed this lawsuit that said it was a sham?
MS. SALVATORE: Objection. Asked and answered.
MR. CONLEY: You may answer.
A. I already answered the question.
MR. CONLEY: Objection. The answer is nonresponsive.

Q. Give me a single fact, just one, that you relied on when you filed this lawsuit that claims the Town of Johnston exercised eminent domain with regard to your property as a pretext?
A. I spoke with counsel.
Q. Say that again?
A. I spoke with my lawyers.
Q. What facts -- I'm not asking what you spoke about, give me one fact, sir, if you can?
A. It's my lawyers job to give you those facts.
MR. CONLEY: Objection to the answer as nonresponsive.
Q. Do you remember we looked at an exhibit this morning, Exhibit J? It was a statement or an interview you gave with Steve Ahlquist; do you remember that?
A. Can you repeat that? I didn't hear the question, or read it back.
Q. Do you remember this morning I asked you some questions in regard to an interview that you gave to Steve Ahlquist, it was Exhibit J?



MS. SALVATORE: Objection.
A. Yes.
Q. And do you remember when I asked you this afternoon what caused you to decide to make an affordable housing proposal for your project in the Town of Johnston; do you remember that?
A. Yes.
Q. Do you remember you told me that the reason was through advice of counsel; do you remember telling me that?
MS. SALVATORE: Objection.
A. Yes.
Q. When Steve Ahlquist asked you that question, did you tell him that was protected by advice of counsel?
A. I don't recall.
Q. Now, you've owned several pieces of the George Waterman property over a period of time; you did not require them all at the same time, right?
A. No.
Q. We've looked at a lot of information about history of the property and how it came into your ownership?



A. Yes.
Q. Do you recall doing that this morning? I went through a series of deeds with you and showed you all of that?
A. Yes.
Q. When you first acquired your ownership interest of the property on George Waterman Road, what was your understanding of the value of that property?
A. I didn't think about the value of the property at the time.
Q. When you first acquired -- when you say you didn't think about it, is that another way of saying to me that you have no idea of what the value of the property was at the time you acquired it?
A. No.
Q. If that's no, then what was the value of the property at the time you acquired it?
A. I don't recall that.
Q. Have you ever done anything, from the time that you initially acquired the property to this date, to today, to determine the value of your property?
A. No.



Q. Have you ever spoken with anybody else about what the value of the property is?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
Q. When you say you don't recall, does that mean you think at sometime somebody did?
A. No. It just means that I don't recall.
Q. During the time period that you have owned the property, have you always filed personal tax returns?
A. Yes.
Q. In filing those personal returns, did you ever do any preparation that required you to determine the value of the property that you acquired?
A. I don't recall.
Q. Did you even disclose to the Internal Revenue Service in those tax returns that you acquired this property?
A. I don't recall.
MR. CONLEY: Objection. Nonresponsive.
MS. SALVATORE: Mr. Conley does

Page 197

not like the answer.
Q. Have you ever spoken with your accountant about needing to determine the value of the property?
A. No, I don't think so.
Q. In preparing your tax returns, did your accountant ever say to you, have you acquired any significant assets in this tax year?
A. I don't recall.
Q. You saw an appraisal done by the Town of Johnston that places the value of property which is the subject of this case at $775,000, right?
A. I never actually saw that.
Q. Are you aware that there is an appraisal done by the Town of Johnston that values the property at $775,000?
A. I was told by my attorney.
Q. Is that a way of you saying to me that the answer is actually yes?
A. No. I'm telling you I didn't actually see the appraisal and my attorney told me what the appraised value was.
Q. So you are aware that the Town of

Page 198

Johnston did an appraisal that puts the value of the property at $775,000, right?
A. Yes.
Q. Do you agree with that?
A. No.
Q. Why?
A. Because I think it's worth more than that.
Q. What's it worth?
A. I don't know; I'm not an appraiser.
Q. How do you know that it's worth more than $775,000 if you say you don't know what it's worth and you're not an appraiser; how do you know it's worth more than that?
A. Because I know.
Q. And how do you know?
A. Based of the current real estate values.
Q. And what current real estate values did you look at to determine that you did not agree with the number of $775,000?
A. I didn't look at any.
Q. You've never looked at the appraisal to determine if it had any merit whatsoever, right?

Page 199

A. I wasn't interested in it.
Q. And you've never done anything, even after knowing that the Town put an appraised value of it at $775,000, to determine what the fair market value of the property is today, right?
A. I have not.
Q. During the time that you have owned the property, have you ever tried to sell it?
A. I have not.
Q. And you kind of put the emphasis on I. Is that because somebody else has tried to sell the property for you?
A. I have not tried to sell the property.
Q. Has anyone tried to sell the property?
A. Not to my knowledge.
Q. In this lawsuit that you filed against the Town of Johnston, are you seeking any damages beyond the fair market value of your property?
MS. SALVATORE: Objection.
MR. CONLEY: You may answer.
A. I have spoken with my lawyer.
Q. And what damages are you seeking?
A. I have not discussed that.

Page 200

MR. CONLEY: Objection. The answer is nonresponsive.
Q. Are you seeking damages?
A. I don't know.
MR. CONLEY: Objection. The answer is not response.
MS. VALOIS: Mr. Conley doesn't like the answer.
MS. SALVATORE: He doesn't like the answer.
Q. You're here today and you know it's a deposition for your case. What damages are you seeking from the Town of Johnston as we sit here today?
MS. SALVATORE: Objection. Asked and answered.
A. I have spoken with my attorney about that.
Q. And as a result of speak with your attorney, I'm not asking what you said to your attorney or what your attorney said to you, as you sit here today, what damages are you seeking from the Town of Johnston?
A. I spoke with my attorney.
MS. SALVATORE: Bill, can we take

a break just for five minutes? Two minutes, I don't care.

MR. CONLEY: Sure. Off the record.

(OFF THE RECORD)

MR. CONLEY: Back on the record.

Q. When you made your proposal to the Town of Johnston for the project that you presented at the pre-application meeting, had you done any financial analysis of the profits you expected to make?

A. No.

Q. Do you have any idea of what profits you expected to make?

A. I don't know.

Q. Did you ever do a financial analysis of, given the project being an affordable housing project and the cost of materials and labor and the soft costs that go along with any development project, whether or not you were going to go make a profit?

A. I think we would have made a profit, yes.

Q. What analysis did you do to make that determination?



A. Basically we have run other buildings and we know what our rents are and we know what our costs are and we felt at those rents, we could make that project a viable project.

Q. Did you do an analysis, not on your other buildings, but specifically as to this project?

A. Just in my mind.

Q. So there's no paperwork to support it?

A. Well, no. I just do my numbers in my mind.

Q. When you did the numbers in your mind, what did the numbers in your mind tell you as to what your profit would be?

MS. SALVATORE: Objection. You can answer.

A. I can't give you a definite number. I mean, that could vary with time and vary with vacancy and everything else, but I felt comfortable doing the project.

Q. And did the number that you arrived at in your mind for profit, is that what you gave you comfort?

A. Yes.



Q. And what was the number that gave you comfort?

A. I don't recall the exact number.

Q. And it was only in your mind, right?

A. That's how I do my calculations.

Q. In your mind, right?

A. Yes.

Q. By the way, I asked you a few questions a moment ago about the lawsuit you filed and you told me you approved it being filed, right?

A. Yes.

Q. Did you read it carefully before you approved it?

A. I must have at one time; I can't tell you exactly when I read it.

Q. I didn't ask you when you read it. Did you read it carefully before you approved it being filed?

A. I read it.

Q. Did you read it carefully?

MS. SALVATORE: Objection. You can answer.

MR. CONLEY: You can answer.

A. I don't know what you mean by carefully.



Q. You understood that you were reading something that would be filed in Federal Court?

A. Yes.

Q. And you understood that by filing that in Federal Court, you were bringing a lawsuit about the Town of Johnston, right?

A. Yes.

Q. And you wanted to be careful about that, didn't you?

MS. SALVATORE: Objection. You can answer.

A. Yes.

Q. You stand behind each and every word in that complaint; you approved each and every word in that complaint, didn't you?

MS. SALVATORE: Objection.

MR. CONLEY: You can answer.

A. My lawyer prepared the document and I feel that I can stand behind it.

Q. Does that mean you can stand behind every word in that complaint?

MS. SALVATORE: Objection. You can answer.

Page 205

A. I think that's a legal question, so I don't feel qualified, but I feel that we did a good job.

MR. CONLEY: Objection. The answer is nonresponsive.

MS. VALOIS: Mr. Conley doesn't like the answer.

Q. It's your lawsuit, right?

A. Yes.

Q. You would want to make sure that lawsuit was accurate and truthful as to every word in it, right?

MS. SALVATORE: Objection. You can answer.

A. Again, that's a legal question, but yes, I would hope so.

Q. What is legal about whether or not a word is accurate and truthful?

MS. SALVATORE: Objection.

A. I don't understand the question.

Q. I'm going to ask it as plain as I can.

A. Okay.

Q. If there are words in this question that you don't understand, tell me what words you do not understand.

Page 206

A. Okay.

Q. When you read that complaint that was going to be filed in Federal Court on your behalf, you read it before you approved it, right?

A. Yes.

Q. When you read it, you wanted to be sure that every word in that complaint was truthful, right?

MS. SALVATORE: Objection. You can answer.

A. Based on my discussions with my lawyer, yes.

MR. CONLEY: Objection. The answer is nonresponsive.

MS. VALOIS: Mr. Conley does not like the answer.

Q. You wanted to make sure that every word in that complaint is accurate, right?

MS. SALVATORE: Objection. Asked and answered.

A. Based on discussions with my lawyer, as I said, I feel everything is right, yes.

MR. CONLEY: Objection. The answer is nonresponsive.

Page 207

MS. VALOIS: Mr. Conley doesn't like the answer.

Q. After having read that complaint that's filed with the Federal Court, you, Ralph Santoro, not anybody else, are you prepared to say today at this deposition that every word in that complaint is truthful and accurate, yes or no?

A. Yes.

MS. SALVATORE: Objection.

MR. CONLEY: Give me just a moment, please. Off the record.

(OFF THE RECORD)

MR. CONLEY: Back on the record. I have no further questions.

MS. VALOIS: We have no cross-examination.

(Closed at 3:12 p.m.)

Page 208

C E R T I F I C A T E

I, Barbara Warner, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing testimony of RALPH SANTORO, a Witness in the above-entitled cause, was taken before me on behalf of the Defendants, at Conley Law & Associates, 123 Dyer Street, Suite 2B, Providence, RI 02903, on August 29, 2025 at 9:00 A.M.; that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned to testify to the truth, the whole truth, and nothing but the truth, and that he thereupon testified in the foregoing manner as set out in the aforesaid transcript.

I further testify that the foregoing Deposition was taken down by me in machine shorthand and was later transcribed by computer, and that the foregoing Deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rules 5(b) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in Court; therefore, the original is delivered to and retained by Plaintiffs' Counsel, Kathryn Valois.

Correction and signature pages were requested at the conclusion of the deposition.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 13th day of September, 2025.

BARBARA WARNER, NOTARY PUBLIC/CERTIFIED COURT REPORTER, NOTARY #50523
*My commission expires October 15, 2026.

DEPOSITION ERRATA SHEET

Our Assignment No. J13372559

Case Caption: SCLS REALTY, LLC; SIXTY THREE JOHNSTON, LLC VS. TOWN OF JOHNSTON, ET AL.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the____ day of

__________________, 20____,

____________________________

RALPH SANTORO



DEPOSITION ERRATA SHEET

Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.___Change to:____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________

SIGNATURE:____________________DATE:__________

RALPH SANTORO



DEPOSITION ERRATA SHEET

Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.____Line No.___Change to:____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________
Page No.___Line No.___Change to:_____________
_____________________________________________
Reason for change:___________________________

SIGNATURE:____________________DATE:__________

RALPH SANTORO